**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**----------------------------------------------------------x**
**SANJAY TRIPATHY,**

**COMPLAINT**

ProSe Plaintiff, **Jury Trial Demanded**

**- against -**

**THE CITY OF NEW YORK, Evelin Guittirez (Investigator), Manhattan DAs (NYCDAO), Mette Risdal (Complainant) in their individual and official capacities,**

**Defendants.**
**----------------------------------------------------------x**

# Overview of Complaint

**The Parties Involved**

- Plaintiff: Sanjay Tripathy, a citizen of the United States and a resident of North Carolina, who claims he was wrongfully convicted and imprisoned in New York for 1,651 days.
- Defendants: The lawsuit names several parties in their official and individual capacities:
  - The City of New York.
  - Evelin Guittirez, an investigator for the Manhattan DA's Office.

  - Individual Assistant District Attorneys (ADAs) from the Manhattan DA's Office, including Kristen Baraiola, Martha Bashford, Nicole Blumberg, and Shannon Lucey.
  - Mette Risdal, the complainant in the criminal case that led to Mr. Tripathy's conviction.

**Core Allegations of Misconduct**

The lawsuit is founded on the plaintiff's claims that his sexual encounter with the complainant, Mette Risdal (referred to as M.R.), was a consensual financial arrangement for sadomasochistic sex. Mr. Tripathy alleges that when he refused M.R.'s attempt to extort more money, she falsely accused him of rape. Defendants violated his constitutional, statutory and legal rights.

**The primary allegations against the defendants are:**

- **Suppression of Evidence (Brady Violation)**: The plaintiff contends that prosecutors, particularly ADA Kristen Baraiola, deliberately withheld M.R.'s message history from the website SeekingArrangement.com. This evidence allegedly proved that M.R. lied to prosecutors about her history on the site, her financial motives,

and her experience with BDSM, and it would have supported the plaintiff's defense.

- **Use of Perjured and False Testimony**: The complaint accuses prosecutors of knowingly presenting M.R.'s false testimony at trial. It is alleged that M.R. lied under oath about her financial stability, her experience negotiating sex for money, and her knowledge of BDSM, all while prosecutors possessed evidence to the contrary.
- **Malicious Prosecution**: The plaintiff claims the criminal proceedings were initiated and continued with malice and without probable cause, as the defendants were allegedly aware that the complainant was lying.
- **Violation of Religious Freedom (RLUIPA)**: Mr. Tripathy, a practicing Hindu, alleges his sincerely held religious belief against falsehood was violated. He claims this occurred when defendants, during his custody, branded him a liar and later forced him to agree to false facts—specifically regarding the severity of the complainant's injuries—to secure a plea deal after his initial conviction was overturned.
- **Systemic Failures (Monell Liability)**: The lawsuit alleges that these actions were not isolated incidents but stemmed from a de facto policy

within the Manhattan DA's Office under former DA Cyrus Vance. The complaint argues the office fostered a "win-at-all-costs" culture, failed to adequately train prosecutors on their constitutional duties to disclose evidence, and neglected to discipline misconduct, thereby encouraging such violations. The plaintiff lists numerous other court cases to support this claim of a pattern of misconduct.

**Legal Claims and Demands**

Mr. Tripathy's complaint asserts nine distinct causes of action, including:

1. Malicious Prosecution (State Law).
2. Intentional Infliction of Emotional Distress (State Law).
3. Denial of Due Process and Fair Trial (Federal Law, 42 U.S.C. § 1983).
4. Evidence Fabrication (Federal Law, 42 U.S.C. § 1983).
5. Withholding Exculpatory Evidence (Federal Law, 42 U.S.C. § 1983).
6. *Brady* Violations (Federal Law, 42 U.S.C. § 1983).
7. Municipal Liability (*Monell* Claim) against the City of New York.
8. Negligent Hiring, Training, and Supervision (State Law) against the City of New York.
9. Violation of Religious Rights (*RLUIPA*).

For the alleged damages—which include over four and a half years of wrongful imprisonment, lost wages, emotional distress, and reputational harm—Mr. Tripathy is seeking a jury trial and demanding substantial financial relief. This includes compensatory damages of no less than $25 million and punitive damages against the individual defendants of no less than $5 million, in addition to attorney's fees and other costs

## B - Section 1 Caption

Plaintiff SANJAY TRIPATHY ("Plaintiff), complaining of the Defendants, respectfully alleges, upon personal knowledge, information and belief where stated, as follows in this 1983 Civil Rights Action.

Plaintiff/Petitioner: Sanjay Tripathy (ProSe)

**Defendants:**

| Category | Designation/Title/ Defendant Name | Capacity | Location |
|---|---|---|---|
| New York City (Manhattan DA - NYCDAO) | THE CITY OF NEW YORK | Official | New York City |
| New York County (Manhattan) DA Defendant | Evelin Gutierrez- Manhattan DA Investigator, Shield #155 | Individual and Official | New York City |
| New York County (Manhattan DA - NYCDAO) Defendants | KRISTEN BARAIOLA; ADA | Individual and Official | New York City |
| | MARTHA BASHFORD; ADA | Individual and Official | New York City |

| | | | |
|---|---|---|---|
| | NICOLE BLUMBERG; ADA | Individual and Official | New York City |
| | SHANNON LUCEY; ADA | Individual and Official | New York City |
| Complainant (M.R)* | METTE RISDAL | Individual and Official | New York City |

- Note - Prose Plaintiff has an Order of protection towards the Complainant and will have to rely upon US Marshals for Service. The Manhattan DAs (NYCDAO) Office can help with the contacts.

**Cause(s) of Action (Defendant):**

| Category | Cause(s) of Action | Capacity | Location |
|---|---|---|---|
| New York City | • 1983; Monell;<br>• Failure and Negligent - Hiring, Training, Supervision, Discipline;<br>• Failure to Intervene;<br>• RLUIPA;<br>• Free Exercise;<br>• Supplemental Jurisdiction - State Law; City Law; | Official | New York City |
| Evelin Gutierrez-Manhattan DA Investigator, Shield #155 | • 1983; 1985; 1986;<br>• Due Process;<br>• Fair Trial;<br>• Malicious Prosecution;<br>• Brady;<br>• False Arrest;<br>• Illegal Search & Seizure;<br>• Deliberate Indifference;<br>• Perjury;<br>• Conspiracy and RICO;<br>• Libel;<br>• Reputation;<br>• RLUIPA;<br>• Free Exercise;<br>• Equal Protection;<br>• Failure to Intervene;<br>• Supplemental Jurisdiction - | Individual and Official | New York City |

| | | | |
|---|---|---|---|
| | State Law; City Law; | | |
| New York County (Manhattan) DA Defendants | • Conspiracy;<br>• Perjury;<br>• Libel;<br>• Reputation;<br>• RLUIPA;<br>• Free Exercise;<br>• Equal Protection;<br>• Failure to Intervene;<br>• Supplemental Jurisdiction - State Law; City Law; | Individual and Official (Investigative Capacity) | New York City |
| Complainant (M.R) Defendant | • Malicious Prosecution<br>• Perjury;<br>• Conspiracy;<br>• Libel;<br>• Reputation;<br>• Supplemental Jurisdiction - State Law; City Law; | Individual and Official | New York City |

## C - Section 2 Statement of Jurisdiction, Venue and Nature of Suit

1. This is a 1983 civil rights action (by Petitioner who is a resident of North Carolina, but was wrongly convicted and incarcerated in The State of New York) seeking damages to defend and protect civil rights guaranteed by the Constitution and Statutes of the United States and The State of New York. This action is brought pursuant to 42 U.S,C. §1983, §1985 and §1986 to include supplemental jurisdiction under State Law and City Law. The US District Court of Southern District of

New York has jurisdiction over this action pursuant to 28 U.S.C. §1331, §1343(3) & (4), and §2201.

2. This is a civil action, pursuant to 42 U.S.C. §§ 1983 and 1988, and New York State law, seeking monetary damages for the Plaintiff, SANJAY TRIPATHY, due to his unlawful criminal prosecution and conviction for assault in Manhattan, New York, his pretrial detention and post-conviction imprisonment totaling four and one-half years, and his additional consequential damages.

3. This lawsuit seeks to hold Defendant Evelin Guittirez, an investigator in the Manhattan DA's Office, individual Manhattan DAs in their personal and official capacities liable for perjury, RLUIPA violation, malicious prosecution, evidence fabrication, false material evidence, witness fabrication, and suppression of Brady material, in violation of Plaintiff's RLUIPA, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights and State Law. In addition, it seeks to hold the Defendant City of New York ("City") responsible because the unlawful actions of Defendant Gutierrez and Manhattan DAs Office and prosecutors in the New York County District Attorney's Office ("DA's Office" or "NYCDAO") foreseeably resulted from the deliberate indifference of policymakers in the NYCDAO—New York City

agencies—to such constitutional violations. This lawsuit seeks to hold Defendant Mette Risdal ("MR" - "Complainant") under RLUIPA, Federal and State Laws and Statutes for Perjury, False Material Evidence, Malicious Prosecution, Libel and other harms.

4. This action arises under 42 U.S.C. §§ 1983 and 1988 and under the common law of the State of New York. The acts and omissions giving rise to this complaint occurred in New York County. Plaintiff's damages exceed $25,000. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 and under the principles of pendent jurisdiction. Venue is proper under 28 U.S.C. § 1391. This action has been commenced within the applicable period for each claim.

## D - Section 3 Parties to this Action

**Plaintiff/Petitioner:** Sanjay Tripathy (ProSe);

**Defendants:** Name and Address

| Name | Designation | Service Status |
|---|---|---|
| Address: NYC Corporation Counsel, Manhattan Tort SLU Unit<br>233 Broadway, 15th & 16th FL., New York, NY 10007<br>Phone: (212) 356-7100 | | |
| New York City | Corporation Counsel | Process Server to be used |
| Address: New York County DAs Office,<br>1 Hogan Place, New York, NY 10013 | | |
| New York County (Manhattan) DA | Serving: Kristen Baraiola; Nicole Blumberg; Shannon | Process Server to be used |

| | | |
|---|---|---|
| Defendants | Lucey;<br>Retired: Martha Bashford<br>Investigator: Evelin Gutierrez-<br>Manhattan DA Investigator,<br>Shield #155 | |
| Address: Unknown to Petitioner (DAs Office has it) | | |
| Complainant | Mette Risdal | Address Unknown' seek Court's intervention; |

Note: Petitioner pleads for US Marshals service to the Defendants (or Defense Counsel accepting Service)

5. "Plaintiff" SANJAY TRIPATHY is a citizen of the US and a resident of the State of North Carolina and of the United States. His conviction occurred within the Southern District of New York.
6. Defendant EVELIN GUTIERREZ ("Gutierrez"), Investigator Shield No. 155, and individual Manhattan DAs (Serving: KRISTEN BARAIOLA; NICOLE BLUMBERG; SHANNON LUCEY; Retired: MARTHA BASHFORD collectively "DAs") were at all relevant times a employed by the Manhattan DA, acting within the scope of their authority and under color of state law. They are named in their individual and official capacities. was at all relevant times an assistant district attorney in the Manhattan D.A. 's Office and an employee of the City of New York, acting within the scope of her authority and under color of state law. They are named here in her individual and official capacities.

7. Defendant CITY OF NEW YORK is a municipal corporation of the State of New York and is a resident of the Southern District of New York.
8. Defendant Mette Risdal (“Complainant”) is a resident of the Southern District of New York named in their individual and official capacities.

## E - Section 4 Previous Lawsuits

There have been no previous lawsuits filed by Plaintiff regarding the same facts raised in this controversy.

Note: SDNY (Case#1:20-CV-1646-LLS) was dismissed as premature on June 30th, 2020 (as Petitioner had not vacated his conviction by that time).

## F - Section 5 Statement of Claim

***NATURE OF ACTION***

9. This is a civil action, pursuant to 42 U.S.C. §1983 , §1985, §1986 and Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ("Brady"), and supplemental jurisdiction of State Law and City Law claims, seeking monetary damages for Plaintiffs - Monell liability, wrongful conviction, denial of fair trial, malicious prosecution, conspiracy, perjury, libel, loss of reputation, substantial burden on his

core and sincerely held religious beliefs, and imprisonment for 1651 days, time since his arrest to conviction, and time post reversal of his conviction, during which he was traumatized, and suffered irreparable harm.

10. The above-named Individual Defendants, all New York Manhattan DAs and investigators and officers, caused Plaintiff's unconstitutional conviction and subsequent imprisonment by deliberately suppressing exculpatory evidence, known as "Brady material," and also lying to and misleading prosecutors. The suppressed Brady material consisted of. The deliberate cover-up of such evidence, as well as the lies elicited by investigators told the prosecutors when denying that any had occurred, was a substantial and proximate cause of Plaintiff's conviction and his horrible experiences in prison which followed. The City of New York is liable, pursuant to ***Monell v. New York City Department of Social Services***, **436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)**, for the deliberate indifference of policymaking officials at the Manhattan DA (“DA”) to such constitutional violations, which was a substantial cause of the wrongdoing that occurred.

***CAUSE(S) of ACTION***

11. **List of Cause(s) of Action**:

a. **Table - Cause(s) of Action**

| | | | |
|---|---|---|---|
| First Cause of Action | Malicious Prosecution under State Law | All Defendants | Individual and Official Capacities |
| Second Cause of Action | Intentional Infliction of Emotional Distress under State Law | All Defendants | Individual and Official Capacities |
| Third Cause of Action | 42 USC 1983; Denial of Due Process and a Fair Trial under the 5th, 6th and 14th Amendments; Malicious Prosecution and the Depravation of Liberty under the 4th and 14th Amendment | All Individual Defendants | Individual and Official Capacities |
| Fourth Cause of Action | Evidence Fabrication, False Material Evidence under 42 USC 1983 Violation of the Fourth, Fifth, Sixth, and Fourteenth Amendments | All Individual Defendants | Individual and Official Capacities |

| | | | |
|---|---|---|---|
| Fifth Cause of Action | Withholding of Exculpatory Evidence, “Shocking to the Conscience,” at Caused Mr. Tripathy’s Loss of Liberty Under 42 U.S.C. § 1983 (“Russo Claim”) Violation of the Fourth, Fifth, Sixth, and Fourteenth Amendments | All Individual Defendants | Individual and Official Capacities |
| Sixth Cause of Action | Withholding of Information Favorable to the Defense Pursuant to Brady v. Maryland, 373 U.S. 83 (1963) Under 42 U.S.C. § 1983Violation of the Fifth, Sixth, and Fourteenth Amendments | All Individual Defendants | Individual and Official Capacities |
| Seventh Cause of Action | Monell Liability for the Policies, Practices, and | Defendant City of New York | Individual and Official Capacities |

| | | | |
|---|---|---|---|
| | Customs of the New York DAs Office Under 42 U.S.C. § 1983. | | |
| Eighth Cause of Action | Negligent Hiring, Training and Supervision under State Law | Defendant City of New York | Individual and Official Capacities |
| Ninth Cause of Action | Religious Rights under RLUIPA and State Law | All Defendants | Individual and Official Capacities |

***ALLEGATIONS COMMON TO ALL CAUSES OF ACTION***

***Plaintiff's Injuries and Demand for Damages***

12. As a direct, proximate, and reasonably foreseeable consequence of the aforementioned actions by the defendants, plaintiff:

(1) Was denied his state and federal constitutional rights and liberties;

(2) Was repeatedly subjected to ;

(3) Was further traumatized by witnessing violence, sexual and physical assaults on other inmates;

(4) Was so distraught;

(5) Suffered severe mental, emotional, and physical distress, including hopelessness;

(6) Suffered permanent mental and emotional harm;

(7) Was denied the opportunity to pursue normal relationships with and to enjoy the companionship of family members and friends;

(8) Was publicly shamed, disgraced, ridiculed and humiliated and suffered damage to reputation;

(9) Suffered lost wages and permanent impairment of earning capacity; and

(10) Incurred other items of attendant damages.

His wrongful prosecution and conviction for sexual assault and related charges; b. His loss of liberty for more than 4.5 years; The loss of the services, society, companionship, and consortium of his family and friends; Past mental and emotional suffering and inadequate treatment therefor; Physical injuries and illness and inadequate treatment therefor; and Lost employment income in an amount to be calculated by an economist.

WHEREFORE, Plaintiff Sanjay Tripathy demands judgment against the Defendants as follows:

- damages for lost income in an amount to be determined;
- additional compensatory damages of not less than $25,000,000;

- punitive damages against the Individual Defendants of not less than $5,000,000;
- reasonable attorneys' fees as applicable, together with costs and disbursements, under 42 U.S.C. § 1988 and the inherent powers of this Court;
- pre-judgment interest as allowed by law; and such other and further relief as this Court may deem just and proper.

**Relevant factual background**

13. M.R. and Mr. Tripathy met over the internet, had dinner and drinks, and wound up in his hotel room. She claimed he violently raped and assaulted her there. He claimed they had explicitly agreed to an exchange of sadomasochistic sex for $1,500, she attempted to extort him for more money because her face was marked up and she was upset she'd have to cancel appointments with other men, and when he refused to give in she falsely accused him of rape.

**Prosecutors' initial interviews of M.R. and early court proceedings**

14. M.R. alleged that Mr. Tripathy raped her on June 15, 2016, after the two met on SeekingArrangement.com ("SA.com"), which billed itself as a website "where sugar babies go to meet sugar daddies." Handwritten notes memorialize the prosecutors' interview of M.R. five

days later, on June 20. M.R. claimed she "[r]egistered a couple of years ago" for SA.com but "didn't use it," and reactivated it only a "couple weeks ago." She also claimed her encounter with Tripathy was her "[f]irst date from" SA.com. Evidence that the D.A.'s Office later obtained, but suppressed, revealed these statements to be lies.

15. On June 24, ADA Baraiola conducted a second interview of M.R., evidently before presenting M.R.'s grand jury testimony. Handwritten notes show that M.R. was asked what her sources of income were, how much cash she had when she met Tripathy, and whether he ever offered her money. These questions may have been asked because defense counsel had alleged that the sexual encounter was a consensual financial transaction. M.R. answered that Tripathy offered her money "at [the] very end" of the encounter, and she "thought [it] weird that [he] offered money." ADA Baraiola then elicited M.R.'s grand jury testimony that M.R. met Tripathy "on online dating" and that the encounter was a normal date. Again, evidence that the D.A.'s Office later obtained, but suppressed, revealed these statements to be false or highly misleading.

16. On June 27, Tripathy's lawyer made a bail application at which he clearly laid out the defense theory that Tripathy and M.R. met on

SA.com and had consensual sex involving "BDSM"—or bondage, dominance/discipline, submission/sadism, and masochism.

17. ADA Baraiola interviewed M.R. again on June 30. Ms. Baraiola's notes show that she had a "record from defense attorney"—apparently an SA.com message in which M.R., before meeting Tripathy, asked him about "$$ on a per meet" basis. Confronted with this message, and evidently unaware that prosecutors would eventually obtain all her SA.com messages, M.R. made numerous additional statements that turned out to be lies:

• She again claimed Tripathy was the "first guy she met w/ on SA.com" and she "never met anyone in the past."

• She claimed "$$ on a per meet" meant "money for travel or dinner," "[n]ot money for sex." When ADA Baraiola insisted the message "does seem to be exchange for money + time," M.R. "denie[d]" it. A moment later, however, M.R. claimed her "discussions about money" on the website were "just in exchange for time." But she insisted she was "NOT" on the website "to have sex." She claimed that being on SA.com, you "don't know something sexual would happen, don't think man expects it. Might happen after a few nights if we agree."

• Asked why she was on SA.com at all, she claimed "[m]oney is NOT an issue." Rather, she claimed, she joined because she "knows someone who met a good guy (married) on that site" and she thinks a guy "should always pay dinner, travel, etc." and "rent" regardless of whether M.R. herself could afford those expenses.

• M.R. claimed she had "gone on a lot of dates" and "ha[d] never gotten paid."

• M.R. claimed she was "not into S&M," "never, ever had rough sex w/ anyone," "never had rough sex, been choked or slapped. EVER."

18. At the end of this interview, ADA Baraiola apparently worried that the defense would "be able to discredit [M.R.]," but M.R. assured her there was "[n]o smoking gun the defense could have." As we will see, such a smoking gun emerged shortly thereafter, but the defense was unable to use it to discredit M.R. because the prosecution suppressed it.

19. Incidentally, the handwritten notes we have contain many redactions, so we cannot say whether the notes prove even more lies by M.R. of which the prosecutors were aware. As part of your automatic discovery obligations, please disclose all such notes without redactions.

**Prosecutors obtain M.R.'s SA.com messages with other men, which prove she repeatedly lied in her interviews and corroborate Tripathy's defense**

20. In July 2016, the defense submitted a pretrial omnibus motion and "Specific Brady Request" for information about M.R. having "ever exchanged sexual intercourse or other intimate activity for financial gain." ADA Baraiola denied such materials existed.

21. We do not yet know exactly when your DA's office obtained M.R.'s complete SA.com messages; as you know, we have requested such information but have not received it. In any case, ADA Baraiola certainly had the messages by January 2017, when she applied ex parte to the court insisting she need not disclose them. These messages show that, within six months of the indictment, and more than a year before the trial, Ms. Baraiola knew there was documentary evidence that was responsive to Tripathy's specific Brady requests, that proved M.R. had lied during her interviews with prosecutors, and that tended to corroborate Tripathy's defense, yet she did not disclose it. The messages included the following:

22. First, contrary to M.R.'s claims that she registered for SA.com "a couple years ago" but "didn't use it" until a "couple weeks ago," the

messages showed she corresponded with dozens of men from April to December 2014, and then started messaging them again in October 2015. Although in the 2014 messages she mostly did not explicitly discuss money, in one message in August, a man offered to give her $8,000 for a month in the Berkshires, and she responded that she "would consider coming and spending a month with [him] for 10k" (conversation 9958324).

23. Second, contrary to M.R.'s claims that Tripathy was the "first guy she met w/ on SA.com" and that she "ha[d] never gotten paid," she told multiple men that she had met someone "on this site" who "died in February" (74847450, 75072942, 75081836, 75083032, 75084243, 75085923, 75102253, 5385243, 75107089, 75177657, 75173999). Messaging numerous other men, she further embellished this story: "we found each other on the site and it lasted well over a year. He gave me 10k a month. Sadly he died in February so now I'm ready to find it again" (75248784, 75249939, 75261981, 75262401, 75270221, 75271492, 75313031, 75271492, 75313031). She told a different man that she wanted "$15,000 a month" and had "just got out of a relationship where the guy was giving [her] this" (4707367).

24. Third, contrary to M.R.'s claim that you "don't know something sexual would happen" on SA.com, and that she was "NOT" there "to have sex," she repeatedly offered sex for money. By our count, she had such exchanges with 48 men in the five days before meeting Tripathy. In each conversation, she proposed the man pay her on a "per meet" or monthly basis. In each one, she gave some version of the promise that she was "super sexy and naughty in bed" and "[l]ove[s] to do anything to please [her] man." In conversation 74410861, she told a man seeking a "long term sex friend" that she was "[l]ooking for the same thing." In conversation 75247814, she promised to be the man's "anal slut." In conversation 75270221, she told the man it will be "$1500 for 3-4 hours." He asked, "does that include sex[?] . . . We know what this website is all about." M.R. responded, "It would include sex if we have a connection." In conversation 75177657, she said, "If we have a connection and go upstairs for sex it will be $1500." When he countered with $1,000, she countered, "$1200." He insisted on $1,000 and she said "No."

25. Fourth, contrary to her claim that "[m]oney is NOT an issue," she told three men, "I have gotten into a situation where I need financial help" (74742206, 17611708, 74760795).

26. Finally, the messages seem to contradict M.R.'s claims that she was "not into S&M" and "never had rough sex . . . EVER." She repeatedly promised men she was "naughty," "open minded to everything," and "lov[ing] to do anything to please [her] man." In conversation 74713789, she told a man seeking someone who "loves all sex, uninhibited oral, anal etc, has submissive side" that she was "[l]ooking for the same thing." In conversation 75339286, a "very dominant" man was "looking for a submissive." M.R. responded, "I would be interested. . . . I am very submissive and very naughty in bed." He said, "My girl friend and I a[r]e very dirty," and M.R. replied, "I am very naughty, dirty and sexual as well." In conversation 75271959, the man asked, "are u an extremely orally inclined sub[?]" M.R., evidently familiar with the man's lingo, responded, "Yes, very submissive[.] Will be your anal slut and drink all your juices."

27. Despite ADA Baraiola's knowledge that these messages proved M.R. a liar and appeared to corroborate Tripathy, she wrote to Judge Obus ex parte, on January 17, 2017, seeking permission to withhold the messages. She contended the messages were "not discoverable" because they were (a) "in no way connected to the investigation in this case," (b) not Brady, as "they do not tend to shed any light on the

defendant's guilt or innocence," "nor do they constitute Giglio," and (c) not admissible under the Rape Shield Law. All three contentions were false. The messages were directly responsive to Tripathy's Brady demand and supported the defense that his lawyer had outlined. They bore directly on ADA Baraiola's questioning of M.R. at the start of the case, as part of the D.A.'s Office's own investigation, showing many of M.R.'s answers to be false. With respect to the Rape Shield Law, the application was misleading because the statute governs only admissibility, not discoverability. The defense is entitled to discovery so it can make an "offer of proof" as to why certain admissibility exceptions should apply. CPL 60.42(5). According to ADA Baraiola's later representations to trial Judge Edwards, Judge Obus—who apparently knew little about the facts of the case and credited her representations—did not order the prosecution to disclose the messages but ruled that the trial judge should ultimately decide the matter. We do not know whether ADA Baraiola and Judge Obus met to discuss the matter and whether there is any recording of such meetings—we requested such disclosure but you have not yet provided a response. What is clear is that ADA Baraiola made a misleading written submission that caused Judge Obus (and later

Judge Edwards) to deny disclosure in advance of trial, thus preventing the defense from reviewing and investigating the materials and determining how to use them, including in an argument for invoking an exception to the Rape Shield Law.

**M.R.'s false Florida deposition testimony**

28. On May 7, 2017, while the Tripathy prosecution was pending, M.R. accused Uber driver Gary Kitchings of raping her in Florida. Kitchings was 57 years old and, like Tripathy, had no previous criminal record. Before Kitchings's trial, his attorneys questioned her under oath about the Tripathy case. DANY prosecutors clearly had this deposition transcript by the time of Tripathy's trial, as ADA Baraiola sought to question M.R. about it. Tr. 292. So they knew that M.R., fully aware the Tripathy prosecution was pending, had given false sworn testimony in Florida about her activities on SA.com and her communications with Tripathy.

29. Asked if she knew what a "sugar daddy" is, M.R. said she "assum[ed] it's a person. . .that takes care of [a woman] financially," but she had "never been in the situation, so [she] wouldn't know exactly." Florida Dep. at 20-21. She denied having "ever accepted money from anybody for a date" or "ever accepted money from any

person ever for sex." Id. at 82. Asked what she knew about BDSM, she said she was "just guessing" it was "something like" what she had seen in the movie Fifty Shades of Grey, which had "shocked" her and made her walk out "halfway through." Id. at 33-34. M.R. also denied, three times, that she had ever discussed money with Tripathy. Id. at 28, 50-51, 71.

30. In March 2018, M.R. testified at Kitchings's trial. Based on her testimony, he was convicted of sexual battery and related charges and sentenced to 22 years in prison. As we discuss later, this conviction was overturned, but not until M.R. had capitalized on it to the tune of $5 million.

**M.R.'s false testimony at Tripathy's trial, disproven by the SA.com messages**

31. At Tripathy's trial, ADA Baraiola was joined by Martha Bashford, a veteran prosecutor and longtime Chief of the Sex Crimes Unit. On the eve of trial, defense counsel requested any SA.com messages that tended to prove the falsity of M.R.'s Florida deposition testimony—particularly her denials that she knew anything about "BDSM" or had ever accepted "money for dates." 05/11/18 Tr. at 20; see also id. at 24. The prosecutors disclosed nothing, again insisting

the messages were "not Brady" and were protected by the Rape Shield Law. Id. at 19. Once again, they addressed admissibility without acknowledging to the court what, as sex-crime prosecutors, they surely knew: the statute governs admissibility, not disclosure. Judge Edwards accepted their arguments, id. at 23-26, despite having little factual understanding of the case, having asked moments earlier what the case was about, see id. at 3; despite almost certainly having no idea that, within days of the encounter, M.R. had given numerous statements to prosecutors that the messages proved false; and despite the defense having been denied all information about the content of the messages and thus having no opportunity to argue admissibility under one of the Rape Shield Law's exceptions.

32. ADA Baraiola—knowing after the court's ruling that she and M.R. need not fear impeachment with the SA.com messages—proceeded to elicit the same misleading and outright false statements that M.R. had earlier made to prosecutors. Her unit chief, Ms. Bashford, failed to intervene.

33. First, ADA Baraiola elicited from M.R. that she was financially stable and thus had no need to solicit money on SA.com—refuting the defense theory that M.R. had done just that with Tripathy. M.R.

testified that she ran her own skincare company, had previously started another company, and owned multiple properties, including in Florida. Tr. 120-23. The prosecution also called M.R.'s friend Joe Palmer to testify that M.R. was "an entrepreneur" with "her own business" and a "real estate investor." Id. at 89. The prosecution knew that this carefully constructed image of M.R. as financially comfortable was disproven by the messages showing that she repeatedly sought large amounts of money and her messages stating that she had "gotten into a situation where [she] need[ed] financial help."

34. Second, ADA Baraiola elicited M.R.'s false testimony that her message to Tripathy asking about "$$ on a per meet" was anomalous, merely something she was "willing to try . . .out," id. at 135, and that her statements on her SA.com profile were not advertisements for financial transactions. M.R. had to acknowledge she was looking for someone to "financially tak[e] care of [her]," but she claimed this just meant the man should, "[y]ou know, make sure [they] go to nice dinners and travel." Id. at 126. Asked if she expected the man to pay her "personal expenses," she responded "[t]hat would be nice," but implied it wasn't required. Id. Asked why she said on her profile that she was "high budget," she answered that it was because she had to

travel a lot between New York and Florida and pampered her dogs so much. Id. at 128. Prosecutors knew the undisclosed messages contradicted these answers.

35. Third, ADA Baraiola elicited testimony from M.R. that falsely implied her SA.com profile was not intended to advertise sex. M.R. said that when she promised she would “take care of [the man] in every way,” she meant “pampering, cooking, you know, massaging their feet.” Id. at 127. Asked what she meant when she said in her profile that she was “looking for fun,” she answered, “travel, . . . going to concerts, Broadway shows, dinners.” Id. The numerous messages in which she explicitly promised sex in exchange for payment disproved this testimony.

36. Fourth, ADA Baraiola elicited several pages of testimony from M.R. about the “date” she had arranged with a man named “Kevin,” whom she was supposed to meet later the same night she saw Tripathy. Tr. 182-86, 193-205. The prosecutors had previously disclosed M.R.’s text messages with Kevin, in which the two discussed meeting up without any mention of money. They did not disclose M.R.’s SA.com messages with Kevin from the same day, in which he had offered her “$10-15,000 a month” for her services, nor did ADA Baraiola elicit any

testimony from M.R. about these SA.com communications. This can only be viewed as another instance of the prosecutor colluding with the witness to deliberately mislead the jury and the defense.

37. Finally, knowing that M.R. repeatedly described herself in the SA.com messages as “naughty,” “open minded to everything,” “very submissive, “dirty,” and an “anal slut” who would “drink all your juices,” ADA Baraiola elicited from M.R. that she had never discussed “submission” or other BDSM-related topics with Tripathy. The messages showed, contrary to this testimony, that discussing such sexual practices was something she did regularly and was part of what she offered for the fee she charged.

38. While the messages had long been Brady—since they proved M.R. lied in her initial interview with prosecutors and then under oath in Florida, and they also tended to corroborate Tripathy—the messages were now also Rosario, because M.R. testified on direct about her supposed financial stability, her reasons for signing up for SA.com, her requirements of the men she met on SA.com, the meaning of the statements in her website profile, what she meant when she asked Tripathy about “$$ on a per meet,” and her texts with Kevin. But

despite their absolute, and obvious, Rosario obligations, the prosecutors continued to conceal the messages.

39. In the middle of M.R.'s direct examination, ADA Baraiola disclosed "notes that [M.R.] had written down in her own time." Tr. 208. She had written, "while it would be nice to have gotten 3 or $400 for those hours on [a] date [with Tripathy], perhaps, if it was more than 3 or $400 that would seem like that would be an exchange for sex to her." Id. at 337. The implication, consistent with her direct testimony, was that M.R. had asked Tripathy for money only on a lark and that she would never want to give even the impression that she was trading sex for money. Of course, the SA.com messages showed that M.R.'s notes, like her testimony, were false—she had traded sex for a lot more than $400 and discussed the possibility with countless men.

40. On cross-examination, ADAs Baraiola and Bashford stood by while M.R. doubled down on the blatant lies she had told under Ms. Baraiola's direct examination. Defense counsel tried to sow doubt about M.R.'s claim—contrary to Tripathy's defense—that after messaging him about "$$ on a per meet" they had never again discussed money. M.R. claimed she "didn't really think much of it" and "was okay with it." Tr. 316-17. She said the "$$ per meet" message

was like a "coffee challenge" where "you ask for ten percent off and if they give it to you, great, if they don't give it to you, that's okay too." Id. at 317. The SA.com messages proved the deceitfulness of this testimony, as M.R. had demanded specific dollar amounts from numerous men. And she had bargained with them, turning down several who would not pay her enough.

41. When defense counsel asked M.R. if she had ever corresponded with Kevin about money, she said she didn't think she had. Id. at 318-20. She testified that she "really wanted to meet up with Kevin" that night, id. at 326, and had "an instinct to leave [her date with Tripathy] to meet Kevin" but did not because she "ha[d] very high integrity," id. at 372. The prosecutors knew Kevin had offered M.R. the unforgettable sum of "$10-15,000 a month," and this surely accounted for her "really want[ing]" to meet him that night, but they remained silent.

42. Using the limited notes the prosecutors had just disclosed in which M.R. wrote about considering whether to ask Tripathy for $300-$400, defense counsel asked M.R. whether she believed she should get that amount of money for her date with Tripathy. Id. at 329. M.R. said "yeah" but reiterated that it was merely something she was "willing to

try." Id. at 329-30. Defense counsel had no way of impeaching her with the evidence showing that, consistent with Tripathy's defense, her practice was to demand $1,500 as a quid pro quo for sex.

43. In the cross-examination that followed, M.R.'s lies reached a climax, while the prosecutors kept silent:

> Q. And when you say, I was willing to try it, are you suggesting that you had never done that before, sought compensation for a date for your time?
> A. *I don't remember if I tried it before.*
> Q. You believe [Tripathy] was the first person you sought compensation from in exchange for your time? . . .
> A. You asked if he is the only one, if I believe he was the only one?
> Q. Yes.
> A. As I said, *I don't remember if I sent a similar e-mail or not so.*
> Q. *You have no recollection whether or not prior to [Tripathy] you ever asked anyone else to pay you for your time on a date with them?*
> *Is that what you are saying?*
> A. *Exactly.*
>
> Tr. 331 (emphasis added).

44. It is inconceivable that M.R. had forgotten discussing this very topic with almost 50 men the same week she discussed it with Tripathy. The prosecutors knew at the time she was giving false testimony but did nothing. The court finally intervened, issuing a bizarre order that the prosecutors interrupt the defense cross-examination to meet privately with M.R. to "refresh her recollection" with the messages, while still withholding them from the defense. M.R. then testified she

remembered she had communicated with "other men regarding exchanging time for money." Tr. 353. The jury likely concluded her testimony was basically truthful but she had legitimately forgotten trying her "coffee challenge" with a couple other men and had never traded sex for money. Any halfway decent defense lawyer in possession of the actual messages would have exploded this misleading testimony, proved M.R. to be a brazen liar, and likely ended the trial right there. The prosecutors simply looked on as defense counsel flailed briefly without the messages and then gave up.

45. Defense counsel also asked M.R. whether she knew what "BDSM" is, and she testified, "I think I know what it is. . . . I watched half of the movie 50 Shades of Gray and I walked out halfway through but that's kind of what I assume it's about." Tr. 361-62. That was "the only thing [she] kn[e]w about BDSM." Tr. 362. Defense counsel could not impeach her with the messages that disproved her testimony.

**Mr. Tripathy testifies in his own defense, and the SA.com messages repeatedly corroborate him, but the prosecutors continued to conceal them.**

46. During Tripathy's testimony, it should have been even clearer to the prosecutors that the suppressed messages were Brady, because despite Tripathy having never seen the messages, he testified to multiple details that they corroborated. M.R. told him "[s]he does anal," which she had advertised in conversations with four different men (75247814, 74713789, 74715322, 75271959). She told him she was into "water sports" or "urine drinking," which is supported by the two conversations in which she told men she would "drink all [thei]r juices" (75271959, 75249939). Tripathy testified she demanded, and he gave her, $1,500 for their encounter, which was the precise amount she demanded from two other men (75177657, 75270221).

47. The concealed SA.com messages between M.R. and Kevin also powerfully corroborated Mr. Tripathy. He testified that, after his consensual sadomasochistic encounter with M.R., she was furious that her face was marked up because she would be unable to go on other dates for a couple days, and she tried to extort him for more money. Tr. 714-15. That she was supposed to meet Kevin, who had promised her "$10-15,000 a month," later that night explains why she was so angry that her subsequent appointments had been ruined.

**ADA Baraiola's bad-faith summation**

48. In summation, ADA Baraiola made numerous damaging arguments that she knew were either highly misleading or outright false in light of the messages. She argued that Tripathy had lied about BDSM because there was "[n]o mention of BDSM" in the texts between M.R. and Tripathy, Tr. 878, knowing the defense had been unable to confront M.R. with her statements to other men showing her interest in such activities. ADA Baraiola argued that M.R. was "a woman who has in her bank account, at a minimum, $700," implying M.R. was financially stable and thus would have had no need to trade sex for money, contrary to M.R.'s SA.com messages describing her financial distress and her efforts to trade sex for money. Tr. 879. ADA Baraiola claimed that M.R.'s testimony that she and Tripathy never discussed sex or money "makes a lot more sense than the defendant['s testimony]," id. at 882, while knowing of the multiple messages showing her discussing sex for money with dozens of men.

49. Regarding M.R.'s credibility generally, ADA Baraiola criticized defense counsel for "insinuat[ing] and then argu[ing] to you that [M.R.] is a liar, that [she] is a prostitute," id. at 920, when the messages prove she was a liar and a sex worker. ADA Baraiola repeatedly told the jury that M.R. was "telling the truth," id. at 874, 918, 921, and was

"trying to answer the question[s in the] most accurate way she can," id. at 917, which the messages proved false. Regarding the minimal impeachment the defense was able to achieve using the Florida deposition, ADA Baraiola argued that M.R. had "admitted those inconsistencies" and "didn't hide from them," which spoke to her candor and trustworthiness, while M.R.'s numerous falsehoods, proved by the messages, remained hidden. Id. at 921. Finally, ADA Baraiola told the jury, "Mr. Rothman stood before you and said that this is a case where the prosecution is trying to hide the truth. I submit to you that is the absolute opposite of what is going on. You have the evidence before you. . . . No one is hiding the truth from you. The truth is laid out in front of you for you to see." Tr. 942. This was egregiously dishonest. The prosecution had hidden the truth.

**Sentencing**

50. At Tripathy's sentencing, ADA Baraiola sought to maximize Mr. Tripathy's punishment by accusing him of giving "blatantly false and offensive trial testimony," and "deliberately l[ying] to [the court] and to this jury about every single detail that he could lie about." Sent. Tr. 12, 20. She accused him of "perjury." Id. at 21. She asked for 18 years in prison. Id. at 11. Meanwhile, she was aware that her own witness had

repeatedly lied to the D.A.'s Office and then, with the prosecutors' full knowledge, committed perjury at trial, and that the suppressed messages supported Tripathy's testimony. Following ADA Baraiola's presentation, the court sentenced Mr. Tripathy to seven years in prison.

**Post-conviction proceedings**

51. In January 2019, Tripathy's appellate lawyer, Arnold Levine, viewed the court file and found, unsealed, the prosecution's ex parte motion to Judge Obus seeking permission to withhold the SA.com messages, with the messages appended. He reviewed some of the messages and immediately recognized their significance. When he later returned to the clerk's office to review them again, however, he was told they should have been sealed and was denied access.

52. On March 12, 2019, Mr. Levine appeared before Judge Edwards to explain what had occurred and to ask her to unseal the messages. ADA Baraiola strongly objected, arguing that the messages "didn't exculpate the defendant from the allegations against him in any way, shape, or form." Knowing the explosive revelations in the messages had been hidden from the jury, she argued that the defense had made all relevant "arguments to the jury anyway, and clearly a jury chose to

discredit the arguments." Judge Edwards asked to see the messages again but the clerk's office couldn't locate them. She instructed Levine to make his unsealing motion to the Appellate Division, while noting that, when she had refused during trial to order the messages disclosed, she had done so believing and intending that, on appeal, the defense would be able to "look[] at the records themselves" and make an argument about "why [they] should have been disclosed," rather than having to rely on "just an in camera inspection" by the appeals court.

53. In May, Levine made his unsealing motion to the appeals court. ADA Katherine Kulkarni of the Appeals Division vigorously opposed. Noting that she "ha[d] spoken with [ADA] Baraiola," ADA Kulkarni argued, against all reason, that the messages had "no connection to the criminal case against defendant" and were "not material to defendant's guilt or innocence." The court denied the defense motion and agreed to review the messages in camera on appeal.

54. In his appeal brief, Levine argued the messages should have been disclosed, but he was severely hamstrung by his inability to discuss the messages in any detail. ADAs Alice Wiseman and Luis Morales argued, yet again, that the messages "did not constitute material

exculpatory or impeachment evidence," because M.R.'s "purported prostitution activity on the dating website[] was extensively explored at defendant's trial through other documentary evidence and questioning"—even though it was clear to anyone familiar with the messages that they contained many revelations that were never explored at trial. The prosecutors repeatedly mischaracterized and falsely underplayed the messages—e.g., by claiming M.R. discussed only "compensation for her time" and never "sex-for-money," arguing that nothing in the messages "indicate[d] familiarity with or willingness to engage in 'BDSM,'" and failing to acknowledge that M.R. had solicited money from almost 50 men in a five-day period and therefore unquestionably lied when she swore she couldn't remember whether Tripathy was the "only one."

55. In affirming the conviction, the Appellate Division apparently relied on your office's mischaracterizations. The court totally missed the significance of the messages when it found they "were not material, because they were generally cumulative of evidence presented at trial such as messages between the victim and the defendant." Further, the court never learned how the messages contradicted M.R.'s early statements to prosecutors and her Florida deposition, because

defense counsel, being in the dark, had never made that material part of the trial record.

56. In February 2020, a Florida appeals court overturned Gary Kitchings's conviction based on certain evidentiary errors at his trial. He is currently out on bail pending retrial. Recent court papers filed in that case show that, after Kitchings was convicted, M.R. threatened to sue Uber and received a $5 million pre-suit settlement from the company. After Kitchings's attorney learned of the settlement, he asked the prosecutor about it, and she responded that "she had just recently spoken with the victim [i.e., M.R.], and she was told by the victim that there was no settlement." In later court filings, however, the prosecutor confirmed that M.R. had indeed received a settlement, proving that M.R. had lied, yet again, when she denied the settlement.

**Tripathy's 440 motion and the role of the PCJU**

57. On April 1, 2022, Joel Rudin's office (new Attorney retained by Tripathy) filed a CPL 440.10 motion seeking to vacate Mr. Tripathy's conviction for ineffective assistance of counsel. The ineffectiveness was counsel's failure to make the right arguments to compel disclosure of the SA.com messages under Brady, Rosario, and other grounds, particularly after M.R. lied at trial and the messages were

used to "refresh her recollection." We could not directly move for vacatur based on the Brady and Rosario violations because the Appellate Division—after the defense briefed such issues without the benefit of the messages, and no doubt influenced by your office's arguments—had denied such claims.

58. In August 2022, the new District Attorney's Post-Conviction Justice Unit disclosed the SA.com messages to my office, having quickly recognized that they should have been disclosed all along. In November, D.A. Bragg commendably agreed to vacate Tripathy's conviction based on ineffective assistance of counsel. Implicit in this decision was that the messages were material, that without them Mr. Tripathy was denied a fair trial, and that the arguments of ADA Baraiola and the Appeals Division to the contrary were wrong. The conviction was vacated on November 22, 2022.

**Based on the extraordinary prosecutorial misconduct detailed above, the indictment should have been dismissed in furtherance of justice. But the DAs office still pursued a plea deal based on false material evidence highlighting an implicit unconstitutional policy practiced by the Manhattan DAs office.**

59. Manhattan DAs office has discretion to dismiss this case if it has lost confidence that it can meet its burden of proof or otherwise in the interest of justice. The circumstances outlined show that M.R.'s credibility is essentially destroyed and that no reasonable jury could convict based upon her uncorroborated testimony. In addition, based upon the factors outlined in CPL 210.40(1), the indictment should be dismissed "in furtherance of justice." The statute allows the court to dismiss "even though there may be no basis for dismissal as a matter of law," if "prosecution of the defendant . . . would constitute or result in injustice." In making such determination, the court must consider:

(a) the seriousness and circumstances of the offense; (b) the extent of harm caused by the offense; (c) the evidence of guilt . . . ; (d) the history, character and condition of the defendant; (e) any exceptionally serious misconduct of law enforcement personnel in the investigation, arrest and prosecution of the defendant; (f) the purpose and effect of imposing upon the defendant a sentence authorized for the offense; (g) the impact of a dismissal upon the confidence of the public in the criminal justice system; (h) the impact of a dismissal on the safety or welfare of the community; (i) where the court deems it appropriate, the attitude of the complainant or victim with respect to the motion; [and]

(j) any other relevant fact indicating that a judgment of conviction would serve no useful purpose. CPL 210.40(1)(a)-(j).

60. Here, these factors weigh strongly in favor of dismissal, particularly given the prosecution's "exceptionally serious misconduct." Before I get to that factor, I will briefly discuss the others.

61. The first two factors seemingly weigh against Tripathy. If this rape happened, it was a serious offense and the harm it presumably would have caused is likewise grave. But the third factor tends to neutralize the first two, because the "evidence of guilt" is extremely weak. This case has always been essentially a credibility battle, and now M.R.'s credibility has been destroyed.

62. Regarding Mr. Tripathy's history and character, he is married with two daughters; has multiple graduate degrees; had a long, stable, well-paying career before this incident; has long been active in charitable causes in his community; and has no criminal record. Indeed, Judge Edwards, at sentencing, said she was "moved by many of the things that [his] friends and family members ha[d] said about [him], and the work that [he'd] done in the community." Sent. Tr. 33. While Tripathy admitted striking M.R. after being provoked by her threat to extort him, it was out of character and he has expressed

deep remorse for that. Id. at 30-31. It certainly doesn't make him a rapist.

63. Regarding Tripathy's sentence, he has already served four and a half years of the six he would have had to serve of his seven-year sentence. See People v. Marrow, 20 A.D.3d 682, 684 (3d Dep't 2005) (affirming dismissal of indictment in the interest of justice and noting that the defendant, originally sentenced to fifteen years to life, had already "served four years in jail before his conviction was reversed").

64. The impact of a dismissal upon the confidence of the public in the criminal justice system weighs in Tripathy's favor. Anything less than dismissal for such an egregious perversion of the judicial process—a top to bottom failure of the Manhattan D.A.'s Office—would be viewed as a defense of these prosecutors' inexcusable actions and would shake the public's confidence in the system and in the integrity of your office.

65. The impact of a dismissal on the safety or welfare of the community is negligible. Tripathy has no criminal record. He was out on bail before his conviction and has been out for several months now, without incident. He had no disciplinary tickets in prison.

66. M.R.'s attitude about whether to continue the prosecution should be given minimal weight given her reprehensible role in wrongly sending Tripathy to prison.

67. Now I turn to the most important factor here, the prosecutors' "exceptionally serious misconduct." In case that is entirely a credibility battle, like this one, any evidence that the complainant is a liar is highly material; evidence that she repeatedly lied about the very subject matter of the case, to prosecutors and under oath, is even more so. The prosecutors knew early on that M.R. had lied over and over, about highly consequential matters. They also knew the messages tended to corroborate Tripathy's theory of the case. Yet they argued to Judge Obus, who surely deferred to their skewed presentation, and later to Judge Edwards, that the messages were "in no way connected" to the case, did "not tend to shed any light on defendant's guilt or innocence," were not Giglio, and should not be disclosed under the Rape Shield Law.

68. No prosecutor—certainly not these veterans—could reasonably believe that, in a case turning entirely on the complainant's credibility, the defense was barred from cross-examining her about her highly material lies to prosecutors and the jury. Such veteran sex-crimes

prosecutors also would know that the Rape Shield Law entitles the defense to disclosure of evidence so it may make an offer of proof as to why certain admissibility exceptions should apply, but that the defense cannot do that if denied the evidence in question, and that the Rape Shield Law cannot be used as a sword to thwart the accused's Brady and confrontation rights. See People v. Williams, 81 N.Y.2d 303, 312 (1993) (Rape Shield Law is "subject to limitation by constitutional guarantees of due process and the right to confront the prosecution's witnesses").

69. But they went further than simply concealing M.R.'s lies: they knowingly elicited testimony they knew was false or at the very least materially misleading, then exploited their misconduct in their summation arguments. It is elementary that such misconduct violates the prosecution's most basic constitutional and ethical obligations. See Giglio v. United States, 405 U.S. 150, 153 (1972) ("deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice'" and violates due process); People v. Colon, 13 N.Y.3d 343, 349 (2009) ("prosecutors 'must deal fairly with the accused and be candid with the courts,'" a duty that "requires prosecutors not only to disclose

exculpatory or impeaching evidence but also to correct the knowingly false or mistaken material testimony of a prosecution witness" (quoting People v. Steadman, 82 N.Y.2d 1, 7 (1993)).

70. Meanwhile, the Appeals Division lawyers, experts in the law, had to have known that the trial lawyers' conduct was indefensible. Yet defend it they did. When the defense sought to access the messages in the Appellate Division and then argued that the messages should have been disclosed as Brady material, the prosecutors had an obligation to carefully review and then disclose them, but instead they misled the court into denying the unsealing motion and later the appeal. D.A. Bragg's decision to vacate the conviction is an implicit acknowledgement that the office's previous position was wrong.

71. Should we be forced to file a motion to dismiss, we will seek an evidentiary hearing concerning the prosecutors' role in preparing M.R. to give—and failing to correct—her false testimony, including whether they told her that the messages that would disprove her testimony were protected from disclosure, and the role of the Appeals Division in continuing the coverup.

72. I recognize Mr. Tripathy has admitted that, inflamed by M.R.'s extortion attempt, he struck her. That behavior was unjustifiable.

Nevertheless, the DA should have dropped this entire prosecution, without any attempt to make him take a misdemeanor assault count, in light of your office's role in causing him to spend 4 1⁄2 years in prison based upon an unjustly obtained and likely false rape conviction. Your office should take responsibility for the harm it has caused.

73. Still the DAs office pursued its unjust conviction that led to a plea deal based on false material evidence and also in violation of Tripathy's Religious rights under RLUIPA.

**The indictment also should have also been dismissed because retrying Mr. Tripathy would violate his constitutional protections against double jeopardy**

74. Under the federal Double Jeopardy Clause, retrial is barred where the defense "successfully moves for a mistrial" if "the conduct giving rise to the successful motion . . . was intended to provoke the defendant into moving for a mistrial." Oregon v. Kennedy, 456 U.S. 667, 679 (1982). The prosecutor's intent may be "[i]nferr[ed] . . . from objective facts and circumstances," id. at 675, or, of course, from testimony by the prosecutor at an evidentiary hearing. The New York

Court of Appeals has held that the Kennedy rule applies under the State Constitution as well. Davis v. Brown, 87 N.Y.2d 626, 630 (1996).

75. Extending Kennedy, the Second Circuit has held that retrial is also barred where the earlier trial was corrupted by “prosecutorial overreaching engaged in with the deliberate intent of depriving [the accused] of having his trial completed by a particular tribunal or prejudicing the possibility of an acquittal that the prosecutor believed likely.” United States v. Pavloyianis, 996 F.2d 1467, 1473 (2d Cir. 1993) (emphasis added); accord United States v. Wallach, 979 F.2d 912, 916 (1992); United States v. Gary, 74 F.3d 304, 315 (1st Cir. 1996), abrogated on other grounds by Johnson v. United States, 576 U.S. 591 (2015); Connecticut v. Colton, 234 Conn. 683, 692-93 (1995); United States v. Gambino, 838 F. Supp. 744, 746 (S.D.N.Y. 1993). The New York Court of Appeals, while never explicitly discussing Wallach/Pavloyianis, has noted that “[s]ome prosecutorial error may be so egregious or provocative as to warrant the interposition of the double jeopardy bar, even when no mistrial is granted,” and that “[s]uch egregious cases might evoke an exceptional circumstances approach to the general remedial relief which allows for retrial.” People v. Adames, 83 N.Y.2d 89, 91 (1993).

76. Numerous courts in other states have similar rules. See, e.g., Hawai'i v. Rogan, 91 Haw. 405, 423 (1999) (retrial barred "where, in the face of egregious prosecutorial misconduct, it cannot be said beyond a reasonable doubt that the defendant received a fair trial"); Pennsylvania v. Johnson, 659 Pa. 277, 309 (2020) (retrial barred where prosecutorial misconduct "deprives the defendant of his right to a fair trial" and "is undertaken recklessly, that is, with a conscious disregard for a substantial risk that such will be the result"); New Mexico v. Breit, 122 N.M. 655, 666 (1996) (retrial barred when misconduct "is so unfairly prejudicial to the defendant that it cannot be cured by means short of a mistrial or a motion for a new trial," and the prosecution "either intends to provoke a mistrial or acts in willful disregard of the resulting mistrial, retrial, or reversal"); Oregon v. Kennedy, 295 Or. 260, 276 (1983) (retrial barred where misconduct is "so prejudicial to the defendant that it cannot be cured by means short of a mistrial," as long as the prosecutor "intends or is indifferent to the resulting mistrial or reversal").

77. The prosecutorial misconduct here satisfies the Wallach/Pavloyianis and state standards above. Long before trial, these prosecutors knew the case boiled down to a credibility battle.

They knew that the SA.com messages severely undermined M.R.'s credibility and buttressed Tripathy's. And they knew that the limited independent evidence, most notably the statement of Tasha Sullivan, who was staying the hotel room next to Tripathy's, also undermined M.R. While M.R. claimed she loudly tried to fight off Tripathy from roughly 10:30 pm to 11:50 pm, Sullivan heard fighting that she was sure started at about midnight. The prosecutors thus had every reason to expect an acquittal if the truth was put before the jurors.

78. In response, they hid the truth to prejudice the likelihood of an acquittal. Not only that, but they also knowingly elicited sworn testimony they knew was false, confident that the defense would be unable to expose M.R.'s lies. This was exceptionally egregious misconduct, manifestly committed intentionally and in bad faith, and was so prejudicial that it warrants imposition of the double-jeopardy bar. As with the interest of justice motion, we would seek an evidentiary hearing to establish the full extent to which the prosecutors acted in bad faith.

**The indictment should have been dismissed because the prosecution also impaired the integrity of the grand jury proceeding**

79. An indictment resulting from a "defective" grand jury proceeding must be dismissed. CPL 210.20(1)(c). A proceeding is defective when, inter alia, "the integrity thereof is impaired and prejudice may result." CPL 210.35(5). Because "a prosecutor serves a dual role as advocate and public officer," she has "the duty not only to seek convictions but also to see that justice is done." People v. Pelchat, 62 N.Y.2d 97, 105 (1984). This "duty of fair dealing to the accused and candor to the courts" extends to "proceedings relating to indictment both at presentment and afterwards." Id. (emphasis added). Thus, where the prosecution learns after indictment that evidence before the grand jury was false or misleading, it is "duty bound to obtain a superseding indictment on proper evidence or to disclose the facts and seek permission from the court to resubmit the case." Id. at 107. Where such error is not corrected, "courts have inherent power to dismiss an indictment, . . . even though there was sufficient other reliable evidence presented." Id. at 106.

80. Here, the prosecutors' handwritten notes show that, as of June 24 at latest, they knew M.R. had met Tripathy on SA.com, a website that exists to facilitate financial transactions, and apparently also knew the defense theory that this was a financial exchange. Yet ADA Baraiola

allowed M.R. to mislead the grand jury by claiming she met Tripathy "on online dating" and depicting her encounter with Tripathy as a normal date. This testimony obscured the transactional nature of the encounter and foreclosed a host of questions the grand jurors would have had about what M.R. and Tripathy had agreed to do.

81. When the D.A.'s Office later obtained the SA.com messages and knew the extent to which they (a) proved M.R. had lied to prosecutors in the days surrounding her grand jury testimony and (b) corroborated Tripathy's defense, it had a duty to come clean about how the grand jury proceeding had been corrupted. In the extraordinary circumstances of this case, it cannot be said that Tripathy was "fairly and justly accused," Pelchat, 62 N.Y.2d at 106 (internal quotation marks omitted), when it was later discovered that the witness upon whom the entire case rested had repeatedly lied to the prosecution about matters central to her accusations and had misled the grand jury. Further, because the messages so powerfully supported Tripathy's defense, he should have been afforded a chance to present that evidence to the grand jury, possibly in conjunction with his own testimony. The grand jury is not supposed to be deprived of information that "would have materially influenced [its] investigation

and findings," People v. Golon, 174 A.D.2d 630, 632 (2d Dep't 1991), and here it plainly was.

82. The details described above likely does not tell the full story of the prosecutors' misconduct because we are still missing important information and documents, specifying items and information that are still pending to disclose under CPL 245.20. This includes items and information regarding when your office obtained M.R.'s SA.com messages; what the prosecutors discussed with Judges Obus and Edwards in their applications not to disclose the messages; the circumstances of such discussions and whether they were memorialized in any way; any messages M.R. exchanged with other men on other websites similar to SA.com; the extent to which ADA Baraiola or other prosecutors informed M.R., before her trial testimony, that the defense would not have access to her SA.com messages; what the prosecutors discussed with M.R. during the private mid-trial meeting in which her "recollection was refreshed" with the messages; and any efforts M.R. has made to seek damages from any party in relation to her accusations against Mr. Tripathy, as she has with Mr. Kitchings. Further, much of the evidence DAs office has disclosed previously contains extensive redactions—including the

handwritten notes of your office's interviews with M.R. and M.R.'s SA.com messages. The present discovery laws require you to disclose these materials essentially unredacted, see CPL 245.20(6), and the unredacted materials may well reveal further misconduct.

83. Religious Liberty under RLUIPA, First Amendment and State Laws and Statutes were violated and also caused due to the City's unwritten and implicit policies.

**Plea deal pursued by the Manhattan DA on April 11th, 2024 (under a separate SCI 71584/24 after the original indictment 2720-2016 was dismissed) was based on false material evidence known to Defendant Gutierrez and the Manhattan DA (in their investigative capacity) - Shannon Lucey, as the underlying charge PL 120.05(1) Assault in the Second Degree key element was based on "severely bodily injury" a legally defined term in New York, which was proven to be false (during Trial in 2018 based on Medical Evidence presented by Prosecution) or absent to even consider this charge.**

84. These material facts about lack of severe bodily injury, an essential element of this charge was very well known to the Investigator Gutierrez and the prosecutor Lucey who despite these established facts during their investigation, knowingly pursued this plea deal with

false material evidence under penalty of perjury. These actions implicated City's policies, liability of Gutierrez and Lucey, which also violated Tripathy's religious rights under RLUIPA and other laws and statutes by forcing him to agree to a lie to end the criminal case.

**Tripathy's religious rights were also violated during the entire criminal process implicating City's liability under Monell, RLUIPA and Gutierrez as described.**

85. Plaintiff is a life-long Hindu (Religion of Hinduism) and one of his core and sincerely held religious beliefs is neither to lie, nor commit perjury, nor agree to lies, false facts. Plaintiff was under the custody of the City (NYC Corrections and City Officials including Gutierrez) during the following periods (relevant periods) for RLUIPA:

   a. June-July 2016 - arrest, bail hearings;
   b. July 11, 2018 - sentencing;
   c. April 11, 2024 - sentencing and plea bargaining;

86. Defendants substantially burdened his core and sincerely held religious beliefs when (when he was in their custody) -

   a. During his arrest detention and bail hearings they called his a liar and said that he did the crimes as charged;

b. During his July 2018 sentencing Defendants claimed that the complainant was speaking the truth and petitioner was lying and the Jury rightly convicted him knowingly fully well that the evidence (suppressed) proved that in fact they knew about the complainants lies, false material evidence and perjury;

c. During his April 2024 sentencing Defendants forced him to lie for the plea bargaining that the complainant in fact received grave injuries consistent with Assault 2nd, when in fact the medical evidence presented (during trial) proved otherwise.

87. Application of RLUIPA Substantial Burden: applicable only when Petitioner is in custody of Defendant. Substantial burden inquiry is when a policy forces a petitioner to choose between his religious beliefs and compliance with a policy receiving federal financial assistance in a program or activity that is mandatory. Policy is of the municipality who is liable under the Monell doctrine towards RLUIPA as it had an unequivocal policy of suppressing Brady, use of false material evidence, use of perjury, lack of supervision and training towards RLUIPA substantial burden to get convictions. Municipalities are under the purview of RLUIPA (for institutionalized persons) and have no-sovereign immunity, under both the spending clause (as they

receive federal funds for a mandatory program or activity) and the commerce clause (as Petitioner and his family had to spend money and resources across state lines to support him during the above periods).

**Allegations common to FIRST CAUSE OF ACTION**: Malicious Prosecution under State Law - All Defendants.

88. Including all items described above from 1 to 87.

89. All the Individual Defendants, individually and in concert, acted knowingly, willfully, intentionally, and with actual malice to initiate and/or to continue criminal proceedings against Mr. Tripathy.

90. They did so without probable cause, knowing the Complainant was lying and intentionally caused him to be deprived of his liberty.

91. The proceedings terminated in Mr. Tripathy's favor with the dismissal of his indictment 2720-2016. His separate plea deal with a 1 day sentence under SCI 71584-24 was based on false evidence known to the investigator (Guittirrez) and the prosecutor (Lucey).

92. Defendants City of New York is also liable for Mr. Tripathy's prosecution and damages under the principle of respondeat superior.

**Allegations common to SECOND CAUSE OF ACTION**: Intentional Infliction of Emotional Distress under State Law - All Defendants

93. Including all items described above from 1 to 87.

94. Defendants engaged in a continuous pattern of extreme and outrageous conduct directed at Plaintiff.

95. Defendants engaged in that pattern of conduct with an intention to cause, or in reckless disregard of distress of the substantial probability that it would cause, Plaintiff severe emotional distress.

96. Specifically, defendants, individually, in concert with, conspiring with, and/or aiding and abetting one another and other persons for whose acts they are liable, coerced one or more witnesses into making false statements to be used against Plaintiff, initiated or caused the initiation and continuation of false and unfounded criminal charges against Plaintiff while lacking probable cause to do so, and suppressed Brady, Giglio, and Rosario material they knew they were required to disclose to the District Attorney for disclosure to Plaintiff.

97. Plaintiff suffered severe emotional distress as a result of, and that was proximately caused by, the Defendants' aforementioned actions.

98. By virtue of the foregoing, Plaintiff suffered the damages identified.

99. Defendants City of New York are liable under the principal of respondeat superior.

**Allegations common to THIRD CAUSE OF ACTION**: 42 USC 1983; Denial of Due Process and a Fair Trial under the 5th, 6th and 14th Amendments; Malicious Prosecution and the Depravation of Liberty under the 4th and 14th Amendment - All Individual Defendants

100. Including all items described above from 1 to 87.

101. The Individual Defendants are liable for their violation of Mr. Kendrick's constitutional rights pursuant to 42 U.S.C. § 1983 and to the Fourth, Fifth and Fourteenth Amendments to the United States Constitution, and all his consequential damages.

**Allegations common to FOURTH CAUSE OF ACTION**: Evidence Fabrication, False Material Evidence under 42 USC 1983 Violation of the Fourth, Fifth, Sixth, and Fourteenth Amendments - All Individual Defendants

102. Including all items described above from 1 to 87.

103. The Individual Defendants, individually and in concert, knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to the truth, caused the manufacture or fabrication of false or patently unreliable witness statements and false or materially misleading documentary evidence implicating Mr. Tripathy in the crime.

104. The Individual Defendants manufactured false evidence for the purpose of causing criminal charges to be approved, and criminal proceedings to be initiated and continued, against Mr.Tripathy.

105. They forwarded or caused the forwarding of such false or manufactured material to prosecutors for use against Mr. Tripathy.

106. They knew that the evidence they forwarded to prosecutors would be likely to influence a jury's decision at trial.

107. As a result of the defendants' aforementioned conduct, prosecutors initiated and continued a prosecution of Mr. Tripathy through trial and his plea deal, and he was deprived of his liberty.

108. The defendants' conduct violated Mr. Tripathy's right to be free from unreasonable seizure as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution, and his rights to procedural and substantive due process and a fair trial as guaranteed to him by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

109. Alternatively, the individual defendants had an affirmative duty to Mr. Tripathy to protect his above-mentioned constitutional rights from infringement by other government officials.

110. Each of the Individual Defendants knew that Mr. Tripathy's constitutional rights would be violated if the conduct of the other government officials caused false, manufactured, fabricated or obviously unreliable evidence to be used against Mr. Tripathy and to deprive him of his liberty.

111. Each of the Individual Defendants had reasonable opportunities to intervene to prevent such infringement of Mr. Tripathy's constitutional rights.

112. Nevertheless, each of the Individual Defendants deliberately, willfully, recklessly, and/or with deliberate indifference to the truth failed to take reasonable steps to intervene.

113. As a result of the Individual Defendants' conduct and/or failure to intervene, Mr. Tripathy's liberty was infringed or curtailed, all in violation of his Fourth, Fifth, Sixth and Fourteenth Amendment rights.

114. The above misconduct by the Individual Defendants was outrageous and shocking to the conscience.

115. By virtue of the foregoing, the Individual Defendants are liable to Plaintiff for all his consequential damages under 42 U.S.C. § 1983.

**Allegations common to FIFTH CAUSE OF ACTION:** Withholding of Exculpatory Evidence, "Shocking to the Conscience," at Caused Mr.

Tripathy's Loss of Liberty Under 42 U.S.C. § 1983 Violation of the Fourth, Fifth, Sixth, and Fourteenth Amendments - All Individual Defendants

116. Including all items described above from 1 to 87.

117. Pursuant to the Fourth, Fifth, Eighth, and Fourteenth Amendments, Mr. Kendrick had a federal constitutional right to timely disclosure to his defense of exculpatory and other information which, considered in its totality was very favorable to Tripathy.

118. Further, it was commonly known as well to investigators and police detectives, including the Defendants named in this case, that the existence of exculpatory evidence might influence a prosecutor's decision whether to seek an indictment and the grand jury's decision whether to approve one.

119. Prosecutors were required to disclose such evidence to the defense so that it could exercise its right under state law to ask the grand jury to call exculpatory witnesses and consider exculpatory or other evidence favorable to the defendant.

120. Absent the disclosure of such evidence to the defense or the presentation of it to the grand jury, the grand jurors would be misled about the strength of the prosecution's case and thus whether to approve an indictment.

121. In this case, the Individual Defendants did not timely disclose to prosecutors handling the initial arraignment of Mr. Tripathy, as well as the subsequent grand jury presentation, exculpatory and impeachment information showing the likely innocence of Mr. Tripathy or at least the weakness of the evidence against him.

122. As a result of the Defendants' withholding of the aforementioned information, Mr. Tripathy was wrongfully indicted

123. The Defendants' conduct was shocking to the conscience.

124. Accordingly, the Defendants are liable to Plaintiff pursuant to 42 U.S.C. § 1983 for all his damages.

**Allegations common to SIXTH CAUSE OF ACTION:** Withholding of Information Favorable to the Defense Pursuant to Brady v. Maryland, 373 U.S. 83 (1963) Under 42 U.S.C. § 1983 Violation of the Fifth, Sixth, and Fourteenth Amendments - All Individual Defendants

125. Including all items described above from 1 to 87.

126. Pursuant to the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, Mr. Tripathy had a federal constitutional right to timely disclosure by the prosecution, in advance of trial, of all material information favorable to his defense, including information tending to show his innocence and information tending to impeach the

credibility of a prosecution witness, so that the defense could make adequate use of it during pretrial hearings and at trial.

127. The prosecution had an obligation to disclose such information without regard to good or bad faith, so long as the information was material to the defense in that it would create a reasonable probability of a more favorable outcome or undermine confidence in a conviction.

128. This in turn imposed an obligation on investigators and police detectives investigating a case to make timely disclosure of all information favorable to the defense so that the prosecution could make a judgment whether to disclose it to the defense.

129. In this case, as set forth above, the Individual Defendants affirmatively concealed from, or failed to disclose to, the prosecution, information that was exculpatory, impeaching of the prosecution's witnesses, or both, including but not limited to the information set forth.

130. This information was material to the outcome of the trial.

131. The defendants acted knowingly, intentionally, willfully, recklessly, with deliberate indifference to their obligations, and/or negligently, in failing to disclose the favorable information.

132. The defendants' failure to disclose was a substantial cause of Mr. Tripathy's conviction and his damages deriving therefrom.

133. Accordingly, the individual defendants are liable to Plaintiff pursuant to 42 U.S.C. § 1983.

**<u>Allegations common to SEVENTH CAUSE OF ACTION</u>:** Monell Liability for the Policies, Practices, and Customs of the New York DAs Office Under 42 U.S.C. § 1983.- Defendant City of New York

134. Including all items described above from 1 to 87.

135. The violations of Mr. Tripathy's constitutional rights to due process and a fair trial by trial prosecutor Baraiola, Bashford, including but not limited to those set forth above herein, wholly or substantially resulted from the unlawful policies, customs, and practices of the New York County District Attorney's Office ("NYCDAO"), for which the District Attorney, as chief policymaker for the Office, was responsible.

136. Prior to Mr. Tripathy's arrest and trial, policymaking officials at the NYCDAO, with deliberate indifference to the constitutional rights of individuals suspected or accused of criminal activity, to the risk of prosecuting and convicting innocent people, and to the rights of all criminal suspects and defendants to due process and a fair trial, implemented the following illegal or inadequate policies, procedures,

regulations, practices, customs, training, supervision, and discipline with respect to prosecutors:

a. Deliberately structuring deals with and promises to cooperating witnesses in a manner designed to improperly conceal the full extent of the benefits such witnesses stood to receive in exchange for their testimony favoring the prosecution;

b. Making false, misleading, and incomplete disclosures of Brady material, including but not limited to exculpatory evidence and impeachment information;

c. Delaying disclosure of such information until it was too late for the defense to make adequate use of it;

d. Using state procedural rules to frustrate federal constitutional requirements for prompt and full disclosure of the bad acts, illegal behavior, and motives to lie of prosecution witnesses;

e. Eliciting, and/or failing to correct, false, incomplete, or materially misleading testimony and evidence;

f. Participating in and/or utilizing at trial unduly suggestive, manufactured lineup identification “evidence”; and

g. Frustrating criminal defendants' constitutional right to a fair trial through false, misleading, inflammatory, or otherwise improper summation advocacy.

137. The aforesaid deliberate or de facto policies, procedures, regulations, practices and/or customs, including the failure to properly instruct, train, supervise, and/or discipline employees with regard thereto, were implemented or tolerated by policymaking officials for Defendant City, including, but not limited to, the D.A. and his delegates, who knew:

a. to a moral certainty that such policies, procedures, regulations, practices, and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

b. that such issues may present employees with difficult choices of the sort that instruction, training, supervision, and discipline will make less difficult;

c. that employees facing such issues have strong incentives to make the wrong choices, especially given the pressure the D.A.'s Office places on prosecutors to win convictions at any cost;

d. that the wrong choice by municipal employees concerning such issues will frequently cause the deprivation of the constitutional rights of the accused and cause him constitutional injury; and

e. that employees of the D.A.'s Office had a history of making wrong choices in such matters.

138. The aforementioned policymaking officials had the knowledge and the notice alleged in the preceding paragraph based upon:

a. numerous credible allegations, many substantiated by judicial decisions (some of which are listed, which is incorporated herein by reference, or discussed below) that New York County County ADAs had:

i. participated in the manufacturing of false testimony or evidence, including identification evidence;

ii. presented or failed to correct false or misleading testimony and argument;

iii. failed to disclose information favorable to the defense that was required to be disclosed by the constitutions and the laws of the United States and of the State of New York; and

iv. made arguments at trial that were so false, misleading, or otherwise improper that they deprived the defendant of due process and a fair trial; and

b. the inherent obviousness of the need to train, supervise, and/or discipline ADAs in the above constitutional obligations to counteract the pressure that the D.A.'s Office applied to prosecutors to obtain convictions.

139. During all times material to this complaint, the City, through its policymaker, the New York County District Attorney, owed a duty to the public at large and to Mr. Tripathy to implement policies, procedures, customs, and practices sufficient to prevent, deter, and avoid conduct by subordinates that violate the constitutional rights of criminal suspects or defendants and of other members of the public.

140. The D.A.'s policies, customs, and/or practice of approval, ratification of, or deliberate indifference to, violations by Manhattan prosecutors of their constitutional obligations to afford criminal defendants a fair trial, foreseeably encouraged such violations to continue and was a substantial cause of ADA Baraiola violations of Mr. Tripathy's constitutional rights before and during his trial, of Mr.

Tripathy's wrongful conviction, and of the continuation thereafter of his wrongful imprisonment and prosecution.

141. ADA Baraiola, Bashford, Lucey and Blumberg were trained, gained experience, and rose to a supervisory level, under District Attorney Cyrus Vance.

142. NYCDAO had non-existent and not properly implemented training programs, no Brady disclosure or fair trial policies, no information management system to track and ensure disclosure of Brady material, no written trial manual, and no disciplinary system wherein these prosecutors were warned, supervised or action taken specifically to address these grave constitutional violations.

143. Under Vance's stewardship, the office deliberately compartmentalized information, including information required to be disclosed to the defense under Brady, knowing that the result would be the denial to numerous criminal defendants of their constitutional right to a fair trial.

144. Indeed, the Office trained ADAs in a "Chinese Wall" policy under which cooperation agreements were made with prosecution witnesses without the assigned prosecutor using the witness's testimony actually knowing the details.

145. Under this system, witnesses would give false or incomplete descriptions of their cooperation agreements and expectation of benefits and the prosecutor would not correct their testimony, causing juries to be misled.

146. The NYCDAO Appellate team argued to the Appellate Division that the exculpatory material was not Brady and should not have been disclosed in clear violations. However, the NYCDAO Appellate team argued to the Appellate Division that the prosecutors had done nothing wrong. This argument communicated to ADAs that the current regime would tolerate the same old illegalities because all that mattered was winning or preserving the conviction.

147. NYCDAO routinely avoided investigating the conduct of the line prosecutors or discipline them.

148. The prosecutors remained in the Office and received raises and promotions. NYCDAO avoided and did not implement procedures for formal or written Brady manuals, standards, or procedures, no disciplinary system, and no remedial training for the prosecutors who had been corrupted under Vance.

149. Baraiola and Bashford not only failed to correct the witness's false testimony, but then falsely vouched for the truthfulness of the

witness's testimony in her summation, arguing the witness had no motive to lie.

150. District Attorney Cyrus Vance was well aware of the pervasive misconduct of the NYCDAO, including Brady violations, summation misconduct, and other infringements on defendants' constitutional fair trial rights, when he became D.A. and of the need to take strong measures to change the rancid culture of the Office.

151. Numerous of these decisions, from the period 2010 through 2020, are listed, which is incorporated herein by reference. These decisions were so numerous and so strongly worded that they suggested the existence of an anything-goes culture and practice aimed at obtaining convictions no matter the cost to criminal defendants' constitutional rights. Nevertheless, upon becoming D.A. himself Vance, through his deliberate indifference, permitted this culture to continue. He did so by failing to conduct internal disciplinary investigations or to discipline the prosecutors who were known to commit such violations, failing to refer such individuals for possible discipline by the Appellate Division's Disciplinary or Grievance Committees, and failing to ensure they were properly trained and supervised.

152. Instead of disciplining prosecutors who were found to have violated the constitutional rights of criminal defendants to a fair trial, District Attorney Vance's policy, custom, or practice was to give these prosecutors positive evaluations, raises, promotions, and commendations, based in part on their record of winning at trial and extracting guilty pleas, even in weak cases, while ignoring or discounting judicial findings of misconduct by these prosecutors. No investigation would be made of bureau chiefs and deputy bureau chiefs who permitted line prosecutors under their supervision to continually violate the rights of criminal defendants. Supervisors weren't trained in how to supervise.

153. Under Vance, the NYCDAO maintained listings of the won-loss trial records of prosecutors and even would rank them. Some of the worst violators were the supervisors themselves, which obviously gave the wrong message to others in the Office.

154. Upon information and belief, except for the aforementioned, none of the prosecutors responsible for the misconduct in these cases were disciplined. The D.A.'s failure to take any reasonable measures to discipline prosecutors responsible for such constitutional violations incentivized them and their colleagues to continue to violate the

constitutional rights of criminal defendants. Prosecutors knew they were likely to be rewarded for winning but would suffer no negative personal consequence in the unlikely event their misconduct was exposed.

155. The Manhattan D.A., as well as subordinates to whom he delegated policymaking, managerial and administrative authority, at all relevant times constituted City policymakers for whom the City is liable. The New York County is a subdivision of Defendant City of New York. The D.A., at all relevant times, was and is an elected officer of the New York county. The D.A.'s Office was and is funded out of the City's budget. The D.A. was and is designated a "local officer," rather than a "state officer," under New York Public Officers Law § 2. 578. The D.A. and his assistant district attorneys are agents and employees of Defendant City of New York.

156. The State of New York has provided by statute that Defendant City's constituent counties (including New York County), and hence Defendant City itself, are liable for torts committed by County officers and employees, such as the D.A. and his assistants. See N.Y. County Law §§ 53, 941.

157. The City represents such officers and employees in judicial proceedings and indemnifies them because they are City officials.

158. Under the principles of municipal liability for federal civil rights violations, the D.A. or his authorized delegates have final managerial responsibility for training, instructing, supervising, and disciplining attorneys and other employees of the D.A.'s Office regarding their conduct in the prosecution of criminal matters, including, but not limited to:

a. their constitutional obligation not to create or to otherwise use false, misleading, or unreliable evidence, testimony, statements, or argument during criminal proceedings, including but not limited to manufactured lineup identifications and in-court identification testimony;

b. their constitutional obligation to correct evidence, testimony, statements, and argument that they know or should know is false, inaccurate, incomplete, misleading, or unreliable;

c. their constitutional obligation not to make improper argument during summations that deny a defendant his right to a fair trial; and

d. their continuing constitutional obligation to timely and fully disclose material evidence and information favorable to the defense as set forth in Brady, Giglio v. United States, and their progeny.

159. As alleged above, the New York County D.A. and his authorized delegates maintained a policy, custom, or practice, at the time of Mr. Tripathy's criminal prosecution and through the end of the tenure of District Attorney Cyrus Vance and Acting District Attorney(s) - Blumberg, Lucey, Bashford and Baraiola, of deliberate indifference to violations by NYCDAO employees of their constitutional fair trial obligations.

160. They did so despite their obligation to set an ethical tone for the Office and to make reasonable efforts to ensure that all personnel in the Office acted ethically and in compliance with the law.

161. They did so despite their awareness that the failure to discipline unethical behavior can poison the atmosphere of the entire office.

162. Despite a shocking history of fair trial violations by prosecutors, the D.A. and his executive staff allowed unlawful policies, customs, and practices to continue, failed to adopt minimally adequate policy and procedural manuals or bulletins, failed to require adequate training or

supervision, failed to adopt any disciplinary standards or procedures, and failed to investigate or discipline known and often startling violations of defendants' rights to due process and a fair trial.

163. This deliberate indifference created a win-at-all-costs culture in which prosecutors were encouraged to do virtually anything they could get away with to achieve convictions.

164. This culture in turn led to even more constitutional violations and improperly obtained convictions, including the conviction of Sanjay Tripathy.

165. By virtue of the foregoing, Defendant City is liable for having substantially caused the foregoing violations of Mr. Tripathy's constitutional rights and his resultant injuries.

166. Below is a list of cases that Plaintiff has researched - **Violations of *Brady* or *Rosario*, or other discovery violations** (Sex Crimes Unit cases are highlighted in green.)

| | **Date of judicial decision or reported vacatur** | **Citation/links** |
|---|---|---|
| 1. | 03/08/11 | Kenneth Moreno and Franklin Mata<br>https://www.nytimes.com/2011/05/16/nyregion/in-absence-of-truth-rape-trial-may-turn-on-officer-lawyer-tension.html |
| 2. | 04/07/11<br>(2009 conviction) | *People v. Sinha*, 84 A.D.3d 35 (1st Dep't 2011), *aff'd* 19 N.Y.3d 932 (2012) |
| 3. | 06/23/11<br>(2008 conviction) | *People v. Ortiz*, 85 A.D.3d 588 (1st Dep't 2011) |

| | | |
|---|---|---|
| 4. | 03/29/12<br>(2008 conviction) | *People v. Rodriguez*, 93 A.D.3d 595 (1st Dep't 2012) |
| 5. | 04/12/12<br>(03/05/10 conviction) | *People v. Carusso*, 94 A.D.3d 529 (1st Dep't 2012) |
| 6. | 06/19/12<br>(2008 conviction) | *People v. McCutheon*, 96 A.D.3d 580 (1st Dep't 2012) |
| 7. | 04/10/14<br>05/19/15<br>(2009 conviction) | *People v. Lee*, 116 A.D.3d 493 (1st Dep't 2014)<br>*People v. Burgess*, 128 A.D.3d 530 (1st Dep't 2015) (co-Δ, same ruling) |
| 8. | December 2014<br>(2011 conviction) | Laurence Harvey<br>https://nypost.com/2015/02/22/mans-conviction-tossed-after-evidence-error-in-sex-torture-case/ |
| 9. | 02/03/15<br>(2011 conviction) | Carlton Wigfall<br>See Nat'l Registry of Exonerations. |
| 10. | 05/16/15<br>(2012 conviction) | *People v. Carter*, 128 A.D.3d 580 (1st Dep't 2015) |
| 11. | 03/24/16<br>(2012 conviction) | *People v. Ulerio*, 137 A.D.3d 629 (1st Dep't 2016) |
| 12. | 09/29/16<br>(2014 conviction) | *People v. Satlin*, 142 A.D.3d 920 (1st Dep't 2016) |
| 13. | 12/21/16<br>(1999 conviction) | Danny Green and Carl Dushain<br>*People v. Cosey*, 54 Misc. 3d 1208(A) (Sup. Ct. N.Y. Cty. 2016)<br>*Cosey v. Lilley*, 460 F. Supp. 3d 346, 356 (S.D.N.Y. 2020), aff'd, 62 F.4th 74 (2d Cir. 2023) |
| 14. | 01/05/17<br>(2015 conviction) | *People v. Ramos*, 146 A.D.3d 443 (1st Dep't 2017) |
| 15. | 01/08/18<br>(2014 conviction) | Jeremiah Spruill |
| 16. | 03/22/18<br>(2016 conviction) | *People v. Nelson*, 159 A.D.3d 570 (1st Dep't 2018) |
| 17. | 10/02/18<br>(2016 conviction) | *People v. Gary Harris* — Slip opinion by trial court |
| 18. | 12/06/19<br>(2015 conviction) | Jawaun Fraser |

| | | |
|---|---|---|
| 19. | 12/19/19 | *People v. McGhee*, 180 A.D.3d 26 (1st Dep't 2019), *rev'd*, 36 N.Y.3d 1063 (2021) |
| 20. | 02/05/20 | Kyriacos Pierides & Harry Chlupsa<br>https://www.thecity.nyc/2020/01/23/a-top-prosecutor-in-manhattan-da-vance-s-office-accused-of-hiding-evidence/<br>https://nypost.com/2020/01/24/prosecutor-diana-florence-resigns-after-allegedly-withholding-key-evidence/<br>https://www.thecity.nyc/2020/02/05/case-tossed-amid-staggering-hidden-evidence-allegations-against-vance-deputy/<br>https://www.thecity.nyc/2021/05/11/candidate-for-manhattan-district-attorney-slammed-vance/<br>https://www.documentcloud.org/documents/20705983-nycrimbarflorence |

167. **Summation misconduct**

| | **Date of judicial decision or reported vacatur** | **Citation/links** |
|---|---|---|
| 1. | 01/12/10 | *People v. Valdez*, 69 A.D.3d 452 (1st Dep't 2010) |
| 2. | 02/17/10 | *People v. Williams*, 26 Misc. 3d 139(A) (App. Term 1st Dep't 2010) |
| 3. | 02/23/10 | *People v. Whaley*, 70 A.D.3d 570 (1st Dep't 2010) |
| 4. | 10/19/10 | *People v. Norman*, 77 A.D.3d 497 (1st Dep't 2010) |
| 5. | 11/23/10 | *People v. Ryant*, 78 A.D.3d 570 (1st Dep't 2010) |
| 6. | 03/24/11 | *People v. Tsouristakis*, 82 A.D.3d 612 (1st Dep't 2011) |
| 7. | 04/12/11 | *People v. Santos*, 83 A.D.3d 471 (1st Dep't 2011) |
| 8. | 02/21/13 | *People v. Rosenberg*, 103 A.D.3d 531 (1st Dep't 2013) |
| 9. | 10/24/13 | *People v. Black*, 110 A.D.3d 569 (1st Dep't 2013) |
| 10. | 12/05/13 | *People v. Acevedo*, 112 A.D.3d 454 (1st Dep't 2013) |
| 11. | 02/04/14 | *People v. Gogoladze*, 114 A.D.3d 417 (1st Dep't 2014) |
| 12. | 05/01/14 | *People v. Stanton*, 117 A.D.3d 412 (1st Dep't 2014) |
| 13. | 06/17/14 | *People v. Almonte*, 118 A.D.3d 548 (1st Dep't 2014) |
| 14. | 10/02/14 | *People v. Lopez*, 121 A.D.3d 412 (1st Dep't 2014) |
| 15. | 10/30/14 | *People v. Padin*, 121 A.D.3d 628 (1st Dep't 2014) |
| 16. | 02/03/15 | *People v. Jones*, 125 A.D.3d 403 (1st Dep't 2015) |
| 17. | 02/03/15 | *People v. Narvaez*, 125 A.D.3d 415 (1st Dep't 2015) |
| 18. | 03/19/15 | *People v. Innis*, 126 A.D.3d 578 (1st Dep't 2015) |
| 19. | 04/19/16 | *People v. Singleton*, 139 A.D.3d 208 (1st Dep't 2016) |

| | | |
|---|---|---|
| 20. | 06/17/16 | *People v. Melendez*, 140 A.D.3d 421 (1st Dep't 2016) |
| 21. | 06/21/16 | *People v. Ramirez*, 140 A.D.3d 545 (1st Dep't 2016) |
| 22. | 08/18/16 | *People v. Taylor*, 142 A.D.3d 465 (1st Dep't 2016) |
| 23. | 11/01/16 | *People v. Hoey*, 145 A.D.3d 118 (1st Dep't 2016) |
| 24. | 11/15/16 | *People v. Rizzo*, 144 A.D.3d 489 (1st Dep't 2016) |
| 25. | 11/29/16 | *People v. Green*, 144 A.D.3d 589 (1st Dep't 2016) |
| 26. | 06/22/17 | *People v. Adams*, 151 A.D.3d 612 (1st Dep't 2017) |
| 27. | 10/12/17 | *People v. Jones*, 154 A.D.3d 511 (1st Dep't 2017) |
| 28. | 01/16/18 | *People v. Rivera*, 157 A.D.3d 545 (1st Dep't 2018) |
| 29. | 06/05/18 | *People v. Acosta*, 162 A.D.3d 411 (1st Dep't 2018) |
| 30. | 10/18/18 | *People v. Pinnacle*, 165 A.D.3d 521 (1st Dep't 2018) |
| 31. | 04/11/19 | *People v. Lithgow*, 171 A.D.3d 517 (1st Dep't 2019) |
| 32. | 10/22/19 | *People v. Carter*, 176 A.D.3d 564 (1st Dep't 2019) |
| 33. | 02/04/20 | *People v. Hayes*, 180 A.D.3d 423 (1st Dep't 2020) |
| 34. | 05/11/21 | *People v. Bailey*, 194 A.D.3d 496 (1st Dep't 2021) |
| 35. | 12/07/21 | *People v. Manley*, 200 A.D.3d 471 (1st Dep't 2021) |

**Allegations common to EIGHTH CAUSE OF ACTION:** Negligent Hiring, Training and Supervision under State Law - Defendant City of New York

168. Including all items described above from 1 to 87.

169. Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth herein.

170. During all times material to this Complaint, Defendants City of New York, through their policymakers, owed a duty to the public at large and to Mr. Tripathy, which such policymakers knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs, and practices sufficient to

prevent, deter, and avoid conduct by their subordinates, including investigators, detectives and assistant district attorneys acting in their investigatory capacity, violating the aforementioned constitutional rights of criminal suspects or defendants and other members of the public.

171. Defendant City of New York are liable because of their negligent failure to adequately hire, train, supervise, and discipline their agents, servants, and/or employees with regard to their aforementioned duties, and because such negligence was a substantial and foreseeable cause of the injuries that Mr. Tripathy suffered.

**Allegations common to NINTH CAUSE OF ACTION:** Religious Rights under RLUIPA and State Law - All Defendants

172. Including all items described above from 1 to 87.

173. Plaintiff is a life-long Hindu (Religion of Hinduism) and one of his core and sincerely held religious beliefs is neither to lie, nor commit perjury, nor agree to lies, false facts. Plaintiff was under the custody of the City (NYC Corrections and City Officials including Gutierrez) during the following periods (relevant periods) for RLUIPA:

a. June-July 2016 - arrest, bail hearings;

b. July 11, 2018 - sentencing;

c. April 11, 2024 - sentencing and plea bargaining;

174. Defendants substantially burdened his core and sincerely held religious beliefs when (when he was in their custody) -

a. During his arrest detention and bail hearings they called his a liar and said that he did the crimes as charged;

b. During his July 2018 sentencing Defendants claimed that the complainant was speaking the truth and petitioner was lying and the Jury rightly convicted him knowingly fully well that the evidence (suppressed) proved that in fact they knew about the complainants lies, false material evidence and perjury;

c. During his April 2024 sentencing Defendants forced him to lie for the plea bargaining that the complainant in fact received grave injuries consistent with Assault 2nd, when in fact the medical evidence presented (during trial) proved otherwise.

175. Application of RLUIPA Substantial Burden: applicable only when Petitioner is in custody of Defendant. Substantial burden inquiry is when a policy forces a petitioner to choose between his religious beliefs and compliance with a policy receiving federal financial assistance in a program or activity that is mandatory. Policy is of the municipality who is liable under the Monell doctrine towards RLUIPA

as it had an unequivocal policy of suppressing Brady, use of false material evidence, use of perjury, lack of supervision and training towards RLUIPA substantial burden to get convictions. Municipalities are under the purview of RLUIPA (for institutionalized persons) and have no-sovereign immunity, under both the spending clause (as they receive federal funds for a mandatory program or activity) and the commerce clause (as Petitioner and his family had to spend money and resources across state lines to support him during the above periods).

# G - Demand for Jury Trial

**JURY TRIAL DEMAND**

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

1. For compensatory damages in an amount to be determined;
2. For punitive damages against the Individual Defendants in an amount to be determined;
3. For reasonable attorneys' fees, together with costs and disbursements, pursuant to 42 U.S.C. §1988 and to the inherent powers of this Court;
4. For pre-judgment interest as allowed by law; and
5. For such other and further relief as this Court may deem just and proper.

# H - Signature under Penalty of Perjury

Petitioner affirms the contents of this complaint, upon personal knowledge, information and belief to the best of his knowledge and ability, under penalty of perjury.

Respectfully Submitted,
*/s/ Sanjay Tripathy*
Sanjay Tripathy
ProSe Petitioner/Plaintiff
sanjay.tripathy@gmail.com
+1-859-380-1515

*An innocent man, exonerated after 1651 days in illegal captivity, due to unconstitutional acts, religious persecutions perpetrated by The State of New York, and State Actors acting under the Color of Law;*