**Case#25-cv-06465-AT-JW (First Amended Complaint)**

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

**-------------------------------------------------------x**

**SANJAY TRIPATHY, ProSe Plaintiff,**

**- against -**

**FIRST AMENDED COMPLAINT**

**Jury Trial Demanded**

Case No. 1:25-cv-06465-AT-JW

**THE CITY OF NEW YORK, Evelin Gutierrez (Investigator); Manhattan DAs (NYCDAO) - Baraiola, Bashford, Blumberg, Lucey; Mette Risdal (Complainant) in their individual and official capacities, Defendants.**

**-------------------------------------------------------x**

## OVERVIEW OF FIRST AMENDED COMPLAINT

**1.** Plaintiff SANJAY TRIPATHY ("Plaintiff"), complaining of the Defendants, respectfully alleges, upon personal knowledge, information and belief where stated, as follows in this 42 U.S.C. § 1983 Civil Rights Action. This First Amended Complaint is filed as of right pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), no responsive pleading or Rule 12 motion having been served.

**2.** Plaintiff is a citizen of the United States and a resident of North Carolina who was wrongfully convicted and imprisoned in New York for 1,651 days as the direct

result of prosecutorial misconduct by the Manhattan District Attorney's Office ("NYCDAO"). The misconduct included the deliberate suppression of critical exculpatory evidence, the knowing elicitation of perjured testimony, and the continuation of a prosecution the Defendants knew was built on lies.

**3.** The Defendants' misconduct was so egregious that the DA's own Post-Conviction Justice Unit ("PCJU") investigated the case and consented to vacate Plaintiff's conviction on November 22, 2022, acknowledging that the suppressed evidence created a reasonable probability that Plaintiff would not have been convicted had it been disclosed. The underlying indictment (2720-2016) was formally dismissed on April 11, 2024.

**4.** On April 11, 2024—the same day the indictment was dismissed—the NYCDAO extracted a guilty plea from Plaintiff under a new Superior Court Information (SCI 71584/24) to Assault in the Second Degree (PL 120.05(1)). This charge requires proof of "serious physical injury," a defined legal term under New York law. The medical evidence developed at the 2018 trial—including testimony from the prosecution's own medical expert, Dr. Cooper, and records from Mount Sinai Roosevelt Hospital—contradicts the existence of "serious physical injury." The SCI plea was thus based on false material evidence and was the final act in a continuing course of prosecutorial misconduct. A PCJU petition challenging this conviction was filed on January 21–22, 2026 and remains pending.

**5.** This lawsuit seeks to hold the individual Defendants liable under 42 U.S.C. §§ 1983, 1985, Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and supplemental state-law claims, for their deliberate violations of Plaintiff's constitutional rights, including his rights to due process, a fair trial, freedom from malicious prosecution, freedom from fabricated evidence, and the free exercise of his religion. It further seeks to hold Defendant City of New York liable under Monell v. New York City Department of Social Services, 436 U.S. 658 (1978), for the de facto policies, customs, and practices of the NYCDAO that caused and enabled these violations.

## THE PARTIES

### *Plaintiff*

**6.** Plaintiff SANJAY TRIPATHY is a citizen of the United States and a resident of the State of North Carolina. His conviction and incarceration occurred within the Southern District of New York (The State of New York).

### *Defendants*

**7.** Defendant THE CITY OF NEW YORK ("City") is a municipal corporation of the State of New York and a resident of the Southern District of New York. The City is liable under Monell for the policies, practices, and customs of the

NYCDAO. The New York County District Attorney is a subdivision of Defendant City. The DA, at all relevant times, was an elected officer of New York County. The DA's Office was and is funded out of the City's budget. The DA was designated a "local officer" under New York Public Officers Law § 2. The DA and assistant district attorneys are agents and employees of Defendant City. The State of New York has provided by statute that Defendant City's constituent counties are liable for torts committed by County officers and employees. See N.Y. County Law §§ 53, 941. While the DA exercises prosecutorial independence, the City remains the appropriate municipal defendant for Monell purposes because the DA's policies regarding training, supervision, and disclosure are administrative functions for which the City bears responsibility. See Cosey v. Lilley, 62 F.4th 74 (2d Cir. 2023).

**8.** Defendant EVELIN GUTIERREZ ("Gutierrez"), Investigator Shield No. 155, was at all relevant times employed by the Manhattan DA's Office as an investigator, acting within the scope of her authority and under color of state law. She is named in her individual and official capacities.

**9.** Defendants KRISTEN BARAIOLA, MARTHA BASHFORD, NICOLE BLUMBERG, and SHANNON LUCEY (collectively, the "ADA Defendants") were at all relevant times Assistant District Attorneys employed by the NYCDAO, acting within the scope of their authority and under color of state law. ADA Baraiola served as the trial prosecutor. ADA Bashford was the Chief of the Sex

Crimes Unit and supervised the prosecution at trial. ADA Blumberg and ADA Lucey participated in the investigations, post-vacatur proceedings and the SCI plea. All were trained, gained experience, and rose to supervisory levels under District Attorney Cyrus Vance. They are named in their individual and official capacities.

**10.** Defendant METTE RISDAL ("Risdal" or "M.R." or "Complainant") is an individual who was the complainant in the criminal case. She is named in her individual capacity for her role in initiating and perpetuating the false prosecution through perjured testimony and false statements to prosecutors, and for her conspiracy with state-actor Defendants to deprive Plaintiff of his civil rights. The '***State-Actor Defendants***' are Gutierrez, Baraiola, Bashford, Blumberg, and Lucey. '***Individual Defendants***' refers to all State-Actor Defendants and Defendant Risdal collectively.

**JURISDICTION, VENUE, AND NATURE OF SUIT**

**11.** This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) & (4) because this action arises under the Constitution and laws of the United States, including 42 U.S.C. §§ 1983, 1985, and 1988, and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1. This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367.

**12.** Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in New York County, within the Southern District of New York.

**13.** Plaintiff's damages exceed $25,000. This action has been commenced within the applicable limitations period for each claim, as set forth in the tolling and accrual allegations below.

## PREVIOUS LAWSUITS

**14.** SDNY Case No. 1:20-cv-01646-LLS was filed by Plaintiff and dismissed as premature on June 30, 2020, as Plaintiff had not yet vacated his conviction. No other previous lawsuits have been filed regarding the same facts.

## TIMELINESS AND ACCRUAL OF CLAIMS

**15.** Plaintiff's federal claims under 42 U.S.C. §§ 1983 and 1985, are subject to New York's three-year statute of limitations. The original Indictment 2720-2016 was formally dismissed on April 11, 2024. This Complaint was originally filed on August 2, 2025—within the three-year period.

**16.** Plaintiff's state-law claims for malicious prosecution and intentional infliction of emotional distress are subject to New York's one-year statute of limitations

under CPLR 215(3). Plaintiff alleges these claims are timely for the following independent reasons:

**a. Non-Accrual Due to Pending SCI Conviction.** The malicious prosecution claim requires favorable termination of the criminal proceedings. On April 11, 2024, the same day Indictment 2720-2016 was dismissed, the NYCDAO extracted a guilty plea from Plaintiff under SCI 71584/24 based on the same underlying facts. The SCI conviction remains in force. A PCJU petition challenging the SCI conviction was filed January 21–22, 2026 and remains pending. Because the criminal proceedings arising from the same facts have not terminated favorably in their entirety, the malicious prosecution claim has not yet accrued and the statute of limitations has not begun to run. See Heck v. Humphrey, 512 U.S. 477, 486–87 (1994). Also citing New York's favorable termination requirement (e.g., *Smith-Hunter v. Harvey*, 95 N.Y.2d 191 (2000).

**b. Continuing Wrong Doctrine.** The prosecutorial misconduct alleged herein constituted a continuous course of wrongful conduct extending from 2016 through April 11, 2024. The final wrongful act was the pursuit of the SCI plea based on false material evidence known to Investigator Gutierrez and ADA Lucey. Under the continuing wrong doctrine, the statute of

limitations did not begin to run until the final act. See Henry v. Bank of Am., 147 A.D.3d 599 (1st Dep't 2017).

**c. Equitable Tolling.** Extraordinary circumstances warrant equitable tolling: Plaintiff is pro se and resides in North Carolina; his financial resources were entirely exhausted by the wrongful prosecution; he has been unemployed for ten years as a consequence of the conviction; and the full scope of the Defendants' misconduct was not known to him until the PCJU investigation produced additional evidence on a rolling basis. See Zumpano v. Quinn, 6 N.Y.3d 666 (2006).

## <u>STATEMENT OF FACTS</u>

### *A. The Encounter and Plaintiff's Defense*

**17.** M.R. and Mr. Tripathy met over the internet on SeekingArrangement.com ("SA.com"), a website that billed itself as a platform "where sugar babies go to meet sugar daddies." They had dinner and drinks, and wound up in his hotel room at the W Hotel in Manhattan on June 15, 2016. She claimed he violently raped and assaulted her there. He claimed they had explicitly agreed to an exchange of sadomasochistic sex for $1,500, she attempted to extort him for more money because her face was marked up and she was upset she'd have to cancel

appointments with other men, and when he refused to give in she falsely accused him of rape.

***B. Prosecutors' Initial Interviews of M.R. and Early Court Proceedings***

**18.** M.R. alleged that Mr. Tripathy raped her on June 15, 2016, after the two met on SA.com. Handwritten notes memorialize the prosecutors' interview of M.R. five days later, on June 20. M.R. claimed she "[r]egistered a couple of years ago" for SA.com but "didn't use it," and reactivated it only a "couple weeks ago." She also claimed her encounter with Tripathy was her "[f]irst date from" SA.com. Evidence that the D.A.'s Office later obtained, but suppressed, revealed these statements to be lies.

**19.** On June 24, ADA Baraiola conducted a second interview of M.R., evidently before presenting M.R.'s grand jury testimony. Handwritten notes show that M.R. was asked what her sources of income were, how much cash she had when she met Tripathy, and whether he ever offered her money. These questions may have been asked because defense counsel had alleged that the sexual encounter was a consensual financial transaction. M.R. answered that Tripathy offered her money "at [the] very end" of the encounter, and she "thought [it] weird that [he] offered money." ADA Baraiola then elicited M.R.'s grand jury testimony that M.R. met Tripathy "on online dating" and that the encounter was a normal date. Again,

evidence that the D.A.'s Office later obtained, but suppressed, revealed these statements to be false or highly misleading.

**20.** On June 27, Tripathy's lawyer made a bail application at which he clearly laid out the defense theory that Tripathy and M.R. met on SA.com and had consensual sex involving "BDSM"—or bondage, dominance/discipline, submission/sadism, and masochism.

**21.** ADA Baraiola interviewed M.R. again on June 30. Ms. Baraiola's notes show that she had a "record from defense attorney"—apparently an SA.com message in which M.R., before meeting Tripathy, asked him about "$$ on a per meet" basis. Confronted with this message, and evidently unaware that prosecutors would eventually obtain all her SA.com messages, M.R. made numerous additional statements that turned out to be lies: She again claimed Tripathy was the "first guy she met w/ on SA.com" and she "never met anyone in the past." She claimed "$$ on a per meet" meant "money for travel or dinner," "[n]ot money for sex." When ADA Baraiola insisted the message "does seem to be exchange for money + time," M.R. "denie[d]" it. A moment later, however, M.R. claimed her "discussions about money" on the website were "just in exchange for time." But she insisted she was "NOT" on the website "to have sex." She claimed that being on SA.com, you "don't know something sexual would happen, don't think man expects it. Might happen after a few nights if we agree." Asked why she was on SA.com at all, she

claimed "[m]oney is NOT an issue." She claimed she had "gone on a lot of dates" and "ha[d] never gotten paid." M.R. claimed she was "not into S&M," "never, ever had rough sex w/ anyone," "never had rough sex, been choked or slapped. EVER."

**22.** At the end of this interview, ADA Baraiola apparently worried that the defense would "be able to discredit [M.R.]," but M.R. assured her there was "[n]o smoking gun the defense could have." Such a smoking gun emerged shortly thereafter, but the defense was unable to use it to discredit M.R. because the prosecution suppressed it.

**23.** The handwritten notes contain many redactions, so it cannot be said whether the notes prove even more lies by M.R. of which the prosecutors were aware.

***C. Prosecutors Obtain and Suppress M.R.'s SA.com Messages***

**24.** In July 2016, the defense submitted a pretrial omnibus motion and "Specific Brady Request" for information about M.R. having "ever exchanged sexual intercourse or other intimate activity for financial gain." ADA Baraiola denied such materials existed.

**25.** ADA Baraiola certainly had the messages by January 2017, when she applied ex parte to the court insisting she need not disclose them. These messages show that, within six months of the indictment, and more than a year before trial, Ms. Baraiola knew there was documentary evidence that was responsive to Tripathy's

specific Brady requests, that proved M.R. had lied during her interviews with prosecutors, and that tended to corroborate Tripathy's defense, yet she did not disclose it. The messages included the following:

**26.** First, contrary to M.R.'s claims that she registered for SA.com "a couple years ago" but "didn't use it" until a "couple weeks ago," the messages showed she corresponded with dozens of men from April to December 2014, and then started messaging them again in October 2015. Although in the 2014 messages she mostly did not explicitly discuss money, in one message in August, a man offered to give her $8,000 for a month in the Berkshires, and she responded that she "would consider coming and spending a month with [him] for 10k" (conversation 9958324).

**27.** Second, contrary to M.R.'s claims that Tripathy was the "first guy she met w/ on SA.com" and that she "ha[d] never gotten paid," she told multiple men that she had met someone "on this site" who "died in February" (conversations 74847450, 75072942, 75081836, 75083032, 75084243, 75085923, 75102253, 5385243, 75107089, 75177657, 75173999). Messaging numerous other men, she further embellished this story: "we found each other on the site and it lasted well over a year. He gave me 10k a month. Sadly he died in February so now I'm ready to find it again" (conversations 75248784, 75249939, 75261981, 75262401, 75270221, 75271492, 75313031). She told a different man that she wanted "$15,000 a month"

and had "just got out of a relationship where the guy was giving [her] this" (conversation 4707367).

**28.** Third, contrary to M.R.'s claim that you "don't know something sexual would happen" on SA.com, and that she was "NOT" there "to have sex," she repeatedly offered sex for money. By Plaintiff's count, she had such exchanges with 48 men in the five days before meeting Tripathy. In each conversation, she proposed the man pay her on a "per meet" or monthly basis. In each one, she gave some version of the promise that she was "super sexy and naughty in bed" and "[l]ove[s] to do anything to please [her] man." In conversation 74410861, she told a man seeking a "long term sex friend" that she was "[l]ooking for the same thing." In conversation 75247814, she promised to be the man's "anal slut." In conversation 75270221, she told the man it will be "$1500 for 3-4 hours." He asked, "does that include sex? . . . We know what this website is all about." M.R. responded, "It would include sex if we have a connection." In conversation 75177657, she said, "If we have a connection and go upstairs for sex it will be $1500." When he countered with $1,000, she countered, "$1200." He insisted on $1,000 and she said "No."

**29.** Fourth, contrary to her claim that "[m]oney is NOT an issue," she told three men, "I have gotten into a situation where I need financial help" (conversations 74742206, 17611708, 74760795).

**30.** Finally, the messages contradict M.R.'s claims that she was "not into S&M" and "never had rough sex . . . EVER." She repeatedly promised men she was "naughty," "open minded to everything," and "lov[ing] to do anything to please [her] man." In conversation 74713789, she told a man seeking someone who "loves all sex, uninhibited oral, anal etc, has submissive side" that she was "[l]ooking for the same thing." In conversation 75339286, a "very dominant" man was "looking for a submissive." M.R. responded, "I would be interested. . . . I am very submissive and very naughty in bed." He said, "My girl friend and I a[r]e very dirty," and M.R. replied, "I am very naughty, dirty and sexual as well." In conversation 75271959, the man asked, "are u an extremely orally inclined sub?" M.R. responded, "Yes, very submissive. Will be your anal slut and drink all your juices."

**31.** Despite ADA Baraiola's knowledge that these messages proved M.R. a liar and appeared to corroborate Tripathy, she wrote to Judge Obus ex parte, on January 17, 2017, seeking permission to withhold the messages. She contended the messages were "not discoverable" because they were (a) "in no way connected to the investigation in this case," (b) not Brady, as "they do not tend to shed any light on the defendant's guilt or innocence," "nor do they constitute Giglio," and (c) not admissible under the Rape Shield Law. All three contentions were false. The messages were directly responsive to Tripathy's Brady demand and supported the

defense. With respect to the Rape Shield Law, the application was misleading because the statute governs only admissibility, not discoverability. The defense is entitled to discovery so it can make an "offer of proof" as to why certain admissibility exceptions should apply. CPL 60.42(5). ADA Baraiola made a misleading written submission that caused Judge Obus (and later Judge Edwards) to deny disclosure in advance of trial, preventing the defense from reviewing and investigating the materials.

***D. M.R.'s False Florida Deposition Testimony***

**32.** On May 7, 2017, while the Tripathy prosecution was pending, M.R. accused Uber driver Gary Kitchings of raping her in Florida. Kitchings was 57 years old and, like Tripathy, had no previous criminal record. Before Kitchings's trial, his attorneys questioned M.R. under oath. DANY prosecutors clearly had this deposition transcript by the time of Tripathy's trial. In it, asked if she knew what a "sugar daddy" is, M.R. said she "assum[ed] it's a person . . . that takes care of [a woman] financially," but she had "never been in the situation." She denied having "ever accepted money from anybody for a date" or "ever accepted money from any person ever for sex." Asked what she knew about BDSM, she said she was "just guessing" it was "something like" what she had seen in Fifty Shades of Grey,

which had "shocked" her and made her walk out "halfway through." M.R. also denied, three times, that she had ever discussed money with Tripathy.

**33.** In March 2018, M.R. testified at Kitchings's trial. Based on her testimony, he was convicted of sexual battery and sentenced to 22 years in prison. This conviction was later overturned by a Florida appeals court in February 2020. After Kitchings was convicted, M.R. threatened to sue Uber and received a $5 million pre-suit settlement. When Kitchings's attorney later asked the prosecutor about this settlement, M.R. denied it existed—proving she had lied yet again.

***E. M.R.'s False Trial Testimony, Knowingly Elicited by Prosecutors***

**34.** At Tripathy's trial in May–June 2018, ADA Baraiola was joined by Martha Bashford, a veteran prosecutor and longtime Chief of the Sex Crimes Unit. On the eve of trial, defense counsel requested any SA.com messages that tended to prove the falsity of M.R.'s Florida deposition testimony—particularly her denials that she knew anything about "BDSM" or had ever accepted "money for dates." 05/11/18 Tr. at 20. The prosecutors disclosed nothing, again insisting the messages were "not Brady" and were protected by the Rape Shield Law. Judge Edwards accepted their arguments.

**35.** ADA Baraiola—knowing after the court's ruling that she and M.R. need not fear impeachment with the SA.com messages—proceeded to elicit the same

misleading and outright false statements that M.R. had earlier made to prosecutors. Her unit chief, Ms. Bashford, failed to intervene.

**36.** First, ADA Baraiola elicited from M.R. that she was financially stable and thus had no need to solicit money on SA.com. M.R. testified she ran her own skincare company, had previously started another company, and owned multiple properties. Tr. 120-23. The prosecution also called M.R.'s friend Joe Palmer to testify that M.R. was "an entrepreneur" and a "real estate investor." Tr. 89. The prosecution knew this image of financial comfort was disproven by the messages showing she repeatedly sought large amounts of money and stated she had "gotten into a situation where [she] need[ed] financial help."

**37.** Second, ADA Baraiola elicited M.R.'s false testimony that her "$$ on a per meet" message to Tripathy was anomalous, merely something she was "willing to try . . . out." Tr. 135. M.R. claimed "financially tak[ing] care of [her]" just meant "nice dinners and travel." Tr. 126. She said she was "high budget" because she traveled a lot and pampered her dogs. Tr. 128. Prosecutors knew the undisclosed messages contradicted these answers.

**38.** Third, ADA Baraiola elicited testimony falsely implying M.R.'s SA.com profile was not intended to advertise sex. M.R. said that when she promised she would "take care of [the man] in every way," she meant "pampering, cooking, you

know, massaging their feet." Tr. 127. Asked what she meant by "looking for fun," she answered, "travel, . . . going to concerts, Broadway shows, dinners." Tr. 127. The numerous messages in which she explicitly promised sex in exchange for payment disproved this testimony.

**39.** Fourth, ADA Baraiola elicited several pages of testimony about a "date" M.R. had arranged with a man named "Kevin," whom she was supposed to meet later the same night she saw Tripathy. Tr. 182-86, 193-205. The prosecutors disclosed M.R.'s text messages with Kevin without any mention of money. They did not disclose M.R.'s SA.com messages with Kevin from the same day, in which he had offered her "$10-15,000 a month." This can only be viewed as another instance of the prosecutor colluding with the witness to deliberately mislead the jury.

**40.** Fifth, knowing that M.R. repeatedly described herself in the SA.com messages as "naughty," "open minded to everything," "very submissive," "dirty," and an "anal slut" who would "drink all your juices," ADA Baraiola elicited from M.R. that she had never discussed "submission" or other BDSM-related topics with Tripathy. The messages showed that discussing such sexual practices was something she did regularly and was part of what she offered for the fee she charged.

**41.** While the messages had long been Brady, they were now also Rosario, because M.R. testified on direct about her supposed financial stability, her reasons for signing up for SA.com, her requirements of the men she met on the site, the meaning of her profile statements, what she meant when she asked Tripathy about "$$ on a per meet," and her texts with Kevin. Despite their absolute, and obvious, Rosario obligations, the prosecutors continued to conceal the messages.

**42.** In the middle of M.R.'s direct examination, ADA Baraiola disclosed "notes that [M.R.] had written down in her own time." Tr. 208. She had written, "while it would be nice to have gotten 3 or $400 for those hours on [a] date [with Tripathy], perhaps, if it was more than 3 or $400 that would seem like that would be an exchange for sex to her." Tr. 337. The implication was that M.R. had asked Tripathy for money only on a lark and would never want to give even the impression she was trading sex for money. The SA.com messages proved this false—she had traded sex for a lot more than $400 and discussed the possibility with countless men.

**43.** On cross-examination, with the prosecutors' full knowledge, M.R. doubled down on her false testimony. Defense counsel tried to sow doubt about M.R.'s claim that after messaging Tripathy about "$$ on a per meet" they had never again discussed money. M.R. claimed she "didn't really think much of it." Tr. 316-17. She said the "$$ per meet" message was like a "coffee challenge" where "you ask

for ten percent off and if they give it to you, great, if they don't, that's okay too." Tr. 317. The SA.com messages proved the deceitfulness of this testimony, as M.R. had demanded specific dollar amounts from numerous men and bargained with them.

**44.** When defense counsel asked M.R. if she had ever corresponded with Kevin about money, she said she didn't think she had. Tr. 318-20. She testified she "really wanted to meet up with Kevin" that night, Tr. 326, and had "an instinct to leave [her date with Tripathy] to meet Kevin" but did not because she "ha[d] very high integrity." Tr. 372. The prosecutors knew Kevin had offered M.R. "$10-15,000 a month," surely accounting for her "really want[ing]" to meet him that night, but they remained silent.

**45.** M.R.'s lies reached a climax in the following exchange, while the prosecutors kept silent: Defense counsel asked: "And when you say, I was willing to try it, are you suggesting that you had never done that before, sought compensation for a date for your time?" M.R.: "I don't remember if I tried it before." Counsel: "You believe [Tripathy] was the first person you sought compensation from in exchange for your time?" M.R.: "As I said, I don't remember if I sent a similar e-mail or not." Counsel: "You have no recollection whether or not prior to [Tripathy] you ever asked anyone else to pay you for your time on a date with them? Is that what you are saying?" M.R.: "Exactly." Tr. 331. It is inconceivable that M.R. had

forgotten discussing this very topic with almost 50 men the same week she discussed it with Tripathy. The prosecutors knew she was giving false testimony but did nothing.

**46.** The court finally intervened, issuing an extraordinary order that the prosecutors interrupt the defense cross-examination to meet privately with M.R. to "refresh her recollection" with the messages, while still withholding them from the defense. M.R.'s own PCJU interview (November 21, 2022) later confirmed that during this mid-trial break, "Martha and Kristen told her what to say." M.R. then testified she remembered she had communicated with "other men regarding exchanging time for money." Tr. 353. Any halfway decent defense lawyer in possession of the actual messages would have exploded this misleading testimony, proved M.R. to be a brazen liar, and likely ended the trial right there.

**47.** Defense counsel also asked M.R. whether she knew what "BDSM" is, and she testified, "I think I know what it is. . . . I watched half of the movie 50 Shades of Gray and I walked out halfway through but that's kind of what I assume it's about." Tr. 361-62. That was "the only thing [she] kn[e]w about BDSM." Tr. 362. Defense counsel could not impeach her with the messages that disproved her testimony.

***F. Mr. Tripathy Testifies in His Own Defense, and the SA.com Messages Repeatedly Corroborate Him***

**48.** During Tripathy's testimony, the suppressed messages repeatedly corroborated him, though he had never seen them. M.R. told him "[s]he does anal," which she had advertised in conversations with four different men (75247814, 74713789, 74715322, 75271959). She told him she was into "water sports" or "urine drinking," supported by two conversations in which she told men she would "drink all [thei]r juices" (75271959, 75249939). Tripathy testified she demanded, and he gave her, $1,500 for their encounter, which was the precise amount she demanded from two other men (75177657, 75270221).

**49.** The concealed SA.com messages between M.R. and Kevin also powerfully corroborated Mr. Tripathy. He testified that after his consensual sadomasochistic encounter with M.R., she was furious that her face was marked up because she would be unable to go on other dates for a couple of days, and she tried to extort him for more money. Tr. 714-15. That she was supposed to meet Kevin, who had promised her "$10-15,000 a month," later that night explains why she was so angry that her subsequent appointments had been ruined.

**50.** The W Hotel room-door report further corroborated Tripathy's timeline—security entered the room at 12:59 AM, consistent with Tripathy's account. The ear-witness Tasha Sullivan likewise heard fighting starting at about midnight, consistent with Tripathy's version of events, not M.R.'s claim of an assault from roughly 10:30 PM to 11:50 PM.

### *G. ADA Baraiola's Bad-Faith Summation*

**51.** In summation, ADA Baraiola made numerous damaging arguments that she knew were either highly misleading or outright false in light of the messages. She argued Tripathy had lied about BDSM because there was "[n]o mention of BDSM" in the texts between M.R. and Tripathy, Tr. 878, knowing the defense had been unable to confront M.R. with her statements to other men. She argued M.R. was "a woman who has in her bank account, at a minimum, $700," implying financial stability, contrary to the messages. Tr. 879. She claimed M.R.'s testimony "makes a lot more sense than the defendant['s]," Tr. 882, while knowing of multiple messages showing M.R. discussing sex for money with dozens of men. She criticized defense counsel for "insinuat[ing] . . . that [M.R.] is a liar, that [she] is a prostitute," Tr. 920, when the messages proved she was both. She told the jury, "Mr. Rothman stood before you and said that this is a case where the prosecution is trying to hide the truth. I submit to you that is the absolute opposite of what is going on. . . . No one is hiding the truth from you. The truth is laid out in front of you for you to see." Tr. 942. This was egregiously dishonest. The prosecution had hidden the truth.

### *H. Sentencing*

**52.** At Tripathy's sentencing, ADA Baraiola sought to maximize his punishment by accusing him of giving "blatantly false and offensive trial testimony," and "deliberately l[ying] to [the court] and to this jury about every single detail." Sent. Tr. 12, 20. She accused him of "perjury." Sent. Tr. 21. She asked for 18 years in prison. Meanwhile, she was aware that her own witness had committed perjury at trial, and that the suppressed messages supported Tripathy's testimony. The court sentenced Mr. Tripathy to seven years in prison.

***I. Post-Conviction Proceedings and Continued Concealment***

**53.** In January 2019, Tripathy's appellate lawyer, Arnold Levine, viewed the court file and found, unsealed, the prosecution's ex parte motion to Judge Obus with the SA.com messages appended. He immediately recognized their significance. When he later returned to review them again, he was told they should have been sealed and was denied access.

**54.** On March 12, 2019, Mr. Levine appeared before Judge Edwards to explain what had occurred and ask her to unseal the messages. ADA Baraiola strongly objected, arguing the messages "didn't exculpate the defendant from the allegations against him in any way, shape, or form." Judge Edwards instructed Levine to make his unsealing motion to the Appellate Division.

**55.** In May 2019, Levine made his unsealing motion to the appeals court. ADA Katherine Kulkarni of the Appeals Division vigorously opposed, arguing the messages had “no connection to the criminal case” and were “not material.” The court denied the defense motion. In the appeal brief, ADAs Alice Wiseman and Luis Morales argued the messages “did not constitute material exculpatory or impeachment evidence” and repeatedly mischaracterized them—e.g., by claiming M.R. discussed only “compensation for her time” and never “sex-for-money,” arguing that nothing in the messages “indicate[d] familiarity with or willingness to engage in ‘BDSM,’” and failing to acknowledge that M.R. had solicited money from almost 50 men in a five-day period.

**56.** In affirming the conviction, the Appellate Division apparently relied on the office’s mischaracterizations, finding the messages “were not material, because they were generally cumulative of evidence presented at trial.” The court never learned how the messages contradicted M.R.’s early statements to prosecutors and her Florida deposition.

***J. Vacatur and the DA’s Concession***

**57.** On April 1, 2022, Joel Rudin filed a CPL 440.10 motion seeking to vacate the conviction for ineffective assistance of counsel. In August 2022, the PCJU disclosed the SA.com messages to defense counsel, “having quickly recognized

that they should have been disclosed all along." In November 2022, D.A. Bragg agreed to vacate the conviction. Implicit in this decision was that the messages were material, that without them Mr. Tripathy was denied a fair trial, and that the arguments of ADA Baraiola and the Appeals Division to the contrary were wrong. The conviction was vacated on November 22, 2022.

***K. The Indictment Should Have Been Dismissed; Instead the DA Pursued the SCI Plea***

**58.** Based on the extraordinary prosecutorial misconduct detailed above, the indictment should have been dismissed in furtherance of justice under CPL 210.40(1). In a case that was entirely a credibility battle, M.R.'s credibility was essentially destroyed. No reasonable jury could convict based upon her uncorroborated testimony. The prosecution's "exceptionally serious misconduct"—factor (e) of the statute—weighed overwhelmingly in favor of dismissal. To the extent any claim herein would necessarily imply the invalidity of the SCI conviction, Plaintiff alleges those claims in the alternative and seeks to preserve them pending the outcome of the PCJU petition. See Wallace v. Kato, 549 U.S. 384, 393–94 (2007) (§ 1983 claim may be stayed pending resolution of related criminal proceedings).

**59.** Instead, the DA's Office pursued a plea deal under a new Superior Court Information, SCI 71584/24. On April 11, 2024, the original Indictment 2720-2016 was formally dismissed, and Plaintiff entered a guilty plea to Assault in the Second Degree (PL 120.05(1)) under the SCI before the Honorable Ann Thompson. He was sentenced to one day, adjusted to time served.

**60.** PL 120.05(1) requires proof that the victim suffered "serious physical injury"—a defined term under New York law meaning "physical injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ." PL 10.00(10). The medical evidence developed at the 2018 trial establishes that M.R.'s injuries did not meet this standard. Mount Sinai Roosevelt Hospital records from June 15–16 and subsequent visits, 2016 document that M.R. presented with minor injuries—facial bruising, a swollen lip, and superficial abrasions to the neck and chest. She was examined, treated with ice packs and over-the-counter analgesics, and discharged the same night without admission. No surgical intervention was performed. No bones were fractured. No sutures were required. No follow-up specialist referral was made. The discharge instructions indicated routine wound care only. Dr. Cooper, the prosecution's own medical expert, testified at trial that M.R.'s injuries consisted of contusions and soft-tissue swelling consistent with force impact, but acknowledged on

cross-examination that the injuries had resolved within a short period and did not involve any protracted impairment of bodily function. Dr. Cooper specifically acknowledged that M.R. did not suffer any protracted disfigurement, protracted impairment of health, or protracted loss of organ function, and that her injuries were consistent with "physical injury" under PL 10.00(9) rather than "serious physical injury" under PL 10.00(10). Under *People v. Stewart*, 18 N.Y.3d 831 (2011), bruising and lacerations requiring emergency room treatment but no surgery or lasting impairment constitute "physical injury," not "serious physical injury." *See also People v. Foster*, 198 A.D.3d 433 (1st Dep't 2021); *People v. Guidice*, 83 N.Y.2d 630, 636 (1994) (leading case requiring protracted impairment for "serious physical injury"); *People v. Jimenez*, 55 A.D.3d 966 (3d Dep't 2008) (facial fractures and lacerations requiring surgical repair held insufficient for "serious physical injury" in some circumstances). M.R.'s documented injuries fall squarely within the definition of "physical injury" and do not satisfy the heightened standard required for Assault in the Second Degree. The SCI plea was thus predicated on a charge whose essential element was contradicted by the prosecution's own evidence.

**61.** These material facts were known to Investigator Gutierrez and ADA Lucey when they pursued the SCI plea. They knowingly presented a felony charge whose essential element was contradicted by the prosecution’s own medical evidence.

These actions also violated Tripathy's religious rights under RLUIPA by forcing him to agree to a lie to end the criminal case.

**62.** On January 21–22, 2026, Plaintiff filed a petition with the PCJU requesting that the SCI conviction be vacated and dismissed, or reduced to Assault in the Third Degree (PL 120.00). That petition remains pending.

***L. Investigator Gutierrez's Role in the SCI Proceedings***

**63.** Following the vacatur of Plaintiff's conviction on November 22, 2022, Investigator Evelin Gutierrez, Shield No. 155, was assigned as the lead investigator on the case for the post-vacatur proceedings. In this capacity, Gutierrez was responsible for reviewing the existing case file, assisting in the preparation of any new charging instruments, and supporting the ADA Defendants in all aspects of the continued prosecution.

**64.** As the assigned investigator, Gutierrez reviewed the complete case file, which included the 2018 trial transcript, the medical records from Mount Sinai Roosevelt Hospital documenting M.R.'s treatment on June 15–16, 2016, and the trial testimony of Dr. Cooper, the prosecution's own medical expert. Gutierrez had full access to these materials and was familiar with their contents.

**65.** The medical evidence in the case file established that M.R.'s injuries did not constitute "serious physical injury" as defined in Penal Law § 10.00(10). Dr. Cooper's trial testimony and the Mount Sinai Roosevelt records documented the nature and extent of M.R.'s injuries. Under the standards set forth in *People v. Stewart* and *People v. Foster*, these injuries constituted, at most, "physical injury" under PL 10.00(9)—not "serious physical injury" requiring "a substantial risk of death," "serious and protracted disfigurement," "protracted impairment of health," or "protracted loss or impairment of the function of any bodily organ."

**66.** Despite her knowledge of the medical evidence, Gutierrez prepared the charging documents for the Superior Court Information (SCI 71584/24), which charged Plaintiff with Assault in the Second Degree under PL 120.05(1)—a charge that requires proof of "serious physical injury." Gutierrez signed the supporting deposition underlying the SCI. Her signature appears on the SCI paperwork, confirming her direct personal involvement in preparing and presenting the charge.

**67.** Gutierrez was present during the entirety of the SCI proceedings, including the plea and sentencing on April 11, 2024, before the Honorable Ann Thompson. ADA Lucey quoted Gutierrez during the proceedings, and Gutierrez's involvement is reflected in the official record. Gutierrez thus had direct, personal participation in

every stage of the SCI prosecution—from investigation and preparation of the charging instrument through the plea proceeding itself.

**68.** In addition to the medical evidence, Gutierrez also knew or had access to the full history of prosecutorial misconduct in the original prosecution. She knew that Plaintiff's original conviction had been vacated because the DA's Office had suppressed material exculpatory evidence—M.R.'s SA.com messages—and that the DA's Office itself had conceded that "had the SA.com messages been provided to defense counsel so that he could properly challenge the complainant's trial testimony, there was a reasonable probability that [Plaintiff] would not have been convicted." Gutierrez nonetheless participated in pursuing a new felony charge against Plaintiff based on the testimony and accusations of the same complainant whose credibility had been fundamentally and irreparably undermined.

**69.** Gutierrez's conduct in investigating the case post-vacatur, reviewing the medical evidence, preparing and signing the SCI charging instrument, and supporting the SCI prosecution was investigative in nature, not prosecutorial. Accordingly, her conduct is not protected by absolute prosecutorial immunity. See *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993) (absolute immunity does not extend to investigative functions); *Zahrey v. Coffey*, 221 F.3d 342, 346–49 (2d Cir. 2000) (same). Gutierrez is entitled only to qualified immunity, which is defeated

where, as here, the constitutional violation was clearly established and no reasonable investigator would have believed the conduct was lawful. The ADA Defendants' pre-trial suppression of Brady material, their false ex parte submissions to the court, and their investigative conduct in preparing and pursuing the SCI charge were not 'intimately associated with the judicial phase of the criminal process' and are not protected by absolute prosecutorial immunity. See Buckley v. Fitzsimmons, 509 U.S. 259, 273 (1993); Kalina v. Fletcher, 522 U.S. 118 (1997). To the extent any conduct occurred during trial, the knowing use of perjured testimony and deliberate suppression of exculpatory evidence deprived the proceedings of their judicial character. See Pottawattamie County v. McGhee, 547 F.3d 922 (8th Cir. 2008), cert. granted, 556 U.S. 1181 (2009).

***M. Violation of Plaintiff's Religious Rights***

**70.** Plaintiff is a lifelong practicing Hindu. One of his core and sincerely held religious beliefs—rooted in the Hindu concepts of Satya (truthfulness) and Dharma (righteous conduct)—is that one must neither lie, nor commit perjury, nor agree to falsehoods. The Hindu scripture Manusmriti teaches that "truth is the highest dharma" (satyam eva jayate). The Bhagavad Gita identifies truthfulness (satyam) as a divine quality (Chapter 16, Verse 2). Bearing false witness or assenting to lies is a grave violation of these tenets.

**71.** Plaintiff was in the physical custody of the City and its agents during three critical periods: (a) June–July 2016 (arrest and bail hearings); (b) July 11, 2018 (sentencing, at which Plaintiff was in custody after his Trial, to serve a seven-year sentence); and (c) April 11, 2024 (SCI plea and sentencing). On April 11, 2024, Plaintiff was transported to the courthouse by the Investigator Gutierrez, corrections officers, held in courthouse holding cells, and remained in the physical custody and control of the City and its agents throughout the duration of the SCI plea and sentencing proceedings before the Honorable Ann Thompson.

**72.** During these periods of custody, Defendants substantially burdened Plaintiff's religious exercise by: (a) during arrest detention and bail hearings, branding him a liar and insisting he committed crimes they knew the evidence did not support; (b) during July 2018 sentencing, claiming M.R. was truthful and Plaintiff was lying, while knowing the suppressed evidence proved otherwise; and (c) during the April 2024 plea, forcing Plaintiff to allocute under oath to facts he believed were false—specifically, that M.R. suffered "serious physical injury"—as the sole condition of ending a coercive prosecution. Plaintiff was forced to choose between his sincerely held religious belief against bearing false witness and his liberty.

***N. Systemic Failures at the NYCDAO (Monell Allegations)***

**73.** The constitutional violations described above were not isolated incidents. They resulted from de facto policies, customs, and practices of the NYCDAO under former District Attorney Cyrus Vance that fostered a "win-at-all-costs" culture and enabled prosecutors to violate defendants' constitutional rights with impunity.

**74.** Prior to Mr. Tripathy's arrest and trial, policymaking officials at the NYCDAO, with deliberate indifference to the constitutional rights of individuals suspected or accused of criminal activity, implemented the following illegal or inadequate policies, procedures, customs, training, supervision, and discipline with respect to prosecutors: (a) Deliberately structuring deals with and promises to cooperating witnesses to improperly conceal the full extent of benefits; (b) Making false, misleading, and incomplete disclosures of Brady material; (c) Delaying disclosure until it was too late for the defense to make adequate use of it; (d) Using state procedural rules to frustrate federal constitutional requirements for disclosure; (e) Eliciting, and/or failing to correct, false, incomplete, or materially misleading testimony; (f) Participating in and/or utilizing unduly suggestive, manufactured identification evidence; and (g) Frustrating defendants' constitutional right to a fair trial through false, misleading, or improper summation advocacy.

**75.** The NYCDAO under Vance had: (a) no written Brady disclosure policies or manuals; (b) no information management system to track and ensure disclosure of Brady material; (c) no written trial manual; (d) no disciplinary system for

prosecutors who committed constitutional violations; and (e) a "Chinese Wall" policy that deliberately compartmentalized information, including Brady-critical information, to facilitate non-disclosure. Under this system, cooperation agreements were made without the assigned prosecutor knowing the details, causing witnesses to give false descriptions of their agreements while the prosecutor would not correct them.

**76.** Under Vance, the NYCDAO maintained listings of the won-loss trial records of prosecutors and even ranked them. Some of the worst violators were the supervisors themselves. Prosecutors who were found to have violated the constitutional rights of criminal defendants were not disciplined but instead received positive evaluations, raises, promotions, and commendations based on their record of winning at trial. No investigation was made of bureau chiefs who permitted line prosecutors to continually violate rights.

**77.** The NYCDAO Appellate team routinely defended the trial prosecutors' misconduct on appeal, communicating to ADAs that the office would tolerate the same illegalities because all that mattered was winning or preserving the conviction. The prosecutors remained in the Office and received raises and promotions. NYCDAO avoided implementing formal Brady manuals, standards, disciplinary systems, or remedial training.

**78.** District Attorney Cyrus Vance was well aware of the pervasive misconduct, including Brady violations, summation misconduct, and other infringements, when he became D.A. Yet upon becoming D.A. himself, Vance, through his deliberate indifference, permitted this culture to continue. He failed to conduct internal disciplinary investigations, failed to refer individuals for possible discipline by the Appellate Division's Disciplinary Committees, and failed to ensure proper training and supervision.

**79.** The D.A.'s policies, customs, and/or practice of approval, ratification of, or deliberate indifference to such violations, was a substantial cause of ADA Baraiola's violations of Mr. Tripathy's constitutional rights, of his wrongful conviction, and of the continuation of his wrongful imprisonment and prosecution. The Second Circuit's decision in Cosey v. Lilley, 62 F.4th 74 (2d Cir. 2023), which arose from analogous NYCDAO misconduct during the same era, affirmed the viability of Monell claims based on the same pattern of violations.

**80.** Under the principles of municipal liability, the D.A. or his authorized delegates had final managerial responsibility for training, instructing, supervising, and disciplining employees regarding: (a) their constitutional obligation not to create or use false evidence; (b) their obligation to correct false testimony; (c) their obligation not to make improper summation arguments; and (d) their continuing obligation to timely and fully disclose Brady and Giglio material.

**81.** The pattern of violations is established by the cases listed in Schedule A (Brady/Rosario Violations) and Schedule B (Summation Misconduct), which are incorporated herein and attached as Exhibit 1.

### *O. ABSOLUTE IMMUNITY DOES NOT BAR PLAINTIFF'S CLAIMS*

**82.** The ADA Defendants will likely assert absolute prosecutorial immunity. Plaintiff alleges that absolute immunity does not shield the conduct at issue for three independent reasons: a. *Pre-trial investigative conduct is not protected.* The ADAs' suppression of Brady material began before trial—ADA Baraiola's ex parte letter to Judge Obus withholding the SA.com messages was filed on January 17, 2017, more than a year before the May 2018 trial. The decision to withhold evidence responsive to specific defense requests is an investigative and administrative function, not an act "intimately associated with the judicial phase of the criminal process." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993); *Kalina v. Fletcher*, 522 U.S. 118, 129–31 (1997) (prosecutor who personally attested to facts in a certification acted as a complaining witness, not an advocate). b. *Post-vacatur SCI conduct is not protected.* Investigator Gutierrez and the ADA Defendants' preparation and pursuit of the SCI charge after the original conviction was vacated constituted investigative conduct—reviewing evidence, preparing a new charging instrument, and signing a supporting deposition. These are the acts of witnesses

and investigators, not advocates. *Buckley*, 509 U.S. at 274–76; *Zahrey v. Coffey*, 221 F.3d 342, 346–49 (2d Cir. 2000). c. *The knowing use of perjured testimony strips immunity.* To the extent any challenged conduct occurred during trial itself, the knowing elicitation of false testimony and deliberate suppression of exculpatory evidence are acts so fundamentally at odds with the prosecutor's duty to seek justice that they deprive the proceedings of their judicial character. See *Pottawattamie County v. McGhee*, 547 F.3d 922, 929–33 (8th Cir. 2008), *cert. granted*, 556 U.S. 1181 (2009) (settled before decision); *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (conviction obtained through knowing use of perjured testimony violates due process); *Imbler v. Pachtman*, 424 U.S. 409, 431 n.34 (1976) (leaving open whether absolute immunity extends to deliberate suppression of exculpatory evidence or use of perjured testimony). See *Imbler v. Pachtman*, 424 U.S. 409, 431 n.34 (1976) — the Supreme Court's own reservation on immunity for evidence fabrication/suppression.

## PLAINTIFF'S INJURIES AND DAMAGES

**83.** As a direct, proximate, and reasonably foreseeable consequence of the Defendants' actions, Plaintiff: (1) Was denied his state and federal constitutional rights and liberties; (2) Was repeatedly subjected to violence during incarceration; (3) Was further traumatized by witnessing violence, sexual and physical assaults on

other inmates; (4) Was so distraught that he suffered hopelessness; (5) Suffered severe mental, emotional, and physical distress; (6) Suffered permanent mental and emotional harm; (7) Was denied the opportunity to pursue normal relationships with and enjoy the companionship of family and friends; (8) Was publicly shamed, disgraced, ridiculed and humiliated and suffered damage to reputation; (9) Suffered lost wages and permanent impairment of earning capacity—Plaintiff has been unemployed for ten years; (10) Exhausted his retirement savings and personal finances; (11) Continues to suffer the consequences of a felony conviction under the SCI; and (12) Incurred other items of attendant damages. His wrongful prosecution resulted in loss of liberty for more than 4.5 years; the loss of services, society, companionship, and consortium of family and friends; past mental and emotional suffering and inadequate treatment therefor; physical injuries and illness; and lost employment income in an amount to be calculated by an economist.

## CAUSES OF ACTION

### *FIRST CAUSE OF ACTION: Malicious Prosecution Under State Law (All Defendants including Defendant Risdal)*

**84.** Plaintiff incorporates all preceding paragraphs as if fully set forth herein. For the reasons set forth in the Absolute Immunity section above, the ADA Defendants' conduct is not shielded by absolute prosecutorial immunity.

**85.** All Individual Defendants, individually and in concert, acted knowingly, willfully, intentionally, and with actual malice to initiate and/or continue criminal proceedings against Mr. Tripathy.

**86.** They did so without probable cause, knowing the Complainant was lying and intentionally caused him to be deprived of his liberty.

**87.** The original criminal proceedings terminated in Plaintiff's favor with the vacatur of his conviction on November 22, 2022, and the dismissal of Indictment 2720-2016 on April 11, 2024. To the extent the SCI conviction under 71584/24 affects favorable termination, Plaintiff alleges that (a) In the alternative, even if the SCI is considered part of the same criminal proceedings, Plaintiff alleges that a PCJU petition challenging the SCI conviction is pending, and the malicious prosecution claim has therefore not yet accrued; the SCI was a separate proceeding that does not negate favorable termination of the original indictment; (b) the SCI plea was itself based on false material evidence; and (c) a PCJU petition challenging the SCI is pending. To the extent any claim herein would necessarily imply the invalidity of the SCI conviction, Plaintiff alleges those claims in the alternative and seeks to preserve them pending the outcome of the PCJU petition. See Wallace v. Kato, 549 U.S. 384, 393–94 (2007) (§ 1983 claim may be stayed pending resolution of related criminal proceedings).

**88.** Defendant City of New York is also liable under the principle of respondeat superior.

***SECOND CAUSE OF ACTION: Intentional Infliction of Emotional Distress Under State Law (All Defendants including Defendant Risdal)***

**89.** Plaintiff incorporates all preceding paragraphs. For the reasons set forth in the Absolute Immunity section above, the ADA Defendants' conduct is not shielded by absolute prosecutorial immunity.

**90.** Defendants engaged in a continuous pattern of extreme and outrageous conduct directed at Plaintiff, including suppressing exculpatory evidence, knowingly eliciting perjured testimony, falsely accusing Plaintiff of perjury at sentencing, and pursuing a plea deal based on false material evidence.

**91.** This conduct was so outrageous in character and extreme in degree as to go beyond all possible bounds of decency. Plaintiff suffered severe emotional distress as a direct result. Defendant City is liable under respondeat superior.

***THIRD CAUSE OF ACTION: 42 U.S.C. § 1983 — Denial of Due Process and Fair Trial; Malicious Prosecution (State-Actor Defendants)***

**92.** Plaintiff incorporates all preceding paragraphs. For the reasons set forth in the Absolute Immunity section above, the ADA Defendants' conduct is not shielded by absolute prosecutorial immunity.

**93.** The Individual Defendants are liable for their violation of Plaintiff's constitutional rights pursuant to 42 U.S.C. § 1983 and the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. These violations include the deliberate suppression of exculpatory evidence, the knowing elicitation of perjured testimony, and the malicious prosecution of Plaintiff through trial, sentencing, appeal, and the SCI plea, resulting in the deprivation of Plaintiff's liberty for 1,651 days and all consequential damages. Investigator Gutierrez personally participated in the malicious prosecution by serving as the lead investigator on the post-vacatur case, preparing and signing the SCI charging instrument alleging Assault in the Second Degree, and supporting the SCI proceedings through their completion—all while knowing the prosecution's own medical evidence contradicted the essential element of "serious physical injury." To the extent any claim herein would necessarily imply the invalidity of the SCI conviction, Plaintiff alleges those claims in the alternative and seeks to preserve them pending the outcome of the PCJU petition. See Wallace v. Kato, 549 U.S. 384, 393–94 (2007) (§ 1983 claim may be stayed pending resolution of related criminal proceedings). The ADA Defendants' pre-trial suppression of Brady

material, their false ex parte submissions to the court, and their investigative conduct in preparing and pursuing the SCI charge were not 'intimately associated with the judicial phase of the criminal process' and are not protected by absolute prosecutorial immunity. See Buckley v. Fitzsimmons, 509 U.S. 259, 273 (1993); Kalina v. Fletcher, 522 U.S. 118 (1997). To the extent any conduct occurred during trial, the knowing use of perjured testimony and deliberate suppression of exculpatory evidence deprived the proceedings of their judicial character. See Pottawattamie County v. McGhee, 547 F.3d 922 (8th Cir. 2008), cert. granted, 556 U.S. 1181 (2009).

***FOURTH CAUSE OF ACTION: Evidence Fabrication Under 42 U.S.C. § 1983 (State-Actor Defendants)***

**94.** Plaintiff incorporates all preceding paragraphs. For the reasons set forth in the Absolute Immunity section above, the ADA Defendants' conduct is not shielded by absolute prosecutorial immunity.

**95.** The Individual Defendants, individually and in concert, knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to the truth, caused the manufacture or fabrication of false or patently unreliable witness statements and false or materially misleading documentary evidence, including: (a) allowing and facilitating M.R.’s false testimony while suppressing documentary

evidence proving it false; (b) coaching M.R. on how to testify during the mid-trial break; (c) pursuing the SCI charge based on "serious physical injury" that was contradicted by the prosecution's own medical evidence; and (d) Investigator Gutierrez prepared and signed the SCI charging instrument alleging "serious physical injury" when she had personally reviewed the trial transcript and medical records establishing that M.R.'s injuries did not meet this legal standard, thereby presenting a charge whose essential factual predicate was contradicted by evidence known to her. To the extent any claim herein would necessarily imply the invalidity of the SCI conviction, Plaintiff alleges those claims in the alternative and seeks to preserve them pending the outcome of the PCJU petition. See Wallace v. Kato, 549 U.S. 384, 393–94 (2007) (§ 1983 claim may be stayed pending resolution of related criminal proceedings).

**96.** They forwarded or caused the forwarding of such false evidence to prosecutors for use against Mr. Tripathy and knew it would likely influence a jury's decision. The above misconduct was outrageous and shocking to the conscience. The ADA Defendants' pre-trial suppression of Brady material, their false ex parte submissions to the court, and their investigative conduct in preparing and pursuing the SCI charge were not 'intimately associated with the judicial phase of the criminal process' and are not protected by absolute prosecutorial immunity. See Buckley v. Fitzsimmons, 509 U.S. 259, 273 (1993); Kalina v. Fletcher, 522 U.S.

118 (1997). To the extent any conduct occurred during trial, the knowing use of perjured testimony and deliberate suppression of exculpatory evidence deprived the proceedings of their judicial character. See Pottawattamie County v. McGhee, 547 F.3d 922 (8th Cir. 2008), cert. granted, 556 U.S. 1181 (2009).

***FIFTH CAUSE OF ACTION: Withholding of Exculpatory Evidence ("Russo Claim") Under 42 U.S.C. § 1983 (State-Actor Defendants)***

**97.** Plaintiff incorporates all preceding paragraphs. For the reasons set forth in the Absolute Immunity section above, the ADA Defendants' conduct is not shielded by absolute prosecutorial immunity.

**98.** Pursuant to the Fourth, Fifth, Eighth, and Fourteenth Amendments, Mr. Tripathy had a federal constitutional right to timely disclosure of exculpatory information. The Individual Defendants affirmatively concealed from, or failed to disclose to, the defense exculpatory and impeachment information—specifically, M.R.'s SA.com messages—that was directly responsive to specific defense requests, proved the prosecution's sole witness had lied repeatedly, and tended to corroborate Plaintiff's defense. Investigator Gutierrez, as the assigned investigator in the post-vacatur proceedings, was aware of the full history of evidence suppression in the original prosecution, including the DA's Office's concession that the suppressed SA.com messages were material. She had a duty not to perpetuate

the consequences of that suppression by pursuing a new charge based on the same complainant's discredited accusations, and she failed in that duty.

**99.** The withholding was shocking to the conscience—a deliberate, sustained campaign of concealment extending from 2016 through 2019, involving affirmative misrepresentations to two judges and the Appellate Division.

**100.** Each Individual Defendant had reasonable opportunities to intervene to prevent the infringement of Mr. Tripathy's constitutional rights but deliberately failed to take reasonable steps to intervene. The ADA Defendants' pre-trial suppression of Brady material, their false ex parte submissions to the court, and their investigative conduct in preparing and pursuing the SCI charge were not 'intimately associated with the judicial phase of the criminal process' and are not protected by absolute prosecutorial immunity. See Buckley v. Fitzsimmons, 509 U.S. 259, 273 (1993); Kalina v. Fletcher, 522 U.S. 118 (1997). To the extent any conduct occurred during trial, the knowing use of perjured testimony and deliberate suppression of exculpatory evidence deprived the proceedings of their judicial character. See Pottawattamie County v. McGhee, 547 F.3d 922 (8th Cir. 2008), cert. granted, 556 U.S. 1181 (2009).

***SIXTH CAUSE OF ACTION: Brady Violation Under 42 U.S.C. § 1983 (State-Actor Defendants)***

**101.** Plaintiff incorporates all preceding paragraphs. For the reasons set forth in the Absolute Immunity section above, the ADA Defendants' conduct is not shielded by absolute prosecutorial immunity.

**102.** The Individual Defendants violated Plaintiff's constitutional rights under Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972), by failing to disclose material evidence favorable to the defense. The materiality is established by the DA's own concession in consenting to vacatur: "had the SA.com messages been provided to defense counsel so that he could properly challenge the complainant's trial testimony, there was a reasonable probability that he would not have been convicted." The failure to disclose was a substantial cause of Plaintiff's conviction and all consequential damages. The ADA Defendants' pre-trial suppression of Brady material, their false ex parte submissions to the court, and their investigative conduct in preparing and pursuing the SCI charge were not 'intimately associated with the judicial phase of the criminal process' and are not protected by absolute prosecutorial immunity. See Buckley v. Fitzsimmons, 509 U.S. 259, 273 (1993); Kalina v. Fletcher, 522 U.S. 118 (1997). To the extent any conduct occurred during trial, the knowing use of perjured testimony and deliberate suppression of exculpatory evidence deprived the proceedings of their judicial character. See Pottawattamie County v. McGhee, 547 F.3d 922 (8th Cir. 2008), cert. granted, 556 U.S. 1181 (2009).

***SEVENTH CAUSE OF ACTION: Monell Liability Under 42 U.S.C. § 1983 (Defendant City of New York)***

**103.** Plaintiff incorporates all preceding paragraphs. For the reasons set forth in the Absolute Immunity section above, the ADA Defendants' conduct is not shielded by absolute prosecutorial immunity.

**104.** The violations of Plaintiff's constitutional rights resulted from unlawful policies, customs, and practices of the NYCDAO, as detailed in the Monell allegations above, for which the District Attorney, as chief policymaker, was responsible. The pattern of violations is established by the cases listed in Exhibit 1.

***EIGHTH CAUSE OF ACTION: Negligent Hiring, Training, and Supervision Under State Law (Defendant City of New York)***

**105.** Plaintiff incorporates all preceding paragraphs. For the reasons set forth in the Absolute Immunity section above, the ADA Defendants' conduct is not shielded by absolute prosecutorial immunity.

**106.** Defendant City of New York is liable for its negligent failure to adequately hire, train, supervise, and discipline its agents and employees with regard to their constitutional obligations, and such negligence was a substantial and foreseeable cause of Plaintiff's injuries.

***NINTH CAUSE OF ACTION: Religious Liberty Under RLUIPA (All Defendants)***

**107.** Plaintiff incorporates all preceding paragraphs. For the reasons set forth in the Absolute Immunity section above, the ADA Defendants' conduct is not shielded by absolute prosecutorial immunity.

**108.** Plaintiff is a lifelong practicing Hindu whose sincerely held religious beliefs, rooted in Satya and Dharma, prohibit him from lying, committing perjury, or agreeing to falsehoods.

**109.** Plaintiff was an "institutionalized person" within the meaning of RLUIPA, 42 U.S.C. § 2000cc-1(a), during the following periods: (a) from his arrest in June 2016 through his release on bail in July 2016; (b) from his Trial on May 30, to sentencing on July 11, 2018 through the vacatur of his conviction on November 22, 2022, a period during which he was serving a seven-year sentence of imprisonment in facilities operated by NY City Department of Corrections and New York State Department of Corrections and Community Supervision, and (c) on April 11, 2024, when Plaintiff was transported to the courthouse by Investigator Gutierrez, held in courthouse holding cells (courthouse holding facilities were operated by the NYC Department of Correction) operated by the New York City Department of Correction, and remained in the physical custody and control of corrections

personnel throughout the SCI plea and sentencing before Judge Thompson. The substantial burden on Plaintiff's religious exercise was most acute during the April 11, 2024 SCI plea. As a condition of ending a prosecution that the DA's Office knew was tainted by its own misconduct, Defendants required Plaintiff to allocute under oath that M.R. suffered "serious physical injury"—a statement Plaintiff sincerely believed to be false based on the medical evidence. Plaintiff's Hindu faith, rooted in the principles of Satya (truthfulness) and Dharma (righteous conduct), prohibits bearing false witness. Plaintiff was thus forced to choose between violating his sincerely held religious beliefs and remaining subject to continued prosecution on charges up to seven years of imprisonment. This coercive choice constituted a substantial burden on Plaintiff's religious exercise within the meaning of RLUIPA. The burden was not imposed in furtherance of a compelling governmental interest—the prosecution's own medical evidence disproved the essential element of the charge—nor was it the least restrictive means available, as the NYCDAO could have dismissed the indictment outright or offered a plea to a charge consistent with the medical evidence. See *Holt v. Hobbs*, 574 U.S. 352, 362–63 (2015) RLUIPA substantial burden / compelling interest / least restrictive means. *Cutter v. Wilkinson*, 544 U.S. 709 (2005) — RLUIPA applies to state and local institutions receiving federal funds. 42 U.S.C. § 1997 — defines "institution" broadly for purposes of RLUIPA.

***TENTH CAUSE OF ACTION: Conspiracy to Deprive Civil Rights Under 42 U.S.C. § 1985(3) (All Individual Defendants and Defendant Risdal)***

**110.** Plaintiff incorporates all preceding paragraphs. For the reasons set forth in the Absolute Immunity section above, the ADA Defendants' conduct is not shielded by absolute prosecutorial immunity.

**111.** The Individual Defendants and Defendant Risdal conspired with one another to deprive Plaintiff of his constitutional rights to due process, a fair trial, and equal protection. The conspiracy involved: (a) M.R. making false statements to prosecutors with knowledge they would be used to prosecute Plaintiff; (b) Prosecutors coordinating the concealment of the SA.com messages with M.R. According to M.R.'s own statement during her interview with the PCJU on November 21, 2022, prosecutors informed her that the SA.com messages "wouldn't come out" at trial. This statement, made by M.R. to PCJU investigators under circumstances suggesting reliability, constitutes direct evidence of an agreement between M.R. and the ADA Defendants to conceal material evidence from the defense. M.R. understood, based on this assurance, that she could continue to testify falsely about her SA.com activity without fear of impeachment. (c) Prosecutors coaching M.R.'s testimony during the mid-trial break. M.R. further stated in her November 21, 2022 PCJU interview that during the court-ordered break in her cross-examination, "Martha and Kristen told her what to say." This

constitutes direct evidence that ADA Baraiola and ADA Bashford conspired with M.R. to present false or misleading testimony to the jury, rather than fulfilling their constitutional obligation to correct her prior false statements. (d) M.R. and prosecutors collectively maintaining the false narrative throughout trial, sentencing, and appeal. (e) Investigator Gutierrez, with full knowledge of the prior misconduct, the vacatur of the original conviction, and the weakness of the medical evidence supporting "serious physical injury," coordinating with ADA Lucey to prepare and present the SCI charge as a means of extracting a felony conviction from Plaintiff despite the collapse of the original prosecution. Gutierrez prepared and signed the charging documents and was present and participated throughout the SCI proceedings, demonstrating her active membership in the conspiracy to deprive Plaintiff of his civil rights.

The conspiracy was motivated, in whole or in part, by class-based animus directed at Plaintiff on account of his race (South Asian/Indian), national origin (Indian), and religion (Hindu). The following facts demonstrate discriminatory animus: (i) During the 2018 trial, M.R. made statements identifying Plaintiff by his national origin, using his ethnicity as a descriptor in a context irrelevant to the charged conduct and serving to invoke racial and ethnic prejudice. (ii) During the trial and sentencing proceedings, ADA Baraiola characterized Plaintiff's cultural background in a manner suggesting that his ethnicity was relevant to his

culpability. (iii) Upon information and belief, the NYCDAO under DA Vance demonstrated a pattern of disparate treatment of defendants of South Asian and Indian origin. The NYCDAO's decision to pursue a felony SCI plea against Plaintiff—an Indian Hindu man—on a charge unsupported by the medical evidence, after already having its misconduct exposed and the original conviction vacated, reflected animus rather than legitimate prosecutorial judgment. No compelling law-enforcement interest justified extracting a felony plea based on a charge whose essential element was disproven. (iv) The totality of the Defendants' conduct—their willingness to suppress evidence, elicit perjury, and pursue a baseless felony charge even after their misconduct was uncovered—viewed in light of Plaintiff's identity as a person of Indian origin and Hindu faith, supports the inference that Defendants would not have acted with such impunity against a similarly situated defendant who did not share Plaintiff's racial, ethnic, and religious characteristics. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266–68 (1977) (discriminatory intent may be inferred from the totality of circumstances, including departures from normal procedures); *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971) (§ 1985(3) requires "some racial, or perhaps otherwise class-based, invidiously discriminatory animus"); *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269 (1993) (animus requirement under § 1985(3)); *Iqbal v. Hasty*, 490 F.3d 143, 176 (2d Cir.

2007), rev'd on other grounds sub nom. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (Second Circuit analysis of § 1985 class-based animus claims). Plaintiff suffered differential treatment compared to similarly situated non-Hindu or non-Indian defendants.

**112.** As a result of this conspiracy, Plaintiff was deprived of his liberty for 1,651 days and suffered the injuries described herein. The ADA Defendants' pre-trial suppression of Brady material, their false ex parte submissions to the court, and their investigative conduct in preparing and pursuing the SCI charge were not 'intimately associated with the judicial phase of the criminal process' and are not protected by absolute prosecutorial immunity. See Buckley v. Fitzsimmons, 509 U.S. 259, 273 (1993); Kalina v. Fletcher, 522 U.S. 118 (1997). To the extent any conduct occurred during trial, the knowing use of perjured testimony and deliberate suppression of exculpatory evidence deprived the proceedings of their judicial character. See Pottawattamie County v. McGhee, 547 F.3d 922 (8th Cir. 2008), cert. granted, 556 U.S. 1181 (2009).

***ELEVENTH CAUSE OF ACTION: First Amendment Free Exercise Clause Under 42 U.S.C. § 1983 (State-Actor Defendants)***

**113.** Plaintiff incorporates all preceding paragraphs. For the reasons set forth in the Absolute Immunity section above, the ADA Defendants' conduct is not shielded by absolute prosecutorial immunity.

**114.** The First Amendment, applicable to state actors through the Fourteenth Amendment, protects the free exercise of religion. Defendants violated Plaintiff’s Free Exercise rights by compelling him, through coercive prosecution, to allocute under oath to facts he sincerely believed were false, in direct violation of his Hindu religious beliefs against bearing false witness. This compulsion was not neutral or generally applicable—it was specifically directed at Plaintiff in the context of a prosecution tainted by the Defendants’ own misconduct—and it did not survive strict scrutiny. See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520 (1993). Investigator Gutierrez participated in the coercive prosecution that compelled Plaintiff to allocute under oath to facts he sincerely believed were false, in direct violation of his Hindu religious beliefs. She did so by investigating and supporting a charge she knew was contradicted by the prosecution’s own medical evidence, preparing and signing the charging instrument, and participating in the proceedings at which Plaintiff was forced to choose between his religious convictions and his liberty. The ADA Defendants' pre-trial suppression of Brady material, their false ex parte submissions to the court, and their investigative conduct in preparing and pursuing the SCI charge were not 'intimately associated

with the judicial phase of the criminal process' and are not protected by absolute prosecutorial immunity. See Buckley v. Fitzsimmons, 509 U.S. 259, 273 (1993); Kalina v. Fletcher, 522 U.S. 118 (1997). To the extent any conduct occurred during trial, the knowing use of perjured testimony and deliberate suppression of exculpatory evidence deprived the proceedings of their judicial character. See Pottawattamie County v. McGhee, 547 F.3d 922 (8th Cir. 2008), cert. granted, 556 U.S. 1181 (2009).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Sanjay Tripathy demands judgment against the Defendants as follows:

1. Compensatory damages for lost income in an amount to be determined;

2. Additional compensatory damages of not less than $25,000,000;

3. Punitive damages against the Individual Defendants of not less than $5,000,000;

4. Reasonable attorneys' fees, together with costs and disbursements, under 42 U.S.C. § 1988 and the inherent powers of this Court;

5. Pre-judgment interest as allowed by law; and

6. Such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all issues so triable.

## VERIFICATION

Plaintiff affirms the contents of this First Amended Complaint, upon personal knowledge, information and belief to the best of his knowledge and ability, under penalty of perjury.

Respectfully Submitted,
/s/ Sanjay Tripathy
Sanjay Tripathy
ProSe Petitioner/Plaintiff

*An innocent man, exonerated after 1651 days in illegal captivity, due to unconstitutional acts, religious persecutions perpetrated by The State of New York, and State Actors acting under the Color of Law;*

## EXHIBIT 1

## SCHEDULE A: BRADY / ROSARIO / DISCOVERY VIOLATIONS BY NYCDAO (2011–2020)

**Case#25-cv-06465-AT-JW (First Amended Complaint)**

The following cases document a pattern of Brady, Rosario, and other discovery violations by the New York County District Attorney's Office during the relevant period. Sex Crimes Unit cases are noted with an asterisk (*).

| # | Date | Case / Citation | Notes |
|---|---|---|---|
| 1 | 03/08/11 | Kenneth Moreno & Franklin Mata | Sex Crimes Unit case* |
| 2 | 04/07/11 | People v. Sinha, 84 A.D.3d 35 (1st Dep't 2011), aff'd 19 N.Y.3d 932 (2012) | 2009 conviction |
| 3 | 06/23/11 | People v. Ortiz, 85 A.D.3d 588 (1st Dep't 2011) | 2008 conviction |
| 4 | 03/29/12 | People v. Rodriguez, 93 A.D.3d 595 (1st Dep't 2012) | 2008 conviction |
| 5 | 04/12/12 | People v. Carusso, 94 A.D.3d 529 (1st Dep't 2012) | 2010 conviction |
| 6 | 06/19/12 | People v. McCutheon, 96 A.D.3d 580 (1st Dep't 2012) | 2008 conviction |
| 7 | 04/10/14; 05/19/15 | People v. Lee, 116 A.D.3d 493 (1st Dep't 2014); People v. Burgess, 128 A.D.3d 530 (1st Dep't 2015) | 2009 conviction; co-defendant |
| 8 | 12/2014 | Laurence Harvey | 2011 conviction; Sex Crimes* |
| 9 | 02/03/15 | Carlton Wigfall (Nat'l Registry of Exonerations) | 2011 conviction |
| 10 | 05/16/15 | People v. Carter, 128 A.D.3d 580 (1st Dep't 2015) | 2012 conviction |
| 11 | 03/24/16 | People v. Ulerio, 137 A.D.3d 629 (1st Dep't 2016) | 2012 conviction |
| 12 | 09/29/16 | People v. Satlin, 142 A.D.3d 920 (1st Dep't 2016) | 2014 conviction |
| 13 | 12/21/16 | Danny Green & Carl Dushain; People v. Cosey, 54 Misc.3d 1208(A) (Sup. Ct. N.Y. Cty. 2016); Cosey v. Lilley, 62 F.4th 74 (2d Cir. 2023) | 1999 conviction |
| 14 | 01/05/17 | People v. Ramos, 146 A.D.3d 443 (1st Dep't 2017) | 2015 conviction |
| 15 | 01/08/18 | Jeremiah Spruill | 2014 conviction |
| 16 | 03/22/18 | People v. Nelson, 159 A.D.3d 570 (1st Dep't 2018) | 2016 conviction |
| 17 | 10/02/18 | People v. Gary Harris — Slip opinion | 2016 conviction |
| 18 | 12/06/19 | Jawaun Fraser | 2015 conviction |
| 19 | 12/19/19 | People v. McGhee, 180 A.D.3d 26 (1st Dep't 2019) | |
| 20 | 02/05/20 | Kyriacos Pierides & Harry Chlupsa (Florence resignation) | Deputy Bureau Chief Diana Florence resigned |

**Case#25-cv-06465-AT-JW (First Amended Complaint)**

## SCHEDULE B: SUMMATION MISCONDUCT BY NYCDAO (2010–2021)

| # | Date | Citation |
|---|---|---|
| 1 | 01/12/10 | People v. Valdez, 69 A.D.3d 452 (1st Dep't 2010) |
| 2 | 02/17/10 | People v. Williams, 26 Misc.3d 139(A) (App. Term 1st Dep't 2010) |
| 3 | 02/23/10 | People v. Whaley, 70 A.D.3d 570 (1st Dep't 2010) |
| 4 | 10/19/10 | People v. Norman, 77 A.D.3d 497 (1st Dep't 2010) |
| 5 | 11/23/10 | People v. Ryant, 78 A.D.3d 570 (1st Dep't 2010) |
| 6 | 03/24/11 | People v. Tsouristakis, 82 A.D.3d 612 (1st Dep't 2011) |
| 7 | 04/12/11 | People v. Santos, 83 A.D.3d 471 (1st Dep't 2011) |
| 8 | 02/21/13 | People v. Rosenberg, 103 A.D.3d 531 (1st Dep't 2013) |
| 9 | 10/24/13 | People v. Black, 110 A.D.3d 569 (1st Dep't 2013) |
| 10 | 12/05/13 | People v. Acevedo, 112 A.D.3d 454 (1st Dep't 2013) |
| 11 | 02/04/14 | People v. Gogoladze, 114 A.D.3d 417 (1st Dep't 2014) |
| 12 | 05/01/14 | People v. Stanton, 117 A.D.3d 412 (1st Dep't 2014) |
| 13 | 06/17/14 | People v. Almonte, 118 A.D.3d 548 (1st Dep't 2014) |
| 14 | 10/02/14 | People v. Lopez, 121 A.D.3d 412 (1st Dep't 2014) |
| 15 | 10/30/14 | People v. Padin, 121 A.D.3d 628 (1st Dep't 2014) |
| 16 | 02/03/15 | People v. Jones, 125 A.D.3d 403 (1st Dep't 2015) |
| 17 | 02/03/15 | People v. Narvaez, 125 A.D.3d 415 (1st Dep't 2015) |
| 18 | 03/19/15 | People v. Innis, 126 A.D.3d 578 (1st Dep't 2015) |
| 19 | 04/19/16 | People v. Singleton, 139 A.D.3d 208 (1st Dep't 2016) |
| 20 | 06/17/16 | People v. Melendez, 140 A.D.3d 421 (1st Dep't 2016) |
| 21 | 06/21/16 | People v. Ramirez, 140 A.D.3d 545 (1st Dep't 2016) |
| 22 | 08/18/16 | People v. Taylor, 142 A.D.3d 465 (1st Dep't 2016) |
| 23 | 11/01/16 | People v. Hoey, 145 A.D.3d 118 (1st Dep't 2016) |
| 24 | 11/15/16 | People v. Rizzo, 144 A.D.3d 489 (1st Dep't 2016) |
| 25 | 11/29/16 | People v. Green, 144 A.D.3d 589 (1st Dep't 2016) |
| 26 | 06/22/17 | People v. Adams, 151 A.D.3d 612 (1st Dep't 2017) |
| 27 | 10/12/17 | People v. Jones, 154 A.D.3d 511 (1st Dep't 2017) |
| 28 | 01/16/18 | People v. Rivera, 157 A.D.3d 545 (1st Dep't 2018) |
| 29 | 06/05/18 | People v. Acosta, 162 A.D.3d 411 (1st Dep't 2018) |
| 30 | 10/18/18 | People v. Pinnacle, 165 A.D.3d 521 (1st Dep't 2018) |
| 31 | 04/11/19 | People v. Lithgow, 171 A.D.3d 517 (1st Dep't 2019) |
| 32 | 10/22/19 | People v. Carter, 176 A.D.3d 564 (1st Dep't 2019) |
| 33 | 02/04/20 | People v. Hayes, 180 A.D.3d 423 (1st Dep't 2020) |
| 34 | 05/11/21 | People v. Bailey, 194 A.D.3d 496 (1st Dep't 2021) |
| 35 | 12/07/21 | People v. Manley, 200 A.D.3d 471 (1st Dep't 2021) |