**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SANJAY TRIPATHY, | Case No.<br>1:25-cv-06465-AT-JW |
| Plaintiff, | |
| -against- | **THIRD AMENDED**<br>**COMPLAINT** |
| THE CITY OF NEW YORK; KRISTEN BARAIOLA;<br>MARTHA BASHFORD; NICOLE BLUMBERG; and<br>SHANNON LUCEY, in their individual capacities; and<br>METTE RISDAL, | Jury Trial Demanded |
| Defendants. | |

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT 5

THE PARTIES 6

JURISDICTION AND VENUE 8

PRIOR LAWSUITS 8

TIMELINESS AND ACCRUAL OF CLAIMS 8

STATEMENT OF FACTS 9

A. The Encounter and Plaintiff's Defense 9

B. The Prosecutors' Pre-Indictment Interviews and the June 30, 2016 Indictment 9

C. The Prosecutors Obtain, Repackage, and Suppress the Complainant's SA.com Messages 11

D. The Complainant's False Sworn Testimony in the Florida Matter 12

E. The Trial: False Testimony Knowingly Elicited, and the Mid-Trial Coaching 13

F. Plaintiff's Testimony and the Messages' Corroboration 14

G. ADA Baraiola's Summation 14

H. Conviction and Sentence 15

I. Post-Conviction Concealment 15

J. The Office's Reinvestigation, Sworn Concession, and the November 22, 2022 Vacatur 15

K. The Seventeen-Month Post-Vacatur Continuation 16

L. The April 11, 2024 Disposition and the Categorically Distinct SCI 17

M. Risdal's Willful Participation in Joint Action With the Prosecutors 18

RELATIONSHIP BETWEEN THIS ACTION AND THE SCI: NO CLAIM IMPLIES ITS INVALIDITY 19

SYSTEMIC FAILURES OF THE NYCDAO AND MUNICIPAL LIABILITY 20

ABSOLUTE IMMUNITY DOES NOT BAR PLAINTIFF'S CLAIMS 23

INJURIES AND DAMAGES 24

FIRST CAUSE OF ACTION 24

42 U.S.C. § 1983 — Malicious Prosecution in Violation of the Fourth and Fourteenth Amendments (Against Defendants Baraiola, Bashford, Blumberg, Lucey, and Risdal) 24

SECOND CAUSE OF ACTION 26

Malicious Prosecution Under New York Common Law (Against Defendants Baraiola, Bashford, Blumberg, Lucey, and Risdal) (Pleaded in the Alternative) 26

THIRD CAUSE OF ACTION 27

42 U.S.C. § 1983 — Denial of Due Process and the Right to a Fair Trial (Against Defendants Baraiola and

Bashford)    27
FOURTH CAUSE OF ACTION    27
42 U.S.C. § 1983 — Fabrication of Evidence (Against Defendants Baraiola and Bashford)    27
FIFTH CAUSE OF ACTION    28
42 U.S.C. § 1983 — Suppression of Material Exculpatory and Impeachment Evidence, and Failure to Intervene (Brady/Giglio) (Against Defendants Baraiola and Bashford)    28
SIXTH CAUSE OF ACTION    28
42 U.S.C. § 1983 — Municipal Liability (Monell) (Against the City of New York)    28
SEVENTH CAUSE OF ACTION    29
42 U.S.C. § 1983 — Conspiracy and Joint Action to Deny Due Process and a Fair Trial (Against Defendant Risdal, as a Willful Participant in Joint Action Under Color of State Law)    29
PRAYER FOR RELIEF    30
JURY DEMAND    30
VERIFICATION    31
EXHIBIT 16    32
Purpose and Use of Exhibit 16    32
Schedule A — Adjudicated NYCDAO Disclosure-Obligation Violations and Findings Decided Before Plaintiff's Trial    33
Schedule B — Selected NYCDAO Trial-Advocacy / Summation Misconduct Context    36
Schedule C — Post-2018 Institutional Acknowledgments, PCJU Vacaturs, and Corroboration    37
Schedule D — Additional Legal Authorities Supporting the Use of Exhibit 16    39

**TABLE OF AUTHORITIES**

## CASES

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970) — 19, 30

*Amnesty Am. v. Town of West Hartford*, 361 F.3d 113 (2d Cir. 2004) — 20

*Askins v. Doe No. 1*, 727 F.3d 248 (2d Cir. 2013) — 23, 29, 36

*Banks v. Dretke*, 540 U.S. 668 (2004) — 28, 37

*Bellamy v. City of New York*, 914 F.3d 727 (2d Cir. 2019) — 7, 20, 29, 32

*Blockburger v. United States*, 284 U.S. 299 (1932) — 17

*Boyd v. City of New York*, 336 F.3d 72 (2d Cir. 2003) — 25

*Brady v. Maryland*, 373 U.S. 83 (1963) — 28, 32, 36

*Buckley v. Fitzsimmons*, 509 U.S. 259 (1993) — 23

*Burns v. Reed*, 500 U.S. 478 (1991) — 23

*Carruthers v. Colton*, 153 F.4th 169 (2d Cir. 2025) — 18, 20, 37

*Chiaverini v. City of Napoleon*, 602 U.S. 556 (2024) — 18, 26, 37

*Ciambriello v. County of Nassau*, 292 F.3d 307 (2d Cir. 2002) — 30

*City of Canton v. Harris*, 489 U.S. 378 (1989) — 21, 29

*Coggins v. Buonora*, 776 F.3d 108 (2d Cir. 2015) — 19, 24, 30

*Colon v. City of New York*, 60 N.Y.2d 78 (1983) — 25-26

*Connick v. Thompson*, 563 U.S. 51 (2011) — 21, 36

*Dennis v. Sparks*, 449 U.S. 24 (1980) — 8, 19, 30

*Frost v. N.Y.C. Police Dep't*, 980 F.3d 231 (2d Cir. 2020) — 27

*Garnett v. Undercover Officer C0039*, 838 F.3d 265 (2d Cir. 2016) — 23, 27, 37

*Giglio v. United States*, 405 U.S. 150 (1972) — 28, 32, 36

*Heck v. Humphrey*, 512 U.S. 477 (1994) — 8, 19

*Imbler v. Pachtman*, 424 U.S. 409 (1976) — 23

*Janetka v. Dabe*, 892 F.2d 187 (2d Cir. 1989) — 20, 37

*Kyles v. Whitley*, 514 U.S. 419 (1995) — 28

*Leather v. Eyck*, 180 F.3d 420 (2d Cir. 1999) — 20

*Lowth v. Town of Cheektowaga*, 82 F.3d 563 (2d Cir. 1996) — 25

*Maleng v. Cook*, 490 U.S. 488 (1989) — 20

*Manganiello v. City of New York*, 612 F.3d 149 (2d Cir. 2010) — 25-26

*McDonough v. Smith*, 588 U.S. 109 (2019) — 8, 28

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) — 6, 29, 36

*Morse v. Fusto*, 804 F.3d 538 (2d Cir. 2015) — 23, 27, 37

*Napue v. Illinois*, 360 U.S. 264 (1959) — 27, 37

*Owen v. City of Independence*, 445 U.S. 622 (1980) — 23, 29, 36

*Owens v. Okure*, 488 U.S. 235 (1989) — 8

*Pangburn v. Culbertson*, 200 F.3d 65 (2d Cir. 1999) — 30

*Poventud v. City of New York*, 750 F.3d 121 (2d Cir. 2014) (en banc) — 19, 24

*Rehberg v. Paulk*, 566 U.S. 356 (2012) — 19, 24, 30

*Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123 (2d Cir. 1997) — 23, 27, 37

*Richardson v. McKnight*, 521 U.S. 399 (1997) — 24, 30

*Russo v. City of Bridgeport*, 479 F.3d 196 (2d Cir. 2007) — 27

*Smith-Hunter v. Harvey*, 95 N.Y.2d 191 (2000) — 18, 37

*Spencer v. Kemna*, 523 U.S. 1 (1998) — 20

*Thompson v. Clark*, 596 U.S. 36 (2022) — 8, 20, 26, 37

*United States v. Bagley*, 473 U.S. 667 (1985) — 28, 37

*Van de Kamp v. Goldstein*, 555 U.S. 335 (2009) — 23, 36

*Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992) — 7, 20, 29, 32, 36

*White v. Frank*, 855 F.2d 956 (2d Cir. 1988) — 19, 24, 30

*Wyatt v. Cole*, 504 U.S. 158 (1992) — 24, 30

*Ying Jing Gan v. City of New York*, 996 F.2d 522 (2d Cir. 1993) — 7, 20

*Zahrey v. Coffey*, 221 F.3d 342 (2d Cir. 2000) — 23, 27, 37

*Zumpano v. Quinn*, 6 N.Y.3d 666 (2006) — 9

## STATUTES, RULES, AND CONSTITUTIONAL PROVISIONS

28 U.S.C. § 1331 — 8

28 U.S.C. § 1343(a)(3)-(4) — 8

3

28 U.S.C. § 1367(a) .......................................................................................... 8

28 U.S.C. § 1391(b) .......................................................................................... 8

28 U.S.C. § 1746 .............................................................................................. 31

42 U.S.C. § 1983 .......................................................... 5-6, 8, 24, 27-30, 32

42 U.S.C. § 1985(3) ........................................................................................... 5

42 U.S.C. § 1988 ......................................................................................... 8, 30

Fed. R. Civ. P. 15(a)(2) ..................................................................................... 5

Fed. R. Civ. P. 15(c)(1)(B) ............................................................................... 9

N.Y. C.P.L. § 60.42 ......................................................................................... 12

N.Y. C.P.L. former § 240.75 ........................................................................... 32

N.Y. C.P.L. § 440.10 ....................................................................................... 15

N.Y. C.P.L.R. § 214(5) ............................................................................... 8, 26

N.Y. C.P.L.R. § 215(3) ...................................................................................... 9

N.Y. County Law §§ 53, 941 ............................................................................. 7

N.Y. Penal Law § 70.02(3)(b)(1) .................................................................... 17

N.Y. Penal Law § 120.05(1) ................................................................. 5-6, 10, 17

N.Y. Penal Law § 120.05(6) ................................................................ 6, 10, 17, 33

N.Y. Penal Law § 121.12 ................................................................................. 10

N.Y. Penal Law § 130.50(1) ............................................................................ 10

N.Y. Penal Law § 130.65(1) ............................................................................ 10

N.Y. Penal Law § 135.05 ................................................................................. 10

N.Y. Public Officers Law § 2 ............................................................................ 7

This Third Amended Complaint ("TAC") is filed pursuant to Fed. R. Civ. P. 15(a)(2), upon the written consent of all appearing parties or the Court's order granting leave. It supersedes and replaces the Second Amended Complaint (Dkt. No. 59) in its entirety. Consistent with Plaintiff's representations to the Court, the TAC narrows this action: it withdraws, without prejudice, the claims for intentional infliction of emotional distress; negligent hiring, training, and supervision; violation of the Religious Land Use and Institutionalized Persons Act; conspiracy under 42 U.S.C. § 1985(3); and violation of the First Amendment Free Exercise Clause; it withdraws all claims against former defendant Evelin Gutierrez (voluntarily dismissed without prejudice, Dkt. No. 60); and it withdraws the malicious-prosecution claim as against the City of New York. The TAC pleads no claim that requires invalidation of Plaintiff's 2024 conviction under Superior Court Information No. 71584/24, which Plaintiff does not challenge in this action, and it rests no claim against any defendant upon that defendant's grand-jury or trial testimony.

## PRELIMINARY STATEMENT

1. Plaintiff SANJAY TRIPATHY ("Plaintiff" or "Mr. Tripathy"), complaining of defendants, alleges as follows, upon personal knowledge as to himself and upon information and belief as to all other matters, in this civil-rights action under 42 U.S.C. § 1983 and New York law.

2. This action arises from one of the most thoroughly documented prosecutions in the recent history of the New York County District Attorney's Office ("NYCDAO" or the "Office") to be undone by the Office's own sworn admissions. In its Response consenting to vacatur of Plaintiff's conviction, the Office admitted that the suppressed messages at the heart of this case had been used to refresh the complainant's recollection "out of view from the jury and defense counsel," so that "the complainant's credibility was unable to be fairly challenged, resulting in prejudice to the defendant," and that, had the messages been disclosed, "there was a reasonable probability that he would not have been convicted of the charges." (Ex. 11 ¶¶ 3-4, PDF pp. 2-3.)

3. Plaintiff was convicted in 2018 on all five counts of Indictment No. 2720-2016 and was incarcerated for 1,651 days. The conviction was the direct product of prosecutorial misconduct: the trial prosecutor obtained, more than a year before trial, hundreds of messages that destroyed the credibility of the sole complaining witness and corroborated Plaintiff's defense; concealed them through false representations in an ex parte application; elicited and left uncorrected trial testimony her own file proved false; and — by the complainant's own later admission to the Office's investigators — joined the Sex Crimes Unit Chief in telling the complainant "what to say" during a court-ordered mid-trial recess, while the impeaching messages remained hidden from the defense. To avoid any possible misunderstanding, Plaintiff pleads the original 2018 judgment as a vacated judgment and does not seek to invalidate, undermine, or recover for the separate 2024 SCI conviction.

4. On November 22, 2022, on the People's consent and concession, the conviction was vacated in its entirety. (Ex. 12 at PDF p. 1.) On April 11, 2024, Indictment No. 2720-2016 — including the first-degree sex offenses, the strangulation count, and the unlawful-imprisonment count that drove the wrongful conviction — was dismissed. (Ex. 14, Plea Tr. 25:4-17.) In a separate instrument the same day, Plaintiff entered a plea to Superior Court Information No. 71584/24 (the "SCI"), charging a single count of Assault in the Second Degree under N.Y. Penal Law § 120.05(1) — an offense never presented to the grand jury, never contained in the indictment, and categorically distinct in elements from every count of the indictment. The sentence was one day,

5

entered nunc pro tunc to July 19, 2018, and was fully served when imposed. (Ex. 14, Plea Tr. 13:14-19.)

5. The plea record itself preserves the line this action respects. Plaintiff's factual allocution was confined to the SCI assault charge. (Ex. 14, Plea Tr. 23:6-11.) His counsel stated on the record: "Mr. Tripathy from the very beginning of this case has denied the allegations against him other than the assault. I just wanted to make that record. It does not impact, one way or the other, his plea today." (Ex. 14, Plea Tr. 7:18-23.) Plaintiff does not challenge the SCI conviction in this action and seeks no relief that depends upon its invalidity. His claims arise from, and his damages are confined to, the wrongful 2018 conviction on the dismissed indictment counts and the 1,651 days of incarceration that conviction caused. To the extent the original indictment's § 120.05(6) felony-predicate assault count is referenced, it is referenced only as part of the vacated 2018 judgment and the dismissed indictment, and not as a challenge to the separate § 120.05(1) SCI conviction.

6. The misconduct was not an aberration. It was the foreseeable product of the Office's longstanding management failures with respect to disclosure obligations — failures documented in a pattern of judicial findings that predates Plaintiff's trial (Ex. 16, Schedule A), and that the Office's current administration has itself acknowledged: in establishing the Post-Conviction Justice Unit ("PCJU") that reinvestigated this case, District Attorney Bragg publicly acknowledged that the Office's predecessor Conviction Review Unit had been "a conviction review in name only."

7. Private defendant METTE RISDAL ("Risdal"), the complainant, was a willful participant in joint action with the prosecutors. Her own statements to the PCJU establish that the prosecutors assured her the messages "wouldn't come out" at trial, and that during the mid-trial recess "Martha and Kristen" — Defendants Bashford and Baraiola — "told her what to say." (Ex. 10 at PDF pp. 1-3.) Her liability in this action rests on her false statements to law enforcement and prosecutors that initiated and sustained the prosecution and on her pre-testimonial and extra-testimonial coordination with the prosecutors — not on her grand-jury or trial testimony.

8. The PCJU issued a final determination on April 16, 2026, declining to revisit the SCI and expressly advising Plaintiff that he "may have further rights to litigate [his] case in Court." (Ex. 15 at PDF p. 1.) This is that litigation.

9. Plaintiff seeks compensatory and punitive damages against the individual defendants under 42 U.S.C. § 1983 and New York law, and compensatory damages against the *City of New York under Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), for the policies, customs, and management failures of the NYCDAO that caused the violations.

## THE PARTIES

10. Plaintiff Sanjay Tripathy is a citizen of the United States and a resident of the State of North Carolina. His arrest, prosecution, conviction, and incarceration occurred in New York County, within the Southern District of New York.

11. Defendant THE CITY OF NEW YORK (the "City") is a municipal corporation organized under the laws of the State of New York. The New York County District Attorney's Office is a subdivision of the City for purposes of the administrative functions at issue here. The District Attorney was at all relevant times an elected officer of New York County; the Office was and is

6

funded out of the City's budget; the District Attorney and the assistant district attorneys are agents and employees of the City; and the District Attorney is a "local officer" under N.Y. Public Officers Law § 2. The City's constituent counties are liable by statute for torts committed by county officers and employees. See N.Y. County Law §§ 53, 941. While the District Attorney acts on behalf of the State when exercising prosecutorial judgment in an individual case, he acts as the City's final policymaker with respect to the management of the Office — the training, supervision, and discipline of assistant district attorneys and the systems by which the Office discharges its disclosure obligations — and the *City is therefore the proper defendant for the municipal-liability claim pleaded here. See Walker v. City of New York*, 974 F.2d 293, 301 (2d Cir. 1992); *Bellamy v. City of New York*, 914 F.3d 727, 756-59 (2d Cir. 2019); *Ying Jing Gan v. City of New York*, 996 F.2d 522, 535-36 (2d Cir. 1993).

12. Defendants KRISTEN BARAIOLA, MARTHA BASHFORD, NICOLE BLUMBERG a/k/a NIKI BLUMBERG, and SHANNON LUCEY (collectively, the "ADA Defendants") were at all relevant times Assistant District Attorneys employed by the NYCDAO, acting within the scope of their employment and under color of state law. ADA Baraiola was the trial prosecutor and the prosecutor who obtained, compiled, and concealed the suppressed messages. ADA Bashford was the Chief of the Sex Crimes Unit; she participated in the vetting of the complainant, supervised the prosecution, sat through trial, and personally participated in the mid-trial coaching of the complainant. ADA Blumberg participated in the 2016 investigation and vetting of the complainant: the Office's own reinvestigation notes record that "Niki Blumberg stated 4 ADAs vetted/met with the CW," and ADA Baraiola independently "remember[ed] supervisors being present during meetings/interviews." (Ex. 9 at PDF p. 2.) That statement is Blumberg's own: she personally described the four-ADA vetting of the complainant to the Office's investigators, demonstrating that she retained specific, detailed knowledge of how the complainant was vetted — knowledge consistent only with her own participation in, or direct supervision of, that vetting. The complainant likewise recalled that at the text-messages meeting, "Martha, Kristen and 1 or 2 other people" were present, and that prosecutors said they were turning over only the messages between her and Plaintiff, with no discussion of showing the remainder to a judge. (Ex. 10 at PDF pp. 1-2.) On June 13, 2022, District Attorney Alvin Bragg appointed Nicole Blumberg as Chief of the Sex Crimes Unit within the newly created Special Victims Division. The announcement stated that the Division was tasked with enhancing how the Office investigates, staffs, and resources sex-crimes and other special-victims cases, and that the Sex Crimes Unit would operate within that supervised structure. (Ex. 18 at PDF pp. 1-2.) In that role, Blumberg held supervisory authority over Sex Crimes Unit prosecutions during the post-vacatur period of Plaintiff's case, after the Office had conceded Brady-grade prejudice but before the indictment was dismissed on April 11, 2024. Blumberg worked in that supervisory structure with ADA Lucey, who on information and belief served as Deputy in the unit, in the Office's post-vacatur handling of Plaintiff's case. To the extent discovery shows that Blumberg did not personally attend a particular June 2016 meeting, Plaintiff pleads in the alternative that her role rested on supervisory knowledge of the collective vetting, official Sex Crimes Unit supervisory authority, and post-vacatur continuation. ADA Lucey participated in the vetting; served the trial prosecution in May 2018, reviewing the complainant's Witness Aid Services Unit file for disclosure and reporting her determinations to ADAs Baraiola and Bashford; personally conducted the post-vacatur prosecution of Indictment No. 2720-2016 from November 22, 2022 through April 11, 2024, appearing for the People at its calendar calls, including on October 12,

2023; and prepared and consented to the 2024 Superior Court Information on the District Attorney's behalf and appeared at the plea. (Ex. 13 at PDF pp. 1-5; Ex. 14, Plea Tr. 2:13-25:17.) By the post-vacatur period, ADA Baraiola's role was compromised by the Office's own sworn concession concerning the conviction she had obtained, and responsibility for the matter rested with the Office's Sex Crimes/Special Victims leadership, including Blumberg and Lucey. Each acted under the policies, customs, and supervision of the NYCDAO. They are sued in their individual capacities. Plaintiff does not plead Blumberg's or Lucey's liability on respondeat superior; he pleads their own knowledge, supervisory participation, and personal post-vacatur continuation of the indictment after the Office had conceded Brady-grade prejudice and after written notice to senior Office leadership identified their roles.

13. Defendant METTE RISDAL ("Risdal," referred to in the criminal proceedings as "M.R." or the "complainant") is an individual who was the complaining witness in the criminal case. She is sued in her individual capacity for initiating and continuing the prosecution through knowingly false statements to law enforcement and prosecutors, and for her willful participation, as a person acting under color of state law pursuant to *Dennis v. Sparks*, 449 U.S. 24 (1980), in a joint scheme with Defendants Baraiola and Bashford to deprive Plaintiff of his rights to due process and a fair trial.

## JURISDICTION AND VENUE

14. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3)-(4) because this action arises under the Constitution and laws of the United States, including 42 U.S.C. §§ 1983 and 1988. The Court has supplemental jurisdiction over Plaintiff's state-law claim under 28 U.S.C. § 1367(a) because that claim forms part of the same case or controversy.

15. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in New York County, within this District.

## PRIOR LAWSUITS

16. *Plaintiff previously filed Tripathy v. City of New York*, No. 1:20-cv-01646-LLS (S.D.N.Y.), which was dismissed as premature on June 30, 2020 because Plaintiff's conviction had not then been invalidated. That disposition confirms what the accrual rules independently establish: Plaintiff's claims could not be brought, and did not accrue, until the 2018 conviction was invalidated and the prosecution terminated in his favor. No other prior lawsuit has been filed regarding these facts.

## TIMELINESS AND ACCRUAL OF CLAIMS

17. Plaintiff's claims under 42 U.S.C. § 1983 borrow *New York's three-year statute of limitations for personal-injury actions. Owens v. Okure*, 488 U.S. 235, 251 (1989); N.Y. C.P.L.R. § 214(5). Each federal claim pleaded here — malicious prosecution, denial of due process and a fair trial, fabrication of evidence, suppression of exculpatory and impeachment evidence, and the Monell claim resting on those violations — accrued no earlier than the favorable termination of the prosecution. *Heck v. Humphrey*, 512 U.S. 477, 489-90 (1994); *McDonough v. Smith*, 588 U.S. 109, 117-21 (2019); *Thompson v. Clark*, 596 U.S. 36, 44-49 (2022). The conviction was vacated on November 22, 2022, and Indictment No. 2720-2016 was dismissed on April 11, 2024. This action was filed on August 2, 2025 — within three years of either date — and the Third

Amended Complaint relates back to the original pleading under Fed. R. Civ. P. 15(c)(1)(B). The federal claims are timely.

18. Plaintiff's supplemental claim for malicious prosecution under New York common law is pleaded in the alternative to the federal malicious-prosecution claim. To the extent the one-year period of N.Y. C.P.L.R. § 215(3) is measured from the April 11, 2024 dismissal, Plaintiff alleges that the period was tolled and that defendants are equitably estopped from asserting it, because the misconduct underlying the claim was actively concealed by the defendants for years and was disclosed only on a rolling basis through the PCJU's reinvestigation, because the Office's own post-conviction process — which culminated in a final determination only on April 16, 2026 expressly directing Plaintiff to the courts (Ex. 15) — remained pending, and because *Plaintiff is a pro se litigant rendered indigent by the wrongful prosecution and residing outside New York. See Zumpano v. Quinn*, 6 N.Y.3d 666, 673-74 (2006). In all events, the federal malicious-prosecution claim (First Cause of Action), which carries a three-year limitations period, preserves the malicious-prosecution theory in full regardless of the disposition of the state-law claim.

**STATEMENT OF FACTS**

**A. The Encounter and Plaintiff's Defense**

19. Plaintiff and the complainant met in 2016 through SeekingArrangement.com ("SA.com"), a website that advertised itself as a platform "where sugar babies go to meet sugar daddies." (Ex. 4 at PDF pp. 1-2.) After dinner and drinks on the night of June 15, 2016, they went to Plaintiff's room at the W Hotel in Manhattan. The complainant alleged that Plaintiff violently raped and assaulted her.

20. Plaintiff's defense, asserted from the outset and maintained to this day, was that the two had agreed to a paid encounter — an exchange of sadomasochistic sex for $1,500 — that the complainant became angry when the encounter left marks on her face that would interfere with other paid appointments, that she attempted to extract additional money, and that when Plaintiff refused she falsely accused him.

21. Plaintiff was arrested in mid-June 2016 and detained for approximately thirteen days before making bail. On June 27, 2016, his counsel made a bail application laying out the defense theory: that the parties had met on SA.com and engaged in a consensual, compensated sadomasochistic encounter. From within days of the arrest, the prosecutors were on specific notice of the precise factual dispute that the later-suppressed messages would resolve.

**B. The Prosecutors' Pre-Indictment Interviews and the June 30, 2016 Indictment**

22. The prosecutors interviewed the complainant on June 20, 2016. (Ex. 2 at PDF pp. 1-2.) She claimed she had "registered a couple of years ago" for SA.com but "didn't use it," reactivating it only "a couple weeks ago," and that her encounter with Plaintiff was her "first date from" the site. Evidence the Office later obtained, and suppressed, showed these statements to be false.

23. On June 24, 2016, ADA Baraiola conducted a second interview before presenting the complainant to the grand jury. (Ex. 2 at PDF pp. 3-5; Ex. 3.) Asked about her sources of income and whether Plaintiff had offered her money, the complainant said he offered money only "at the very end" and that she "thought it weird." On information and belief, all four ADA Defendants participated in the complainant's vetting, including this June 24 interview conducted on the day

9

of her grand-jury presentation and the interviews that followed. That belief rests on the Office's own records. First, the PCJU notes record that "Niki Blumberg stated 4 ADAs vetted/met with the CW." Second, ADA Baraiola told the same investigators that she "remember[ed] supervisors being present during meetings/interviews." Third, the complainant herself recalled a text-messages meeting at which "Martha, Kristen and 1 or 2 other people" were present; at that meeting, prosecutors allegedly told her they were turning over only the messages between her and Plaintiff, with no discussion of showing the rest of her messages to a judge. (Ex. 9 at PDF pp. 2-3; Ex. 10 at PDF pp. 1-2.) The vetting was therefore collective in fact and in judgment: as the Office's notes record, "[w]hen they confronted the [complainant], there was consensus that she was a victim" — a consensus reached in interviews at which the complainant made statements the Office's own reinvestigation itself identified as "untrue." (Ex. 9 at PDF pp. 2-3.) Blumberg's individual role is established by her own words. It was Blumberg — not the trial prosecutors — who told the PCJU investigators the specific fact that four ADAs had vetted and met with the complainant (Ex. 9 at PDF p. 2), an account of the internal vetting that only a participant in, or a direct supervisor of, that process would possess. The precision of her statement — the number of prosecutors involved and the fact of repeated meetings with the complainant — supports the inference that Blumberg was one of the four ADAs who personally vetted the complainant, evaluated her credibility, and joined the recorded "consensus that she was a victim," a consensus formed in the very interviews in which the complainant made the statements the Office's reinvestigation later identified as untrue. Blumberg thus had personal, contemporaneous knowledge in 2016 of the complainant's account and of the credibility judgment on which the prosecution was built.

24. ADA Baraiola interviewed the complainant again on June 30, 2016; Detective Jones was also present. (Ex. 2 at PDF pp. 6-10.) Confronted with a message — obtained from defense counsel, not from any disclosure by the People — in which the complainant had asked Plaintiff about "$$ on a per meet" basis before meeting him, the complainant made further statements that the Office's later-obtained messages and related paid-arrangement evidence proved false: that Plaintiff was the "first guy she met w/ on SA.com" and she "never met anyone in the past"; that "$$ on a per meet" meant "money for travel or dinner," "not money for sex"; that she was "NOT" on the website "to have sex"; that she was seeking a serious relationship; and that she had "never had rough sex, been choked or slapped. EVER."

25. At the close of that interview, ADA Baraiola recorded her concern that the defense would "be able to discredit" the complainant; the complainant assured her there was "no smoking gun the defense could have." (Ex. 2 at PDF pp. 6-10.) The smoking gun existed. The defense was prevented from using it only because the prosecution later obtained it and suppressed it.

26. On June 30, 2016, Indictment No. 2720-2016 was filed, charging Plaintiff with five offenses: Criminal Sexual Act in the First Degree (N.Y. Penal Law § 130.50(1)); Sexual Abuse in the First Degree (§ 130.65(1)); Strangulation in the Second Degree (§ 121.12); Unlawful Imprisonment in the Second Degree (§ 135.05); and Assault in the Second Degree on the felony-predicate theory (§ 120.05(6)). The indictment contained no charge under § 120.05(1), the intentional serious-physical-injury theory of second-degree assault; that offense was never presented to the grand jury at any time.

27. The prosecution was driven from its inception by the complainant's account. There was no eyewitness, no confession, and no forensic evidence inconsistent with Plaintiff's account of a

consensual, compensated encounter. The complainant's credibility — specifically, the truth of her denials that she sold sex, sought or accepted money from men on paid-arrangement platforms, and engaged in sadomasochistic practices — was the case.

**C. The Prosecutors Obtain, Repackage, and Suppress the Complainant's SA.com Messages**

28. In July 2016, the defense served a pretrial omnibus motion and a Specific Brady Request for information concerning whether the complainant had "ever exchanged sexual intercourse or other intimate activity for financial gain." (Ex. 5 at PDF pp. 1-2.) ADA Baraiola represented that no such materials existed.

29. By January 2017 at the latest — more than a year before trial — ADA Baraiola had obtained from SA.com hundreds of messages exchanged by the complainant with dozens of men, and the post-conviction production later included related paid-arrangement evidence, including WhatsYourPrice screenshots. (Ex. 4 at PDF pp. 1-153; Ex. 6 at PDF pp. 1-2.) These materials were directly responsive to the Specific Brady Request, proved that the complainant had repeatedly lied to the prosecutors, and corroborated Plaintiff's defense in granular detail. Among other things:

30. Contrary to her claim that she registered for SA.com years earlier but "didn't use it" until weeks before meeting Plaintiff, the messages showed she had corresponded with dozens of men in 2014 and again beginning in October 2015, including a 2014 exchange in which, offered $8,000 for a month, she replied that she "would consider coming and spending a month with [him] for 10k" (conversation 9958324). (Ex. 4 at PDF p. 126.)

31. Contrary to her claim that Plaintiff was the "first guy she met w/ on SA.com" and that she had "never gotten paid," she told numerous men that she had previously found a benefactor "on this site" who "gave [her] 10k a month" until he "died in February," and that she now wanted "$15,000 a month" (conversations 74847450, 75072942, 75248784, 4707367, and others). (Ex. 4 at PDF pp. 126, 139-142.)

32. Contrary to her claim that she was "NOT" on the site "to have sex," she repeatedly offered sex for money — by Plaintiff's count, in exchanges with approximately 48 men in the five days before meeting Plaintiff — proposing payment "per meet" or monthly. In conversation 75270221 she stated it would be "$1500 for 3-4 hours"; asked whether that "include[d] sex," she answered, "It would include sex if we have a connection." In conversation 75177657 she stated, "If we have a connection and go upstairs for sex it will be $1500," and bargained when the man countered. (Ex. 4 at PDF pp. 139, 141.)

33. Contrary to her claim that "money is NOT an issue," she told three men, "I have gotten into a situation where I need financial help" (conversations 74742206, 17611708, 74760795). And contrary to her claim that she was "not into S&M" and had "never had rough sex . . . EVER," she repeatedly described herself to men as "very submissive," "open minded to everything," "naughty, dirty and sexual," and in explicit terms as a willing participant in the specific sadomasochistic practices at issue (conversations 74713789, 75339286, 75271959, and others). (Ex. 4 at PDF pp. 126, 142-143.) The paid-arrangement evidence also included WhatsYourPrice screenshots showing that the complainant used another platform structured around paid dates. Those screenshots show accepted or countered paid-date offers in amounts including $300, $350, and $500, display interface language such as "Offer Accepted" and "PAYS YOU $350," and include a message in which the complainant stated, "I am not looking for a serious relationship

11

only fun." (Ex. 4 at PDF pp. 144-153.) That evidence directly contradicted her statements that money meant only dinner or travel, that she was seeking a serious relationship, and that she had not accepted or pursued money for dates.

34. ADA Baraiola did not disclose the messages. Instead, a District Attorney analyst, at the direction of and for the use of the prosecution, affirmatively assembled a curated "conversation mode" compilation of the messages — a created document that selected, filtered, and framed the underlying communications. (Ex. 9 at PDF p. 1.) It was this prosecution-created compilation, and not the complete messages, that the prosecution put before the court, while the complete messages were withheld from the defense.

35. On January 17, 2017, ADA Baraiola applied ex parte to Justice Obus for permission to withhold the materials. (Ex. 6 at PDF pp. 1-2.) She represented that the messages were "not discoverable" because they were "in no way connected to the investigation in this case"; that they were not Brady because they "do not tend to shed any light on the defendant's guilt or innocence" "nor do they constitute Giglio"; and that the Rape Shield Law barred them. Each representation was false. The messages and related paid-arrangement evidence were directly responsive to the defense's pending Specific Brady Request and powerfully supported the defense; and the Rape Shield Law, N.Y. C.P.L. § 60.42, governs admissibility at trial, not the People's disclosure obligations, and contains its own interest-of-justice exception, id. § 60.42(5).

36. The misleading ex parte submission caused Justice Obus, and later Justice Edwards, to deny disclosure in advance of trial, preventing the defense from reviewing, investigating, or using the materials. (Ex. 6; Ex. 7, Part A.)

**D. The Complainant's False Sworn Testimony in the Florida Matter**

37. On May 7, 2017, while Plaintiff's prosecution was pending, the complainant accused an Uber driver, Gary Kitchings — a 57-year-old man with no criminal record — of rape in Florida. Before that trial, Kitchings's attorneys questioned the complainant under oath, and the NYCDAO possessed the deposition transcript by the time of Plaintiff's trial. In it, the complainant denied ever having "accepted money from anybody for a date" or "for sex" and denied having been in a "sugar daddy" arrangement (Dep. Tr. 20-21); claimed her only knowledge of sadomasochism came from a film she had walked out of (Dep. Tr. 33-34); denied making any financial arrangement with Plaintiff before meeting him; denied discussing money with Plaintiff through text or email; denied any conversation with Plaintiff about BDSM or intimacy; and denied, three times, ever discussing money with Plaintiff, including ever accepting money for dates or sex (Dep. Tr. 82). (Ex. 17, Fla. Dep. Tr. 20-21, 33-34, 82.) The suppressed SA.com messages in the Office's possession proved each of these sworn statements false, and the WhatsYourPrice screenshots independently refuted the deposition denial that she had ever accepted money from anybody for a date. (Ex. 4 at PDF pp. 144-153.)

38. On the strength of the complainant's testimony, Kitchings was convicted in March 2018 and sentenced to 22 years; a Florida appellate court overturned the conviction in February 2020. The complainant thereafter obtained a multimillion-dollar pre-suit settlement from Uber, the existence of which she later denied. These facts were known or available to the prosecutors, bore directly on the complainant's credibility and financial motive, and were never disclosed to Plaintiff's defense in usable form.

**E. The Trial: False Testimony Knowingly Elicited, and the Mid-Trial Coaching**

39. Plaintiff was tried in May-June 2018. ADA Baraiola was joined at counsel table by ADA Bashford, the longtime Chief of the Sex Crimes Unit, who supervised and personally participated in the prosecution throughout. ADA Lucey served the trial prosecution as well, performing disclosure review: on May 17, 2018, she reported by email to ADAs Baraiola and Bashford that she had "[r]eviewed WASU files" — the file of the Office's Witness Aid Services Unit concerning the complainant — and had determined "No Rosario," while noting that the unit had provided the complainant counseling and car service and that the State Office of Victim Services had paid $994 of her medical expenses related to the alleged assault. The email was produced to the defense only in the post-conviction period. Disclosure determinations in this prosecution were thus not ADA Baraiola's alone.

40. On the eve of trial, the defense again requested any messages tending to prove the falsity of the complainant's Florida testimony, including her denials of knowledge of sadomasochism and of accepting money for dates. (Ex. 7, Part A.) The prosecutors disclosed nothing, again invoking the Rape Shield Law, and Justice Edwards accepted the argument on the strength of the prosecutors' representations.

41. Knowing that the messages had been withheld and that the complainant could not be confronted with them, ADA Baraiola elicited from her on direct examination — and ADA Bashford, knowing the contents of the file, did not correct — the same false and misleading account the complainant had given the prosecutors. (Ex. 7, Part B, Trial Tr. 120:3-23, 123:14-124:10, 126:11-23, 133:20-135:4.) Among other things:

42. ADA Baraiola elicited testimony that the complainant was financially secure — that she ran a skincare company, had started another, and owned properties — and called a witness to describe her as an "entrepreneur" and "real estate investor." (Ex. 7, Part B, Trial Tr. 120:3-23, 121:23-122:3.) The prosecutors' own file showed the complainant repeatedly soliciting large monthly sums, telling men she "need[ed] financial help," and using paid-arrangement platforms to accept or counter paid-date offers. (Ex. 4.)

43. ADA Baraiola elicited testimony that the "$$ on a per meet" message to Plaintiff was anomalous — merely something the complainant was "willing to try out" — and that being "financially take[n] care of" meant only "nice dinners and travel." (Ex. 7, Part B, Trial Tr. 126:11-23, 133:20-135:4.) The withheld SA.com messages and WhatsYourPrice screenshots contradicted both statements, and the screenshots also contradicted the trial narrative that the complainant was seeking a serious relationship rather than paid arrangements. (Ex. 4.)

44. ADA Baraiola elicited testimony falsely implying that the complainant's profile was not intended to advertise sex and that she had not discussed sadomasochism. (Tr. 127.) The messages — in which she explicitly offered sex for payment and described sadomasochistic practices — disproved this.

45. ADA Baraiola elicited extended testimony about a man named "Kevin," whom the complainant planned to meet later the same night. The prosecutors disclosed the complainant's innocuous text messages with Kevin while withholding her SA.com messages with him from the same day, in which Kevin had offered "$10-15,000 a month." (Ex. 7, Part B, Trial Tr. 182-86, 193-205; Ex. 4 at PDF p. 143.)

13

46. The SA.com messages, the WhatsYourPrice screenshots, and the related Florida-deposition impeachment evidence had been Brady and Giglio material from the moment the Office obtained them. Once the complainant testified on direct about her finances, her use of paid-arrangement platforms, the meaning of her profile, and her communications with Plaintiff and Kevin, those materials were also Rosario material. (Ex. 7, Part B/C, Trial Tr. 208, 336-337; Ex. 4 at PDF pp. 139-153.) The prosecutors continued to conceal them.

47. On cross-examination, with the prosecutors listening, the complainant doubled down: she compared her "$$ per meet" message to a "coffee challenge," denied any memory of seeking compensation from anyone before Plaintiff, and testified that she believed Plaintiff "was the first person [she] sought compensation from." (Ex. 7, Part B, Trial Tr. 328:1-331:6.) The prosecutors knew from their own file that she had negotiated compensation with dozens of men that same week; and the post-conviction production further showed that she had accepted or countered paid-date offers on WhatsYourPrice. They said nothing. (Ex. 4.)

48. The trial court then took the extraordinary step of directing the prosecutors to interrupt the defense's cross-examination and meet privately with the complainant to "refresh her recollection" with the messages — while the messages remained withheld from the defense. What happened in that recess is established by the complainant's own admission to the PCJU: "Martha and Kristen told her what to say." (Ex. 10 at PDF p. 2; Ex. 7, Part C, Trial Tr. 335:15-336:25.) "Martha" is Defendant Bashford. "Kristen" is Defendant Baraiola. The complainant then returned to the stand and testified that she now remembered communicating with "other men regarding exchanging time for money" (Ex. 7, Part C, Trial Tr. 353) — a formulation that minimized the truth the messages established — and, asked again about sadomasochism, repeated that her only knowledge came from a film she had walked out of (Ex. 7, Part C, Trial Tr. 361-62). A defense in possession of the actual messages would have exposed the revised testimony as false. The defense had nothing.

**F. Plaintiff's Testimony and the Messages' Corroboration**

49. Plaintiff testified in his own defense. Although he had never seen the suppressed messages, they corroborated his account again and again: the complainant had described to other men the same specific sexual practices Plaintiff testified she discussed with him (conversations 75247814, 74713789, 74715322, 75271959, 75249939), and Plaintiff testified that he paid her the precise $1,500 figure she had quoted to other men (conversations 75177657, 75270221). (Ex. 4 at PDF pp. 139, 141-143.)

50. The withheld messages between the complainant and "Kevin" — who had offered her "$10-15,000 a month" later that same night — corroborated Plaintiff's testimony that the complainant became enraged when the encounter marked her face and threatened her other appointments. (Trial Tr. 714-15; Ex. 4 at PDF p. 143.)

51. Independent record evidence corroborated Plaintiff's timeline, including the hotel room-entry record and an ear-witness account of when the dispute began, both consistent with Plaintiff's account rather than the complainant's.

**G. ADA Baraiola's Summation**

52. In summation, ADA Baraiola argued to the jury that the complainant had no financial motive — emphasizing her supposed success as an entrepreneur and property owner — and that the "$$

14

on a per meet" message was an aberration, telling the jury there was no evidence the complainant sold sex or sought money from men. (Ex. 7, Part D, Trial Tr. 839-840, 833-52; Ex. 4 at PDF pp. 139-153.) She made those arguments while in possession of the SA.com messages establishing the opposite, and while the Office's later production showed additional paid-arrangement evidence in the form of WhatsYourPrice screenshots. (Ex. 4.) The summation also attributed to the complainant testimony she never gave: as the Office's own reinvestigation later recorded, the complainant "never testified about the door locking twice, but it was mentioned during summation as being [her] testimony." (Ex. 9 at PDF p. 2.) The summation is pleaded not as an independent basis of liability but as evidence of the prosecutors' knowledge of the messages' exculpatory force and of their intent that the jury never learn the truth.

**H. Conviction and Sentence**

53. On May 29, 2018, the jury — which never saw the suppressed messages — convicted Plaintiff on all five counts of Indictment No. 2720-2016. He was sentenced on July 11, 2018 and, in total, was held in custody for 1,651 days: approximately thirteen days following his June 2016 arrest before he made bail (¶ 21), and continuous post-conviction incarceration from May 29, 2018 to November 22, 2022 in medium-security custody. (Ex. 7, Parts D-E.)

**I. Post-Conviction Concealment**

54. Plaintiff, through counsel, continued to seek the suppressed messages on appeal and in post-conviction proceedings, and the Office continued to withhold them. (Ex. 8.) The Appellate Division affirmed the conviction without the suppressed materials ever having been disclosed.

55. On April 1, 2022, Plaintiff's post-conviction counsel moved under N.Y. C.P.L. § 440.10 to vacate the conviction. In August 2022 — more than five and a half years after ADA Baraiola obtained them, and more than four years after the conviction — the Office's Post-Conviction Justice Unit finally disclosed the SA.com messages and related paid-arrangement evidence, including WhatsYourPrice screenshots, to the defense, having recognized, in substance, that they should have been disclosed all along. (Ex. 4 at PDF pp. 1-153; Ex. 8; Ex. 11 ¶¶ 3-4, PDF pp. 2-3.)

**J. The Office's Reinvestigation, Sworn Concession, and the November 22, 2022 Vacatur**

56. The PCJU reinvestigated the prosecution. Its investigation included interviews of ADA Baraiola (Ex. 9 at PDF pp. 1-3) and of the complainant (Ex. 10 at PDF pp. 1-3). The complainant confirmed to the PCJU both halves of the scheme: that the prosecutors had told her the messages "wouldn't come out" at trial, and that, during the mid-trial recess, "Martha and Kristen told her what to say." (Ex. 10 at PDF pp. 1-3.)

57. In its sworn Response to the § 440.10 motion, the Office conceded the violation. It acknowledged that the messages had been used to refresh the complainant's recollection "out of view from the jury and defense counsel"; that as a result "the complainant's credibility was unable to be fairly challenged, resulting in prejudice to the defendant"; and that, had the messages been disclosed, "there was a reasonable probability that he would not have been convicted of the charges." (Ex. 11 ¶¶ 3-4, PDF pp. 2-3.) The Office styled its concession as one of ineffective assistance of counsel, faulting the defense for "failing to demand disclosure" of the messages. The record refutes the premise of that styling: the defense had served a Specific Brady Request for precisely such material in July 2016 (Ex. 5 at PDF pp. 1-2), and the prosecution had

15

answered it by representing that no such material existed and by procuring an ex parte order on the strength of that representation (Ex. 6 at PDF pp. 1-2). However the concession was captioned, what the Office admitted — use of the suppressed messages out of the view of the jury and the defense, the resulting inability to challenge the complainant's credibility, prejudice, and a reasonable probability of a different verdict — is the substance of the constitutional violations alleged here.

58. On November 22, 2022, the Supreme Court, New York County, granted the motion on the People's consent and vacated Plaintiff's conviction in its entirety. (Ex. 12 at PDF p. 1.)

### K. The Seventeen-Month Post-Vacatur Continuation

59. After the vacatur, the slate was clean: there was no conviction, the Office's own reinvestigation had documented the suppression and the coaching, the complainant's credibility had been destroyed by her own admissions and by the messages, and the Office knew it could not retry the indictment counts. Yet Defendants Blumberg and Lucey, who were personally responsible for the matter in this period, continued the prosecution of Indictment No. 2720-2016 for seventeen months — from November 22, 2022 to April 11, 2024 — with Plaintiff remaining under the compulsion of pending first-degree felony sex charges throughout. By this time, ADA Bashford had retired; Blumberg had been appointed Chief of the Sex Crimes Unit within the Office's newly created Special Victims Division before the November 22, 2022 vacatur (Ex. 18 at PDF pp. 1-2); ADA Lucey served, on information and belief, as Deputy in that unit; and ADA Baraiola's role was compromised by the Office's concession that the conviction she had obtained was infected by Brady-grade suppression. Blumberg's responsibility in this period was direct and personal, not nominal: installed as Chief of the Sex Crimes Unit on June 13, 2022, before the vacatur, she was the supervisor with line responsibility for Plaintiff's matter at the moment the Office conceded Brady-grade prejudice and throughout the seventeen months that followed, and she continued the prosecution with knowledge drawn from the Office's own reinvestigation — the same reinvestigation that had recorded her own account of the four-ADA vetting. The post-vacatur continuation was therefore not merely the residue of the original trial prosecution; it was a fresh supervisory decision by the Office's Sex Crimes/Special Victims leadership to continue pending indictment charges after the Office had already conceded that the 2018 conviction could not stand. On March 28, 2023, while the indictment remained pending after vacatur, Plaintiff's criminal counsel wrote directly to District Attorney Bragg urging dismissal. The letter identified Lucey as the reassigned prosecutor and Deputy Chief of the Sex Crimes Unit; identified PCJU notes concerning Blumberg's statement that four ADAs vetted/met with M.R.; notified the Office that newly disclosed discovery showed, in counsel's words, that "possibly current Chief Nicole Blumberg also played a role in the misconduct"; and warned that continued prosecution would ratify misconduct already conceded by the Office. (Ex. 19 at PDF pp. 1, 4-6, 8.) The Office nevertheless continued the indictment until April 11, 2024. The continuation was active and personal: at an October 12, 2023 calendar call — nearly eleven months after the vacatur and more than six months after the March 28 notice letter — ADA Lucey appeared for the People before Justice Ann D. Thompson; Plaintiff was required to appear, and did, by video; the court directed the People to subpoena the complainant's post-incident mental-health records for in camera review "to determine whether the records contain any Giglio and/or Brady material"; and a schedule was set for the defense's motion to dismiss the indictment. (Tr. of Calendar Call, *People v. Tripathy*, Ind. No. 2720-2016 (Sup. Ct.

N.Y. Cnty. Oct. 12, 2023), at 2-4.) Eleven months after the Office's own concession, its prosecution of Plaintiff was still generating Brady and Giglio process concerning the same complainant.

60. During this post-vacatur period the Office was not presenting the State's case at trial or litigating its merits; its court appearances were administrative calendar calls. It was investigating and evaluating what, if anything, could be charged or salvaged, through the same PCJU reinvestigation apparatus that had produced the concession. The March 28, 2023 notice to District Attorney Bragg and Chief Assistant District Attorney Reiss placed the Office on post-vacatur notice of the reassigned Lucey role, Blumberg's PCJU-noted collective-vetting statement, jury-selection concerns reported by trial counsel, and Exhibit 4's WhatsYourPrice screenshots, which Rudin specifically flagged as undisclosed impeachment material in his notice letter. (Ex. 4 at PDF pp. 144-153; Ex. 19 at PDF pp. 1, 4-6, 8.) Plaintiff pleads the letter as notice, continuation, malice, Monell, and discovery-relevance evidence, and relies on primary records where they are available. The continuation of the prosecution in that posture — with actual knowledge that the charges rested on suppressed evidence and discredited testimony — was the product of a purpose other than bringing an accused to justice. The claim against Blumberg and Lucey therefore rests on personal continuation after actual institutional notice, not merely on job title or supervisory status.

**L. The April 11, 2024 Disposition and the Categorically Distinct SCI**

61. On April 11, 2024, the People moved to dismiss Indictment No. 2720-2016 in the interest of justice, and the court granted the motion and dismissed the indictment. (Ex. 14, Plea Tr. 25:4-17.) That dismissal terminated, in Plaintiff's favor, each of the four indictment counts at the heart of this action: Criminal Sexual Act in the First Degree, Sexual Abuse in the First Degree, Strangulation in the Second Degree, and Unlawful Imprisonment in the Second Degree. ADA Lucey stated on the record that the disposition was intended "to bring closure to both Mr. Tripathy and the victim." (Ex. 14, Plea Tr. 6:1-7, 25:4-8.)

62. In a separate proceeding the same day, Plaintiff entered a plea to a new Superior Court Information, SCI No. 71584/24, charging a single count of Assault in the Second Degree under N.Y. Penal Law § 120.05(1). (Ex. 13 at PDF pp. 1-5; Ex. 14, Plea Tr. 13:9-25.) That charge was never presented to the grand jury and was never contained in Indictment No. 2720-2016.

63. The SCI charge is categorically distinct from every count of the indictment, including the indictment's lone assault count. The indictment charged Assault in the Second Degree under § 120.05(6) — felony assault, requiring proof that the defendant caused physical injury in the course of and in furtherance of a separate felony. The SCI charged Assault in the Second Degree under § 120.05(1), requiring proof of intent to cause serious physical injury and the causing of such injury, as a standalone offense with no predicate felony. Each subsection requires proof of facts the other does not, and proof of one would not establish the other. *See Blockburger v. United States*, 284 U.S. 299, 304 (1932). The first-degree sex offenses, the strangulation count, and the unlawful-imprisonment count are more distinct still: none shares with § 120.05(1) the elements of intent to cause serious physical injury or causation of serious physical injury, and § 120.05(1) requires neither forcible compulsion, sexual conduct or contact, obstruction of breathing, nor restraint.

64. Plaintiff received a sentence of one day on the SCI, entered nunc pro tunc to July 19, 2018, and the sentence was fully served when imposed. (Ex. 14, Plea Tr. 13:14-19.) The 1,651 days Plaintiff had spent in custody were time served under the vacated 2018 judgment. The People referenced those years only as a mitigating circumstance under N.Y. Penal Law § 70.02(3)(b)(1) — that Plaintiff had already served "approximately four and a half years" — and not as a term of imprisonment imposed for the SCI offense. (Ex. 14, Plea Tr. 6:18-25, 13:14-19, 24:21-25.)

65. The plea record confines the plea. Plaintiff's factual allocution was limited to the SCI charge — that "with the intent to cause serious physical injury," he "caused such injury." (Ex. 14, Plea Tr. 23:6-11.) The allocution admitted no rape, no sexual abuse, no forcible compulsion, no strangulation, no unlawful imprisonment, and no predicate felony. Plaintiff's counsel stated on the record: "Mr. Tripathy from the very beginning of this case has denied the allegations against him other than the assault. I just wanted to make that record. It does not impact, one way or the other, his plea today." (Ex. 14, Plea Tr. 7:18-23.)

66. The dismissal of the four favorably-terminated counts was driven by the collapse of the prosecution that the People's own concession had already acknowledged: a vacated conviction, suppressed evidence, a complainant whose credibility had been destroyed by her own statements, and the Office's resulting inability to retry the indictment. Nothing in the record establishes that the dismissal of those counts was bargained consideration exchanged for the plea to a different offense in a different instrument; ADA Lucey's stated rationale was "closure," not the strength of the evidence. Carruthers confirms the charge-by-charge rule in the guilty-plea context: a charge dismissed as part of a negotiated plea disposition is not favorably terminated, but a distinct charge dismissed or otherwise terminated apart from the plea disposition can satisfy favorable termination, and at the Rule 12(b)(6) stage the absence of record facts tying the dismissal to the plea must be construed in the plaintiff's favor. *See Carruthers v. Colton*, 153 F.4th 169, 174, 183-89 (2d Cir. 2025); *Chiaverini v. City of Napoleon*, 602 U.S. 556, 562-63 (2024) (favorable termination and probable cause are assessed charge by charge); *Smith-Hunter v. Harvey*, 95 N.Y.2d 191, 195-99 (2000) (termination need only be not inconsistent with innocence).

67. On April 16, 2026, the PCJU, by its Supervisor, issued a final determination declining to revisit the SCI, stating that "PCJU will not review this case any further and will not consider any additional requests or applications," and that Plaintiff "may have further rights to litigate [his] case in Court." (Ex. 15 at PDF p. 1.) Plaintiff does not challenge the SCI in this action.

**M. Risdal's Willful Participation in Joint Action With the Prosecutors**

68. Risdal initiated the prosecution by making statements to law enforcement and to the prosecutors — in her report and in her recorded interviews of June 20, 24, and 30, 2016 (Ex. 2 at PDF pp. 1-10) — that she knew to be false, including her denials that she used paid-arrangement platforms to seek money, that she had ever been paid or accepted money for dates, that she sought money from Plaintiff, and that she had any familiarity with sadomasochistic practices. (Ex. 4 at PDF pp. 1-153.) Those false out-of-court statements, not her later testimony, set the prosecution in motion and supplied its only evidentiary foundation.

69. Before trial, Defendants Baraiola and Bashford assured Risdal that the SA.com messages documenting the transactional and sadomasochistic character of her conduct "wouldn't come out" at trial. (Ex. 10 at PDF pp. 1-2.) That assurance reflected an agreement: the prosecutors would keep the messages from the defense and the jury, and Risdal would testify to a financial

and sexual history the messages contradicted, secure in the knowledge that she could not be confronted with them.

70. Risdal performed the agreement. She gave the false account described above; and when cross-examination threatened to expose her, she met privately with the prosecutors during the court-ordered recess, where — as she admitted to the PCJU — "Martha and Kristen told her what to say." (Ex. 10 at PDF p. 2; Ex. 7, Part C, Trial Tr. 335:15-336:25.) She then returned to the stand and conformed her testimony to the prosecutors' direction. (Ex. 7, Part C, Trial Tr. 353.)

71. Risdal's liability in this action rests on her false out-of-court statements that initiated and sustained the prosecution and on her pre-testimonial and extra-testimonial agreement and coordination with the prosecutors — conduct independent of, and provable without resort to, her grand-jury or trial testimony. The evidence of the scheme is her own 2022 admission to the PCJU (Ex. 10 at PDF pp. 1-3), which is not testimony in the criminal proceeding. A complaining witness who procures a prosecution through knowingly false statements, and a private person who reaches an understanding with state actors and acts jointly with them to deprive a defendant of a fair trial, act under color of state law and enjoy no absolute immunity for that conduct. *Dennis v. Sparks*, 449 U.S. 24, 27-29 (1980); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970); *White v. Frank*, 855 F.2d 956, 958-62 (2d Cir. 1988); *Coggins v. Buonora*, 776 F.3d 108, 112-13 (2d Cir. 2015); see *Rehberg v. Paulk*, 566 U.S. 356, 369-70 & n.1 (2012).

## RELATIONSHIP BETWEEN THIS ACTION AND THE SCI: NO CLAIM IMPLIES ITS INVALIDITY

72. Every claim in this action arises from the wrongful 2018 conviction on Indictment No. 2720-2016 and from the prosecution of its counts. That conviction was vacated on November 22, 2022, and the indictment was dismissed on April 11, 2024. *Under Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994), those claims are cognizable because the conviction they attack has been invalidated.

73. No claim in this action would, if successful, necessarily imply the invalidity of the SCI conviction. The SCI charges an offense categorically distinct from every indictment count (¶ 63; Ex. 13 at PDF pp. 1-5), to which Plaintiff allocuted on an independent factual basis confined to intentional assault (¶ 65; Ex. 14, Plea Tr. 7:18-23, 23:6-11). A judgment that the defendants suppressed the messages, fabricated and shaped evidence, and prosecuted the indictment counts without probable cause is fully consistent with the validity of the separate assault plea. *See Poventud v. City of New York*, 750 F.3d 121, 132-34 (2d Cir. 2014) (en banc). Indeed, this case is cleaner than Poventud itself: there, the post-vacatur plea was to a lesser-included offense of the vacated conviction, and the en banc Court still held the § 1983 claims not barred; here, the post-vacatur plea was to an offense never charged in the indictment and categorically distinct from the favorably terminated sex-offense, strangulation, unlawful-imprisonment, and felony-predicate assault counts pleaded here.

74. Plaintiff's damages are confined accordingly. He seeks recovery for the deprivations caused by the vacated 2018 conviction and the prosecution of the dismissed indictment counts — including the 1,651 days of incarceration served under the vacated judgment — and not for any consequence properly attributable to the one-day, fully-served SCI sentence. See Poventud, 750 F.3d at 132-36. In the alternative, to the extent any allocation is required, Plaintiff seeks recovery

19

for 1,650 of the 1,651 days, excluding the single day attributable to the SCI. Plaintiff does not seek damages for the validity, entry, or one-day sentence of the SCI conviction itself.

75. No collateral remedy was or is available by which Plaintiff could challenge the SCI even if he wished to: the one-day sentence was fully served upon imposition, so Plaintiff was never "in custody" under it for habeas purposes, see *Maleng v. Cook*, 490 U.S. 488, 491-92 (1989), and the Office's own post-conviction process closed with the PCJU's final determination of April 16, 2026 directing Plaintiff to the courts (Ex. 15). *See Spencer v. Kemna*, 523 U.S. 1, 21 (1998) (Souter, J., concurring); *Leather v. Eyck*, 180 F.3d 420, 424 (2d Cir. 1999). This action accordingly presents no conflict with the habeas channel that Heck protects.

76. For the malicious-prosecution claims, the favorable-termination element is satisfied as to the four dismissed indictment counts for the reasons pleaded at ¶¶ 61-66: the prosecution of those counts ended without a conviction, in a manner not inconsistent with innocence, and not as part and parcel of the plea to the categorically distinct SCI; at a minimum, the relationship between the dismissal and the plea is a question of fact that cannot be resolved against *Plaintiff on the pleadings. Thompson v. Clark*, 596 U.S. 36, 49 (2022); *Carruthers v. Colton*, 153 F.4th 169, 183-89 (2d Cir. 2025); *Janetka v. Dabe*, 892 F.2d 187, 189-90 (2d Cir. 1989) (favorable termination assessed count by count where charges are distinct).

## SYSTEMIC FAILURES OF THE NYCDAO AND MUNICIPAL LIABILITY

77. The constitutional violations that caused Plaintiff's wrongful conviction were not the isolated acts of individual prosecutors. They were the foreseeable product of the NYCDAO's longstanding policies, customs, and management failures with respect to the disclosure of exculpatory and impeachment evidence. The District Attorney is the City's final policymaker for the management of the Office — the training, supervision, and discipline of assistant district attorneys, and the design and operation of the systems by which the Office discharges its disclosure obligations. Those are administrative functions of local government, distinct from the exercise of prosecutorial judgment in an individual case, and the *City is liable for the constitutional consequences of the policymaker's deliberate indifference in performing them. Walker v. City of New York*, 974 F.2d 293, 297-301 (2d Cir. 1992); *Bellamy v. City of New York*, 914 F.3d 727, 756-59 (2d Cir. 2019); *Ying Jing Gan v. City of New York*, 996 F.2d 522, 535-36 (2d Cir. 1993); *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 126 (2d Cir. 2004). The Office's June 13, 2022 Special Victims Division announcement confirms that sex-crimes prosecutions were treated as a specialized, supervised, and resource-managed institutional function: the Division was tasked with enhancing how the Office investigates, staffs, and resources those cases, with the Sex Crimes Unit housed within that structure. (Ex. 18.)

78. At all times relevant to Plaintiff's prosecution, the NYCDAO maintained the following interrelated policies, customs, and practices, each of which was a moving force in the violation of Plaintiff's rights:

79. First, the absence of any adequate policy, manual, or system for identifying, tracking, and disclosing Brady, Giglio, and Rosario material. Disclosure decisions — including the decision to withhold material directly responsive to a specific defense demand, and the decision to seek ex parte permission to withhold it on representations the file contradicted — were left to the unsupervised judgment of individual line prosecutors, with no centralized logging, no audit

20

function, and no mechanism to ensure that material responsive to a specific Brady demand was identified and produced.

80. Second, the absence of meaningful supervisory review of disclosure decisions. In Plaintiff's case, the failure was not the act of an unsupervised junior prosecutor evading oversight: the Chief of the Sex Crimes Unit herself sat at counsel table, knew the file, and personally joined the misconduct. A suppression of this magnitude proceeded unchecked through pretrial litigation, an ex parte application, trial, sentencing, direct appeal, and years of post-conviction litigation. That trajectory is possible only in an office with no functioning supervisory check on disclosure compliance — and in which the supervisors themselves had been trained by the Office's customs to treat suppression as acceptable.

81. Third, a custom of not disciplining prosecutors for disclosure violations. Despite the repeated judicial findings catalogued in Schedule A (Ex. 16), upon information and belief no NYCDAO prosecutor was meaningfully disciplined for a disclosure violation in the years preceding Plaintiff's trial. That custom of impunity communicated to line prosecutors and supervisors alike that suppression carried no professional consequence.

82. Fourth, a conviction-driven office culture in which disclosure obligations were treated as obstacles to be managed — including through curated evidence compilations and ex parte applications designed to keep responsive material from the defense — rather than as constitutional commands, and in which securing and preserving convictions was the measure of professional success.

83. The need for adequate training, tracking systems, supervision, and discipline was obvious, and the policymakers knew it. The District Attorney knew to a moral certainty that line prosecutors would routinely confront the recurring situation at issue here — possession of evidence favorable to the defense, in a case whose outcome turned on a complainant's credibility. That situation presents prosecutors with a choice in which the constitutional command is clear but the institutional incentives run the other way, and a history of mishandling — documented in Ex. 16, Schedule A — made the danger concrete. And the wrong choice in that situation predictably causes the deprivation of constitutional rights: the conviction of defendants who never see the evidence that would have acquitted them. See Walker, 974 F.2d at 297-300; *City of Canton v. Harris*, 489 U.S. 378, 388-90 (1989).

84. The notice was actual, specific, and antecedent. Long before Plaintiff's May 2018 trial, the courts had repeatedly adjudicated Brady, Rosario, Giglio, and related disclosure issues in New York County prosecutions, including published findings that the Office failed to disclose material it was obligated to produce in the adjudicated pattern set out in Schedule A (Ex. 16, Schedule A), together with the contemporaneous pattern of improper trial advocacy catalogued in Schedule B. Public pre-2018 reporting concerning the Office's Sex-Crimes Unit, including disclosure lapses in high-profile sex-crimes prosecutions and delayed disclosure of complainant-related communications, further supplied notice and context that the Unit required meaningful supervisory disclosure controls. (public reporting described in Schedule B). Each adjudication was a public judicial finding directed at the Office itself. In the face of that accumulating record, the policymakers adopted no adequate disclosure system, instituted no meaningful supervisory review, and disciplined no one.

21

85. That sustained inaction in the face of a known, recurring pattern of the same kind of violation constituted deliberate indifference to the constitutional rights of criminal defendants, including Plaintiff. This is not a claim that a single incident, or ignorance of an obscure point of law, supports municipal liability. *Cf. Connick v. Thompson*, 563 U.S. 51, 62-63 (2011). The deficiency alleged is not a failure to teach a nuance of Brady doctrine; it is the Office's failure, despite years of adjudicated violations, to manage, supervise, and discipline the disclosure function at all — precisely the management-failure theory that Walker and Bellamy sustain. In Bellamy, the Second Circuit held that a city may be liable under Monell on allegations that a district attorney's office failed to discipline prosecutors for repeated misconduct of the same character; the pattern pleaded here is longer, more specific, and adjudicated.

86. The causal connection between the management failures and Plaintiff's injury is direct, and each failure was independently a moving force. Had the Office maintained an adequate system for identifying and tracking material responsive to specific Brady demands, the messages would have been flagged and produced in response to the July 2016 demand. Had the Office subjected disclosure decisions — and ex parte applications to withhold — to meaningful supervisory review, the January 2017 application and the suppression at trial would have been caught and corrected. Had the Office disciplined disclosure violations, its prosecutors, including the Unit Chief who personally participated here, would not have understood suppression to be cost-free. And had the Office's culture not rewarded conviction over compliance, the prosecution would not have been continued for seventeen months after the Office's own concession. The post-vacatur continuation by successor Sex Crimes/Special Victims leadership, including Blumberg as Chief of the Sex Crimes Unit under the Special Victims Division structure and Lucey as the Deputy-level prosecutor handling the case after Bashford's retirement and after Baraiola's role had been compromised by the Office's sworn concession, further demonstrates that the injury was caused by Office policy, supervision, and institutional practice rather than by a single rogue prosecutor. (Exs. 18-19.)

87. The Office's conduct after Plaintiff's trial confirms the pattern and the policymakers' institutional awareness of it — and is pleaded as corroboration, ratification, post-vacatur notice, and continuation evidence, not as the sole antecedent notice that preceded the trial violation. The Office's own reinvestigation produced its sworn concession in this case (Ex. 11 ¶¶ 3-4, PDF pp. 2-3) and the consent vacatur (Ex. 12 at PDF p. 1). The March 28, 2023 Rudin letter gave District Attorney Bragg and Chief Assistant District Attorney Reiss direct post-vacatur notice that Plaintiff's counsel was demanding dismissal, identifying the reassigned Lucey role, referencing Blumberg's PCJU-noted statement concerning four ADAs who vetted/met with the complainant, expressly identifying current Sex Crimes Chief Nicole Blumberg as among the supervisors the newly disclosed discovery implicated, and warning against continued prosecution after the Office's Brady-grade concession. (Ex. 19 at PDF pp. 1, 4-6, 8.) The wave of post-2018 conviction-integrity vacaturs of NYCDAO convictions reflected in Schedule C (Ex. 16) acknowledges the same systemic disclosure failures. The Office's later public response to the Franco discovery collapse, including reported acknowledgement that "the D.A.'s Office as a whole is responsible for preparing a case" and that root-cause analysis was needed, further corroborates that disclosure breakdowns were office-management failures, not merely isolated personal mistakes. (public reporting described in Schedule C). And in establishing the Post-Conviction Justice Unit, District Attorney Bragg publicly acknowledged that the Office's predecessor Conviction Review Unit had been "a conviction review in name only" — a

policymaker-level admission that, through the very period of Plaintiff's prosecution, the Office's mechanism for catching and correcting wrongful convictions did not function.

88. The City's liability under Monell does not depend on a judgment of liability against any individual prosecutor. Where the constitutional violation is established, the municipality is liable for the policies that caused it even if the individual employees are shielded by immunity. *Owen v. City of Independence*, 445 U.S. 622, 638, 650-54 (1980); *Askins v. Doe No. 1*, 727 F.3d 248, 253-54 (2d Cir. 2013); *Van de Kamp v. Goldstein*, 555 U.S. 335, 348-49 (2009) (immunity of supervisory prosecutors does not extend to the municipality).

## ABSOLUTE IMMUNITY DOES NOT BAR PLAINTIFF'S CLAIMS

89. Prosecutorial absolute immunity attaches only to conduct "intimately associated with the judicial phase of the criminal process," and the inquiry is functional: it asks what the official was doing, not what title she held or when she acted. *Imbler v. Pachtman*, 424 U.S. 409, 430-31 (1976); *Buckley v. Fitzsimmons*, 509 U.S. 259, 269-74 (1993); *Burns v. Reed*, 500 U.S. 478, 492-96 (1991). When prosecutors perform investigative or administrative functions — gathering evidence, creating evidentiary materials, or operating outside the presentation of the State's case — they are protected, if at all, only by qualified immunity. Buckley, 509 U.S. at 273-76; *Van de Kamp v. Goldstein*, 555 U.S. 335, 342-43 (2009).

90. Substantial conduct charged in this complaint is not advocacy under that functional test. The acquisition of the complainant's messages from SA.com was evidence-gathering — the classic investigative function. The direction and creation of the analyst-prepared "conversation mode" compilation was the creation of evidentiary material, an administrative and investigative act; a state actor who knowingly creates false or misleading documentary material — including through deliberately selective presentation — and forwards it for use in a proceeding is not absolutely immune, even though the material is later used in litigation. *Zahrey v. Coffey*, 221 F.3d 342, 346-55 (2d Cir. 2000); *Morse v. Fusto*, 804 F.3d 538, 547-50 (2d Cir. 2015). The shaping of the complainant's account — culminating in telling her "what to say" — was the manufacture of evidence, not its presentation. *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997); *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 274-80 (2d Cir. 2016). And during the post-vacatur period, when no conviction existed and the Office was reinvestigating and re-evaluating the case through the PCJU, Defendants Blumberg and Lucey were functioning in an investigative, administrative, and supervisory posture, not merely presenting a case in court; the March 28, 2023 notice letter to District Attorney Bragg reinforces that the post-vacatur issue was supervisory case management, dismissal review, disclosure remediation, and continuation, not trial advocacy. (Ex. 19.)

91. Plaintiff acknowledges that certain discrete acts in the chain — the presentation of testimony at trial and the making of applications to the court — are advocacy. Those acts are pleaded for their evidentiary significance: they establish the defendants' knowledge, intent, malice, materiality, and causation, and they are the mechanism through which the non-advocative fabrication and suppression inflicted Plaintiff's injury. Liability is rested on the non-advocative conduct; the protected acts complete the causal story. See Zahrey, 221 F.3d at 353-54 (the deprivation of liberty caused by investigative-phase fabrication is actionable although the fabricated evidence is later used in protected proceedings).

92. The City enjoys no immunity of any kind. A municipality may not assert absolute or qualified immunity against § 1983 liability for violations caused by its policies and management failures. *Owen v. City of Independence*, 445 U.S. 622, 638, 650 (1980); *Van de Kamp*, 555 U.S. at 348-49.

93. Risdal, a private individual, has no prosecutorial immunity, and a private party invoking § 1983's joint-action doctrine may not assert qualified immunity. *Wyatt v. Cole*, 504 U.S. 158, 168-69 (1992); *Richardson v. McKnight*, 521 U.S. 399, 412-13 (1997). To the extent she invokes the testimonial immunity of a witness, that immunity does not reach her non-testimonial conduct — her false statements to law enforcement and prosecutors, her pre-trial agreement with the prosecutors, and her participation in the recess coordination — on which her liability is pleaded. *Rehberg v. Paulk*, 566 U.S. 356, 369-70 & n.1 (2012); *Coggins v. Buonora*, 776 F.3d 108, 112-13 (2d Cir. 2015); *White v. Frank*, 855 F.2d 956, 958-62 (2d Cir. 1988).

## INJURIES AND DAMAGES

94. As a direct and proximate result of defendants' misconduct, Plaintiff was wrongfully convicted in 2018 of crimes he did not commit and was incarcerated for 1,651 days under the vacated judgment. Because that conviction has been invalidated and the indictment counts dismissed in his favor, *Plaintiff is entitled to recover the full damages caused by the wrongful conviction and incarceration. Poventud v. City of New York*, 750 F.3d 121, 132-36 (2d Cir. 2014) (en banc).

95. Plaintiff was confined for approximately four and a half years in medium-security custody, where — wrongly convicted of first-degree sexual offenses — he endured violence, threats, degrading conditions, and constant fear for his safety, and was stripped of his liberty, his family life, and every ordinary incident of a free existence.

96. Plaintiff lost an exceptional career. Before his arrest, Plaintiff was a senior executive of a global professional-services firm, with a two-decade record at premier institutions, a documented trajectory of rapidly increasing compensation, and substantial unvested equity awards. The prosecution forced his separation from his employer, caused the forfeiture of approximately 25,000 restricted stock units across multiple grant years, destroyed the executive career he had built, and has rendered him effectively unemployable at his prior level for nearly a decade, permanently impairing his earning capacity. He exhausted his savings and retirement assets defending himself and supporting his family through the prosecution and incarceration.

97. Plaintiff suffered, and continues to suffer, severe emotional and psychological harm, including the trauma of wrongful imprisonment, anxiety, and depression; profound and lasting injury to his personal and professional reputation, magnified by the nature of the charges; and the irrecoverable loss of years of his life and of his children's youth.

98. Plaintiff seeks compensatory damages in an amount to be determined at trial, and punitive damages against the individual defendants, whose conduct was intentional, knowing, and undertaken in reckless disregard of Plaintiff's constitutional rights.

24

## FIRST CAUSE OF ACTION

**42 U.S.C. § 1983 — Malicious Prosecution in Violation of the Fourth and Fourteenth Amendments (Against Defendants Baraiola, Bashford, Blumberg, Lucey, and Risdal)**

99. Plaintiff repeats and realleges each preceding paragraph as if fully set forth herein.

100. Initiation and continuation. Risdal initiated the prosecution by knowingly false statements to law enforcement and the prosecutors (¶ 68) — the conduct of a complaining witness, for which no immunity attaches. *White v. Frank*, 855 F.2d 956, 958-62 (2d Cir. 1988). Defendants Baraiola and Bashford procured and continued the prosecution of the indictment counts, and continued it after January 2017 with actual knowledge of evidence destroying its foundation. All four ADA Defendants participated in the complainant's vetting before and after the indictment (¶ 23), giving each contemporaneous knowledge of the account on which the prosecution rested and of the evidence contradicting it. Defendants Blumberg and Lucey thereafter personally continued the prosecution from November 22, 2022 to April 11, 2024, after the conviction was vacated, after the Office's own concession, and with full knowledge of the reinvestigation record and the March 28, 2023 post-vacatur notice to District Attorney Bragg. (Ex. 19 at PDF pp. 1, 4-6, 8.) Blumberg did so as the officially appointed Chief of the Sex Crimes Unit within the Special Victims Division, a structure created to supervise and resource sex-crimes and other special-victims prosecutions, after Bashford's retirement. (Ex. 18 at PDF pp. 1-2.) She worked with Lucey, the Deputy-level prosecutor in that unit who appeared for the People at the post-vacatur calendar calls, including on October 12, 2023 (¶ 59), and who prepared and consented to the SCI that ended the case (Ex. 13 at PDF pp. 1-5). Their continuation of the indictment prosecution after the Office's own concession was a personal and supervisory continuation of proceedings, not merely passive inheritance of a prior prosecution. As to Blumberg specifically, her individual involvement is established at both ends of this prosecution by the Office's own records: in 2016, by her own statement to the PCJU describing the four-ADA vetting of the complainant (Ex. 9 at PDF pp. 2-3), evidencing her personal knowledge of and participation in the evaluation of the complainant's credibility on which the charges depended; and from November 2022 through April 2024, by her continuation of the indictment as the Chief of the Sex Crimes Unit (Ex. 18 at PDF pp. 1-2), after the Office's own sworn concession and after Plaintiff's counsel's March 28, 2023 letter to District Attorney Bragg expressly stated that newly disclosed discovery showed "possibly current Chief Nicole Blumberg also played a role in the misconduct" (Ex. 19 at PDF pp. 1-2). The claim against Blumberg does not depend on her having personally tried the 2018 case or personally made the January 2017 ex parte application; it rests on her own admission of collective-vetting knowledge, her official Sex Crimes Unit supervisory responsibilities, and her personal post-vacatur continuation of the indictment after specific written notice naming her. This pleading uses protected courtroom advocacy only as evidence of knowledge, causation, malice, materiality, and injury; liability against the ADA Defendants is based on non-testimonial, investigative, administrative, evidence-creating, suppression, and post-vacatur continuation conduct.

101. Absence of probable cause. Any presumption of probable cause arising from the indictment is rebutted, because the indictment and the prosecution were procured by fraud, perjury, the suppression of evidence, and other bad-faith police and prosecutorial conduct: the complainant's knowingly false statements supplied the grand-jury presentation's foundation, and the prosecutors thereafter concealed the evidence disproving it. *See Colon v. City of New York*, 60

N.Y.2d 78, 82-83 (1983); *Manganiello v. City of New York*, 612 F.3d 149, 161-63 (2d Cir. 2010); *Boyd v. City of New York*, 336 F.3d 72, 76-77 (2d Cir. 2003). Independently, whatever arguable probable cause existed at inception dissipated no later than January 2017, when the prosecutors obtained the SA.com messages establishing that the complainant — the sole source of the charges — had lied to them about the facts at the core of the case; a prosecution may not be continued once the authorities learn of facts that vitiate probable cause. *See Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996); Manganiello, 612 F.3d at 161-63. The paid-arrangement evidence later disclosed in Exhibit 4, including the WhatsYourPrice screenshots, further confirmed that the complainant's denials about accepting money for dates and seeking a serious relationship were false. After the November 22, 2022 vacatur and concession, and after the March 28, 2023 notice identifying the WhatsYourPrice screenshots as additional undisclosed impeachment evidence, the continuation of the prosecution lacked any conceivable basis in probable cause. (Ex. 4 at PDF pp. 1-153; Ex. 19 at PDF pp. 1, 4-6.)

102. Malice. The defendants acted with actual malice — a purpose other than bringing an accused to justice — established by, among other things: Baraiola's false ex parte representations to obtain an order withholding responsive evidence; the prosecutors' assurance to the complainant that the messages "wouldn't come out"; Bashford's and Baraiola's mid-trial direction of the complainant's testimony; Risdal's knowing falsehoods and her financial motive, including the undisclosed Uber settlement; the seventeen-month post-vacatur continuation of charges the Office knew it could not prove; the Office's continuation of the indictment after Plaintiff's criminal counsel wrote directly to District Attorney Bragg on March 28, 2023 demanding dismissal and identifying Lucey, Blumberg, PCJU notes, WhatsYourPrice screenshots, and additional disclosure issues (Ex. 19 at PDF pp. 1, 4-6, 8); and ADA Lucey's on-record explanation that the disposition was intended "to bring closure to both Mr. Tripathy and the victim" (Ex. 14, Plea Tr. 6:1-7) — a purpose of accommodation and case management, not a judgment that the charges were supported by evidence. Malice may also be inferred from the absence of probable cause and from the deliberate suppression and fabrication alleged.

103. Favorable termination and deprivation of liberty. The prosecution of the four indictment counts terminated in Plaintiff's favor (¶¶ 61-66, 76), and Plaintiff suffered a deprivation of liberty as a direct result of the prosecution, including 1,651 days of incarceration, pretrial restraint, and seventeen months of post-vacatur compulsion. *Thompson v. Clark*, 596 U.S. 36, 49 (2022); *Chiaverini v. City of Napoleon*, 602 U.S. 556, 562-63 (2024). As against the ADA Defendants, this claim rests on the investigative, administrative, and evidence-creating conduct described in ¶¶ 89-91, and on the post-vacatur continuation undertaken in an investigative posture; it is not pleaded against any defendant on the basis of grand-jury or trial testimony. The claim is timely under N.Y. C.P.L.R. § 214(5). The claim does not seek to invalidate the SCI or recover for any consequence properly attributable to the SCI conviction.

## SECOND CAUSE OF ACTION

**Malicious Prosecution Under New York Common Law (Against Defendants Baraiola, Bashford, Blumberg, Lucey, and Risdal) (Pleaded in the Alternative)**

104. Plaintiff repeats and realleges each preceding paragraph as if fully set forth herein.

105. For the reasons stated in the First Cause of Action, the defendants commenced and continued a criminal proceeding against Plaintiff on the four indictment counts; the proceeding

terminated in Plaintiff's favor in a manner not inconsistent with innocence; there was no probable cause, and any presumption from the indictment is rebutted under *Colon v. City of New York*, 60 N.Y.2d 78, 82-83 (1983); and the defendants acted with actual malice. *See Smith-Hunter v. Harvey*, 95 N.Y.2d 191, 195-99 (2000); *Manganiello v. City of New York*, 612 F.3d 149, 160-63 (2d Cir. 2010). This alternative state-law claim is likewise confined to the dismissed indictment counts and does not challenge the SCI conviction.

106. This claim is pleaded in the alternative to the First Cause of Action and is timely for the reasons stated in ¶ 18. Plaintiff does not assert this claim against the City.

**THIRD CAUSE OF ACTION**

**42 U.S.C. § 1983 — Denial of Due Process and the Right to a Fair Trial (Against Defendants Baraiola and Bashford)**

107. Plaintiff repeats and realleges each preceding paragraph as if fully set forth herein.

108. Defendants Baraiola and Bashford, acting under color of state law, deprived Plaintiff of his Fourteenth Amendment rights to due process and a fair trial by corrupting the truth-finding function of his criminal trial: they presented and failed to correct testimony their own file proved false, see *Napue v. Illinois*, 360 U.S. 264, 269-72 (1959); they withheld from the defense, through the entire prosecution, the evidence that would have exposed the falsity; and they deliberately prolonged Plaintiff's deprivation of liberty by concealing exculpatory evidence through trial, sentencing, appeal, and post-conviction proceedings, conduct that shocks the conscience and independently violates due process, see *Russo v. City of Bridgeport*, 479 F.3d 196, 205-11 (2d Cir. 2007). Protected courtroom acts are pleaded only as evidence of knowledge, intent, causation, materiality, and injury; liability rests on the non-advocative suppression, evidence-shaping, and extra-testimonial conduct alleged above.

109. As a direct and proximate result, Plaintiff was wrongfully convicted under the vacated 2018 judgment, incarcerated for 1,651 days, and otherwise injured as alleged, subject to the SCI limitations pleaded in ¶¶ 72-76. As against these defendants, the claim rests on the non-advocative conduct described in ¶¶ 89-91. The claim accrued at favorable termination and is timely.

**FOURTH CAUSE OF ACTION**

**42 U.S.C. § 1983 — Fabrication of Evidence (Against Defendants Baraiola and Bashford)**

110. Plaintiff repeats and realleges each preceding paragraph as if fully set forth herein.

111. Defendants Baraiola and Bashford, acting under color of state law and in an investigative and administrative capacity, fabricated evidence against Plaintiff: they caused the creation of the misleading "conversation mode" compilation — an affirmatively assembled document that selected and framed the complainant's messages — and deployed it in the ex parte process while the complete messages were withheld (¶ 34); they shaped the complainant's account to conform to a narrative their file disproved; and, during the court-ordered recess, they told the complainant "what to say," manufacturing the revised testimony she then delivered (¶ 48). The knowing creation of false or misleading evidentiary material — including by deliberately selective presentation and omission — and the manufacture of testimony are fabrication, distinct from a mere failure to disclose. *Zahrey v. Coffey*, 221 F.3d 342, 349-55 (2d Cir. 2000); *Morse v. Fusto*,

27

804 F.3d 538, 547-50 (2d Cir. 2015); *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997); *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 274-80 (2d Cir. 2016); *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 244-50 (2d Cir. 2020). The protected use of the manufactured narrative in court is pleaded as the causal mechanism of injury; the fabrication liability itself rests on the non-advocative creation, shaping, and transmission of false or misleading evidence.

112. The fabricated and manufactured evidence was likely to influence, and did influence, the jury's verdict: the Office itself has conceded a reasonable probability that Plaintiff would not have been convicted absent the suppression and the resulting distortion of the complainant's testimony. (Ex. 11 ¶ 4, PDF p. 3.) As a direct and proximate, and foreseeable, result, Plaintiff was wrongfully convicted under the vacated 2018 judgment and deprived of his liberty for 1,651 days, subject to the SCI limitations pleaded in ¶¶ 72-76. The claim accrued at favorable termination, *McDonough v. Smith*, 588 U.S. 109, 117-21 (2019), and is timely.

## FIFTH CAUSE OF ACTION

**42 U.S.C. § 1983 — Suppression of Material Exculpatory and Impeachment Evidence, and Failure to Intervene (Brady/Giglio) (Against Defendants Baraiola and Bashford)**

113. Plaintiff repeats and realleges each preceding paragraph as if fully set forth herein.

114. The complainant's SA.com messages, the WhatsYourPrice screenshots, her false sworn Florida testimony, and the related impeachment material (Ex. 4 at PDF pp. 1-153; Ex. 17, Fla. Dep. Tr. 20-21, 33-34, 82) were favorable to Plaintiff both as exculpatory evidence corroborating his defense and as impeachment evidence destroying the credibility of the sole complaining witness, and they were the subject of a specific defense demand — a circumstance that heightens the constitutional violation. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United States*, 405 U.S. 150, 154 (1972); *United States v. Bagley*, 473 U.S. 667, 682-83 (1985).

115. Defendants Baraiola and Bashford suppressed that evidence: they withheld it before trial through false ex parte representations; continued to withhold it after the complainant's direct testimony made it Rosario material as well; concealed it through sentencing, direct appeal, and years of post-conviction litigation; and disclosed it only in August 2022, under the compulsion of the PCJU reinvestigation. Each had personal knowledge of the materials and of the demand; each had the authority and the obligation to disclose or to intervene; and Bashford, the supervising Unit Chief present throughout, failed to intervene to prevent or correct the suppression and instead joined it. The SA.com messages, WhatsYourPrice screenshots, Florida deposition impeachment, and related paid-arrangement evidence were material both item by item and cumulatively: there is a reasonable probability that, had they been disclosed, the result would have been different — as the *Office has conceded. Kyles v. Whitley*, 514 U.S. 419, 433-37 (1995); *Banks v. Dretke*, 540 U.S. 668, 691 (2004); see also Ex. 11 ¶¶ 3-4, PDF pp. 2-3.

116. As a direct and proximate result, Plaintiff was wrongfully convicted under the vacated 2018 judgment and incarcerated for 1,651 days, subject to the SCI limitations pleaded in ¶¶ 72-76. As against these defendants, the claim rests on the non-advocative conduct described in ¶¶ 89-91; in all events, the suppression states the underlying constitutional violation on which the Sixth Cause of Action against the City independently rests. The claim accrued at favorable termination and is timely. Protected courtroom acts are pleaded only as evidence of the violation's operation and consequences, not as the independent basis for individual ADA liability.

28

## SIXTH CAUSE OF ACTION

**42 U.S.C. § 1983 — Municipal Liability (Monell) (Against the City of New York)**

117. Plaintiff repeats and realleges each preceding paragraph, and in particular ¶¶ 77-88, as if fully set forth herein.

118. Plaintiff was deprived of his constitutional rights to due process, a fair trial, and freedom from malicious prosecution and fabricated evidence, as pleaded in the First and Third through Fifth Causes of Action.

119. Those deprivations were caused by the City, acting through the District Attorney as its final policymaker for the management of the NYCDAO, by reason of the policies, customs, and management failures pleaded in ¶¶ 77-88: the absence of any adequate disclosure-management system; the absence of supervisory review of disclosure decisions; the custom of non-discipline; and the conviction-driven culture — each maintained with deliberate indifference in the face of the antecedent, adjudicated pattern of the same category of violation set out in Schedule A (Ex. 16, Schedule A). *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-94 (1978); *City of Canton v. Harris*, 489 U.S. 378, 388-90 (1989); *Walker v. City of New York*, 974 F.2d 293, 297-301 (2d Cir. 1992); *Bellamy v. City of New York*, 914 F.3d 727, 756-59 (2d Cir. 2019). The City's Monell liability is further supported by the Office's post-vacatur ratification and continuation of the prosecution after the direct March 28, 2023 notice to District Attorney Bragg and Chief Assistant District Attorney Reiss pleaded in ¶¶ 60 and 87. (Ex. 19 at PDF pp. 1, 4-6, 8.)

120. Each policy, custom, and failure was a moving force in, and directly and proximately caused, Plaintiff's wrongful vacated 2018 conviction and 1,651 days of incarceration, subject to the SCI limitations pleaded in ¶¶ 72-76 (¶ 86). The City enjoys no immunity, *Owen v. City of Independence*, 445 U.S. 622, 638, 650 (1980), and its liability does not depend upon a judgment of liability against any individual defendant, *Askins v. Doe No. 1*, 727 F.3d 248, 253-54 (2d Cir. 2013). The claim accrued at favorable termination and is timely.

## SEVENTH CAUSE OF ACTION

**42 U.S.C. § 1983 — Conspiracy and Joint Action to Deny Due Process and a Fair Trial (Against Defendant Risdal, as a Willful Participant in Joint Action Under Color of State Law)**

121. Plaintiff repeats and realleges each preceding paragraph, and in particular ¶¶ 68-71, as if fully set forth herein.

122. Agreement. Risdal and state actors — Defendants Baraiola and Bashford — reached an understanding to deprive Plaintiff of his rights to due process and a fair trial: the prosecutors would withhold from the defense and the jury the messages that disproved Risdal's account, assuring her they "wouldn't come out," and Risdal would supply and maintain the false account on which the prosecution rested. (Ex. 10 at PDF pp. 1-3.) On information and belief, the understanding formed during the complainant's collective vetting: Defendants Bashford, Lucey, Blumberg, and Baraiola met with Risdal on multiple occasions in June 2016 and thereafter in the course of their investigation (¶ 23). The Office's own records tie Blumberg to that collective vetting because "Niki Blumberg stated 4 ADAs vetted/met with the CW," Baraiola remembered supervisors being present, and Risdal recalled "Martha, Kristen and 1 or 2 other people" at the text-messages meeting where prosecutors said they were turning over only the messages between

29

her and Plaintiff, with no discussion of showing the remainder even to a judge. (Ex. 9 at PDF pp. 2-3; Ex. 10 at PDF pp. 1-2.)

123. Overt acts. In furtherance of that agreement: Risdal made and repeated knowingly false statements to law enforcement and the prosecutors that initiated and sustained the prosecution (¶ 68); the prosecutors concealed the messages, including through the false ex parte application (¶ 35); Risdal maintained the false narrative through the proceedings; and, during the mid-trial recess, Risdal met privately with Baraiola and Bashford, who "told her what to say," after which she conformed her account to their direction (¶¶ 48, 70; Ex. 10 at PDF p. 2; Ex. 7, Part C, Trial Tr. 335:15-336:25).

124. State action and absence of immunity. By her willful participation in joint activity with state officials, *Risdal acted under color of state law. Dennis v. Sparks*, 449 U.S. 24, 27-29 (1980); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970); *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999); *Ciambriello v. County of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002). Her liability is pleaded on her non-testimonial conduct, provable through her own 2022 PCJU admissions rather than her testimony, and is barred neither by witness immunity nor by any qualified immunity available to a private party. *Rehberg v. Paulk*, 566 U.S. 356, 369-70 & n.1 (2012); *Coggins v. Buonora*, 776 F.3d 108, 112-13 (2d Cir. 2015); *White v. Frank*, 855 F.2d 956, 958-62 (2d Cir. 1988); *Wyatt v. Cole*, 504 U.S. 158, 168-69 (1992); *Richardson v. McKnight*, 521 U.S. 399, 412-13 (1997).

125. As a direct and proximate result of the conspiracy and joint action, Plaintiff was wrongfully convicted under the vacated 2018 judgment, incarcerated for 1,651 days, and otherwise injured as alleged, subject to the SCI limitations pleaded in ¶¶ 72-76. The claim accrued at favorable termination and is timely.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and award:

1. Compensatory damages against each defendant on the claims asserted against that defendant, jointly and severally where permitted by law, in an amount to be determined at trial, including damages for loss of liberty, physical and emotional injury, lost earnings and permanent impairment of earning capacity, and injury to reputation;

2. Punitive damages against the individual defendants in an amount to be determined at trial;

3. Reasonable attorneys' fees and costs to the extent permitted by 42 U.S.C. § 1988, and costs of suit;

4. Pre-judgment and post-judgment interest as permitted by law; and

5. Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: Morrisville, North Carolina

_____, 2026

Respectfully submitted,

_____

SANJAY TRIPATHY

Plaintiff Pro Se

2013 Jadewood Drive

Morrisville, NC 27560

+1-859-380-1515

sanjay.tripathy@gmail.com

**VERIFICATION**

I, Sanjay Tripathy, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I am the plaintiff in this action, that I have read the foregoing Third Amended Complaint, and that the factual allegations stated therein are true of my own knowledge, except as to those matters alleged on information and belief, and as to those matters I believe them to be true.

Executed on _____, 2026.

_____

SANJAY TRIPATHY

**EXHIBIT 16**

Updated Schedules A, B, C, and D

*Tripathy v. City of New York*, et al., No. 1:25-cv-06465-AT-JW

**Purpose and Use of Exhibit 16**

This exhibit (also provided separately as Exhibit 16) sets out representative schedules supporting Plaintiff's municipal-liability (Monell) allegations under 42 U.S.C. § 1983. The schedules are intended to identify the categories of public notice, context, corroboration, ratification, and legal authority on which the Third Amended Complaint relies.

Schedule A is the principal antecedent-notice schedule. It identifies published judicial decisions of the Appellate Division, First Department, the New York Court of Appeals, and the Second Circuit in or arising from New York County District Attorney's Office prosecutions, decided before Plaintiff's May-June 2018 trial, in which courts found, or required further proceedings concerning whether, the Office failed to disclose exculpatory, impeachment, witness-statement, or credibility material it was obligated to produce under *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and/or *People v. Rosario*, 9 N.Y.2d 286 (1961). These decisions are offered as antecedent notice to the District Attorney, as the City's final policymaker for management of the NYCDAO, of a recurring pattern of disclosure-management failures in the same relevant category as this case: failures to identify, track, supervise, and disclose exculpatory, impeachment, witness-statement, and credibility material in prosecutions dependent on witness credibility, including cases involving specific defense demands.

Schedule A spans both the pre-2001 Rosario regime, under which Rosario violations required reversal per se, and the post-2001 regime, after the Legislature abolished the per se rule and required a showing of a reasonable possibility that the nondisclosure affected the verdict. See N.Y. C.P.L. former § 240.75. The persistence of judicial findings and remands concerning disclosure failures after the 2001 statutory change is offered to support Plaintiff's allegation that the disclosure problem was systemic, known to policymakers, and unremedied by adequate training, tracking systems, supervisory review, or discipline. Plaintiff offers that pattern to support a plausible inference of deliberate indifference under Monell and its progeny, including *Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992), and *Bellamy v. City of New York*, 914 F.3d 727 (2d Cir. 2019).

Schedule B provides selected trial-advocacy, summation-misconduct, and public-reporting context as evidence of the broader conviction-driven office culture in which disclosure obligations allegedly were treated as obstacles rather than constitutional commands. Schedule B supplements Schedule A; it is not offered as the principal antecedent-notice schedule and public reporting is not offered as an adjudicated finding.

Schedule C identifies post-2018 institutional acknowledgments, PCJU vacaturs, and related conviction-integrity matters offered as corroboration, ratification, institutional-admission, and post-vacatur continuation evidence. These entries are not offered as the primary antecedent notice for the pre-2018 violation; Schedule A supplies the primary antecedent-notice pattern.

Schedule D identifies the governing legal authorities supporting the schedules' Monell, Brady/Giglio, fabrication/fair-trial, immunity, and favorable-termination functions.

The schedules are representative, not exhaustive, and are pleaded for the limited purposes stated in the Third Amended Complaint. They do not seek relief that depends on invalidating Plaintiff's 2024 SCI conviction. Authorities that are not verified as fitting the schedules' stated criteria are not included.

**Schedule A — Adjudicated NYCDAO Disclosure-Obligation Violations and Findings Decided Before Plaintiff's Trial**

Use in TAC: Antecedent notice for deliberate indifference, failure to train, failure to supervise, failure to discipline, and disclosure-management-system failures (TAC ¶¶ 77-88).

The entries are ordered by closeness of fit to this case rather than chronologically: the most analogous decisions appear first — sex-offense and credibility-driven prosecutions, suppression of complainant impeachment and financial-motive evidence, cases involving a specific defense demand, and charge-overlap — followed by decisions in which the Office conceded the violation, additional witness-statement nondisclosures evidencing the sustained pattern, and post-2001 decisions confirming that the pattern persisted after the statutory change. The "Date" column preserves the chronology.

| # | Case | Citation | Date | Disclosure Issue / Disposition | Use in TAC / Monell Notes |
|---|------|----------|------|-------------------------------|---------------------------|
| 1 | *People v. Wallert* | 98 A.D.2d 47, 469 N.Y.S.2d 722 (1st Dep't 1983) | 1983 | Reversal in a sex-offense prosecution for suppression of Brady/Giglio impeachment of the complainant: the People withheld evidence of the complainant's financial motive to fabricate (a pending civil lawsuit) while suggesting she had no motive to lie; the First Department found a clear Brady violation. | Closest factual analog — suppressed complainant financial-motive impeachment in a sex-offense/credibility-driven case. Directly parallels the suppression of SA.com messages showing Risdal's financial motive and paid-arrangement history. |
| 2 | *People v. Sinha* | 84 A.D.3d 35, 922 N.Y.S.2d 275 (1st Dep't 2011), aff'd, 19 N.Y.3d 932, 976 N.E.2d 223 (2012) | Apr. 7, 2011 | Reversal for late and incomplete disclosure of impeaching communications between the prosecution and the complainant and her mother; affirmed by the Court of Appeals. | Recent pre-trial disclosure reversal involving complainant-related impeachment communications. Court of Appeals affirmance gives high authority weight. Directly analogous to suppression of complainant-impeachment material. |
| 3 | *Mayo v. Henderson* | 13 F.3d 528 (2d Cir. 1994) | Jan. 3, 1994 | Federal habeas relief in a New York County prosecution grounded in a Rosario violation: the prosecutor failed to produce police memo books containing the testifying officers' original notes of the complainant's statements — despite an express pretrial defense demand and a warning against being "sandbagged" — and admitted she knew the documents existed. The trial court called the failure "inexcusable" and "shocking"; the New York Court of Appeals, in the codefendant's appeal, had treated such a Rosario violation as a per se ground for reversal; | Strong demand-and-refusal parallel to Plaintiff's July 2016 Specific Brady Request; public federal-court notice of a serious NYCDAO witness-statement nondisclosure in a credibility-driven case. |

| # | Case | Citation | Date | Disclosure Issue / Disposition | Use in TAC / Monell Notes |
|---|------|----------|------|-------------------------------|----------------------------|
| | | | | and the Second Circuit (Kearse, C.J.) affirmed habeas relief, granted because appellate counsel was ineffective for failing to raise the violation. | |
| 4 | *People v. Kanani* | 226 A.D.2d 226, 641 N.Y.S.2d 26 (1st Dep't 1996) | 1996 | Reversal in a sex-offense prosecution for the People's failure to produce complainant grand-jury testimony as Rosario material. | Sex-offense disclosure-failure analog involving complainant testimony and the Office's obligation to produce witness statements in credibility-driven prosecutions. |
| 5 | *People v. Spivey* | 177 A.D.2d 216, 581 N.Y.S.2d 739 (1st Dep't 1992) | 1992 | Reversal for failure to produce Rosario material in a prosecution that included Assault in the Second Degree under § 120.05(6). | Charge-overlap analog: the prosecution included Assault 2° under § 120.05(6), a count charged in Plaintiff's own indictment; recurring witness-statement nondisclosure in an assault prosecution. |
| 6 | *People v. Quinones* | 139 A.D.2d 404, 527 N.Y.S.2d 5 (1st Dep't 1988), aff'd, 73 N.Y.2d 988 (1989) | 1988-1989 | Reversal for failure to produce Rosario material; the People conceded the nondisclosure; affirmed by the Court of Appeals. | Office concession of a Rosario violation; Court of Appeals affirmance; public notice of recurring witness-statement disclosure failures. |
| 7 | *People v. Dixon* | 209 A.D.2d 274, 618 N.Y.S.2d 710 (1st Dep't 1994) | 1994 | Reversal for failure to produce Rosario material; the People conceded, and substantial compliance was held to be no defense to a Rosario violation. | Office concession; rejection of the substantial-compliance excuse; supports notice that ad hoc disclosure practices were constitutionally and procedurally inadequate. |
| 8 | *People v. Johnson* | 245 A.D.2d 134, 666 N.Y.S.2d 160 (1st Dep't 1997) | 1997 | Reversal for failure to disclose Rosario material; the People conceded the error. | Office concession of a Rosario violation — recurring acknowledgment of the same category of failure. |
| 9 | *People v. Dennis* | 265 A.D.2d 271, 697 N.Y.S.2d 599 (1st Dep't 1999) | 1999 | Reversal for the People's failure to disclose Rosario material in connection with a pretrial Wade hearing; the People conceded. | Office concession; disclosure failure extending even to pretrial identification proceedings. |
| 10 | *People v. Rothman* | 117 A.D.2d 535, 498 N.Y.S.2d 811 | 1986 | Reversal for the People's failure to disclose Rosario material (prior statements of a testifying witness). | Recurring failure to disclose a testifying witness's prior statements — the same category of |

| # | Case | Citation | Date | Disclosure Issue / Disposition | Use in TAC / Monell Notes |
|---|------|----------|------|-------------------------------|----------------------------|
| | | (1st Dep't 1986) | | | witness-statement nondisclosure at issue here. |
| 11 | *People v. Parker* | 157 A.D.2d 519, 549 N.Y.S.2d 710 (1st Dep't 1990) | 1990 | Reversal for failure to disclose Rosario material concerning a testifying witness. | Recurring witness-statement nondisclosure; part of the sustained pre-trial pattern of which the Office had notice. |
| 12 | *People v. Geathers* | 172 A.D.2d 134, 577 N.Y.S.2d 796 (1st Dep't 1991) | 1991 | Reversal for nonproduction of Rosario material (notes of a testifying witness/agent). | Loss or nonproduction of witness notes — evidence of inadequate systems for tracking and preserving disclosable witness material. |
| 13 | *People v. Jarrells* | 190 A.D.2d 120, 597 N.Y.S.2d 305 (1st Dep't 1993) | 1993 | Reversal for failure to disclose Rosario material in a case that turned on witness credibility. | Disclosure failure in a credibility-dependent prosecution — the same dynamic the TAC alleges here. |
| 14 | *People v. Wright* | 197 A.D.2d 398, 602 N.Y.S.2d 378 (1st Dep't 1993) | 1993 | Reversal for failure to produce Rosario material (a report concerning a testifying witness). | Recurring failure to produce witness-related reports; cumulative notice of disclosure-management deficiency. |
| 15 | *People v. Jordan* | 207 A.D.2d 700, 616 N.Y.S.2d 495 (1st Dep't 1994) | 1994 | Reversal for uncontested nonproduction of a testifying detective's notes (Rosario). | Uncontested nondisclosure of a detective's notes — recurring witness-statement failure involving law-enforcement witnesses. |
| 16 | *People v. Jennings* | 248 A.D.2d 265, 670 N.Y.S.2d 438 (1st Dep't 1998) | 1998 | Reversal on Rosario grounds for failure to produce a testifying witness's prior statements. | Recurring witness-statement nondisclosure near the close of the per se regime; continuing pattern. |
| 17 | *People v. Lee* | 116 A.D.3d 493, 983 N.Y.S.2d 524 (1st Dep't 2014) | Apr. 10, 2014 | The First Department held that the People's undisclosed DD5 reports constituted Rosario material that should have been disclosed, and that an undisclosed hospital report describing the assailant's complexion — which the People conceded did not match the defendant — was Rosario and Brady material. | Post-2001 explicit judicial finding that the Office failed to disclose Rosario/Brady material; the disclosure error was found harmless and the reversal rested on an unrelated jury-instruction ground. Shows the problem continued after the statutory change. Trial court: Supreme Court, New York County (Laura A. Ward, J.). |
| 18 | *People v. Burgess* | 128 A.D.3d 530, 10 N.Y.S.3d 26 | May 19, 2015 | Co-defendant companion to Lee, arising from the same prosecution and record; the same | Paired post-2001 entry with Lee. Reinforces that the Office continued to fail to |

| # | Case | Citation | Date | Disclosure Issue / Disposition | Use in TAC / Monell Notes |
|---|------|----------|------|--------------------------------|----------------------------|
| | | (1st Dep't 2015) | | finding that undisclosed DD5 Rosario material should have been produced, with no reversal required for want of demonstrated prejudice. | disclose witness-statement and Brady/Rosario material close to Plaintiff's trial period. |
| 19 | *People v. Ulerio* | 137 A.D.3d 629, 27 N.Y.S.3d 558 (1st Dep't 2016) | Mar. 24, 2016 | Between verdict and sentencing the People disclosed that arresting officers were under investigation for perjury arising from other cases with similar fact patterns; the First Department held the appeal in abeyance and remanded for a hearing on whether the Office — whose Official Corruption Unit had been assigned the perjury investigation before trial — possessed and failed to disclose that impeachment information. | Post-2001 adjudicated concern sufficient to require a Brady/Giglio hearing concerning impeachment information about police witnesses; supports notice that the Office's disclosure systems had recurring problems with witness-impeachment material. |

Note on pre-2001 versus post-2001 cases: Before 2001, a Rosario violation required reversal per se. After the 2001 statutory change, reversal required a showing of a reasonable possibility that the nondisclosure affected the verdict. For Monell-notice purposes, Plaintiff offers both categories because the recurring judicial findings and remands concern the Office's obligation to identify, supervise, and disclose witness-statement, impeachment, Brady, Giglio, and Rosario material. The schedule is representative rather than exhaustive; each entry is a published decision in a New York County prosecution decided before Plaintiff's trial.

## Schedule B — Selected NYCDAO Trial-Advocacy / Summation Misconduct Context

Use in TAC: Context for the alleged conviction-driven office culture, supervisory tolerance, and lack of discipline (TAC ¶¶ 82, 84). These entries supplement Schedule A and are offered as context, not as the principal disclosure-notice pattern.

| # | Case / Source | Citation / Date | Misconduct / Relevance |
|---|---------------|-----------------|------------------------|
| 1 | *People v. Whaley* | 70 A.D.3d 570 (1st Dep't 2010) | Prosecutor characterized defense counsel's role as calling the People's witnesses liars. Offered as office-culture context concerning trial-advocacy boundaries and supervisory tolerance. |
| 2 | *People v. Padin* | 121 A.D.3d 628 (1st Dep't 2014) | A portion of summation could be viewed as a misstatement of law; curative instructions were found sufficient. Offered as office-culture context; not disclosure-specific. |
| 3 | *People v. Narvaez* | 125 A.D.3d 415 (1st Dep't 2015) | Improprieties in cross-examination and summation were challenged and a mistrial denied. Offered as office-culture context concerning supervisory tolerance of advocacy misconduct. |

| # | Case / Source | Citation / Date | Misconduct / Relevance |
|---|---|---|---|
| 4 | *People v. Singleton* | 139 A.D.3d 208, 29 N.Y.S.3d 358 (1st Dep't 2016) | Admission of prejudicial propensity evidence; provides trial-misconduct context. Offered as office-culture context relevant to supervision and discipline. |
| 5 | *People v. Melendez* | 140 A.D.3d 421, 33 N.Y.S.3d 223 (1st Dep't 2016) | Prosecutor used a laser pointer and argued trajectory/muzzle-flash as unsworn expert material in summation. Offered as office-culture context concerning fair-trial risk, advocacy boundaries, supervision, and discipline. |
| 6 | *People v. Hoey* | 145 A.D.3d 118, 41 N.Y.S.3d 477 (1st Dep't 2016) | Improper government conduct and due-process issues were raised; the reversal addressed the defendant's absence from Molineux/Ventimiglia proceedings. Offered as office-culture and due-process context. |
| 7 | *People v. Adams* | 151 A.D.3d 612, 54 N.Y.S.3d 292 (1st Dep't 2017) | Summation invited the jury to speculate about facts not in evidence; the court found a curative instruction sufficient. Offered as pre-trial office-culture context concerning summation boundaries and supervisory tolerance. |
| 8 | Public reporting on Manhattan DA Sex-Crimes Unit lapses | Wall Street Journal, "Sex-Crimes Unit's Lapses Trip Up Cases," July 5, 2011 | Public reporting concerning Sex-Crimes Unit disclosure lapses, including delayed disclosure of surveillance/video material, documentary outtakes, and complainant-related communications in high-profile sex-crimes cases. Offered only as pre-2018 public notice and context, not as an adjudicated finding. |

## Schedule C — Post-2018 Institutional Acknowledgments, PCJU Vacaturs, and Corroboration

Use in TAC: Post-trial corroboration, ratification, institutional-admission, and post-vacatur continuation evidence (TAC ¶¶ 87-88). These entries are not offered as the primary antecedent notice for the pre-2018 violation; Schedule A supplies the primary antecedent-notice pattern.

| # | Matter | Citation / Source | Corroborating Fact / Limited Use |
|---|---|---|---|
| 1 | *People v. Tripathy (this case)* | N.Y. Sup. Ct., N.Y. Cty., Nov. 22, 2022; Exs. 11-12 | People consented to vacatur after conceding that suppressed SA.com messages prevented a fair challenge to the complainant's credibility and created a reasonable probability of non-conviction. Offered as case-specific causation, materiality, institutional concession, and ratification evidence. |
| 2 | Muhammad Aziz & Khalil Islam (Malcolm X convictions) | N.Y. Sup. Ct., N.Y. Cty., Nov. 18, 2021; public reporting | A reinvestigation resulted in vacatur and dismissal of decades-old convictions after withheld exculpatory evidence was identified, including evidence attributed to the Manhattan District Attorney's Office and other |

| # | Matter | Citation / Source | Corroborating Fact / Limited Use |
|---|--------|-------------------|----------------------------------|
|  |  |  | law-enforcement actors. Offered as institutional acknowledgment and conviction-integrity corroboration. |
| 3 | *People v. Lopez (Central Park jogger-related conviction)* | N.Y. Sup. Ct., N.Y. Cty., July 2022; public reporting | The conviction was vacated on the District Attorney's motion — the PCJU's first exoneration; public reporting states the defendant was charged and pleaded in the face of false statements, unreliable forensic analysis, and external pressure. Offered as Bragg-era corroboration of conviction-integrity failures. |
| 4 | Eric Smokes & David Warren | N.Y. Sup. Ct., N.Y. Cty., Jan. 31, 2024; public reporting | A PCJU reinvestigation uncovered evidence of witness pressure and "fraudulent police practices"; the Office's prior (2020) position had opposed vacatur. Offered as corroboration of the CRU/PCJU contrast and conviction-integrity failure. |
| 5 | Jon-Adrian "J.J." Velazquez | N.Y. Sup. Ct., N.Y. Cty., 2024; public reporting | A PCJU reinvestigation and forensic evidence undermined the identification; the Manhattan District Attorney consented after PCJU review. Offered as Bragg-era corroboration and institutional-reform evidence. |
| 6 | PCJU vacaturs — individual exonerations and police-misconduct dismissals | Manhattan D.A. press releases; Gothamist (Nov. 18, 2022); amNY (Sept. 2024); N.Y. Law School Wilf Center (2025) | Since its 2022 creation, the PCJU has vacated convictions in individual reinvestigations (reported as roughly ten by 2024 and at least thirteen by 2025) and has separately moved to vacate several hundred convictions tied to former NYPD officers convicted of misconduct (188 in November 2022 and 316 in 2023). The two tracks are distinct: the police-misconduct vacaturs rested on the officers' own convictions, not on disclosure findings against the Office. Offered as corroboration of the scale of conviction-integrity review and institutional acknowledgment; the individual-reinvestigation track (including Plaintiff's case) is the disclosure-relevant cohort. |
| 7 | Joseph Franco prosecution collapse | Public reporting; N.Y. Sup. Ct., N.Y. Cty. dismissal with prejudice (2023) | Public reporting states that the Office failed on multiple occasions to turn over required discovery, the prosecution was dismissed with prejudice, and the Office publicly discussed officewide responsibility and root-cause review. Offered as post-2018 corroboration and institutional acknowledgment of discovery-management failures, not as antecedent notice. |

**Schedule D — Additional Legal Authorities Supporting the Use of Exhibit 16**

Use in TAC: Governing legal authority for the schedules' Monell, Brady/Giglio, fabrication, fair-trial, immunity, and favorable-termination functions.

| Doctrine | Authority | Use in TAC |
|---|---|---|
| Monell final-policymaker / management liability | *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978); *City of Canton v. Harris*, 489 U.S. 378 (1989); *Connick v. Thompson*, 563 U.S. 51 (2011) | Supplies the elements of municipal liability — policy or custom, deliberate indifference, and moving-force causation — and the single-incident limit of Connick, which Plaintiff distinguishes through Schedule A's representative pattern. |
| New York DA as municipal policymaker for management functions | *Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992); *Bellamy v. City of New York*, 914 F.3d 727 (2d Cir. 2019); *Ying Jing Gan v. City of New York*, 996 F.2d 522 (2d Cir. 1993) | Supports treating disclosure-system training, supervision, discipline, and office-management failures as City policy, distinct from prosecutorial judgment in a particular case. |
| Municipality cannot borrow individual immunity | *Owen v. City of Independence*, 445 U.S. 622 (1980); *Askins v. Doe No. 1*, 727 F.3d 248 (2d Cir. 2013); *Van de Kamp v. Goldstein*, 555 U.S. 335 (2009) | Even if individual prosecutors assert absolute immunity, City Monell liability may remain where the underlying constitutional violation and policy causation are pleaded. |
| Disclosure / materiality authorities | *Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972); *United States v. Bagley*, 473 U.S. 667 (1985); *Kyles v. Whitley*, 514 U.S. 419 (1995); *Banks v. Dretke*, 540 U.S. 668 (2004) | Defines favorable exculpatory and impeachment evidence, suppression, and materiality; supports the materiality of the SA.com messages, WhatsYourPrice screenshots, and complainant-impeachment evidence. |
| Fabrication / fair-trial authorities | *Napue v. Illinois*, 360 U.S. 264 (1959); *Zahrey v. Coffey*, 221 F.3d 342 (2d Cir. 2000); *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123 (2d Cir. 1997); *Garnett v. Undercover Officer C0039*, 838 F.3d 265 (2d Cir. 2016); *Morse v. Fusto*, 804 F.3d 538 (2d Cir. 2015) | Supports fair-trial and fabrication claims where false or misleading evidence is created, shaped, or forwarded for use in a criminal proceeding, and where false testimony is knowingly presented or left uncorrected. |
| Charge-specific malicious prosecution / favorable termination | *Thompson v. Clark*, 596 U.S. 36 (2022); *Chiaverini v. City of Napoleon*, 602 U.S. 556 (2024); *Carruthers v. Colton*, 153 F.4th 169 (2d Cir. 2025); *Janetka v. Dabe*, 892 F.2d 187 (2d Cir. 1989); *Smith-Hunter v. Harvey*, 95 N.Y.2d 191 (2000) | Supports charge-by-charge favorable termination analysis and distinguishes dismissed charges unrelated to a later plea disposition from charges dismissed as part of a negotiated plea. |