# pretrial proceedings May 11

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK PART 77

---

THE PEOPLE OF THE STATE OF NEW YORK : **Indictment No.** 2720/16

-VS-

SANJAY TRIPATHY, : Jury Trial

DEFENDANT :

---

May 11, 2018
100 Centre Street
New York County

**B E F O R E:**

HONORABLE ERIKA EDWARDS,
Justice

**A P P E A R A N C E S:**

CYRUS R. VANCE, JR., ESQ.,
District Attorney, New York County
One Hogan Place
BY: KRISTEN BARAIOLA, ESQ.,
MARTHA BASHFORD, ESQ.,
Assistant District Attorneys

FRANK ROTHMAN, ESQ.,
Attorney for the defendant
100 Lafayette Street
New York County

SARAH MAXEY
SENIOR COURT REPORTER

PROCEEDINGS

THE COURT CLERK: This is Calendar No. 1, 2760/2016 as to Sanjay Tripathy. This case was sent forthwith from Tap B.

Appearances.

MS. BARAIOLA: Christine Baraiola, B-A-R-A-I-O-L-A, for the People.

MR. ROTHMAN: Frank Rothman, R-O-T-H-M-A-N, 100 Lafayette Street, for Mr. Tripathy.

Good morning, your Honor.

THE COURT: Ms. Baraiola, who's here with you?

MS. BARAIOLA: This is Sarah Skutch, your Honor, S-K-U-T-C-H. She's a trial preparation assistant with the District Attorney Office.

THE COURT: So she'll be sitting with you?

MS. BARAIOLA: Yes, and also another district attorney will be doing the trial with me as well.

THE COURT: Okay.

Who's that?

MS. BARAIOLA: Martha Bashford, B-A-S-H-F-O-R-D, will be sitting in with me.

THE COURT: Ms. Bashford is still coming to the court these days?

MS. BARAIOLA: Yes.

THE COURT: We have some preliminary matters. We have all day today. We can't get our jurors until Monday.

PROCEEDINGS

Usually weak make the call at 10:30. I'd like to take care of everything that we need to take care of in advance so we can have a smooth transition once we start with jury selection.

First of all, you have to tell me something about the case -- whatever you want to share with us it's up to you, Mr. Rothman -- and tell me where we are, if there's been an offer made, if the Court made an offer. We're not supposed to talk about disposition even if there is a possibility.

MS. BARAIOLA: The People's recommendation is on a plea to the charge to the first count which is criminal sexual act in the first degree, 15 years in jail, five years post-release supervision, a Waiver of Appeal, SORA registration.

And to my recollection there has been no conversation with a Judge at any point. I know Mr. Rothman is the third lawyer on the case, but I don't believe there's ever been any conversation with a Judge about resolving the case.

THE COURT: There's no interest?

MR. ROTHMAN: Zero.

THE COURT: Okay.

Tell me about the case.

MS. BARAIOLA: The defendant and complaining

witness met each other on a website called Seeking Arrangement. This was a first date. They met up in Manhattan. They went to dinner at a restaurant called Zuma, Z-U-M-A. After dinner, they decided to get drinks together. So they took an Uber back to the W Hotel where the defendant was staying. They went up to his room where he dropped off his briefcase.

They went down out of the hotel to Bank of America where he withdrew some money, and then they went into a bar located at the W Hotel. And they were in the bar having drinks, spending time together for about an hour and a half to two hours. And then the defendant asked the complaining witness to go upstairs to his hotel room with him, and she did.

Once they were inside the hotel room, the defendant became aggressive. The complaining witness said she didn't like it, and she wanted to leave. And the defendant wouldn't let her leave, and then things kind of devolved from there.

The complaining witness at one point tried to escape the room, and after that happened the defendant began to physically punch her and assault her. And eventually she performed oral sex on the defendant. And after telling the defendant that she had a child she had to get home to he had her wash herself off, and he allowed her to leave.

PROCEEDINGS

A search warrant was done on the defendant's person. The complaining witness did a rape kit. A search warrant was done on the hotel room. In the hotel room, recovered photographs and everything from the crime scene, bloody sheets. It was blood that splattered on the walls. There was some blood on the ground. There was blood around the sink of the bathroom. Her ripped stockings and her bra were recovered from inside of the hotel room as well, and she obviously has very significant bruising to the face. She was chocked. She had very distinct choking marks on her neck and a lot of petechiae around the eyes, and she was in a lot of pain for several days after this.

And that's pretty much what the case is.

THE COURT: Okay.

Anything you want to share, no? Okay.

MR. ROTHMAN: Judge, the defense is essentially going to be no secret. Much of what happened, probably 95 percent of what happened was bought and paid for. This was a consensual BDSM relationship with a woman on a website called Seeking Arrangements.com. There was correspondence about money. They went to an ATM together, once with her and once without her. There was a argument over money. She ended up with some injuries, some of which were part and parcel of the interaction that was discussed ahead of time, some small percentage of it was not.

Subsequent to this case, she made another claim of rape against someone else in another state eight months later. It's our position that this woman is totally unworthy of belief. We'll leave it at that.

THE COURT: Okay.

So no interest in discussing any resolution?

MR. ROTHMAN: We suggested a misdemeanor assault might resolve the case.

MS. BARAIOLA: I have never heard that before, but we are not making an offer of a misdemeanor assault.

THE COURT: Okay. All right.

So moving forward what sort of preliminary matters we need to address?

MS. BARAIOLA: Your Honor, I did file an ex parte motion when the case was pending in Tap B, and Judge McGrath was the Judge sitting on the bench; and that was regarding the subsequent sexual assault which Mr. Rothman is definitely aware of. But the motion I had filed was --

THE COURT: I read it.

MS. BARAIOLA: I'm sorry.

THE COURT: I read the motion.

MS. BARAIOLA: Okay.

THE COURT: But I didn't know where we were on that. That was like August or something of last year.

SKWRAO: Correct.

Judge McGrath had ruled it was not discovery. It was not Rosario. It was not something that needed to be disclosed.

THE COURT: I didn't see a decision just that it was an ex parte motion.

MR. ROTHMAN: I've seen nothing by the way.

THE COURT: Okay.

MS. BARAIOLA: He left it up to the trial judge to make the ultimate determination about whether or not it would be something that would be admissible at trial. He was not going to make that decision whether or not testimony could be elicited at trial regarding this.

For the same argument that I made in the motion which you've read, I don't think that it's something that should be discussed at this trial.

THE COURT: Let's deal with this.

I assume you want to question the complainant about it?

MR. ROTHMAN: It's a possibility I want to ask her about the subsequent rape.

THE COURT: Okay.

So let's talk about the motion in limine. This is all out. I know it's ex parte where everybody knows everything, and let's figure out what can come it.

So what's your position on it?

PROCEEDINGS

MS. BARAIOLA: It's my position that --

THE COURT: I'm sorry.

Before you tell me that, not that this is dispositive what was the end result of this Florida case?

MS. BARAIOLA: The case went to trial, and defendant was convicted of five out of the six counts that he was charged with.

THE COURT: Okay.

Was it assault sex?

MS. BARAIOLA: Yes, there was --

THE COURT: Rape?

MS. BARAIOLA: The defendant was an Uber driver, and the complaining witness got into his car as part of an Uber pool. And the she was the last person dropped off. So part of the sexual assault begins in the car, and then once she got to her house he followed her into the home, and she was raped in her home.

So there's burglary, rape. There was some sort of sexual charge for what happened in the vehicle which, I believe, that is the count, the one out of the five that he was not convicted of; but he was convicted of the other charges.

THE COURT: So they met through -- he was the Uber driver.

MS. BARAIOLA: Yes.

THE COURT: It wasn't like it was a website?

MS. BARAIOLA: Correct.

And there were no allegations in that case. The defense was just consent which as your Honor I'm sure is aware that's very common defense when there is DNA.

THE COURT: No money exchanged?

MS. BARAIOLA: No, there was no allegation that, you know, there was money, that there was an agreement for any type of benefit, no allegation that she is a prostitutes, nothing similar to the defense in this case.

THE COURT: So from what you knew back in August the defendant down there was saying that she was -- it sounds like she was coming on to him -- you didn't say it like that -- she said she was lonely, and something like that?

MS. BARAIOLA: Yeah, and I believe he did testify at trial.

THE COURT: Give us some updated information on what his defense was if you know.

MS. BARAIOLA: I don't have the transcript of his testimony at trial, but I believe he did testify at trial; and that it was consistent with the statement he had given to the police.

THE COURT: So nothing about getting paid, you know, paying her money in exchange for any sort of sexual

interaction?

MS. BARAIOLA: To my knowledge, I don't know. I don't know if you have anymore information about that.

MR. ROTHMAN: Sure.

I was in Florida for part of the trial. I saw the complainant testify. The defendant there, Gary Kitchen which is the driver's name, like Mr. Tripathy is an individual with no prior criminal history, married, children, solid background from what everyone knows.

His defense essentially was that this was a consensual arrangement. He picked her up in a car. She had been drinking at a concert, was taking her home. They struck up a conversation, and she said she had been lonely looking for some company, invited her into the home -- invited him into the home rather, and they had a consensual relationship in the home.

Her version was that he threatened to kill her, said he had a weapon, forced her to perform oral sex on him in the vehicle, immediately or slightly before that forced her to drink his urine in the car, and then a forcible rape in the home.

He was acquitted of all the charges that were related to the car but convicted of everything that happened in the home which I'm not sure why or how logical it works, but that's basically the scenario. It's nothing to do with

I pay her for X, Y, and Z, but it was a first arrest, consensual defense as well.

THE COURT: Okay.

So how do you -- this is a subsequent incident. What's your position on why it should be allowed at all to ask, you know, anything about it?

MR. ROTHMAN: I know, Judge, it's a tricky issue. It seems to me just the sheer percentages of someone, the likelihood of somebody being attacked --

THE COURT: Mr. Rothman, you got to come better than that.

MR. ROTHMAN: Both individuals' first arrest claiming consent. That's the issue. Both defenses are is consensual. There's an extreme unlikelihood that this happened, both scenarios, both individuals, both married men, both claiming consent. It justifies logic.

THE COURT: Well, you know, complainant is protected.

MR. ROTHMAN: I'm sorry.

THE COURT: The complainant is protected.

MR. ROTHMAN: Yes.

THE COURT: So CPL 60.42, you would be precluded from questioning her about any of those -- anything about Florida. It doesn't fall within any of the permissible categories.

MR. ROTHMAN: I know the case law.

THE COURT: I know you do. I appreciate that. What else can we talk about?

MS. BARAIOLA: So also, your Honor --

THE COURT: Hold on one second.

I'm assuming you're not going to be bringing anything out about that?

MS. BARAIOLA: No.

THE COURT: I just want to make sure. Case law gets a little tricky there.

MS. BARAIOLA: I have no intention of bringing anything out about the Florida case.

So, your Honor, after the complaining witness left the defendant's hotel room she walked out of the hotel and immediately approached a police van which was parked across the street from the hotel. It is all on video. It's exactly like she said it happened, and the officer said it happen. The officer interacted with her and gained from her several details about what had happened.

So I am seeking to admit not only that it was a very prompt outcry, she merely walked out of the hotel after this ended and approached law enforcement and explained that she was sexual assaulted, but I'm also seeking to bring in the content of what she tells this officer that had happened to her, namely, that it was Sanjay in room 4906. He had

tried to kill her. He forced her to perform oral sex, and she didn't want to. She needed to get out of the room, those sorts of things.

The officer which is Sgt. Schack, S-C-H-A-C-K, already testified at the hearing; and I presume he'll testify consistently at trial that when the complaining witness approached him she was frantic. She was extremely upset. She was very, very much under the stress of the situation that just occurred to her.

So I'm asking your Honor to allow the substance of the statement about what happened to her to come in as an excited utterance.

THE COURT: What's your position on that?

MR. ROTHMAN: If we're talking to prompt outcry, the case law is clear that while the promptness of the outcry is admissible, the underlying facts are not. That's Black Leather law.

My understanding is, and this is based on discovery that I received last night and written notice from the assistant, is when the complainant in this case went to the police she believed she said she had been assaulted, didn't think she said anything about any sexual attack, was thinking about a sexual attack; that she told the officer she was assaulted, yes, by Sanjay, yes, in a the room. That's not a dispute that it was Sanjay in room 4906 at the

W Hotel. There's no dispute about that. It's really unnecessary. It doesn't add anything. This is not an ID case. We're not saying you got the wrong guy or wrong room. It's a question of what happened. If we're talking about prompt outcry, then the reporting, itself, is admissible but none of the underlying facts.

THE COURT: What exactly does she report?

MS. BARAIOLA: She walks up to the officer, and, you know, it's not a coherent story. She's very, very upset, but she is saying it happened in this room. It was this person. I went on a date with him. She's explaining what happened in the room. She does definitely say he tried to kill me.

THE COURT: Is there sexual stuff in there as well?

MS. BARAIOLA: She does also tell him that she was forced to perform oral sex.

THE COURT: All right.

Do you want to speak on excited utterance because that's what details would come in, ID, and all of that?

MR. ROTHMAN: I guess, you know, it would --

THE COURT: You have to see that the testimony is?

MR. ROTHMAN: Correct. You know, if it's actually under the influence of, you know, this disturbance if you will, if it's --

THE COURT: I got a question.

So here's an offer of proof. So it appears that -- are you saying this was like her first opportunity to actually leave the room, and that the first individual she actually approached was right across the street?

MS. BARAIOLA: Yes.

We have the video from the hotel suite. I mean she walks, she gets in the elevator, she comes down. W Hotel is strange. You have to switch elevators to get all the way down to the bottom floor. She does that, and she walks immediately out into a police van.

THE COURT: I have to know more about before she left the hotel room. It's not like he was sleeping --

MS. BARAIOLA: No.

THE COURT: -- or it was two hours later she went to the bathroom and cleaned up. It is your position based on what you know she got dressed I assumed.

MS. BARAIOLA: She actually left some of her items in the room, stockings, her bra. Defendant had dumped her purse all over the room, and so her little wallet was still in the room. I mean she got out of there as quick as she could.

And basically the testimony that I expect the Court would hear is, you know, she had been resisting for a period of time, and things were not going well. And so she switched tactics. And she started saying, I have a daughter

at home. I have a babysitter. I need to get home to the babysitter. Please, let me go. I just care about my daughter. And the defendant telling her she can't tell anybody. He's higher up than the F.B.I. She'll get deported, and all sort of things. And she's just playing along. And then eventually he allows her to leave, follows her to the elevator. And so she waits until she gets outside to make a report. She walks right -- you can watch on the video -- walks right across the street to a police van.

MR. ROTHMAN: Well, the only thing that was left out -- well, that scenario -- much of that is undisputed that that's what she would say. But I also expect her to say that before she left the room after this -- what she'll describe as a heinous attack, that Mr. Tripathy also said to her, Don't forget we have plans for next Monday night.

THE COURT: If the testimony comes out the way People are saying it then to me it should come in under prompt outcry as well as excited utterance. You know if the testimony is substantially different, then certainly we can talk about that at sidebar or talk about it next. But at this point if it's fairly close to the way you're saying it I'm permitting it in under both prongs.

Hold on a second.

(Pause in the record.)

(Record resumed.)

THE COURT: What's next?

Give me a minute.

(Pause in the record.)

(Record resumed.)

THE COURT: Okay, what's next?

SKWRAO: So, your Honor, I did back when this case was pending in Part 51 submit some subpoenaed material to Judge Obus for en camera review; and based on the ruling of Judge Obus the People were not ordered to disclose the complaining witness' communications with other individuals on this dating website. But Judge Obus similarly to Judge McGrath did believe the ultimate decision about whether or not anything would be admissible at trial was up to the trial judge.

It's the People's position that her communications with other men on this website have absolutely no bearing on guilt or innocence of this defendant in this case. They have -- and they -- there's no reason for them to be admissible, or anything that she should be able to be questioned about because of the protection that she's afforded under the Rape/Shield Bar. They don't fall into any of the exceptions. There's no situation in any other sexual assault or communications or flirtatious comments or something with people wholly uninvolved with the current

case would ever be admissible. There is no reason for them to come in.

So I'm asking the Court to make a decision that they don't need to be disclosed. They don't need to be --

THE COURT: Let me ask you some questions.

Is there any dispute as to how they met? They definitely met through this site?

MS. BARAIOLA: No.

THE COURT: Is this something where the complainant has like a profile or something?

MS. BARAIOLA: Yes.

THE COURT: Okay.

And that's what the defendant was able to see, the profile?

MS. BARAIOLA: Yes.

THE COURT: And was the defendant able to see the conversations that she may have had with other men?

MS. BARAIOLA: No. Well, I don't know if they --

THE COURT: At the time of their meeting? Is that something he can see. He can see her communication with other people, and he decides if he wants to date her?

MS. BARAIOLA: My understanding is that if you both like each other then you start communicating through the site. I think they call it email through the site.

THE COURT: So it's private between --

MS. BARAIOLA: Yes.

THE COURT: -- the two individuals.

MS. BARAIOLA: That's my understanding.

THE COURT: Not public. Whoever is a member of the site. I assume there is a membership or something that everybody can see.

MS. BARAIOLA: Yes.

THE COURT: All right.

And you have the communications between the complainant and the defendant?

MS. BARAIOLA: Yes, those have been turned over to defense a long time ago. I have communications with other people, not the defendant; and those I had Judge Obus review them en camera. And the decision was they're not discovery. They are not Brady material. You know, Judge Obus is aware of what the defense was in this case which is that a BDSM or some agreement. So Judge Obus or his court clerk went through the material and decided it was not discovery.

But what the ultimate decision for the Court as to whether or not if there's ever any contacts, Vigilio. My position is the same as it was when I submitted that to Judge Obus which is that they don't fall into any exception within the Rape/Shield Law.

THE COURT: I can't imagine that it would. I mean I assume it's all prior. Well, it doesn't matter.

Can I see the -- you have some communications between the complainant and the defendant?

MS. BARAIOLA: Yes.

THE COURT: Before they met?

MS. BARAIOLA: Yes. I left that downstairs. But it was part of the motion that was submitted, and I believe it's in the court file. I can point it out to you if you want, Judge.

MR. ROTHMAN: Just so we're clear, Judge, I have zero interest in whether or not the complaining witness in this case flirted with other men, had arrangements with other men to go on other dates. The only thing that would be relevant from my point of view is if there were any discussions about either BDSM because she had said under oath in prior proceedings that that's something she's never spoken about, never engaged in, and never done. Or if there are conversations having to do with money for dates which is another thing she says she's never done in her life. And that's not what this case was about.

THE COURT: So I'm going to look at the communications between her and her client. You're saying there's nothing in here about any --

MR. ROTHMAN: Her and my client, yeah, there's something about money. There's an email about money that they concede although the complainant under oath said it

never happened. But the email defies that.

THE COURT: Okay.

MS. BARAIOLA: And when you're done, your Honor, I want to respond to something that was said.

THE COURT: Okay.

So her profile's there, and somebody can respond to her directly?

MS. BARAIOLA: Yes.

THE COURT: Just privately say, you know, I think you're pretty, whatever. Let's talk. And communication starts?

MS. BARAIOLA: Correct.

MR. ROTHMAN: They exchange cellphone numbers.

THE COURT: So this what I'm looking at is the initial conversation?

MS. BARAIOLA: Initial communication, and then they exchange --

MR. ROTHMAN: If you're looking at email, that's the initial conversation.

THE COURT: It says user Sanjay to -- and the body of it is to Nina, You're clearly a catch.

MR. ROTHMAN: That's later because Sanjay is not the name she knows at first.

MS. BARAIOLA: So, your Honor, the way the Seeking Arrangement messages are there's an ID for the account and

then a message ID. And just to make it easier to understand rather than using the account number we just changed that to the defendant's name and to her user name just to make it easier to understand who's speaking to who.

THE COURT: What did she know him as?

MS. BARAIOLA: New Yorker 2016 was his like screen name. He originally told her his name was Sam. And then when they actually got to the restaurant he said his name is Sanjay.

MR. ROTHMAN: She likewise used aliases, Judge.

THE COURT: How do I know when this is?

MS. BARAIOLA: Your Honor, that is -- I want to say that is about a week before the date. I didn't bring everything upstairs with me.

THE COURT: Okay.

MS. BARAIOLA: But I can tell you the exact answer on that.

THE COURT: So there's something in the other document that talks -- I think this is the same thing -- talks about Sam and something. I assume the People used a paperclip and a highlighted square.

MS. BARAIOLA: Yeah, the large document is where they kind of fall in with the other messages, but as you can see they weren't in order. They jump around a little bit. So that's why we pulled them out, extracted it to make it

easier to read.

THE COURT: Okay.

The only reason I'm saying that it was like in June --

MS. BARAIOLA: It's definitely June of 2016. I want to say about a week or so before this incident. And then I think they exchanged the numbers, and they communicate on the phone about two days before this date. And the date is June 15, 2016.

MR. ROTHMAN: The emails come first between the defendant, New York 16, whatever it is. The email comes first, and then she provides a cellphone to him. And then they pick up on cellphone text.

THE COURT: Okay.

I'm looking at emails through the site?

MS. BARAIOLA: Correct.

THE COURT: Got it. I see the dates and stuff on the next page.

So in terms of -- I'm assuming, Mr. Rothman, from what you said you're interested in, if there's BDSM stuff and money stuff, I believe that, at least, my position is at this point I don't see how you'll be permitted to first of all obtain the conversations she had with other men whether it addresses those topics or not because this is what's important, her conversation and her exchange with the

defendant. There's certainly a mention -- I see the dollar sign -- there is a mention of money. I guess I have to see what the testimony is in terms of what she's saying.

MR. ROTHMAN: The testimony --

THE COURT: You think she would have never agreed to engage in any of that?

MR. ROTHMAN: She said under oath that she had zero communication with this defendant before this date about money. She said that under oath.

THE COURT: Okay.

MR. ROTHMAN: She's also said under oath that she's never engaged in BDSM, face smacking, consensual choking, dates for money. She's never done that. So to the extent that there's stuff that is contradictory to that or statements that should be discovery. But she's said under oath that this never happened before in her life. And if they have something that says the opposite clearly --

THE COURT: Now, isn't there something, some information about the defendant's profile --

MR. ROTHMAN: Yes.

THE COURT: -- that he's into light BDSM?

MR. ROTHMAN: Yes. That's on another website. This website says nothing about BDSM. That conversation as you will learn, I believe you will see, takes place during the day about what --

THE COURT: Okay.

You will not be permitted to have access to those conversations or ask her those types of questions, if she's ever engaged in certain, particular type of sexual activity. That's all protected. You can't ask her if ever in her life has she even if she met somebody from that site and engaged in that. That's not appropriate cross-examination.

MR. ROTHMAN: Well, I'm saying assuming her answer to that is no, but there are materials that contradict that --

THE COURT: You would not be able to ask her so she would not have an answer to that question.

MR. ROTHMAN: We know the answer because the answer has been under oath to start with no. If they possessed information that's contradictory to that in their sealed envelope, my position is that should be turned over to me. I don't know if we're on the same page.

THE COURT: I think we are.

MR. ROTHMAN: Okay.

THE COURT: I think we are.

MR. ROTHMAN: I don't plan on asking it because you're telling me I can't because the answer is going to be and has been no. But if they know based on materials they've received that that's a lie because they have their proof that that's a false statement, they should be directed

to turn it over to me. Don't you agree with that?

THE COURT: Not in this scenario.

MR. ROTHMAN: Okay.

THE COURT: Anything else, I'm sure there is, before we get to like Molineux, Sandoval.

MS. BARAIOLA: I'm just going to put on the record just to be clear, I don't think it's going to be an issue if I understand the Court's ruling, but just in response to what Mr. Rothman is saying about whether or not there was any communications about money ever with anybody, you know, that does not fall under any of the exceptions of CPL 60.42. And I believe -- I'm not going to believe or say that you're saying you can't ask anything about --

THE COURT: There are dollar signs in their conversation. So I think he has sufficient cross-examination specifically those conversations talking about --

MS. BARAIOLA: Of course.

MR. ROTHMAN: Yeah, that can't be barred.

THE COURT: Absolutely.

MS. BARAIOLA: Right, so we're on the same page.

THE COURT: But nothing about have you ever asked about money with anybody else. That is not something that would be admissible here.

MS. BARAIOLA: Thank you, your Honor.

THE COURT: He's got what they talked about.

MS. BARAIOLA: Okay, your Honor.

There is actually no Sandoval application. The defendant doesn't have a prior history.

THE COURT: Okay.

Give me one second.

(Pause in the record.)

(Record resumed.)

THE COURT: Do you anticipate any information about this particular type of website like it may be different than -- a little different than some of the dating apps that the jurors may be more familiar with, Mingle.com?

MS. BARAIOLA: I don't think that there's any way of getting around this, what this website is for.

THE COURT: So it's fair game if Mr. Rothman wants to ask the complainant --

MS. BARAIOLA: What the website is about?

THE COURT: Sure.

MS. BARAIOLA: I expect that that will come out.

THE COURT: Okay.

MS. BARAIOLA: I'm more just focused on communications with other people on websites or her other, you know, other dates with other men or her sexual preferences with other men, you know, all those things that are protected under Rape/Shield. I don't believe -- I

understand he will be able to ask her about being on this website and her communications with this defendant and what she's looking for with this defendant. That's all logically something she should be able to be asked about.

THE COURT: Okay.

MR. ROTHMAN: I am assume the People are not going to try to elicit on their direct through the complainant in this case, Ma'am, have you ever accepted money for a date or things like that because that came out in prior stuff. I assume that given your ruling that I'm barred from going there they can't go there either, right?

THE COURT: If they are going to open the door to something, that changes my ruling completely.

MR. ROTHMAN: Well, I don't know.

THE COURT: Yeah. I mean any opening of the door then we'll talk about it. We'll talk about it at sidebar or afterwards.

MR. ROTHMAN: Understood.

THE COURT: We won't have a full conversation in front of the jury. That changes all the rulings.

MR. ROTHMAN: Okay.

MS. BARAIOLA: So I do have one issue, your Honor.

The complaining witness in the other incident, the Florida case, she was deposed. And in one of the depositions she was asked questions about our case, the

New York case. Mr. Rothman has a copy of that, and he's seen it. I would just ask to the extent if there's going to be any sort of impeachment of the complaining witness regarding anything she may have said, I would ask that it be limited to, If you were under oath and there was a prior proceeding, not bringing out that it's Florida, not bringing out it's a different sexual assault, not bringing out any of those things.

MR. ROTHMAN: Of course. There is no issue, and the witness should be instructed before she gets here that those questions might very well be posed for her, and were you sworn to tell the truth at a prior proceeding three months ago, two months ago, whatever, I think the part that was done over the phone. So we can direct her to it so she knows what I'm talking about.

THE COURT: Okay.

MS. BARAIOLA: What I'm actually saying, your other sex case that you were the complainant or anything like that, or Florida. I have no interest of violating the Court's rules, but it's their witness so they should kind of tell her as well.

THE COURT: So then I think we should also be consistent. We're going to talk about she testified -- I assumed she testified in the grand jury.

MS. BARAIOLA: Just the grand jury.

THE COURT: Okay.

So weak talk about that. The time period should be different since the Florida thing is a year later.

MR. ROTHMAN: It was over the phone.

MS. BARAIOLA: Yes.

THE COURT: So that's an easy way to talk about it also.

MR. ROTHMAN: Still sworn.

THE COURT: Right.

MR. ROTHMAN: But not in person.

THE COURT: Sure. Okay.

You know, it's weird if you highlight in this particular case, this proceeding and you also have another proceeding.

MS. BARAIOLA: Okay.

MR. ROTHMAN: I wouldn't do that. I will say under oath at a certain time.

THE COURT: Okay. Sounds good.

So tell me about Sandoval, Molineux.

MS. BARAIOLA: So, your Honor, there's actually no Sandoval application. The defendant doesn't have a prior criminal record. And I believe for now that is what I have as far motions in limine.

THE COURT: No Molineux or anything?

SKWRAO: No.

THE COURT: Mr. Rothman, anything we need to discuss?

MR. ROTHMAN: No.

THE COURT: Let's talk about Antommarchi. You want to have a conversation with him about that, and if he is interested we'll get the form.

(Pause in the record.)

(Record resumed.)

MR. ROTHMAN: We had a discussion about Antommarchi, and the defendant will remain seated at counsel table during the proceeding.

THE COURT: Okay.

We have a form. Take a look at it and have your client sign it.

MR. ROTHMAN: It's been executed, your Honor.

THE COURT: Mr. Tripathy, I have in my hand a waiver of right to be present at sidebar conversations. I understand you had a conversation with your attorney, Mr. Rothman, about whether or not it's in your best interest to be present during sidebar conversations or to remain seated at the table. And you've decided to waive what's called Antommarchi right and just let your attorney and the People and I and the court reporter have sidebar over here to my left, and the door will come up if they have a particular issue that they are not comfortable addressing

with everybody. And then I will give your attorney an opportunity to come back and speak to you.

And some times I do forget, Mr. Rothman, so if you need some additional time to consult with your client before we continue just let me know.

MR. ROTHMAN: I appreciate that.

THE COURT: The reality of the situation is it's a very small courtroom.

MR. ROTHMAN: Hopefully not because then the jurors can hear.

THE COURT: Well, you know, your client is 25 feet away from where we are. The jurors will be across the room. So that is a little bit different, but we do try to give the jurors some privacy.

So it looks like this is your signature. Is this your signature as it appears to the right-hand side of this document that I'm holding up, sir?

THE DEFENDANT: Yes, Judge.

THE COURT: And when you signed it did you do so freely and voluntarily?

THE DEFENDANT: Yes, Judge.

THE COURT: Did anybody force you to sign this document?

THE DEFENDANT: No, Judge.

THE COURT: And prior to signing it do you have

sufficient opportunity to consult with your attorney as to whether or not it's in your best interest to sign this?

THE DEFENDANT: Yes, Judge.

THE COURT: Are you satisfied with his representation of you?

THE DEFENDANT: Yes, Judge.

THE COURT: Did anybody make you any promises to induce you to sign this document?

THE DEFENDANT: No, Judge.

THE COURT: Did anybody threaten you in any way?

THE DEFENDANT: No, Judge.

THE COURT: All right.

I am going to voluntarily sign off on it as well.

If at anytime you decide you no longer wish to waive this right and want to be present, just let me know. The only thing is we have to make arrangements. So we will have to excuse potential jurors from the courtroom and let you hear it.

We'll mark this as Court's Exhibit No. 1.

Now, in terms of witnesses, you have a witness list?

MS. BARAIOLA: I forgot to print it, your Honor. I'm sorry. I will bring it back upstairs.

THE COURT: All right.

Well, I heard there's a possibility of 20 something

witnesses or possibly 12 depending on things which can be consented to or stipulated.

MS. BARAIOLA: I think based on conversations with Mr. Rothman we will be able to work out stipulations to about six things. So I think that makes my witness list now 12 or 13 people.

THE COURT: So what's our anticipated length of the trial? So how long you think --

MS. BARAIOLA: I think that I can probably -- I think I will be able to rest on the 21st.

THE COURT: Mr. Rothman, you don't have to disclose anything. Do you expect at this point to call any witnesses.

MR. ROTHMAN: Possibly one.

THE COURT: You can rest on Monday or Tuesday of next week?

MR. ROTHMAN: I think that's fair.

THE COURT: So what I will do is tell the jurors they can expect the case to last around a week and a half, no more than two weeks. I think that's pretty fair.

MS. BARAIOLA: Yes.

MR. ROTHMAN: Yes.

THE COURT: Just to give us some time.

MR. ROTHMAN: If we start the testimony on the 15th at some point --

THE COURT: Yes.

MR. ROTHMAN: -- I can't imagine they wouldn't be deliberating by the 23rd.

THE COURT: I agree. Expect a week and a half or so.

Tell me some of the things that you're stipulating to.

SKWRAO: So I believe that we're going to be able to work out a stipulation to the Zuma which is the restaurant they went to, the receipt, and the video.

MR. ROTHMAN: The whole dinner is on video. So, yes, there'll be stipulations about that.

SKWRAO: I believe we're going to be able to make a stipulation to Bank of America which is also the records that the defendant withdraw the money, and also the video of them at the ATM together.

MR. ROTHMAN: As well as the one with him in there by himself.

THE COURT: He went to the same ATM twice?

MR. ROTHMAN: Yes, once with her and once without her.

THE COURT: So you're saying that you're not intending to introduce anything about they went to the ATM ever?

MR. ROTHMAN: Is this news to the People?

THE COURT: It's just a matter of what they intend to introduce.

MR. ROTHMAN: But the look on Ms. Baraiola's face I'm thinking they just --

MS. BARAIOLA: I know there are two withdrawals. I don't believe I videoed both. I believe the video I turned over to you I only have one.

MR. ROTHMAN: I'll show you the one that I have of him by himself that night an hour later.

THE COURT: So let us take a look at it.

MS. BARAIOLA: That's fine.

THE COURT: So the same person would be testifying about the authenticity of both?

MS. BARAIOLA: Yes.

THE COURT: Look at what you have. Look at what you requested and see if it's legit.

MS. BARAIOLA: Okay.

I believe we will be able to work out a stipulation to the Uber records, to the Seeking Arrangement records, and then the phone records.

THE COURT: So for the Seeking Arrangement records that would be the conversation of between the two?

MS. BARAIOLA: The two, and just the subscriber email profile, like what their the profiles say.

THE COURT: Okay.

And what is after the Seeking Arrangement?
MS. BARAIOLA: The cellphone records, AT&T and T-Mobile.
THE COURT: Who's got the AT&T?
MS. BARAIOLA: I believe it's the defendant.
THE COURT: Is that right, Mr. Rothman?
MR. ROTHMAN: Yes, so we have a stipulation for defendant's phone records and a stipulation for the complainant's phone records.
THE COURT: Right.
What about emails?
MR. ROTHMAN: I would submit a yes to that.
MS. BARAIOLA: I'm sorry. What was the question?
MR. ROTHMAN: Two stipulations, one for the defendant's, and one for the complainant's.
MS. BARAIOLA: I believe so, yes.
THE COURT: AT&T and T-Mobile?
MS. BARAIOLA: AT&T and T-Mobile, yes.
THE COURT: So what are you concerned about?
MR. ROTHMAN: I just want to hear it. I don't want any surprises.
THE COURT: What about regular emails that are not part of like the gmail or Seeking Arrangement? There's nothing like that?
SKWRAO: No, we have photographs of text messages

that they were exchanging. And we got those from the complaining witness' phone, and those will come in.

THE COURT: What about the W Hotel?

MS. BARAIOLA: I'm going to call witnesses from the W Hotel.

THE COURT: But like a security witness, or someone to say he checked in?

MS. BARAIOLA: It's going to be -- the W Hotel person would talk about checking in, what room he's in. The video will come in. The door open and close records will come in, and the --

MR. ROTHMAN: Bar tab.

MS. BARAIOLA: The bar tab, yes, will come in. Those sort of things.

THE COURT: Okay.

What about in terms of evidence collected, DNA or anything like that? Is that part of the case?

SKWRAO: Yes, there's going to be a doctor who does the sexual assault kit on the victim, a doctor who does the suspect kit on the defendant, and then the criminalist who tests and there's a DNA match.

THE COURT: And none of that can be stipulated to like the DNA testing or anything?

MS. BARAIOLA: No.

And we have crime scene and some officers and the

complaining witness obviously and a person who is in the hotel room next door we could hear screaming.

THE COURT: I'm going to look at the second day of the hearing. I understand certain evidence is suppressed. I want to make sure we're on the same page. I have not looked at the decision, but I see conversations about it. It's two cellphones, a laptop, and a tablet?

MS. BARAIOLA: Yes, your Honor.

THE COURT: Bot cellphone were the defendant's?

MS. BARAIOLA: Both were the defendant's.

THE COURT: Two cellphones, a laptop, and a tablet. Those will stay out.

MS. BARAIOLA: And I believe all the information about -- there was an Apple search warrant done, and I believe the information that was obtained from that was also suppressed.

THE COURT: The information from the Apple search warrant?

MS. BARAIOLA: Correct.

THE COURT: All right.

So tell me about that.

MS. BARAIOLA: Subscriber information, an I-Card account, an email account. Those are stuff that were suppressed as well because the Judge ruled that we shouldn't have gotten the phones in the first place, the way that they

were obtained. So they were suppressed as physical evidence. She suppressed the results.

THE COURT: How does that relate to the actual text messages?

MS. BARAIOLA: It doesn't have any effect because we have them from the complaining witness' cellphone.

THE COURT: Are you on the same page with that, Mr. Rothman?

MR. ROTHMAN: I am.

THE COURT: Okay.

MS. BARAIOLA: All of that is turned over anyway.

THE COURT: Let me finish reading.

MR. ROTHMAN: Well, the statement was suppressed too.

THE COURT: Well, statement you withdraw.

MS. BARAIOLA: Correct. And what was granted was Dunaway and the Mapp -- I mean Dunaway and the lineup.

THE COURT: I want to go back.

But it wasn't suppressed it's just that they withdrew statement notice --

MS. BARAIOLA: Correct.

THE COURT: -- on case-in-chief. So if there is a rebuttal case then they can, you know, bring it up.

MR. ROTHMAN: He evoked his right to counsel immediately. That was conceded.

PROCEEDINGS

THE COURT: Was there a voluntariness hearing?

MS. BARAIOLA: No, there was not a voluntariness hearing.

THE COURT: Would you ever think of a scenario where you would be bringing up those statements?

SKWRAO: I don't know at this minute. I'm not planning to bring it up on my case-in-chief at any point.

MR. ROTHMAN: But the statements, themselves, should the defendant testify you would need to examine for relevance. There's stuff about, I have a lot of money and I can make this go away. Something like that. I don't know if they would seek to introduce those or whether your Honor would even allow them should he testify.

THE COURT: I think that's about it from my part. Anything else you can think of?

MS. BARAIOLA: No.

I'm finalizing the schedule. I think I should be okay, but it may be one day that I'm a little bit short a witness. And I'm not sure if it's going to be the 16th or the 17th, Wednesday or Thursday. But I'm still waiting to finalize a few people.

THE COURT: Okay.

MR. ROTHMAN: That's it as well. I mean since we are talking about potentially 12 witnesses, and I assume we can get to the testimony on Tuesday. I'd just ask the

People to tell me on Monday who we're going to call on Tuesday.

THE COURT: Okay.

Everything's been turned over in terms of Rosario?

MS. BARAIOLA: Yes.

THE COURT: Anything you have to deal with with the officers?

SKWRAO: The bulk of that was turned over at the hearing. Do you have that from previous counsel?

MR. ROTHMAN: Yes.

MS. BARAIOLA: We re-ran them, and I do have for one officer an additional lawsuit that I have to turn over. So I will do that today.

THE COURT: Okay.

So in terms of today is there anything that you intend to ask about?

MR. ROTHMAN: No.

THE COURT: So just do me a favor. Give me a heads up if there's something that you intend to question so I can make a ruling on it. At this point, there's nothing for me to read?

MR. ROTHMAN: No, Judge.

THE COURT: That's it.

Anybody have anything else?

MR. ROTHMAN: No.

MS. BARAIOLA: No.

THE COURT: What I'd like to do is, I guess, on Monday let's start at ten. Like I said, we can't call for a panel until 10:30. But I want everybody here in case there are other issues, and we can finalize it. Let's say 10:15.

MR. ROTHMAN: How do we seat people here?

THE COURT: When we start for selection, one through nine, and then ten through 18.

MR. ROTHMAN: Okay.

THE COURT: And then once actually we have our jurors, the first juror selected will now be in the first seat. So it will go one, two, three, and then two alternates. I usually pick two alternates. If we have an opportunity to pick a third, we'll talk about it. But I usually like to go with two.

Anything else?

I'm pretty liberal when I come to my general questions. I ask a lot to try to deal with who has issues and the actual charges. You know, a lot of people think they are so important they can't serve for a week and a half.

MR. ROTHMAN: Of course.

THE COURT: So I'm pretty good about letting people off.

If you feel there is somebody that you feel is

inappropriate, I'll give you an opportunity. But generally I try to be -- I'd like to be general in those sort of screening questions about the law. I don't want them being seated here for the individual questioning if they have a chance now to say, By the way, I don't speak English. I can't be here next week. I have to take off next Thursday, things like that.

Once I'm done with my questions, I expect it to be about ten to 15 minutes for each side. It's not a hard line, but I don't like a lot of hypotheticals, you know, stuff like that, a lot of trying the case. But I'll give you a chance to do your questioning, and if you need additional time, just let me know.

MR. ROTHMAN: How many minutes first round?

THE COURT: Ten to 15. It's not hard line.

MR. ROTHMAN: Understood.

THE COURT: And as long as you're asking relevant questions to keep it moving I have no problem with that.

MS. BARAIOLA: You have a questionnaire?

THE COURT: I do the questionnaire.

What I need is if you have something with the date and location and any names that may be mentioned as well.

MS. BARAIOLA: I'm going to have that with the witness list. I have my name, the date, location all of that at the top, and then I have a list of potential

witnesses will be called and names you'd hear.

THE COURT: Okay.

Normally in my preliminary instructions talk about burden and all of that and the defendant doesn't have to testify, no adverse inference.

MR. ROTHMAN: Yes.

MS. BARAIOLA: Can you parkerize the defendant.

THE COURT: I can do that.

Mr. Tripathy, I don't know but I think another Judge may have said this to you. It's called Parker Warnings.

You have a right to be present during the trial and all the proceedings in this case. If you voluntarily choose not to come to court, that's certainly within your right as well. But if you do so just please note that we'll going forward without you. We will have a trial in this case, and if you are, in fact, convicted you will be sentenced in your absence. And if you are convicted you could be sentenced to a period of imprisonment with other punishment including post-release supervision, registering as a sex offender, mandatory fees and surcharges. All of that stuff will come into play. So that's if you voluntarily fail to appear. And also a warrant will be issued for your arrest. You understand, sir?

THE DEFENDANT: I understand.

THE COURT: All right.

Anything else?

MS. BARAIOLA: No, your Honor.

THE COURT: Okay. See you Monday.

MR. ROTHMAN: Have a good weekend, Judge.

THE COURT: If something comes up, you're free to text me, send me an email.

MS. BARAIOLA: Okay.

(Case adjourned; continues 5-14-15.)