(Jury enters)

THE COURT: Everybody have a seat. Thank you. We just have one thing that we need to address. There was an amendment to two of the stipulations. Just a minor change. So I will let the People read that into the record.

MS. BARAIOLA: So the stipulations for 10 and 13 which are the T-Mobile and then the AT&T, the times of the phone calls were correct, but the stipulation I stated it was eastern standard time. I was actually eastern daylight time because it was June.

THE COURT: Because it was June it's eastern daylight time instead of standard?

MS. BARAIOLA: Yes.

THE COURT: Thank you very much. The People ready to call their next witness?

MS. BARAIOLA: The People call Mette Risdal.

THE COURT: Let's bring in Ms. Risdal.

COURT OFFICER: Witness entering.

(Proceedings continued next page)

THE COURT OFFICER: Witness entering.

(Whereupon Ms. Risdal enters the courtroom.)

THE COURT OFFICER: Left hand on the Bible; raise your right hand.

THE COURT CLERK: Do you solemnly swear or affirm that the testimony you're about to give this Court and this jury will be the truth, the whole truth, and nothing but the truth?

MS. RISDAL: Yes.

M E T T E R I S D A L, on behalf of and being called by the PEOPLE, having been duly sworn, testified as follows:

THE COURT CLERK: Please, be seated.

MS. RISDAL: Thank you.

THE COURT OFFICER: In a loud, clear voice, state your first and last name, spelling out your last, and county you reside.

MS. RISDAL: Mette Risdal, R-I-S-D-A-L, New York City.

THE COURT OFFICER: And county of your residence?

MS. RISDAL: New York City.

THE COURT: Ms. Risdal, I'm going to ask if you can make yourself comfortable, and raise your chair if you like. And just keep your voice as high as possible.

People.

DIRECT-EXAMINATION

BY MS. BARAIOLA:
Q. Ms. Risdal, how old are you?
A. 38.
Q. How long have you lived in New York City?
A. I'd say about 13 years.
Q. Where are you originally from?
A. From Norway.
Q. You have any family members here in New York?
A. No, no family members.
Q. Where do most of your family members live?
A. They all life in Norway.
Q. Are you close with your family members?
A. I am. I am very close to my family.
Q. How many times a year do you go to Norway?
A. I usually -- at least once a year, some times three times a year. Anywhere from one to three times a year.
Q. You said you've been in New York City for 13 years?
A. Yes.
Q. How long ago was it when you first moved to New York City?
A. I think it was 13, 14 years now.
Q. So is New York City the first place you moved?
A. Yes, I first moved to New York City. Yes.
Q. What's the highest grade you've completed in school?
A. I think it is the same as college. We have three years

in Norway. It is like a gymnasium which is three years. I think it equals about college here.

Q. What did you study?

A. Finance and real estate.

Q. Are you currently employed?

A. Yes.

Q. What do you do for work?

A. I own my own skincare company.

Q. What's the name of your skincare company?

A. Nordic Beauty.

Q. How long have you had that company?

A. I started that company in August of 2014.

Q. And what were you doing before August of 2014?

A. I had another company, another beauty company that involved dealing with products, other brands, about 30 different brands. And I did that for about, at least, seven years or something; and then Nordic Beauty is my own brand that I created.

Q. And what do you like to do in your free time?

A. I mean -- I also have properties, and I invest in properties which is one of my favorite things of work, but financing as well as investing. And I love to travel, and I love to do a lot of charity work. So I pick up food from offices, and I deliver to homeless shelters. And I worked a lot at the soup kitchen. I love to do spinning and most of all my dogs.

Q. And you said your dogs. You have how many dogs?

A. I have two dogs now.

Q. Okay.

Do you know someone named Gabrielle Muir?

A. Yes.

Q. And who is she?

A. She's my best friend.

Q. How long have you known her for?

A. Six to seven years.

Q. How did the two of you meet?

A. We met -- actually we met at a coffee shop, and we were both -- I was on my iPad looking at property, and she kind of noticed I was looking at property. And she was going to look at the same property because she also invests in real estate, and we ended up becoming very good friends. And that's how we met, yes.

Q. How often do you see each other?

A. Oh, I would say when she is in town. She travels a lot. After she got married, she travels a lot. But before we would see each other, at least, three times a week, maybe four times a week. And then after she got married she travels a lot. But when she's in town I'd say twice a week roughly, maybe two, three times a week, yes.

Q. So what do the two of you do when you see each other?

A. We love talking real estate. That is both of our favorite things, looking at floor plans, combinations of units, renovation. We both renovate, and we talk a lot about my

skincare company. She's a real estate developer. So we talk about from that point of view, from her side; and then we talk about my skincare company. We talk a lot about charity too because she does that as well.

Q. Do you have each others phone number?

A. Yes, we do.

Q. How often do you speak?

A. We text each other everyday almost I would say, and probably again talk on the phone two, three times a week can.

Q. Do you know someone named Joe Palmer?

A. Yes, I do.

Q. Who's that?

A. That's also a very good friend of mine.

Q. And how long have you known him for?

A. I would say about five to six years now about.

Q. And where were you when you met him?

A. I was in Florida.

Q. Do you remember where.

A. Should I say the town in Florida?

THE COURT: You probably want to describe it.

A. I do remember obviously the town. If it's possible to say the exact town, but it's Duden, Florida.

Q. And how often do you see each other?

A. I'm sure we would see each other a whole lot more if we lived in the same town, but Joe travels all the time. I spend

the winters in Florida. I have a property down there, and I spend the winters with my parents down there. And Joe usually does come around that time, and we go biking everyday when he's in town in Florida, when he often stops by in New York on his way to Europe because he spends a lot of time in Paris and Rome and Argentina. He travels the world basically playing chest a lot. So whenever we're in the same town we see each other all the time. We text a lot.

Q. When you say "text a lot," how often?

A. Well, I would, you know, I would say again like, at least, once a week to check with each other; and very often we can text for three or four days back and forward.

Q. Are you familiar with the website Seeking Arrangement?

A. Yes.

Q. And in June of 2016 did you have an account on that website?

A. Yes.

Q. If you remember, you have to pay to belong to that website?

A. Yes.

Q. What was the name of your account?

A. Nina.

Q. Why did you put the name Nina?

A. I really like that name. It's my cousin's name.

Q. Why would you put something that's not your name?

A. I would never put my real name on a profile account.

Q. Why?

A. Just for privacy reasons.

Q. What do you mean by privacy reasons? What are your concerns?

A. Even just by Googling my first name in this country my company would come up. So I kind of rather not say my name because it's pretty unique. If the people know the country and my first name, they right away would know about my company and potentially my real estate as well.

Q. Does that concern you?

A. I rather them not knowing right off. I'm okay talking about it after a little while, but I rather not have that out there on profile.

Q. But why?

A. No privacy. For my own protection.

Q. Do you remember what your profile said?

A. Well, I like to cook and do charity work, like to travel. Looking for someone to travel. Want guy to -- you know, to find one guy to pamper me with one guy. I think it's something.

Q. So I'm going to show you what's in evidence as People's 12 for identification.

THE COURT: Well, it's in evidence.

MS. BARAIOLA: In evidence. Sorry.

THE COURT: You want to publish it to the jury?
MS. BARAIOLA: Yes, your Honor.
THE COURT: Okay.
MS. BARAIOLA: For the record, I am clicking on a file labored known that know file.
THE COURT: And People's 12 is the Seeking Arrangement?
MS. BARAIOLA: Correct, your Honor.
For the record, I'm clicking on a tab labeled, Profile, and I'm moving over to column --
THE COURT: I know it's cold. We have been talking about it and trying to figure something out. I think it's the way it's going to be until it warms up. Sorry.
MS. BARAIOLA: I'm now on column labeled, AF.
A. Okay.
Q. Can you see that in front of you?
A. Yes, I do see it.
Q. That column is labeled, Heading; and that does the Heading say?
A. Beautiful looking for fun.
Q. Okay.
MS. BARAIOLA: And I'm going to move over to, About Me, which is column AG.
Q. What does that say?
A. I love to travel and work out, stay in great shape.

Love to cook.

MS. BARAIOLA: Now, I'm going to go over to column AH which says, Looking for.

Q. What does that say?

A. Hi, I want to find a great guy that knows how to take care of a woman and spoil her. Looking for just one guy to see on a regular basis for a lot of fun. I will pamper, appreciate, respect, and take care of you in every way. We would have a blast together. I'm very giving and helpful to the people close to me, and you need to be the same way. Kisses.

Q. When you say you want to find a guy that will take care of you and spoil you, what does that mean? What are you looking for?

A. At the time, I was looking for someone to -- probably more of an alpha guy to take care of me and spoil me and be generous to me.

Q. Would does that mean, to be generous to you?

A. I think I was more referring to someone probably more financially taking care of me, yeah.

Q. What sort of things financially?

A. You know, make sure we go to nice dinners and travel and things like that.

Q. What about any of your personal expenses? Was that something you were looking for?

A. That would be nice if they would help with that as well.

Q. Okay.

And then you say you're looking for one guy to see on a regular basis for a lot of fun. What do you mean by, a lot of fun?

A. To me, I mean a lot of fun is travel a lot which I do; and I love to travel a lot. Go to the concerts which I constantly do and Broadway shows, and that would be most things, yes.

Q. Then you say, I will pamper, appreciate, respect, and take care of you every way. What do you mean by that?

A. When I'm in an exclusive relationship with someone, that's -- definitely I will be very pampering, cooking, you know, massaging their feet, whatever they may want or need.

Q. Okay.

MS. BARAIOLA: And I want to move to -- back to the column AF which is Heading. It says beautiful looking for fun.

Q. What do you mean by that?

A. Well, kind of the same as I was saying for me, you know, looking for someone very fun. And to me that means love to travel, being a little bit more outgoing, going to concerts, Broadway shows, dinners. I go out to a lot of dinners with my friends all the time. Definitely someone a little bit more active, social activities.

MS. BARAIOLA: I want to go to column Y labeled,

Budget.
Q. What does that say?
A. Hi.
Q. Was does that mean?
A. I guess I consider myself being high budget meaning I'm traveling back and forward between New York and Florida for the last ten years at least. I have property in both places, and between me and the dogs. Yeah, I definitely do seem to pamper and spend a lot on my -- probably more on my dogs than myself.
Q. So on the column Z, birthday year, what does that say?
A. 1985.
Q. Is that correct?
A. No.
Q. Why did you lost a different birth date here?
A. I guess I thought I looked younger at the time.
Q. But why list not your real birthday?
A. I, you know, I don't know. I did put a younger year, yes.
Q. For what?
A. Not sure, you know, why I put something incorrect under profile.
Q. Did you fill out the profile?
A. Yes, I did. Probably to appear younger.
Q. Okay.
MS. BARAIOLA: So I would like to move now to --

I'm going to move to another file on this disc.

Q. So I want to direct your attention now to June 11, 2016. Did you communicate on Seeking Arrangement with a profile that has a user name, New Yorker 2016?

A. Yes.

Q. Do you remember who reached out to whom first?

A. He reached out to me.

Q. And do you remember when you were communicating with him what he told you his name was?

A. Sam.

Q. Do you remember anything about what his profile said?

A. I remember it said, Sam, 41 years old, single with zero children; that he likes to travel I think. Those are the things that Sam -- yeah.

Q. And so when you looked at his profile after he sent you a message did you write back to him?

A. Yes, I did.

Q. What made you write back?

A. I really at the time had this thing for Indian guy. I always said that I wanted to ideally find an Indian guy because I have a very good friend who is Indian, and he is lovely. His family is lovely, and his friends are lovely. So I really had this perception of them that they're similar to me; that they didn't grow up with too much, came to this country and made it on their own. But, yeah, I definitely found Indians very

attractive.
Q. Was there anything about his profile that you found attractive?
A. I don't remember anything in particular else that stood out.
Q. Did he like your common interest or anything like that?
A. If it said travel, that would have been it. But I don't remember all the specifics that he said, but that would be one thing that I would definitely look for, for someone who likes to travel.
Q. You remember the general substance of your conversation on Seeking Arrangements?
A. On the email you mean?
Q. Through the website, yes.
A. Yes, some of it. Yes.
Q. Okay.
So just generally, not word for word, but just generally what did you talk about?
A. Let's see. Trying to remember the difference between emails, and there were text messages after obviously.
On the email -- I don't remember exactly how the first email started. I think he said something like -- yeah, I don't remember the very first email.
Q. Well, I'm just asking generally.
A. Right.

Q. Did you talk about yourselves? Did you exchange numbers, anything like that?

A. We did exchange numbers, yes. We exchanged phone numbers.

THE COURT: What was the general nature of your conversation?

MS. RISDAL: Yes.

THE COURT: What type of things did you discuss?

MS. RISDAL: Yes. There was an email that I sent that I remember saying, How much dollars? And then I put two dollar signs per meet. I think he said something while -- I don't know the word, if it was beautiful or something attractive or what exactly the word was, yeah.

Q. Did you make plans to see each other?

A. Well, then as we exchanged the phone numbers we would be texting each other, and then he was asking to meet at Zuma Restaurant. I think the email he was asking how long I was in New York, and I said until July. And I don't remember the specific day because I was going to Norway which I do every summer. So that was in the email as well.

MS. BARAIOLA: So I'm putting up now People's 12. The file is CW and D messages on SA.

Q. So what was your profile name when you were on Seeking Arrangement?

A. Nina.

Q. So let's start with the first message.
Who sent that message?
A. He sent that message.
Q. What does it say?
A. Nina, you are clearly a catch. Would love to meet and see if there is chemistry.
Q. And what's the next messages?
A. Then I say back, Thank you. That would be lovely.
Q. Okay.
And then what is the next communication?
A. Then he says, Great. When are you in NYC next?
Q. Do you respond?
A. Yes, I respond, I'm here now until mid-July. What about you?
Q. And then is there a response to that?
A. Then he replies, I am NYC often and there Monday. Do you think we could meet Wednesday for drink and discuss.
Q. Do you respond?
A. Yes, I respond, Yeah, that would work. What are you thinking, dollar sign, dollar sign on per meet. If there is chemistry, it might be good to get a feel for where we stand. Thanks.
Q. What's the next message.
A. I'm flexible. All depend on how we get along and if we are into exactly and we are into each, then it should not be a

problem.

Q. And the next message.

A. Sounds good. Do you want to email or text me a picture, or you prefer not to? Where and what time do you want to meet Wednesday. I'm free Monday too. Thanks.

Q. What's the next message?

A. Then he says, I will ping you Monday on location and time. Send me your number. I replied, My number is (646)683-4129, Elsa. And then he says, Great. Elsa is a beautiful name. I am Sam. And then he sends again, Hi, Elsa. See you on Wednesday at 6 p.m., dinner. Let me know. Nice Japanese restaurant. And then I reply, That works. Text me Monday. Looking forward to meeting you. And then he replied, Will do.

Q. And what dates are all those messages?

A. Well, the first message started on June 11th.

Q. Okay.

So now I want to talk to you about line seven. It's a message that you sent. You write, What are you thinking dollar sign, dollar sign on a per meet if there is chemistry.

A. Yes.

Q. What do you mean when you put the dollar sign?

A. I wanted to make sure we're on the same page.

Q. About what?

A. About some compensation.

Q. So you're talking about money when you write dollar sign, dollar sign?
A. I guess so, yeah.
Q. You guess so, or you know?
A. Well, yes.
Q. And when you say on a per meet basis what does that mean?
A. Every time we see each other.
Q. And then you say, If there is chemistry. When you write to word, chemistry, what are you talking about?
A. Chemistry to me would mean we have to be into each other in some way. It has to be a connection.
Q. And when you say, Might be good to get a feel for where we stand, what do you mean by that?
A. To make sure we're on the same page.
Q. About what?
A. About some sort of combination.
THE JUROR: Compensation.
MS. RISDAL: Thank you.
THE COURT: Ladies and gentlemen of the jury, when we have a witness who is under oath, I appreciate the assistance, but try to refrain from yelling out words. But I appreciate it.
A. Compensation.

Q. So per meet -- money on a per meet, what did that mean?
A. I am willing to try that out.
Q. Does that mean money every time you see each other?
A. That was what I was willing to try out, yes. That's what I meant, yes.
Q. Why did you give the name Elsa?
A. I love the name Elsa.
Q. So you have a profile in the name Nina, but then you signed it Elsa?
A. Yes.
Q. Why?
A. Again, for my privacy reason. I really didn't want him to know my real name because my real name is really only, I think, very few. I know if you Google it you will find my company. So I did use a different name, yeah.
Q. You write in a message, Do you want to email me or text me a picture, or do you prefer not to. Do you remember whether or not he sent you a picture?
A. He did not.
Q. So you gave your phone number. At some point, did you get a text message?
A. I did, yes.
Q. So the phone number that you gave, the one ending 4129, you remember your cellphone carrier?
A. T-Mobile.

Q. You remember the type of phone that was?

A. I think it was the old iPhone 4, I believe. Is that what you mean?

Q. Yes.

So it is an iPhone?

A. I think it was an iPhone 4. I think so.

Q. All right.

So when you received the text message do you remember, again, in general what you communicated about?

A. I remember there was one text message coming in early in the morning, and he was saying something like, Are you also an early person or are you also up early or something. I believe I relied I'm still in bed, or maybe he replied I'm still in bed and me too. And then we agreed to meet at Zuma, Wednesday, June 15th, at 6:00 p.m.

Q. I'm going to back up a second. I forgot to ask you something.

A. Yes.

Q. For the T-Mobile records, do you remember the name on the account?

A. I think Nina.

MS. BARAIOLA: I'm going to show you what's being marked as People's 14 for identification.

Q. Do you recognize People's 14 for identification?

A. Yes.

Q. What is People's 14?
A. What?
Q. Well, is it a disc first of all?
A. Yes.
Q. And have you reviewed the contents of that disc before testifying today?
A. Yes, I have.
Q. Are your initials on that disc?
A. Yes, my initials are on this disc.
Q. Okay.
And does what's on that disc fairly and accurately depict text messages you just described, the conversations between you and Sam?
A. Yes.
MS. BARAIOLA: Your Honor, at this time, I would ask that People's 14 for identification be moved into evidence.
THE COURT: Any objections?
MR. ROTHMAN: No.
THE COURT: We will move it into evidence. I would like to mark it at this point.
(People's Exhibit 14 marked and moved into evidence.)
MS. BARAIOLA: At this time, I would like to publish People's 14 to the jury.
THE COURT: Sure.

MS. BARAIOLA: I am going to start at the very top.

Q. What is the phone number that you received this message from?

A. (919)809-4477.

Q. And at the very top what is the date and the time of the first message?

A. Monday, June 13th, 1:29 p.m.

Q. Okay.

Now, can you read the first message you received.

A. Hi, Elsa-Nina. Sam here from SA.

Q. And go down the message.

A. Hi, Sam. How are you today?

Q. Okay.

A. I'm good. And you, Elsa. Great, smiling emoji. Reconfirming Zuma Wednesday at 6 p.m. Perfect. Looking forward to meeting you. Kiss emoji.

Q. And then the response?

A. Likewise. Enjoy -- then I say, Enjoy your day. You too.

Q. Okay.

And so what time does that communication end?

A. The communication ends at 1:33 p.m.

Q. When is the next communication that you get?

A. Wednesday, June 15th, at 12:38 a.m.

Q. And what communication is that?

A. Hi, Elsa.
Q. So that's sent to you?
A. Yes.
Q. Okay.
And then when do you respond?
A. I reply, Wednesday, June 15th, at 5:46 a.m.
Q. And what do you say?
A. Hi, Sam. Still on for tonight at six.
Q. Okay.
And what did he respond?
A. At 6 p.m., he respond, Yes, looking forward.
Q. Go ahead.
A. Me too. Smiling emoji. You an early bird? Still in bed.
Q. Okay.
A. Okay. Are you on your way to the office? Not yet but in one hour. What are your day plans? Okay. Visiting my friend at the hospital and a little work then seeing you. Kiss emoji.
Q. And what does he write back?
A. Hospital. All okay.
Q. And you reply?
A. She will be okay. Thank you. Can tell you more later. Okay? Have a great day. You too. You have been to Zuma before? No, but I've heard it's great.
Q. That's you replying, No, but I heard it's great?

A. That was me replying.
Q. And what time was this communication?
A. 6:13 a.m.
Q. Okay.
And what is the next message that's sent? Who sent it?
A. I send a message same day, June 15th at 4:44 p.m. Seeing you soon. Smiling emoji.
Q. Okay.
And then do you get a response?
A. He replies, Yes, at 4:58 p.m. Then he continues at 5:00 p.m. Let me know what you are wearing so I recognize you. And then smiling emoji.
Q. And then what does he write after that?
A. I.
Q. And then you respond?
A. I respond, Same to you. Smiling emoji. And I continue on saying, Is the reservation under Sam?
Q. Okay.
Do you get a respond?
A. Yes, he reply at 5:14 p.m., Sanjay. I am in white jeans and with a blue jacket.
Q. And do you reply?
A. I reply, Blue, sparkling bling dress and very long, blond hair. What is the bling dress?
Q. And what do you write back?

A. Then I write back, You will see me. Smiling emoji. Blue short dress.
Q. What time did you write that message?
A. At 5:16 p.m.
Q. Did you get a response?
A. He replied right after at 5:17 p.m., Okay. And then at 5:40 p.m. he says, In traffic. Running little late.
Q. And then what does he say?
A. And then he says, Are you there? I reply at 5:47, I'm in traffic too. I should get there 6:05. You, question mark.
Q. And then you get a response?
A. Yeah. He reply, Worse case, 6:15 p.m. Hate cats in traffic, but I don't do subways. Smiling emoji. Cars.
Q. Then what do you reply?
A. I reply, No worries.
Q. Do you get another message?
A. Get a message at 6:00 p.m. He's saying, Seven minutes away. I reply, Perfect.
Q. What is the next message?
A. 6:04. He says, I am here at the bar area. And I reply, Three minutes. Sorry. So much traffic coming off FDR.
Q. Okay.
What time you say that was sent?
A. That message was sent at 6:05 p.m.
Q. And did you get a response?

A. He says, Okay.
Q. And then what's the next message?
A. The next message says, One minute.
Q. Who sent that?
A. I send it at 6:12 p.m.
Q. Do you get a response?
A. He says, Okay, waiting. Smiling emoji.
Q. And what time is that?
A. 6:12 p.m.
Q. And when is the next time you get a communication?
A. Then it goes to later in the evening at 9:42 p.m. saying, Hello. And then another message saying, How are you.
Q. Then you respond?
A. I respond saying, Great. Still here waiting for you. Kissing emoji.
Q. Ms. Risdal, were you present when these photographs were taken of the messages?
A. Yes.
Q. Where did they come from?
A. Off my phone.
THE COURT: You say photographs. You mean screen shots?
MS. BARAIOLA: Photographs of these messages.
THE COURT: It's like a screen shot or photograph of the phone.

Q. Were these photographs taken as a screen shot or taken as a photo unit from the DA's Office.

A. They took it at the facility on the sixth floor off my phone though.

Q. Is it the photo unit?

A. I believe so, yes.

Q. I want to talk to you now about the Zuma Restaurant.

How did you get to the restaurant?

A. I took a taxi.

Q. Where were you coming from before going to Zuma?

A. I was coming from my home.

Q. Is that in Manhattan?

A. Yeah.

Q. Did you have anything to drink at all before you went to the Zuma Restaurant that day?

A. No.

Q. I want to direct your attention now to about 6:10, 6:12 or so in the evening on June 15, 2015.

Did you actually arrive at the Zuma Restaurant which is located at 261 Madison Avenue in Manhattan?

A. Yes. On June 15th, yes.

Q. Now, when you got to that location, the person that you were meeting there did you recognize him right away?

A. No, not really. But he came towards me, and he had white jeans on which he said he was wearing.

Q. Where was he when you got to Zuma?
A. He was kind of like standing up or sitting -- standing by the bar at Zuma.
Q. Was he drinking or eating anything?
A. He was drinking a glass of red wine.
Q. Once you arrived, where did the two of you go?
A. As soon as I arrived, we went straight to be seated at the table.
Q. Okay.
So what did you have to eat that day if you remember?
A. I believe we had six dishes family style and sharing style. And suggestions from the waiter which he seems very nice. We had a glazed cod and, you know, some sushi rolls. I think some fried vegetables, maybe some salmon. It was very good food.
Q. Did you have anything to drink?
A. Yes, I had two Lychee Martinis.
Q. What is a Lychee Martini?
A. Lychee is the Asian food. It's like a round white thing. It's in a shell, and you peel it out. It's very good.
Q. And during dinner was Sam drinking anything?
A. Yes, he ordered a glass of red wine.
Q. Would you recognize the person that you knew to be Sam if you saw him again?
A. Yes.
Q. I'm going ask you to take a look around the courtroom,

and if you recognize anyone as the person that you knew from this day as Sam please point to him and identify him by an article of clothing.

A. Yes. He's sitting right there.

THE COURT: If you can indicate an article of clothing for me.

A. He has a yellow tie. He has a gray --

THE COURT: Thank you. Indicating the defendant.

A. Never forget that face.

Q. How long do you think you were at dinner at Zuma for?

A. I would say -- do you mean about what time we left from Zuma?

Q. How long you think the dinner was that you were there for?

A. Let's see. I'm guessing -- well, you know, maybe an hour and a half roughly. We ordered an Uber, and it that took a long time. But, yeah, maybe around, I would guess, around a half hour. I'm not quite sure. I didn't look at the time.

Q. While you are at dinner, how were things going?

A. Things were going great at dinner, you know. I felt -- yeah, I thought he seemed like a very nice guy.

Q. What sort of things were you discussing at dinner?

A. A lot of real estate again because he told me that he work in real estate and finance, but he knew about real estate as well. So we talked about that. Travel. He mostly talked about

himself though. But he said that he travels a lot and looking for someone to travel with, someone who's flexible. I said that's great. I have a very flexible schedule. I can travel all the time. He said that he lives between Dallas, Texas and New York City; and he spends one week in London out of months. And I used to live in London so I know London really well. So we talked a lot about London and the Asian food because that's my favorite food. So it was mostly stuff like that.

Q. You said talked a lot about London. What did you talk about?

A. Where I used to live, that area, the difference between New York and London. You know, you don't get like the same food delivery. Back then you didn't, for sure when I lived there. Just like dry clean is different. The weather. The people are more friendly in New York, I said; and he agreed. And what else about London. Just sort of things like that, different areas.

Q. Did he tell you specifically what he did for work.

A. He said finances, but he also said that he's also involved in real estate as well.

Q. Did he tell you where he worked?

A. He did not say where he worked, no.

Q. Did he say anything else about his personal life?

A. He said that -- yes, he did. He said that he was recently divorced, and he said that he had children. And he said that he had a brother that lived in New Jersey that is more

successful than him that he's very close to. He talked also about how different growing up in Indian, growing up poor, being able to come here to the U.S., things like that.

Q. Did you talk at all about his divorce or his marriage?

A. Not a whole lot. Not a whole lot, anything in particular that I can think of.

Q. Did he say anything about why they were getting divorced?

A. He did not say why they got a divorce. I don't think he said why they got a divorce. No, I don't think so.

Q. Did he tell you anything about how many children he had or how old they were or anything like that?

A. He did not say the ages. No, he did not say the ages of the children.

Q. Who paid for dinner?

A. He paid.

Q. And do you remember how he paid?

A. I think he paid by card, but I'm not sure.

MS. BARAIOLA: I'm going to show you what's in evidence as People's 9.

Q. Ms. Risdal, have you ever seen video from Zuma Restaurant.

A. Last night was the first time that I saw video from Zuma, yes.

Q. Have you seen a receipt from that evening?

A. Let's see. Did I see the receipt? I think so, yes.
Q. And when was that?
A. Last night.
Q. Was that in my office?
A. Yes, it was.

MS. BARAIOLA: So just for the record, I am clicking on the player to open up the video, and then I'm going into the file labeled, F1, Dining. And then for the record right now, it's says 6:00. I'm going to fast forward to approximately 6:14.

THE COURT: That is the time just for the record, not the date?

MS. BARAIOLA: The time, yes.

So just for the record it's now at 6:14:06. I'm going to press play.

(Whereupon the taped is played.)

(Record resumed.)

Q. Do you see yourself in this camera?
A. Yes, I do.
Q. Where are you?
A. This is me right here.

MS. BARAIOLA: Your Honor, may the record reflect that the witness is pointing in the center of the camera angle. There's what appears to be a woman with blond hair and a darker colored dress.

MR. ROTHMAN: Blue bling dress.

THE COURT: Yes, blue bling dress according to Mr. Rothman.

MR. ROTHMAN: That's what it looks like.

THE COURT: The record will so reflect.

MS. BARAIOLA: I'm going to press play.

(Whereupon the taped is played.)

(Record resumed.)

Q. So, Ms. Risdal, the time's about 6:15:08. What does this show now?

A. They show us both sitting down at the table.

Q. So, Ms. Risdal, in addition to the things that you were discussing while you were on this date, were you physically affectionate at all with the defendant?

A. Yes, we were kissing on the dinner.

Q. Do you remember who kiss whom first?

A. I believe he kissed me first. I believe so, yes.

Q. And did you kiss him back?

A. Yes.

Q. Were you touching each other in any other way at Zuma Restaurant?

A. Yes, holding the hand, the leg or thigh, whatever you call the upper leg area.

Q. While you were at Zuma Restaurant, did you discuss BDSM with the defendant?

A. No.
Q. Did you discuss with the defendant sexual fantasies?
A. No.
Q. Did you discuss with the defendant whether or not you were going to have sex after the date?
A. No.
Q. What about anything else sexual that was going to happen after the date?
A. No, did not discuss.
Q. While you're at Zuma, did you have a conversation with the defendant about money, about compensation?
A. No.
Q. So money did not come up at Zuma Restaurant?
A. No.
THE COURT: You have five minutes or so, and we can break for lunch.
MS. BARAIOLA: For the record, I've put the video back up on the screen. And for the record the timestamp is 7:22:32. I'm going to press play.
(Whereupon the tape is played.)
(Record resumed.)
Q. So, Ms. Risdal, what's going on here at this point.
A. Looks like he's reaching to kiss me.
(Whereupon the taped is played.)
(Record resumed.)

Q. So, Ms. Risdal, what just happened?
A. He just put his card in the bill.
Q. What's happening right now?
A. Looks like he's just signing for the bill, looking it over.
Q. Did you look at the bill?
A. I don't think so. I'm not sure.
MS. BARAIOLA: So for the record it's about 7:24:57, 58.
Q. What's happening now?
A. We're leaving the restaurant.
MS. BARAIOLA: I'm now going to click on a document that's labeled, Close Check.
Q. At the very top, what does that say?
A. Zuma.
Q. And what's the address?
A. 261 Madison Avenue, New York, New York.
Q. What's the date?
A. June 15, 2016.
Q. Okay.
MS. BARAIOLA: Now, I'm going to go below the top black line.
Q. What's the very first thing listed?
A. Two Lychee -- it says M which is for Martini -- vodka.
Q. So those are the two drinks that you had during the day?

A. Yes, it was.
Q. And what are the next two lines?
A. One salmon shiso, one vegetable tempura, one glass -- one GL bouvier burg, for burgundy, and one spicy tuna maki, one Zuma saki sushi, one lobster, ribeye, one black cod, one shitake mushroom.
Q. And what does it say the amount of the bill was?
A. $197.06.
Q. And what does it say the tip was?
A. $40.
Q. All right.
So when you left Zuma Restaurant where did you go.
A. Then he get his little suitcase from the coat check and booked an Uber, and we took the Uber to W Hotel on West 47th right off Broadway.
Q. So when you say he booked the Uber --
A. Yes.
Q. -- how did he do that?
A. How he did it?
Q. Yes.
A. On his phone. He booked an Uber.
Q. So it was through his account?
A. I assume so. He definitely did it on his phone.
Q. How long did it take you to get from the Zuma Restaurant to W Hotel?

A. It took quite some time even though it's not far. It took a little of time because it was a lot of traffic.

Q. Okay.

When you say "a little bit of time," long how do you think that was?

A. Maybe 20 minutes, and I would say maybe normally it should only be 12 minutes. I'm just guessing.

THE COURT: Is this a good time to take our lunch break?

MS. BARAIOLA: Sure.

THE COURT: Ladies and gentlemen, it is almost 1:00. We're going to take our lunch recess and come back at 2:15.

Same thing that we talked about, please keep an open mind. Don't discuss the case. Don't do any research.

Thank you. Have a good lunch.

THE COURT OFFICER: All rise.

(Whereupon the jury exits the courtroom.)

THE COURT: We're going to take our lunch recess and meet you back no later than 2:15. You can step down and follow the instructions of our officers.

(Whereupon Ms. Risdal exits the courtroom.)

THE COURT: Have a seat everybody.

Does anybody need to say anything for the record before we break? No? Okay.

I just want to make sure that we do mark the stipulations as admitted. I think they're marked.

MS. BARAIOLA: She did the back of -- she did the exhibits. I don't know if she did the --

THE COURT: Okay. Well, just make sure they say admitted.

Enjoy your lunch. Thank you.

(Whereupon a lunch recess is taken.)

(Record resumed with next reporter.)

THE COURT: Let's bring out the witness, please.

(Witness enters)

THE CLERK: All rise. Jury entering.

THE COURT: Everybody have a seat, please.

THE CLERK: Case on trial continued. All parties are present. The jury is present and properly seated.

THE COURT: Everybody. Thank you so much. Hopefully you enjoyed your lunch. I apologize for the delay. As we said before, we definitely need all of our jurors here promptly at the time assembled together so that we can begin.

Our witness is reminded that you are still under oath and you may proceed, Mr. Baraiola.

**DIRECT EXAMINATION CONTINUED**

**BY MS. BARAIOLA:**

Q I think where we left off before the lunch break we were talking about you taking an Uber from Zuma to the W Hotel?

A Yes.

Q I don't remember if I asked you this question.

About how long was the Uber ride from Zuma to the W Hotel?

A Yeah.

I'm guessing it was a lot of traffic. I'm just guessing I think later than normal. So maybe 20 minutes which I would estimate normally would be a 12-minutes ride.

Q And what were you talking about in the Uber?

A In the Uber, we were mostly just talking about the meal, you know, the dinner. Just how good it was, and it really was a very good dishes. Other than that not too much in particular. I think it was mostly about the food and things.
Q Okay.
Were you being physically affectionate at all when you were in the Uber?
A Yes, we were kissing.
Q While you were in the Uber, did you talk about sexual fantasies?
A No.
Q Did you talk about being into bondage?
A No.
Q What about dominance and submission?
A No.
Q Did you talk about sadomasochism?
A No.
Q Did you talk about anything sexual in the Uber.
A No.
Q While you were in the Uber, did you discuss and arrangement for money?
A No.
Q Did money come up in the Uber at all.
A No.
Q Why were you going to the W Hotel?

A He then said that it where he's staying until he finds a place to live in New York. He was looking for an apartment to live, and he always stays at the W, and we were going there for a drink at the bar.

Q Had you ever been to the W hotel before?

A Not the one on that location. I think I've been to the one -- there is one in Union Square that I had went to with some girl friends a long time ago that I been to, not to this W.

Q So about 20 minutes later after dinner when you arrived at the W hotel, what do you do?

A When we arrive he wants to put his bag, his little suitcase up in the room so we go up to the room, 4906, and he puts his bag in the room.

Q When you say bag, what are you talking?

A It's like one of those business little suitcases. I don't know what you call them, but they have a little roller on it.

Q Why did you go upstairs with him?

A I went with him because he was putting his bag up there.

Q Why not just wait in the bar?

A I didn't really know really where the bar was, I guess, but I wouldn't have done that. I wouldn't have thought of that. I didn't see anything wrong going with him to put the bag away.

Q Now, when you get into the room, about how long do you think you're in the room for?

A Maybe only -- maybe like five, ten minutes.
Q And what are you talking about when you are in the room?
A I don't really even think we were necessarily talking that much. He puts his bag in the corner or over like a southwest exposure I'm guessing. Windows to both sides.
So he goes over there and does something in his bag, and then I'm on my phone just waiting by the door the whole time.
Q So you're waiting by the door?
A Yeah. Well, I might have stepped a little bit into the room, but I was not all the way into the room the way he was.
Q Can you describe the layout of the room?
A Yes.
When you walk into the room, the bathroom is on the right side, and, you know, the bed is straight ahead, but it's pointed like that.
(Indicating)
So the long way, you would be facing the long way of the bed when you're looking coming from the front door.
Q When you say the long way are you facing the side of the bed? The headboard? The end of it?
A Yes.
That is what they call the side of the bed, and there is night tables, and on the night table closest to the entrance door is the phone, the hotel phone, and then there is windows facing south. I'm just guessing. There is windows.

MR. ROTHMAN: I'm going to object to when she said she is just guessing. If she doesn't know. She doesn't know.

THE COURT: Sure. Sustained.

We're not asking you to guess. You can estimate things or let us know if you're not a hundred percent sure of something.

THE WITNESS: Thank you.

THE COURT: So if you're not sure of the direction of the view, that is fine.

THE WITNESS: Yeah.

A It definitely had windows on both sides though. So it is a corner. It was a corner room.

Q And do you remember what room this was?

A 4906.

Q Do you remember how you got there from the -- once you entered the W Hotel?

A First you have to go to the seventh floor with the elevator, and then at the seventh floor you have to switch elevators and take another elevator up to 49th floor.

Q When you were in the room, did you observe personal belongings of the defendants?

A No, I didn't.

Q So you are in the room you said for about 10 minutes?

A Uh, huh.

Q What did you talk about?

A I don't really think at that point we were really talking that much because he was over there in the corner in the farthest corner where the window is, and I'm still not even past the bed. So I'm still closer to the door; and, you know, he is on the floor doing stuff in his bag. I didn't really pay attention to what he was doing, and I went on my phone.

Q So while you're are in the room at this point, do you discuss money?

A No.

Q Did you discuss any sort of financial arrangement?

A No.

Q Do you discuss sex after the date.

A No.

Q Do you discuss any sort of sexual fantasies of any kind?

A No.

Q Do you discuss what you are into sexually?

A No.

Q So after you're in the room and you decide you will leave, where do you go?

A Then we went down to the seventh floor. I believe it was the seventh floor, and then at the bar -- at the hotel bar. Sorry. Actually before that we go -- he in the elevator he says he has to go to the ATM, and I go with him, and he goes to the ATM on Eighth Avenue around maybe around 51st or 52nd Street,

Banks of America.

Q Okay.

So you said when you were in the elevator is when he mentioned he needed to go to the bank?

A Yes.

Q Did you have any conversation about why he was going to the bank?

A I didn't ask.

Q Did he say anything at all other than I need to go to the bank?

A No.

Q Did he have, do you know if he had money to deposit. Do you know if he was going there to take out cash? Anything?

A I think he took out cash.

Q Did you know when you were on your way?

A No. I didn't know when we were walking to the Bank of America, no.

Q So I am going to show you what is in evidence as People's 4. So we're going to go to the clip labeled "main". And just for the record -- I'm sorry -- we're in the file labeled "guest entry and interaction." And we are going to go to the --

MR. ROTHMAN: I'm sorry to interrupt. Can you turn this one on, please?

THE COURT: Just so we're clear, People's 4 is the W Hotel video, correct?

MS. BARAIOLA: Yes, Your Honor.

Q And where going to fast forward to approximately 7:47, and for the record it's 7:47:21.

(Playing of video tape)

Q Ms. Risdal, I've paused it at 7:48:16 seconds. Do you see yourself in this camera angle?

A Yes.

Q Do you mind getting up just pointing yourself out to the jury?

A Sure.

(Pointing)

This is me.

MS. BARAIOLA: Your Honor, may the record reflect, the witness has identified herself as what appears to be a blond female in the left middle portion of the frame.

A Yes.

Q Ms. Risdal, you can have a seat?

(The witness resumes the witness stand)

Ms. Risdal, have you ever seen this video clip before?

A No, I have not.

Q So we're now going to -- and then we are going to switch to camera angle, "waterfall." And we're going to fast forward to approximately 7:48.

For the record it's 7:48:22 seconds, pressing play.

(Playing of video tape)

Q Ms. Risdal, I've paused this frame. Do you see yourself in it?
A Yes.
Q Okay.
And where are you?
A It's this back at --
Q Is this the -- are you the only blond female in this camera frame?
A Yes.
Q And the person you're walking next to?
A That is -- Well, Sam, I guess, he called himself.
Q So now we're going to switch to the camera angle "seventh floor shuttle." We're going to be at about 7:48:48. I am going to press play.
(Playing of video tape)
Q It's a little late in the pause. Ms. Risdal, do you see yourself in this camera angle?
A Yes.
Q Where are you?
A I'm behind -- you want me to show?
THE COURT: The only blond woman in the photo?
THE WITNESS: Exactly, yes.
Q All right, and now we're going to go to the "highrise" camera angle. And it's going to be about 7:49, and I'm go to press play.

(Playing of video tape)

Q Risdal, do you see yourself in this camera angle?

A Yes.

Q And are you the blond female, the only blond female on this camera angle?

A Yes.

Q What are you doing now?

A About to go into the elevator.

(Playing of video camera)

Q Ms. Risdal, I paused the camera angle at 7:15:04. The elevator that you just got into, that bank does it show a floor?

A Yes, 49.

Q I am now going to go to -- I'm going to stay on this camera angle, and I am going to fast forward to 8:01 approximately. We're at 8:01:16. I am going to press play.

(Playing of video tape)

Q Ms. Risdal, do you see yourself in this camera angle?

A Yes.

Q Where -- are you the blond female that is depicted in this camera angle?

A Yes.

MS. BARAIOLA: I'm sorry. For the record it's paused at 8:01:39.

Q So we' now going to switch to camera angle "seventh floor shuttle" and press play.

(Playing of video tape)

MS. BARAIOLA: For the record, it's supposed to be about 8:02 so I paused it.

Q Ms. Risdal, where did you just come from when you were in this in camera angle?

A Let's see. I'm just come -- Well, I'm assuming we came from the 49th floor down, yes.

Q Have you seen this camera angle before?

A No.

MS. BARAIOLA: Press play.

(Playing of video tape)

Q Now, I am going to go to camera angle "waterfall." It should be about 8:02:13. We're going to press play.

(Playing of video tape)

Q Ms. Risdal, do you see yourself in this camera angle?

A Yes.

Q Can you just stand and point to yourself for the jurors?

A Yes.

MS. BARAIOLA: Your Honor, may the record reflect that the witness is pointing in the left hand lower portion of the frame. There is what appears to be a blond female with her back to the camera holding what appears to be a black purse.

A Yes.

Q Now, I'm going to switch to camera angle "main."

(Playing of video tape)

So, Ms. Risdal, what street is this camera angle on?

A What street angle? This one is -- Well, I couldn't quite be certain I would need to see a little bit more I think.

(Playing of video camera)

Q Okay.

Do you see yourself in this camera angle?

A Yes.

Q Okay.

Again, I'm sorry. Can us just stand up and point to yourself?

A Sure, yeah.

THE COURT: I'm assuming you can let the record reflect it's the lower left hand corner.

MR. ROTHMAN: I would agree with that.

THE COURT: You can have a seat.

MS. BARAIOLA: So let the record reflect it's the lower left hand corner. There is what appears to be a blond female with her back to the camera?

A Yes.

Q Okay.

So Ms. Risdal, you had told us you went to the Bank of America with the defendant?

A Yes.

Q And you think it was on 51st or 52nd and Eighth Avenue?

A I think so.

Q How did you get there?

A We walked.

Q While you're walking to the bank, what are you talking about?

A Uhm, I mean I don't remember anything in particular what we were talking about then, you know. I mean throughout the whole evening we were sort of just talking about, as I said, travel or work, things like that. So I'm not exactly sure what particular subject walking on the way over there.

Q So when you're on the way to the bank, does a conversation happen where you discuss how much money the defendant is going to withdraw?

A No.

Q Did you have any sort of financial conversation at all at that point?

A No.

Q Does the conversation happen where you discuss what sexual act should be performed for a certain amount of money?

A No.

Q Are you talking about compensation to you at any point on your way to the bank?

A No.

Q When you get to the bank, how long are you in the bank for?

A I'm just guessing --

MR. ROTHMAN: Objection.

THE COURT: Sustained.

Again, I know it sems like a figure of speak. So if you can estimate. Nobody wants you to guess.

THE WITNESS: Estimate. Yes. Thank you.

A I'm estimating maybe three minutes.

Q And what happened in those three minutes?

A He got -- he did take cash out.

Q Do you how much cash he withdraw?

A No.

Q Did he tell you?

A No, I don't think so.

Q Where were you standing while he withdraw cash?

A I think I was standing -- I think was standing pretty close behind him.

Q Were you talking at all while he's withdrawing cash?

A Maybe. I'm not sure.

Q Do you have a recollection of having a conversation?

A Definitely no conversation in particular, no.

Q Did you talk with him at that point while you're inside the ATM about how much money he should be withdrawing?

A No.

Q Did you know how much cash he's taking out at that point while you're inside of the Bank of America?

A No.

Q Did you have any clue why he was withdrawing money? Had he told you on the walk there, or once you were in the ATM?

A No.

Q What did you think he was withdrawing money for?

MR. ROTHMAN: Objection.

THE COURT: Overruled.

Based on your conversations with him, based on that evening did you form an opinion about what you believe he was taking the money for out for?

THE WITNESS: You know, maybe to pay for the drinks at the bar. I don't really know if I thought of something in particular, no.

Q While you're in the ATM, are you discussing compensation for yourself?

A No.

Q Are you discussing the amount of money for sexual acts to be engaged in?

A No.

Q Do you discuss sexual acts at all in the Bank Of American?

A No.

Q I am going to show you what is in evidence as People's 8.

(Pause in the proceedings)

I'm sorry. We're just trying to load the video. I apologize?

THE COURT: It's okay.

People's 8 for the record was the stipulation regarding the Bank of America records in the video.

Q Ms. Risdal, have you ever seen video from inside of Bank American?

A No.

Q So today is the first time you will see it?

A Today will be the first time I will see that video, yes.

MS. BARAIOLA: So, for the record, I clicked on camera angle labeled "ATM vestibule." And it says "Eighth Avenue." I am going to fast forward -- actually I am going to about 20:09, and I am going to press play.

(Playing of video tape)

Q Ms. Risdal, do you see yourself in this camera angle?

A Yes, I do did.

Q Where are you?

A I'm the blond, only one in there.

MS. BARAIOLA: So Your Honor, let the record reflect the witness has identified herself as the blond female standing essentially next to the front door, the entrance door to this ATM?

THE COURT: Yes.

MS. BARAIOLA: May the record reflect that it's

about 8:11 or 20:11 hours.

Q Ms. Risdal, what are you doing?

A We are walking out of Bank of America.

Q While are you were inside Bank of America, did the defendant give you cash?

A No.

Q What about prior to this point? Had the defendant given you any cash?

A No.

MS. BARAIOLA: So now we are going to go back to People's Exhibit 4 we're going to the "main" camera angle. And we're going to fast forward to approximately 8:18:40 if possible. For the record we are at 8:18:36, and press.

(Playing of video tape)

Q Ms. Risdal, on the walk back from the Bank of America, what are you and he defendant talking about?

A I can't like remember anything in particular, you know, that we were talking about.

Q Are you talking about the money that he withdraw?

A No.

Q Do you know for sure? Do you remember?

A That I do know for sure. We did not talk about money.

Q On the walk back from Bank of America to the W Hotel, did the defendant give you his cash?

A No.

Q Did you discuss what the cash was for?
A No, I did not.
Q Why didn't you ask?
MR. ROTHMAN: I am sorry. What was the question?
THE COURT: "Why didn't you ask?"
A I wouldn't ask, I guess.
Q Why not?
A I didn't.
Q Okay.
Were you curious at all what the cash was for?
A Not really. I don't think so.
Q So now we were going to go I'm --
Ms. Risdal do you see yourself in this camera angel?
MS. BARAIOLA: For the record it's at 8:18:50?
A Yes.
THE COURT: The lower left hand portion of photograph. Is that correct?
THE WITNESS: That's correct.
Q And now we are going to go the "waterfall" angle.
(Playing of video tape)
Do you see yourself?
A Yes, I do.
Q And what are you about to do?
MS. BARAIOLA: Just for the record it's paused at 8:19:03 seconds?

A About to take the elevator to the seventh floor to the hotel bar.

Q Now, I am going to move to the camera angle, "seventh floor shuttle" 8:19. And press play.

(Playing of video tape)

Q Ms. Risdal, do you see yourself in this camera angle?

A Yes.

Q Are you the blond female in the lower portion of the camera angle?

A Yes.

Q Where are you going now?

A Going to the hotel bar.

Q We are now going to go to the camera angle labeled "DJ Booth." And we're going to go to approximately 8:19:52 seconds as close to it as we can get.

It's 8:19:49. We're going to press play.

(Playing of video tape)

Q Ms. Risdal, do you see yourself in this camera angle?

A Yes, I do.

Q Where are you?

A Just sat down.

Q So are you the only female visible in this camera angle?

A Yes, I'm.

Q And are you sitting on the far right-hand side of the camera?

A You mean left or right side?
Q Looking at the screen, is it on your right side.
A Oh, yes.
Q What are you doing?
A Now, we are kissing.
Q Who was kissing?
A Me and Sam was kissing.
Q Did he tell you whether his name was Sam when you met him.
A Well, he told me — he told me by text message that the reservation was under Sanjay, and he also did tell me -- at the restaurant he did say his name was Sanjay as well.
Q Ms. Risdal, I am going to pause this right here?
A Uh, huh.
Q It's at 8:21:00 seconds. What are you doing?
A I have my hand on his upper leg or the thigh, whatever, thigh and leg area.
Q Okay.
And what are the two of you doing?
A Looks like about to kiss.
Q Are you talking while you're inside of this area?
A Yeah. I'm sure we're talking, yes.
Q Do you remember what you were talking about?
A I mean not in particular this area, but, you know -- not particular in this area. I wouldn't specifically remember

particularly if there was anything different than all the things we talked about throughout the whole evening.

Q While you are in this room, are you talking about money?

A No.

Q Are you talking about engaging in any sort of sexual act?

A No.

Q Are you talking about what your compensation should be?

A No.

Q Do you talk at all about whether or not you are into bondage or slapping?

A No.

THE COURT: Excuse me just a minute, is there any juror who may need a break. Some people may be a little sleepy today. Mr. Nelson, you okay? You with us?

JUROR: Yes, I'm good.

THE COURT: Anybody need a break today? Everybody is good? Anybody needs to stretch or stand up, please feel free to do so, and if you would like a glass of water, a cup of water, just let me know that as well, please.

Thank you.

Q Ms. Risdal, about how long were you in this section of the bar?

A Not very long because he couldn't get the attention of the waiter so we very soon will be moving to the bar.

Q Ms. Risdal, just for the record the time is about 8:22. What are you doing?

A At this point we're walking to the bar area to the bar.

MS. BARAIOLA: So I am going to switch to camera angle "LR bar main."

(Playing of video tape)

Q Ms. Risdal, I've paused the camera angle. Do you see yourself in it?

MS. BARAIOLA: For the record it's at 2:83:06 seconds?

A Yes, I'm the blond in the bottom right corner.

Q Almost out of the frame?

A Yes.

MS. BARAIOLA: Your Honor, may the record reflect that the witness identified herself.

THE COURT: Yes.

Q Ms. Risdal, once you get to the bar, about how long are you in there in this section of the W hotel. At the bar maybe -- I can't say maybe -- estimating --

THE COURT: You can say maybe.

THE WITNESS: I can say maybe.

THE COURT: It's just we don't want you to feel you have to have an answer.

THE WITNESS: Yes.

A Estimating two hours.

Q And did you have anything to drink while are you at this bar?
A Yes.
Q Do you remember what you had?
A Yes, I had a Leychee Martini again.
Q Do you remember how many you had?
A Two or 3.
Q And do you remember was the defendant drinking anything while you were at the bar?
A Yes.
He was drinking red wine.
Q Do you know many drinks he had.
A You know, maybe around four glasses.
Q And this time that you're at the bar are you physically affectionate with each other?
A Yes, we are kissing.
Q Are you touching each other anywhere else?
A On the thigh or leg again.
Q Are you kissing each other -- where are you kissing each other?
A Kissing on the mouth.
Q So I am going to fast forward to approximately -- let me ask you this. I will pause that.
While you're at the bar you say you were there for maybe about two hours?

A Yes.

Q You had a couple of drinks. The defendant has a couple of drinks. What are you talking about then?

A He was -- he said that -- at one point he said he went to Harvard. I said, I don't believe you, and kind of a joking way I you just said it. Maybe I offended him because he seemed he was looking to prove to me and show that he did go there.

Q What do mean looking to prove to you?

A He said he could show me some sort of certificate or something he was searching on his phone to find it. He did not find it. Let's see we also -- what else did we talk about at the bar?

I know he also called and made reservations for dinner for the following Monday.

Q Who called.

A Should I refer to Sanjay or Sam?

Q How do you know him.

A Well, Sam. He called and made a reservation he said.

Q When was that?

A At some point when we are at the bar.

Q Does he do it in your presence?

A He was like partially walking around doing it. He might -- yeah.

Q And when was the reservation for?

A Monday. The follow Monday at, I believe it was

6:30 p.m.

Q So at that point you would agree to go on or date?

A Yes, we had.

Q Okay.

And so you talked about making a reservation. You talked about Harvard. What else did you talk about?

A I mean we did maybe came into the whole Harvard thing, you know. Again, as we had talked about the dinner similar things, about go up to India, and I think I talked a little bit about Scandinavia, you know. He just he said he loved to travel and he travels all of the time and so do I. So mainly just about countries and things like that.

Q While you were in the W Hotel bar, do you talk to the defendant about money?

A No.

Q Do you talk to the defendant about compensation for yourself about a financial agreement.

A No.

Q While you're in the hotel bar, do you talk with the defendant about a safe word?

A No.

Q Do you talk with the defendant about sexual fantasies?

A No.

Q Do you talk with the defendant about slapping?

A No.

Q Do you talk with the defendant about "breath play?"
A No.
Q Do you know what "breath play" is?
A "Breath play?" No, I don't. I must have missed it.
Q Do you talk to the defendant about "water sports?"
A No.
Q To you know what that is?
A No. I don't think so.
THE COURT: I'm assuming you mean in a sexual context?
MS. BARAIOLA: Yes.
THE WITNESS: That is what I was assuming.
MR. ROTHMAN: I'm sorry. What did she say?
THE WITNESS: I assume it was the same way that's what she was referring to as well.
Q Does the fact that you had mentioned in the message, on seeking arraignment two dollar signs come up at all while you're in this bar?
A It did not come up. He didn't mention it, no.
Q Does it come up at all what you would be paid for the date. The date you've already made a couple days later.
A No.
Q Does there come a point where the defendant leaves?
A Yes, he goes to the restroom.
Q And about how long is he gone for?

A I'm guessing 20 minutes that he must have been gone.
Q What do you do at that time?
MR. ROTHMAN: I am sorry. At which time after 20 minutes, or when he first leaves?
MS. BARAIOLA: I am sorry.
THE COURT: Just rephrase it, please.
Q When -- while he is gone what are you doing?
A Yes. Well, I again check my phone, and I see that I have a text message from Joe so I had -- he says something like, Give me a call when you get a chance, or give me a call when you get a moment, or something like that. So I decide to call him, and because he was supposed to come and visit me and stay for a few days on his way to Europe.
I never know when he shows up so, you know, we could have been -- let's see that was Wednesday -- Yeah. He was supposed to come like Friday or Saturday or something. So I called him, Joe.
Q What is your conversation with Joe about?
A At first I think we definitely -- I just say, You can come whenever if you want to, and he is not quite sure of the day that he is, you know, going to arrive. I say, That's okay. I'm here as you know any time. You can come and stay anytime.
We start off like that mostly first talking about, you know, him coming to stay with me for a few days, and I never know how long he stays, but I always tell him to stay as long as he

wants.

And then I tell him I'm on this first date, and the guy had been gone for a really long time. I think I'm just going to leave.

Q Okay.

And what does Joe say to you?

A Joe says, Huh, you know. What I do remembering him saying is that he might have said, That's Weird, but he said he gave me like a few different reasons to stay and not to leave.

So he said, you know, he's probably catching up on work email or maybe he's calling on the phone call with someone or something like that I'm sure. I'm sure that is fine. Yeah.

Q Are you texting with anything else during this timeframe?

A Yes, I'm.

Q Who are you texting?

A I'm texting with Kevin that I had arranged to meet that evening for a date.

Q Okay.

A So I'm texting and communicating. I see that he had — I think he had texted me, and then I texted him, I think that I'm running a little late or something, but I definitely texted with Kevin.

Q What time was your date with Kevin supposed to be?

A You know, I told him because we had — I told him -- I

told him I didn't know quite -- You know, I don't think I had set an exact time. I'm not quite sure, but because I did tell him that I am going out on a business dinner I texted him. So I think I told him I'm not quite sure what time; but, you know, I was hoping no later than 10 so to have a drink with Kevin.

Q So your plan was to meet up after?

A Yes.

Q Do you text at all with the defendant during this time period?

A I do get a text. Yeah, I do get a text from him.

Q Do you remember what that text was about?

A Let's see. I think it says -- I am wondering if it says how you doing, or something like that, and I reply something like, I'm still here waiting for you or something like that.

Q So I want to ask you. What phone are you communicating with Joe on?

A My business phone.

Q And who is the carrier, the company that you have your business phone through?

A AT&T.

Q Is that a different number than the T-Mobile number?

A Yes.

Q Why do you have two phones?

A Well, my business phone, again, has not only my business name, but my full name on it as well.

Q What are the last four digits of your business phone?
A 9944.
Q And this is the phone that you communicate with Joe on?
A Yes, I did.
Q Do remember about how long your phone call with Joe was?
A I would estimate, you know, maybe seven minutes. I'm not quite sure.
Q And do you know Joe's number by heart?
A I don't.
Q What phone are you texting Kevin from?
A From another phone, the same phone that I was communicate with Sam on.
Q The T-Mobile phone you have?
A T-Mobile, yes.
Q I am going to show you what is in evidence as People's 6.
(Exhibit being displayed)
Ms. Risdal, do you recognize what this is a picture of?
A Yes, I do.
Q What is it?
A This is the picture of my phone with text messages from Joe.
Q So that your phone is photographed and this text message is from your phone?
A Yes.

Q What time did you get a text message from Joe and what date?
A June 15th at 8:51 p.m.
Q What does the messages say?
A "Hi, Mette. Please let me know when I can call you for a few minutes.
Q And after you saw that message was that when you made the phone call you just described?
A Then when Sam is gone for the bathroom, and I look at my phone, I noticed that I have this message from Joe, and that is why I give him a call.
Q Okay.
I am going to show you what is being marked as People's 15 for identification.
(Exhibit being displayed)
Do you recognize People's 15 for identification
A Yes.
Q What is that?
A This is -- it has my signature.
Q It's a CD you viewed before testifying today?
A Yes.
Q And does it have text messages with Kevin on that disk?
A Yes, I believe so.
Q And does that fairly and accurately depict your communication with him on that date on June 15th?

A Yes.

MS. BARAIOLA: Your Honor, at this time I would offer People's 15 for ID into evidence.

THE COURT: Any objection?

MR. ROTHMAN: No.

THE COURT: It is now admitted into evidence. Can we just mark it?

MS. BARAIOLA: Sure.

(So marked)

THE COURT: So this is T-Mobile, and these are text messages with Kevin.

MS. BARAIOLA: These are photos of text messages.

THE COURT: Photos. Okay.

MS. BASHFORD: Can we approach briefly?

THE COURT: Sure. On the record?

MS. BASHFORD: No.

THE COURT: Off.

(Discussion held off the record at the bench)

THE COURT: Ladies and gentlemen, we're going to take a few minutes. Take a break, please. So you can go in the back, use the restroom, whatever you need to do, and we'll be able to get back.

(Jury exits)

THE COURT: Ms. Risdal, I will ask you to step down

as well. Step on down, and we'll bring you back in as soon as we can.

THE WITNESS: Thank you.

THE COURT: It shouldn't be too long.

THE WITNESS: Thank you.

(Witness exist)

THE COURT: Have a seat, please. I still stand. I am sorry. Feel free to sit every time the jurors leave or whatever.

So I want to make sure we're clear for the record. Our juror number 12. Let me just make sure of that number. That's Mr. Anthony Nelson has been appearing to look asleep. I noticed it early during the testimony of the complainant in this case, and I'm concerned that he is missing a large portions of testimony.

I tried to be a little subtle about it, you know maybe dropping my pen or doing something. It hasn't work. That is why I did say what I said which I usually don't do with jurors. I don't want to embarrass anybody.

But to be honest with you with the type of case this is, you know, not many trials are as interesting, I would for, say for some jurors; and I know we other witnesses coming up which may not be not be as interesting.

I don't mean to belittle any witnesses, but I think we need to have a conversation as to whether or not we should

bring him in, or whether or not he should remain as a juror in this case, but I do believe he's missed large portions of the testimony.

MR. ROTHMAN: I haven't observed that.

MS. BARAIOLA: I think we should ask him. Your Honor, I think we should ask him. I've had jurors say before they just listen with their eyes closed. So I don't know if we should just find out from him if he believes he fell asleep or not.

THE COURT: Also for the record, you know, it's chilly in this courtroom, very cold. And he does appear at times to bring his jackets so kind of snuggling down crouching in the back. And it is hard to see his face.

MS. BARAIOLA: I do believe this is the gentleman who did tell us that he's anemic. So he does get very cold also.

THE COURT: You're right about that.

The other thing that was brought to my attention is he may have head phones in his ears. I did not notice that. As he got up though, I did see with his sweat shirt he has strings that hang done; and by the way, for the record he has a hood on which I don't mind since it is very cold in here. But I did not notice headphones.

So if anyone has noticed anything else, let me know that as well.

So let's bring Mr. Nelson in, please.

(Proceedings continued next page)

There's another juror who appears to close his eyes from time to time, but he did catch himself.

MR. ROTHMAN: Which one is that, Judge? I have not seen that either, but maybe that person needs to be spoken to as well.

THE COURT: It was so quick honestly. It was very quick.

MR. ROTHMAN: Oh, it sounded like it happened more than once.

THE COURT: It did, but it was quick.

MR. ROTHMAN: It sounds like that person may not just almost falling asleep.

THE COURT: Let's have the attorneys step up a moment.

Off the record, please.

(Discussion held off the record.)

(Record resumed.)

THE COURT OFFICER: Juror entering.

(Whereupon a juror enters the courtroom.)

THE COURT: Mr. Nelson, please don't feel that I am trying to embarrass you in any way. It appears that you are nodding off, and you were perhaps sleeping.

THE JUROR: No, it wasn't that I was sleep. But it's cold. I was trying to like focus on what she was saying without having my eyes go like this. Again, it's not

so much like I'm nodding off or I'm tired. After a while -- I'm just like sometimes it helps me hear her.

THE COURT: It looked like you have some red wires.

THE JUROR: Oh, yeah. It's my headphone.

THE COURT: I need you to take that out. I didn't notice that. I apologize.

THE JUROR: It wasn't on all day. Earlier when I first left I took them out.

THE COURT: All right. I just didn't notice it.

All right. So here's the thing. Some people listen better with their eyes close. And I know it's freezing in here. I'm sorry. I know you told us you get cold. So normally we wouldn't want a hooded or a hood.

THE JUROR: I'll take it off.

THE COURT: No, no. If you're cold, please put it on. I need you to be comfortable. My concern is that you may have missed portions of the testimony which concerns me a little bit, and it's hard to ask you if you don't realize you nodded off.

THE JUROR: Well, I didn't miss anything. I did notice that a lot of the same questions were asked a lot. I know they got to do that.

THE COURT: That's not what I'm asking, for your critique of the trial.

PROSPECTIVE JUROR: I was paying attention. That

is how I heard all those questions.

THE COURT: You feel comfortable continuing as far as a juror here?

THE JUROR: Yes.

THE COURT: Okay.

Can you just promise me though if you feel, you know, you're too cold, you need a break to warm up, or if you do get a little sleepy just let me know. Raise your hand and just ask for a break. I'm always happy to do that. I want to keep you all comfortable. Just go back -- did anybody have any questions or anything?

MR. ROTHMAN: No.

THE COURT: Thank you. And I apologize for calling you out.

THE JUROR: It's all right, Ms.

(Whereupon the juror exits the courtroom.)

THE COURT: Anybody want to put anything else on the record? He says he's fine.

MR. ROTHMAN: He said he hasn't missed anything. He's never been a sleep. He likes to close his eyes to listen. He has not missed one thing.

THE COURT: Okay.

MR. ROTHMAN: That's what he said.

THE COURT: That's the abbreviated version of what he said.

MR. ROTHMAN: I can keep going, but I think that's it.

THE COURT: That's it. Okay.

We can bring the rest of the jury panel out and bring in the witness. We can bring them all back out, the witness first.

THE COURT OFFICER: Witness entering.

(Whereupon Ms. Risdal enters the courtroom.)

THE COURT: Ms. Risdal, come and have a seat again, and we'll bring the jurors back in.

THE COURT OFFICER: Jury entering.

(Whereupon the jury enters the courtroom.)

THE COURT: Just so everybody know, we'll go about another -- no more than a half hour, between four and 4:15 today. It does not appear that we will finish with this witness. So just keep that in mind if you are going to ask for a break or you need to do something. We should be able to wrap things up today.

People.

DIRECT-EXAMINATION

BY MS. BARAIOLA (CONT'G):

Q. So, Ms. Risdal, I think where we left off before we took the break was I've just shown you the CD where text messages were kept.

A. Yes.

MS. BARAIOLA: So I'm going it publish that to the jury.

Q. Ms. Risdal, where are these photographs from?

A. Well, this is Kevin sending me a picture of him.

Q. Is that a photo of a message from him. I apologize.

A. Okay, sorry.

Well, this is a picture of my phone.

Q. Are you the blue or gray messages?

A. I'm sorry. I think I'm the blue if I can look a little bit more to make sure. Yes, I am definitely the blue one. Thank you.

Q. When is the first message sent?

A. Wednesday, 11:45 p.m.

Q. And is that the same Wednesday as this incident?

A. Yes.

Q. And what does he say?

A. Hi, this is (blacked out). How is your day going.

Q. And what's the response?

A. Kevin replies great.

Q. Okay.

A. And then he sends me a picture of him, and then he states flight training in this and T (phonetic) flying both.

Q. And what do you respond?

A. Nice. Smiling emoji.

Q. And the next message?

A. And then he says, What is your SA, and what are you thinking.

Q. And what do you say?

A. Not sure what my SA is. I thought it was (blacked out). LOL. You just email me ten minutes ago.

Q. What's the next message?

A. He's saying, I'm (blacked out).

Q. What's the next message that he responses to you?

A. LOL. I had it on outbox. All set.

Q. What's the next message he sends you?

A. Can you meet me (blacked out). Can you meet tonight, and are you free this weekend. LOL, question mark.

Q. And then what's blocked out there?

A. Well, another picture of him.

Q. And then what do you say?

A. Well, he says might make life easy. LOL. And then I say, K. Nice. I have an early dinner tonight but not sure when it will be done, maybe nine-ish.

Q. And does he respond?

A. Yes.

Q. Does he tell you where he lives?

A. He tell me where he lives, and he says that works fine.

Q. And then what do you say?

A. Okay. I can text you as soon as I'm done. It's in Midtown.

Q. And did you tell him where you live?
A. I wouldn't put down the address, but I said the area that I live.
Q. Okay.
And then what did he say?
A. Okay. I can text you as soon as I'm done -- oh, sorry. I live (blacked out), but dinner is in Midtown. I said I live up town.
Q. Then what does he say?
A. I say nice picture. Thank you. He says, I can send you an Uber. Ha, Ha. You have bad eyes.
Q. What do you respond?
A. No, I don't. LOL.
Q. Did he ask you where you're from?
A. Yes.
Q. And then do you answer?
A. Yes.
Q. And then what's the next message you send?
A. Move to NYC eight years ago.
Q. What is the next message?
A. Sends Svenska Flick, S-V-E-N-S-K-A F-L-I-C-K.
Q. First of all, what language is that?
A. Swedish. And it means Swedish girl.
Q. And what did you respond?
A. I reply, Ja, J-A.

Q. What does that mean?
A. Yes.
Q. Is that in Swedish?
A. Yes, Norwegian and Swedish.
Q. And what is the next message?
A. And he says, Ha, Ha, Ha, Ha. I race sailboats there.
Q. What did you respond?
A. Cool. Were you thinking to have a drink around your West Village neighbor. I love that area of town.
Q. What's does he respond?
A. Yes, that would be great. Or if have a friend for safety we could do it on my deck.
Q. What do you say?
A. Do I need a bodyguard. Smiling emoji.
Q. Then what does he respond?
A. No, but I always ask as a gentleman. There are a lot of creeps.
Q. What's the next message?
A. Let me know if your plans change. I will be flying in and getting into the city around five.
Q. And what do you rely?
A. Okay. Great. I doubt it, but should not be too late.
Q. What are you talking about there?
A. I'm definitely not referring to -- I doubt my plans will change, but should not be too late meaning I want to meet him

after.

Q. When you say your plans, are you talking about your dinner plans with the defendant?

A. Yes.

Q. What's the next message you send him?

A. Where are you flying in from.

Q. And what does he say?

A. In Maine training. So I'm flying the plane in my profile, Falcon 900, back. I go to Maine and bring up to 15 people every weekend. We hike, yoga at my house, bowl, tennis, golf, et cetera. We all cook and have amazing time. Jumping back in the plane. See you tonight.

Q. And what time is that last message, jumping back in the plane. See you tonight?

A. 12:15 p.m.

Q. I'm sorry. What time is it?

A. Oh, sorry. 12:10 p.m.

Q. And what do you respond?

A. Oh, so nice. I love Maine. Reminds my (sic) of the village where I grow up. Safe travels. Kiss emoji.

Q. When is the next communication? What time is the --

A. Same Wednesday evening at 6:00 p.m.

Q. Okay.

And who send the message at 6:00 p.m.?

A. Kevin sends me the message, Back in NYC. Getting on the

bike.

Q. What do you say?

A. Nice. I love biking and spinning. So I misspelled. I will text you later.

Q. What time do you send that, I will text you later.?

A. At 6:02 p.m.

Q. Okay.

Does Kevin respond?

A. He replies, Right a way. Perfect.

Q. When is the next message?

A. 8:08 p.m.

Q. And who sends that message?

A. Kevin sends me a picture.

Q. What's the picture of?

A. Of a wine bottle.

Q. And when's the next message after the picture of the wine bottle?

A. Kom Och Hosta Pa Vi Mar Massor Vin.

Q. What language is that in.

A. Swedish.

Q. And what does that mean?

A. Come and say hello. We have lots of wine.

Q. And what time is that message sent?

A. 9:27 p.m.

Q. The same evening?

A. Yes.
Q. Do you reply?
A. Yes, I do.
Q. And when do you reply?
A. 9:43 p.m.
Q. And what do you say?
A. Still out for dinner. Running behind. Sorry. Will keep you posted.
Q. Where are you when you send this text message?
A. I'm sitting at the bar waiting for Sam or Sanjay.
Q. What bar?
A. I'm sitting at the bar at the W Hotel.
Q. Waiting for him? Where had he gone?
A. Yeah, because he was in the restroom still. So while I'm waiting for him while he's in the restroom. While I'm waiting for Sam, I'm sending this message to Kevin.
Q. And what does he respond?
A. As long as you're going to make it, happy to wait. If not, let me know and no worries. Just don't want to wait and have you bail.
Q. What do you reply?
A. I know. Sorry. Not sure. So do what you need to do. Don't want to hold you up.
Q. What time is that?
A. 9:46 p.m.

Q. And then does he respond?
A. Yes, he does. LOL. The girl with me said, keep you posted, is not a good sign. I'm having a good night. Tired from flying training.
Q. And what do you respond?
A. So you have girls with you, question mark.
Q. Okay.
And what's the message?
A. And he replies, My son's friends. They are just leaving to go to Boom Boom and Pauls.
Q. Did you reply?
A. Yes.
Q. What did you say?
A. Well, I'm out on business dinner. So going with the flow unfortunately.
Q. What time is that?
A. 9:49 p.m.
Q. What do you mean by "business dinner"?
A. I didn't want to tell him that I was on a second date, on another date. So I just said that.
Q. Okay.
You didn't want to tell Kevin you were on a date?
A. Exactly. I did not want to tell Kevin that I was on another date with another guy from another date the same evening, yes.

Q. And then what does he reply?
A. He replies, I totally understand. I want to meet you so if you're committed I will wait as long as it takes. Good things are worth waiting for. And, yes, one of them is (blacked out).
Q. And what do you say?
A. I'm trying. If I ever get there, I will be very drunk.
Q. So what time is that at?
A. 9:50 p.m.
Q. And what do you mean you will be very drunk?
A. I mean I don't know if I would say very, but I definitely felt that I have been drinking.
Q. So, again, at this point when you're sending this text message where are you?
A. I'm still waiting at the bar at W while Sam is still in the restroom.
Q. So you felt -- you could feel the effects of the alcohol that you were drinking?
MR. ROTHMAN: I'm sorry. I missed that question.
THE COURT: Can you repeat it, please.
Q. So you were feeling the effects of the alcohol that you had been drinking?
A. Yes, I felt that I had been drinking but not too drunk, yes.
Q. Were you able to stand?
A. Absolutely.

Q. Were you able to walk on your own?
A. Yes, absolutely.
Q. Did the amount of alcohol that you had effect your ability to know what was going on?
A. No, I absolutely knew what was going on.
Q. Okay.
And then when -- what does he say back to you?
A. And he replies, Ha, Ha, Ha. No worries. I don't judge. And will Uber you safely in both directions. Safe with me.
Q. And do you reply?
A. Yes, I reply a peace emoji. And I say, Trying to move this along fast.
Q. What time you say that?
A. 9:53 p.m.
Q. Okay.
Does he reply?
A. Yes, he does. He replies, Ha, Ha, Ha.
Q. When you say "trying to move this along fast," what do you mean?
A. Just wanting to get out — you know, just wanting to lay pretty much at this point. But I also do feel a little bit bad or guilty to leave someone without saying goodbye. So I do continue to wait for Sam to come back.
Q. Okay.
And does Kevin response?

A. He says, I am very patient and know that you have left me no. I have no problem waiting. Smiling emoji.
Q. What time is that text message?
A. 9:54 p.m.
Q. Is there another text message from Kevin?
A. Yes, he says, Any moment. LOL. At 10:44 p.m.
Q. Do you respond to that?
A. No.
Q. What's the next text?
A. Then he sends another message saying, Well, don't I feel stupid. That is why my profile has Forest Gump. Be safe.
Q. What time is that?
A. 11:22 p.m.
Q. Do you reply?
A. I doubt that.
Q. And when is the next text message that you get?
A. Thursday at 8:16 a.m. He says, Sorry couldn't wait up last night. I was exhausted from flight training, but I hope you had a great night.
Q. And then what else does he say?
A. Let me know if you want to give it another try today. LOL. Hope you are not too hung over.
THE COURT: Is this a good time to break?
MS. RISDAL: I think it's okay. I'm sorry. I am going to pull myself together.

Q. Did you meet up with Kevin that night?
A. No, I didn't.
Q. When Kevin sends you a text message at 10:44p.m., where are you?
A. In the hotel room, 4906, with Sam.
Q. And when he sends you a text message at 11:22 p.m., where are you?
A. Still in the hotel room.
Q. With the defendant?
A. Still in the hotel room with Sam in the room, 4906, yes.
Q. And when he sends you a text message the next day at 8:16 in the morning where are you?
A. I'm at the hospital, Mt. Sinai Hospital. It's either 59th Street or 60th Street, maybe 10th Avenue, somewhere around there.
Q. Ms. Risdal, I'm going to show you what's been marked as People's 16 for identification.
Do you recognize People's 16 for identification?
A. Yes.
Q. What is People's 16?
A. It's photos of hospital, and I have my initials, MR.
Q. Is this the disc you viewed before today?
A. Yes, you showed it to me. Yes.
Q. And are the pictures that are on this disc do they fairly and accurately depict the way you appeared when you were

at the hospital in the early morning hours of June 16, 2016?

A. That's how I looked like that morning, yes.

MS. BARAIOLA: Your Honor, I would offer People's 16 for identification into evidence.

THE COURT: Any objections?

MR. ROTHMAN: No.

MS. BARAIOLA: I would like to publish it to the jury.

THE COURT: Let's mark it admitted, and then we'll publish it.

(People's Exhibit 16 marked and moved into evidence.)

MS. BARAIOLA: For the record, we're clicking on the file labeled, P1060914J-Peg.

Q. Ms. Risdal, is this a photograph of you? I need you to answer.

THE COURT: Let the record reflect the witness is nodding and physically upset.

A. Yes, it is a picture of me.

Q. When was this photograph taken? How long had you been at the hospital?

A. I was at the hospital all night. I probably got there I have to estimate -- I am estimating that I got there maybe around 1:15 a.m., maybe, I think. I stayed there all night til maybe around 11:00 a.m. or noon. So it was taken between those hours.

Q. Were these photographs taken within hours of when you

leave from 4906?

A. Yes, they took the pictures right away. They did scanning, and then they took pictures, yes.

Q. Ms. Risdal, I'm now on file 916.

What is that a picture of?

A. A picture of my neck and my hair. You can see blood in my hair.

Q. Ms. Risdal --

A. It's okay. You can continue.

Q. Ms. Risdal, what is this a photograph of?

A. This is a picture of my face. This is a picture of my face of that night -- after that night, yes.

Q. What injuries this shows?

A. I could barely open my left eye, and it shows how my mouth also was very, very painful. And I couldn't eat for several days, and I could barely open my mouth. I had pieces of my front tooth that came off, and my ear, my right ear got hurt for several weeks after.

MS. BARAIOLA: Your Honor, I think we'll break here.

THE COURT: Good time to break.

Ladies and gentlemen, it's about six minutes after four. We're going to break for the day.

9:30 everybody is okay with? I'm going to ask -- just one moment.

(Pause in the record.)

(Record resumed.)

THE COURT: I'm going to ask everybody to come back 9:30 in the morning on Monday. Enjoy your weekend if you can. We have a long break now, a couple of days.

Again, keep an open mind. Please, do not discuss the case with anybody else. Do not research anything. Don't start Googling. Don't go to visit W or Zuma, anything like that, any particular websites that you might have heard about in this case.

Thank you very much.

(Whereupon the jury exits the courtroom.)

THE COURT: The jurors have left. And, Ms. Risdal, we need you back on Monday at 9:30, please.

MS. RISDAL: Thank you so much. Have a good weekend.

(Whereupon Ms. Risdal exits the courtroom.)

THE COURT: There are a few things I believe we need to put on the record about additional Rosario that was turned over.

MS. BARAIOLA: Yes, your Honor.

Today on the lunch break Ms. Risdal had a piece of paper with her. They were notes that she had written down in her own time. I didn't know about them, but once I saw them I made a copy of the page that she had. And I provided

it to Mr. Rothman right after the lunch break.

THE COURT: Anything you want to add about that?

MR. ROTHMAN: No.

THE COURT: You also mentioned, I believe, there was other Rosario since we first started that you wanted to put on the record. You don't have to do it right now.

MS. BASHFORD: There was some witness aid service, a page of notes, and an email saying, it had been filed and been reviewed by a deputy, and there was no Rosario in it.

MS. BARAIOLA: Also I believe what was disclosed as far as Giglio was that there was one car service provided by the DA's Office for Ms. Risdal. The amount of that was turned over as well as the car service aid to Mr. Rothman. The fact that our office had provided her with counseling and the Office of Victim Services had compensated her for medical expenses, that was all turned over to Mr. Rothman as well.

MR. ROTHMAN: Acknowledge.

THE COURT: As far as you know, People, you believe all the Rosario and whatever other material that needs to be provided to counsel has been provided at this time?

MS. BARAIOLA: I believe so, your Honor.

THE COURT: Okay.

Ms. Bashford, you have something different to say?

MS. BASHFORD: I have nothing further to say.

THE COURT: Okay. So you will continue with her testimony.

MS. BARAIOLA: Yes.

COURT OFFICER: Witness entering.

(Whereupon, the witness enters the courtroom and takes the stand.)

THE COURT: Okay. Ms. Risdal, you are just reminded that you are still under oath.

THE WITNESS: Yes.

THE COURT: And good morning to you.

THE WITNESS: Good morning. Thank you.

MS. BARAIOLA: You may inquire, your Honor.

THE COURT: Absolutely.

CONTINUED DIRECT EXAMINATION

BY MS. BARAIOLA:

Q Good morning, Ms. Risdal.

A Good morning.

Q I think where we left off on Friday we had gone through some text messages that you had sent to a person named Kevin, right?

A Yes.

Q And we were talking about when you were at the W Hotel bar.

A Yes.

Q There was a point you had described, I believe, where

the defendant had left for a period of time?
A Yes.
Q Now, up until that point, how were things going on this date with the defendant?
A Um, it was going fine up until that point.
Q Would you describe it as a good first date, at that point?
A Yes.
Q Were you interested in the defendant?
A I was interested in having a second date, and that's why I agreed for him to make reservations for the following Monday for Nobu.
Q When, to your knowledge, when do you believe that he made those reservations?
A He told me he called right there at the bar. He was kind of standing behind me, or walking a little bit on the phone while I'm sitting at the bar.
Q Now, we were talking about at the time period that the defendant had gone. Again, how long was he away for?
A I'm just estimating that he was gone for 20 minutes.
Q What did he tell you that he was doing?
A He said he was going to the bathroom, because I said I have to leave now, and he said, I'm just going to the bathroom, and I guess I said okay, or I think I said okay, and he went to the bathroom.

Q While he was gone for this 20 minute period of time, did he communicate with you via text message?
A Yeah. He sent me a text message a little while after.
Q Okay. Do you remember what it said?
A I think it said hello.
Q Okay. So I'm going to show you what's already in evidence as People's 14.
So I want to direct your attention to the bottom portion of this message. What is the date and time where the text message says "Hello?"
A Wednesday, June 15th at 9:42 p.m..
Q And what's the message below that?
A It says, "Hello. How are you?"
Q And what do you respond?
A I reply at 9:44 p.m., "Great. Still here waiting for you." Kiss emoji.
Q I'm now going to go to what is in evidence as People's 4, the W Hotel video.
And, for the record, we are in the file named guest entry angle, and we are going go to the camera angle, LR Main Bar?
THE COURT: Sorry, what is the exhibit number again?
MS. BARAIOLA: Yes. People's 4, your Honor.
Q And we are going to go to, approximately, 9:35.

So we are at 9:34:23, and I'm going to press play.
(Video playing.)
Q Ms. Sullivan what is happening now?
A Um, he's giving me a kiss, or several kisses.
(Video playing.)
Q Now, the direction that he just walked, Miss Risdal what is in that direction?
A Um, I think there is an entrance behind here, as well.
Q So there is another entrance to the bar that is not in this camera angle?
A Yes, I believe so, because I think we came in that entrance.
Q Okay. Just for the record we paused it at 9:35:13.
We're going to go to the seventh floor shuttle camera angle.
Okay. And we're going to press play. It is at 9:35:13.
(Video playing.)
Q Just for record, we paused it at 9:37:24.
Miss Risdal, do you recognize the person in this camera angle?
A Yes, I do.
Q Who is that?
A Sanjay or Sam.
Q We're now going to switch to camera angle Waterfall.

Just for the record, the time is 9:37:54.

(Video playing.)

Q And we're now going to switch to the camera angle Main. And, for the record, the time is about 9:38:22 seconds.

(Video playing.)

Q Okay. I paused it at about 9:38:28. And I am now going to go back to the LR Bar main view. I'm going to press play.

(Video playing.)

Q I apologize. I'm going to just rewind a little bit to about 9:36:53.

Miss Risdal, what are you doing right now?

(Video playing.)

A It looks like I'm on my phone. I think this is maybe about the time I'm about to call -- I'm reading my message from Joe, and it says to give him a call when I get a chance.

Q What are you doing right now?

A It looks like I'm on the phone with Joe. Yes.

Q I'm now going to go back to the main camera angle, and we are going to fast forward to 9:53.

So we are at 9:52:54. I'm going to press play.

(Video playing.)

Q I'm now going to switch to the Waterfall camera angle.

For the record, the time is about 9:53:11.

(Video playing.)

Q And we're going to switch to the seventh floor shuttle at 9:53:28.

(Video playing.)

Q Okay. Now I am going to switch to the LR Bar, main. Just for the record, it is about 9:53:56.

(Video playing.)

Q It's about 9:54. Ms. Risdal. What is going on now?

A Well, now Sanjay just got back.

Q When he returned, did you ask him what took so long?

A No, I don't think so.

Q Why not?

A Um, I would usually -- I don't think I'm the type to. And I think after talking to Joe he was sort of more -- he's probably just e-mailing or catching up on e-mails, so I think that's what I thought.

Q Did the defendant apologize to you for being gone for so long?

A I don't think so.

Q Did he tell you where he had been?

A No.

Q As you sit here right now, to your knowledge, where was the defendant for 20 minutes?

A He was in the bathroom for 20 minutes. Estimating.

Q When he returned from the bar, what did you two discuss?

A I know at some point I say that I want to leave, because I had said it before he left for the restroom, as well. And I'm not sure if that is right away. It could be a little after five, 10, minutes or so.

He's definitely saying that -- when I do say that, if that's now or a little more later, probably, yeah, I can't, like, particularly remember if there was something specifically he said or I said.

Q Did you, after he returned from being gone, discuss money with him?

A No.

Q Did you discuss being paid for the date?

A No.

Q Did you discuss money for sexual fantasies?

A No.

Q Did you discuss bondage?

A No.

Q Did you discuss slapping?

A No.

Q Did you discuss rough play?

A No.

Q After he returns to the bar, about how much longer are you in the bar with him?

A I think we do stay at the bar for potentially another half hour, or maybe 20 to 30 minutes. Estimating.

Q And what's going on, at that point?
A Well, I believe we're talking. Talking about the next date for Monday.
Q Are you being physically affectionate?
A Probably.
Q At this point, now that he has returned from being gone for 20 minutes --
A Yes.
Q -- how would you say the date is going?
A Um, even though I had a gut feeling that I wanted to leave, and I had other commitments, so I did want to leave, and I told him I wanted to leave, it was still going well with him, at that point.
Q At some point do you leave this bar?
A Yeah. At some point we leave the bar, yes.
Q Do you know about what time?
A Um, I would just estimate between 10:15 to 10:30. Closer to 10:15, I would say. Around.
Q Where do you go when you leave this bar?
A Um, Sanjay says let's go upstairs and I'll give you the present that I have for you from Texas, and I'll give you my business card, as well.
Q When does he first tell you that he has a present for you from Texas?
A At dinner he tells me that, I believe.

Q Did you know what the present was?
A No, he did not tell me what it was.
Q Were you expecting the present to be cash?
A I don't really think I thought of what it was. I don't think I thought it was cash, just because he called it a present, so...
Q Why did you want his business card?
A Um, I think I just assumed that he, you know, potentially wanted to give his full name and e-mail address at that point.
Q Before you go upstairs to the room do you discuss whether or not you're going to engage in any sort of sexual acts, once you are inside of the room?
A No.
Q Did you go upstairs to his room willingly?
A Yes.
Q And was it the same room you had been in a few hours earlier?
A Yes. Room 4906.
Q What were you -- how long did you think you were going to be in the room?
A Um, in my opinion, it was just go up to his room, get his business card and the present, you know, kisses goodnight, and leave. So I guess estimating 10, 15, minutes.
Q What happened once you got into room 4906?

A Yeah. As soon as I get into the room, I walk in and, you know, he's like, oh, come over here. Let's look at, you know, stand here by the window. And the window is right on the edge of the bed. The short side of the bed. That's kind of like if you face the window, then the bed is right behind there. And as soon as we walk over there, then his little suitcase is in the corner, even further in the room. He just starts right away, um, even just like estimating like a minute after kissing me like very, very, rough, right away. Biting my lips and biting my tongue. Being very, very, aggressive. And as soon as he does that, because he was really biting on my tongue and biting on my lips. It wasn't the kind of kissing we had done at the bar or the restaurant.

So I say I want to go home now. I want to leave. And he's saying, "No, you're not leaving." I say yes, I want to go home. And then he throws me on the bed. He pushes me down on the bed to where I'm on my back, and he goes on top of me, and he puts his hands around my neck, and he's saying, "No, you're not leaving." And I screaming, yes, I'm going. I want to go home. I'm leaving now. No. Stop it. Stop this. Several times. And I'm screaming it very loud. And he pulls down my pantyhose and takes off my shoes. He's holding -- then he's holding my arm, at that point. Doing that (indicating.) And I try to get up, and he's just being very, very, aggressive. And I scream no. Stop it. No. Stop it. And he -- when he has my

pantyhose down, he puts a finger in my vagina, and he puts another finger in my anal, and he's saying, "I'm going to fuck you in the ass." And I say no, you're not. Fuck you. You are never going to have me. You will never fuck me. You will never have me. No. And then he just holds me down very tight and very aggressively. Just fingering me in and out of my vagina and my anal.

And then I tell him that I have to go to the restroom, and he -- I'm trying to take my purse with me and he says, "You can go to the restroom, but you cannot take the purse with you." I say okay, and I go to the restroom, which is closest to the front door, and he goes with me to the restroom, standing in the doorway, not letting me close the doors. Having the doors open. And he's first facing me while I'm starting to pee a little bit, and then he's turning towards the other window, because there is two windows in the room. And as soon as he turns a little bit towards the window, then I try to run for the front door.

So I run for the front door and I try to open the door, and I scream help me, help, as loud as I can. And then the hatch is on, so the door is only opened a little bit when I scream help me, help. But it does open a little bit, but the hatch is on the door, and then he's coming behind me right away, and he's pushing the door, again. Closing the door, again. And he's pulling me back to the bed. And next to the bed. And he's pulling me back, and I get off the phone receiver, because it's

on his side of the night table, the side of the bed that is closest to the front door. I get up the phone receiver and I try to hit one of the buttons, because I think that is usually where you have concierge or the operator, or the front disk. I hit something, hoping that somebody will hear me then, too, and I'm screaming, and he puts -- he covers my mouth, and he puts the phone receiver back on, and he just starts punching me. He just starts punching me on the floor. He's punching me on the cheek and on my face, and then he drags me back up and he's punching me so hard with his fists, and I couldn't believe it.

When I got the first punch I couldn't believe it. And he does a few of them before he drags me back up on the bed. And then when I'm back up on the bed he takes my purse and he empties it all over the room, and he finds my phone and he takes my phone and he throws it in the corner of the room. I think he was looking for my phone, emptying out my purse. He throws it in the corner of the room, and I'm on the bed, and he goes on top of me and he is strangling me, again, with both his hands. And he says, "I am going to kill you. You are going to die." That's what he's saying. And he's strangling me for a long time. The way he's sitting on top of me, I'm lying down on my back. Both my hands is to the side. So he is sitting on top of my belly, but also on top of both my hands. So I tried to move. I tried to get up, but I can't move. There is no chance I can get up. There is no chance I can get off of this guy. And I am

not the type to give up. I am a very stubborn person. I tried everything to get loose.

And then, eventually, after awhile, I cannot breath. I cannot breath. I'm not sure if I was conscious or unconscious. But after awhile, when I get to it again, he's still just sitting on top of me, staring me in my eyes. And after strangling me he starts punching me again. He just starts punching me. "I am going to kill you. I am going to kill you. You are going to die here tonight." And he's looking me in the eyes, and he just keeps saying that, and starts punching me, and then I start to see -- I start to see he's punching me on the side of the brain. He's punching me on the boobs. He's punching me on my eye. Everywhere on the face. On the mouth. Everywhere. Many, many, many, punches. And then I start seeing blood splatter. That is coming from every punch that he's doing. I see blood splatter is coming all over the bed. On the white sheets. And as soon as I -- and I can feel it, too. I can feel it in my face, that it is so painful. It is so painful. And my eye is hurting. My mouth is hurting. My face is hurting. And as soon as I see the blood splatter I get terrified. I am terrified, and I am realizing I am never going to look the same. I'm never going to look the same again. And I probably am going to die here tonight. How the heck can I get out of here alive.

And there is a moment where I don't even see a chance

to get out of there alive. I do start believing him. I actually am going to die. And he just keeps repeatedly is punching me and telling me that he's going to kill me. I keep thinking about, you cannot give up. You never give up on anything. You cannot give up. That is not you. You have to get out of here alive, somehow. You have to figure out a way to get out of here alive. And I start -- I start saying -- actually, as soon as I see the blood splatter coming I got so terrified. I changed my tone and I said, please, please, please, don't kill me. Please. Please. Please, no. No, please. No, please, don't. But he didn't stop. He just kept punching and punching and punching.

And then I see a phone in my corner, and then I look at the night table and it says 11:50 p.m., it says. And I say oh -- I make up a story. I say oh, wow, it's already 11:50 p.m. I cannot believe it. My babysitter is only staying until noon. I have to go. I have to leave. I got to go now. And then he says, "What do you mean, babysitter? You don't have children." I say oh, I'm so sorry, I know I told you that I don't, and I just heard that guys don't really like -- that maybe it's even more challenging to date when you're a single mom, so I just didn't want to tell you right away, and was going to wait until after, you know. So that's why I didn't tell you that, but I am a single mom, and my babysitter, Stephanie, is a college student, and she can't stay longer than noon, because she has

classes tomorrow, and I really got to get home to my daughter. And he -- and I said -- and he says, "No, you're not leaving. I want to fuck you in the ass. You're not leaving." And then I say okay, I'll do what you want, but I have to then text my babysitter, Stephanie. I have to text her when I will be home. I have to let her know, because otherwise she might just leave. I have to tell her. What time do you think -- when do you think I can leave, and when do you think I can be home so I can text Stephanie?

And I say I have to go and get my phone. And he says, "No, I'll go and get the phone." So he goes and gets my phone in the corner, and then he says, What's her number?" And I make up a phone number. And he texts, "Hi, Stephanie. Can you please stay until 1 a.m.?" And he keeps the phone on his side of the night table. I'm sitting here (indicating.) He's on the side of night table, closest to the front door. And we're talking a little bit after, and he keeps checking the phone while we're talking, and I just keep talking about my daughter, and I'm picturing my little niece. And while I'm explaining how my daughter is -- and before that I forgot to say I also said, when I said I'm sorry, I have to get home to my daughter, I say because I am a single mom, and my daughter's father died, so I'm the only one she has here in the US. I'm the only one she has here. Everyone else is oversea, so I really, really, have to go home to my daughter. I was just explaining just, like, what my

niece does. She plays soccer. She plays handball.

I'm talking. I'm explaining about how she is. And as we're talking about things he looks on the phone -- he tells me what he wants me to do. Then he looks on the phone, again, and I ask, did Stephanie reply yet? And, nope. And then he tells me that he wants me to go down on him, to give him a blow job, which I do. I start sucking him while he's lying on his back, and he's fingering me and touching me while I am -- while I'm, I'm, giving him a blowjob. And he keeps guiding me and telling me things the whole time. And then he tells me to lick his ass, which I also do. And then he tells me to play and finger with his ass, which I also do. And then he flips me over on my back, and then he goes on top of me and he puts his penis in my mouth, sitting on top of me, and he goes in and out of my mouth. And my face is so painful, and mouth at this point, doing all of this. I'm just trying to, you know, I can barely even -- and he goes all the way to where I am gargling, or whatever you call those words when he's doing it. And I just feel the pain of my mouth. And my mouth can barely open, and the pain on my face after all the punching, and he tells me, if you don't make me cum I'm going to fuck you in the ass. So you better make me cum, and swallow.

And, eventually, he does cum in my mouth, and I do swallow. And then he -- when I'm done doing that he looks at the phone, and there is still no message from Stephanie, and I,

the whole time I just prayed, please do not reply, whoever this person is. Please do not reply. God, please, God, make those people just not see or hear this message and do not reply. This is my only hope to get out of here alive. This is my only hope.

And then I go to gather, to put my stuff back in my purse. I think he, also, actually put some stuff back in. He, also, picked up the stuff on the floor. And then, actually, before that, still sitting in the bed he's saying, you know, "I'm above the police. I'm above the cops. I'm above the law. You don't know who I am. I'm so powerful. If you go to the police, I know where you live," because I had given him roughly two blocks away from where I actually do live, I know this building very well, so I gave him the address and the apartment number of a building that I know very well, but that is not actually, exactly, where I do live. But he said, "I know where you live and I will find you if you go to the police. I will find you." I said oh, no, I just want to go home to my daughter. We still have not heard back from Stephanie yet. She probably just left. I know she could not stay past midnight. She has school tomorrow. I just really, really, want to go home to my daughter. "Yeah, because you know what will happen to your daughter. You're probably not legal here in America, are you?" I said oh, you are absolutely right. I'm not. "Yes. You know what will happen to your daughter. You know what will happen to your daughter. They will take her into foster care

and you will never see her again. And that's what will happen to her. And they will deport you." And I said oh, my gosh, oh, no, that is awful. Yeah, I suspect they would. You're absolutely right. No, no, really, I promise you, I just have to get home to her. I'm really, really, worried. She's too young to be home alone. Six years old. You just -- really, really, that is all I want. Just to get home to my daughter.

And then I get dressed, again, and get all the -- gather all the stuff back in. Back in my purse. He puts my phone back in the purse, and then he says, "I will see you Monday for Nobu at 6:30. I will text you." And I say yes, absolutely. And then he follows me to the elevator, and then he goes back to the room, and I go in the elevator, and there is a guy in the elevator.

Oh, before that, I'm sorry, before that, before he let's me leave, I am dressed at this point, and I have the purse and all that. But before I get to exit the door he tells me to go to the bathroom and to wash my face. To wash the blood off my face. And I do. I go to the bathroom and I wash the blood off my face, and then I use a Kleenex to dry it off. And then he says, "Not good enough. Wash your face again, properly." So I wash it for a second time. I wash my face, as well, as much as I can. And then I dry it off with Kleenex. And then when I leave, and I'm in the elevator, and there is a guy in the elevator that looks terrified, and he said, "Oh, my gosh." He

says, "Are you okay?"

MR. ROTHMAN: Objection. Objection.

THE COURT: Yes. Sustained.

Please don't tell us what this gentleman said to you.

THE WITNESS: Oh, okay.

THE COURT: I'm going to ask the jurors to disregard that statement.

THE WITNESS: Oh, okay. I'm sorry.

THE COURT: You can continue with what happened.

THE WITNESS: There was a person in the elevator. There is this man in the elevator, and -- am I allowed to say that?

THE COURT: Yes. It is just the conversation.

THE WITNESS: Oh, what he said to me?

THE COURT: Yes. Please don't talk about what he told you.

THE WITNESS: Oh, okay. Thank you. Sorry.

Q Um, and then --

THE COURT: But you can say what you did, or what happened as a result of that.

THE WITNESS: Yes. Yes. Okay. I'm sorry.

A I just looked down and I tried to cover my face with my hair. I just wanted to make sure that I got out of there. I was just terrified that somehow he is going to be waiting in the

lobby when the elevator stops. That he's been running the stairs, or got in the other elevator, or some way or another. I'm just waiting. I have my phone there, ready to call 911.

And so I didn't really -- I'm just covering my face, and I'm just looking down. And as the elevator opened, and I'm about to run out to call 911, there is a police van right across the street. And I run right across the street to this person, this male police officer sitting in his van, rolling down the window, and I tell him I went on a first date and the guy tried to kill me. I potentially might have said that he raped me, too, but, particularly, what I did say is that the guy tried to kill me. I almost died here. And I had a profile up. This guy tried to kill me, and his name is Sanjay, and he's in room 4906. And he said, Are you sure, 4906?" Yes. Room 4906, Sanjay.

And then a Detective Jones arrived.

Q I'm going stop you there?

A Okay. Yes.

THE COURT: Hold on a second. Would you like to take a break?

THE WITNESS: No. I'm good. Thank you. Thank you. Do you need it back?

THE COURT: No, just hold onto it.

THE WITNESS: Okay. Thank you.

Q So I'm just going to backup now and ask you some follow-up questions, okay?

A Yes.
Q Now, when you first got up to the room you said something about looking out the windows.
A Yeah.
Q Where are the windows in relation to the door?
A Yeah, there are two windows. This is the front door. When you walk in from the front door the bathroom is on the right side. Then the bed is there. This is the long side of the bed. This is the short side of the bed (indicating.) There is one window there, straight ahead, and there is one window on the right. So, on the short side of the bed. So the windows are after the bathroom.
Q And about how long are you in the room before, as you said, he got "aggressive?"
A Only one to two minutes. Just like looking outside the window.
Q And you stated that you had told him you didn't like it and to stop?
A Yes.
Q How many times did you say that, when he was biting your lip?
A Several times. I said no, stop it. I don't like it. You're being way aggressive. I'm going home now. I want to leave.
Q And what did he say to you?

A He just continued being aggressive.
Q How many times did you say you wanted to go home?
A Um, throughout the whole --
Q No, just this beginning portion.
A Just that beginning portion? I'm estimating four times.
Q And what did he say to you?
A Well, eventually he said that -- eventually he said I'm not going home. He threw me down on the bed and started to be even more aggressive.
Q Now, when you say the words, he threw you onto the bed, or pushed you onto the bed, where did his hands touch your body?
A Well, first he is pushing me down somewhere on my body. Upper body. I don't know, exactly, where. When he is pushing me down on the bed, then he is holding his hands along my neck. Around my throat.
Q So when he pushed you down on the bed you said his hands are on the upper part of your body. Do you end up on the bed on your back, on your side, on your front?
A I'm on my back.
Q Is your body fully on the bed?
A I don't think so, at that point. I think my knees are not.
Q And are you laying on the part of the bed, you know, with your head towards where the pillows are and your feet

towards the end, or are you laying on the other side of the bed?

A No. My head is towards the pillows, and my feet are towards the end. And then there is the window straight ahead there. One of them.

Q You also stated at the point that you were pushed onto the bed that he was on top of you.

A Yes.

Q Where was his body in relation to yours?

A Completely on top of me, because -- yeah, completely face to face.

Q Like laying on top of you? Straddled over you?

A Laying fully on top of me.

Q At the point that he pushes you down onto the bed, do you have all of your clothes on?

A When he's pushing me on the bed, at first, yes.

Q And does the defendant have all of his clothes on, at that point?

A Yes.

Q About how long do you think you were laying on the bed before he put his hands around your neck?

A Not very long, at all. Maybe only 30 seconds.

Q Was it one hand or two hands, at that point?

A At first it was two hands, and then it is one hand while he's also grabbing onto my hand. And then he takes off the neck hands and is still grabbing onto, like, my arm and

hand, pulling down my pantyhose and taking off my shoes.

Q What is going through your head at this point?

A Oh, I'm terrified. I am scared. I was even scared when he started biting my tongue and lip and he didn't stop when I told him to stop. But now I'm very scared, and I'm screaming no, very loud.

Q Now, you said that he had one hand that was holding your arm and with his other hand he pulled down your stockings?

A Uh-huh.

Q Were they pulled all the way off your body?

A Eventually, because he took my shoes off, too. So, yes, fully off.

Q What about the rest of the items you were wearing? You still have your dress on?

A I still have my dress on.

Q And did you have any undergarments on?

A I didn't. I didn't have -- well, I didn't have underwear since I had thick pantyhose, but I did have a bra on.

Q At this point, when you are pushed down on the bed, is your bra still on at this point.

A Yes.

Q What about the defendant, are his clothes still on?

A Yes.

Q Now, you used the words he had inserted a finger into your vagina.

A Yes.
Q What was he doing with the finger that was inside of your vagina?
A Both. And anal. He was just in and out, very roughly.
Q Did you want him to do that?
A No.
Q What did you say?
A That's when I was screaming no, stop it, as loud -- loud. I was screaming it loud. I don't want to. No. Stop it. I'm going home. I want to go home. Stop it.
Q How many times did you say no and stop it?
A Oh, so many times.
Q Is it more than once?
A Oh, absolutely. Estimating throughout the whole time, or just that part?
Q This portion where you're pushed on the bed.
A Yeah. Estimating each word? Estimating five times, each word. No five times. Stop it, five times.
Q Now, you said you were screaming at him.
A Uh-huh.
Q And you said you will never have me.
A Yes.
Q What do you mean by that?
A You will never fuck me. You will never have me. I even used that word. You will never. Yeah.

Q What did the defendant say to you in response to that?
A I am going to fuck you in the ass is what he said.
Q What was going through your head? You said at some point you decided to say you had to go to the bathroom. What was going through your head, at that point?
A I was attempting to escape. I wanted to go to the bathroom. I knew that is very close to the door, and I'm going to just run. I didn't care that the purse was left behind. Nothing.
Because he didn't allow me to take my purse, so I'm like fine, I'm going to go to the restroom and I'm going to run. But he came with me to the restroom.
Q Did he come into the restroom?
A No. He was standing in the door opening.
Q Did you try to shut the door?
A Um, I'm not sure if I tried or not. He was standing right there in the door opening, so I probably -- yeah, I don't think I did. And he was standing where the door would have been shut, so...
Q I'm sorry, I had another question for you.
A Sure.
Q The point that you are on the bed you said he had put his hand around your neck?
A Yes.
Q Were you able to breathe?

A Yeah. I think I could breath at this point.
Q Were you able to talk?
A Um, yeah. I think so. Yeah.
Q Okay. At the point -- we're back at the bathroom now. You said you tried to make a run for it?
A I did.
Q Where was the defendant in relation to you when you tried to run for the front door?
A Yes. First when I start peeing a little bit he is facing me, and as soon as I do he is turning to look towards the other window. So then he's front turning. So there is room between him and the door. Then the door is open when he's turning to look out the window, or look that way. He's still very close. Very close. Because he didn't go back to the bed. He's still standing there, but not looking at me. That's when I'm trying to run for the door.
Q Okay. Now, you used the word the hatch was on the door.
A Yeah. Or whatever.
Q What are you talking about?
A Oh, whatever that silver thing is called that you can put on the doors. I believe that must have been on, because I could only open the door a little bit. But he was also coming so quickly behind me, pushing the door, shutting the door, so I only got a little bit of a grab on the door to scream.

Q And what did you scream?
A I screamed help me, help, as loud as I could, is what I was screaming.
Q How many times do you think you screamed that?
A Um, you know, I'm not sure if I got -- I screamed it more, but I'm not sure if the door was still open, or if he had already gone to shut it.
At least I got that in before he shut the door. But I did continue to scream. But then, you know, he's covering my mouth and dragging me towards the bed. And then, again, I get the phone off and try to scream again and again. He's covering my mouth, so...
Q Now, you said -- you used the words came behind you and he dragged you?
A Uh-huh.
Q Where were his hands touching your body?
A Yeah, you know, I had my back then towards him, and he's just, like, pulling me backwards. I'm not quite sure if he was down here, or up here (indicating), but both his hands is just, like, pulling me backwards, as soon as he shuts the door, and he's just pulling me backwards again.
Q You're doing this (indicating.) Does that mean his hands were rapped around you?
A Yes. At one point they definitely were, when he is pulling me back to the bed.

THE COURT: For the record, at one point you had your hands down by your stomach area, and at one point you had your hands up by your chest, I believe, was your demonstration.

THE WITNESS: Yes.

Q Does the defendant say anything to you, at this point?

A I don't think so, in the moment from the door back to the -- next to the bed. I don't think so.

Q Now, you described reaching for the phone.

A Uh-huh.

Q Did you actually hit a button?

A So the hotel phone, yes, I did.

Q And do you know what button you hit?

A I have no clue. I have no clue. I'm not even -- he's still holding me, and I'm just getting the phone receiver off, and I'm hitting something. I hit one button. I don't know which one or what. I couldn't even see, you know, up there. I'm facing the other way, kind of.

Q Why were you doing that?

A Again, I'm trying to -- I'm screaming help. I'm screaming no and help. I hoped it would have hit concierge or operator to where they would have heard me, and they would have called security to come to the room. That's what I needed.

Q You described that the defendant covered your mouth. Can you just demonstrate for the members of the jury what he

did?

A Then when -- yeah, then he's covering like this (indicating.)

MS. BARAIOLA: May the record reflect that the witness has taken the palm of her hand and placed it completely over her mouth.

THE COURT: Yes. Her right hand.

Q You described being punched by the defendant when you were on the floor next to the bed.

First of all, what did the defendant's hand look like? Was it an open hand or a closed fist?

A Oh, it was a closed fist.

Q Did he ever strike you with an open hand?

A I don't think on the floor. I don't think so. I think it was mostly like this (indicating,) because even on top of the bed it was just like this, because he was -- it was everywhere.

Q Where was the first punch? Where on your body?

A On my face.

Q Where on your face?

A You know, on my cheeks.

Q What was going through your head, at that point?

A I couldn't believe it. I cannot believe it. The first punch, I was shocked. I was shocked. I couldn't believe it.

Q Then you used the words that he dragged you onto the bed. How did his hands touch your body?

A He lifted me up on the bed.
Q So where were his hands on your body?
A Well, I'm thinking and estimating. I guess that he was more like, you know, like this (indicating.) Like, the side of the stomach. Above the hips I guess it would be called.
MS. BARAIOLA: Let the record reflect that the witness has both of her hands around her waist.
THE COURT: Yes.
A To lift up that way, yes (indicating.)
Q About how many times do you think you were struck by the defendant on the floor, before he dragged you on the bed?
A How many times he punched me you mean?
Q Uh-huh.
A On the floor, you know -- on the floor, maybe five to eight times.
Q You also described, at some point, that your purse was emptied. When was that?
A Yes. As soon as I'm up on the bed, and then I am in shock and terrified, and want to escape again, but I'm terrified of escaping again, doing a second attempt of escaping. So he takes -- but it's still on my mind. I'm still actually considering it, if I can get a chance to run out again, but I don't know if it is locked or hatched, or what, but that's when he takes -- as soon as I'm up on the bed, he takes my purse and he empties out all my stuff. So my purse is empty. And he

finds my phone and he throws it in the corner.
Q Where was your purse when he picked it up?
A Yeah, I think it was at the edge of the short side of the bed. By the window.
Q And where was it dumped onto the ground? Where in the room?
A He actually dumped it on the other side of the bed. Not the one closest to the door, but the other side.

So that's when I am kind of thinking, well, you have a -- you know, do you run for it again, you know, because I'm sitting on the bed and I'm thinking, do I really try to run for it again?
Q And you said that your phone was thrown in the corner. What corner of the room are we talking about?
A That would be the corner by the window that is on the short side.

So if you're sitting on the bed, and this is the pillows behind me, like this, then it's that corner over there by that other window over there. And my stuff for the purse is over here (indicating.)
Q After the defendant dumped your purse, what happened?
A That's when he just starts -- he starts -- well, that's when he goes on top of me and he sits on top of me on the bed. I'm on my back and he's sitting on my belly with my hands down.

Do you want me to show you, or --

Q Sure. You can demonstrate where your hands were.

A Yeah. I'm laying on my back and both my hands are down like this, and he's sitting on top, and I cannot move my hands even (indicating.)

MS. BARAIOLA: Let the record reflect that the witness has both arms straight next to the side of her body.

THE COURT: Right.

A And then he puts his hands around my neck and starts strangling me.

Q Was it one hand or two hands?

A That was two hands.

Q About how long did that go on for?

A That felt like a long time. Because in the beginning he said, "I'm going to kill you." And I am still trying to wiggle, but there is no chance. I can't get my hands out. I can't get him off me. And I don't know how long, but I couldn't breath, and I don't know if I'm conscious or unconscious, because when he -- it takes me a little while to get back to it, so that is why I'm not sure if I'm out or not. I'm not sure how long it lasted.

Q When you say it felt like a long time --

A Yeah.

Q -- how long did it feel like to you?

A Well, um, maybe, you know, maybe three to four minutes, or --

Q You said that you couldn't breath?
A Yes.
Q Were you able to speak?
A No.
Q Now, I know you said you're not sure if you lost consciousness or not, but I believe you said you were out of it?
A Yes.
Q What did you mean by that? Can you just explain to the members of the jury what you actually felt?
A Well, I couldn't -- I couldn't speak and I couldn't breath, so, you know, I -- yeah.
Q But what did you mean by "out of it?" What did you feel like?
A I felt like I was gone for maybe a couple of minutes, or a minute. I -- yeah, that's what it felt like.
Q When you say "felt like you were gone," what do you mean?
A Um, because then when I kind of get to it again, he's just like sitting on top of me, staring, and just like started punching me.
Q Okay. I'm just trying to figure out what you -- when you say when you get to it again --
A Yeah.
Q -- what do you mean by that?
A Um, I was -- I was -- I was just really worried for my

life. I was just really, really, really, worried for my life. And, you know, I felt like I was gone for a little while. It felt like I was gone for a little while.

Q When you say gone --

A Yeah.

Q -- do you mean you're not awake?

A Yeah. That I am unconscious. It's what it felt like. But I've never been unconscious before, so I'm not quite sure what that feels like, so...

Q When you are, I think you used words "get to it again?"

A Yeah.

Q What do you feel?

A Well, not just that. What I also mean is, like, you know, exactly -- because I can't even, you know, I can barely, like, speak, and it's painful, and that's why it takes me a little while to even, like, get my breath back, even. Like, I can't even, you know.

Q And you stated that he was still sitting on top of you, at that point?

A Yeah, he's still sitting in the same position.

Q Where are your arms, at that point?

A Yeah. Still down the same way. Sitting the same way.

Q And then you said he had started to punch you again. Where was he punching you?

A Then he's just punching me everywhere. He's punching

me on my mouth. He's punching me on each side of my cheek. On my eyes, my ears. On each side of my brain.

I do -- so when I wake up like that, but when I get to, like, sit up halfway, that's when he's starting to punch all over again. All the places I said. On the brain. On my mouth. On my eyes. On my nose.

Q Did he strike you anywhere on your body?

A He also punched me on my chest. Somewhere on my chest.

Q You said that you tried to get up.

A Yeah.

Q Were you able to get up?

A Um, at one point I was able to, like, sit up a little, yeah, but he still -- he still continued to punch me.

Q At this point, now that you're on the bed, after you've been choked, about how many times do you think you were punched, approximately?

A Uh-huh.

Q Is it more than two?

A Oh, absolutely. I am saying -- I'm estimating, you know, 15 to 25, somewhere like that.

Q You said that at one point after you had been punched you saw blood splatter.

A Oh, yeah.

Q Did that happen for multiple punches, or just one punch?

A Oh, yeah. That was for multiple punches.
Q What was going through your brain, at that point?
A I realized that I'm never going to be able to be in public again, because, you know, I realized I'm never going to look the way I look, and I'm never going to be able to -- you know, my company is all about meeting editors, and, you know, I meet with all the magazines all the time, all the celebrities that buy apply skin care. It's just -- it's all that I do. It's kind of important, a little bit, you know.
That didn't quite go down in my head with the editors and the beauty company, but it was just like, yeah, I'm never going to look the same again. I'm never going to look the same again. I am the face of my company. I can never -- maybe I can never even -- I got very, very, very, worried, seeing all of that blood coming.
Q And what, if anything, does the defendant say to you?
A What he says while he's punching you said?
Q Yeah.
A Um, he just kept saying, "I'm going to kill you. You're going to die." He says that many times.
Q About how many times?
A Oh, so many times. He's saying it while he is strangling me. He's saying it punching me.
Q Both of them together, or separate of the two?
A It's kind of both of them together. You mean to say

estimated, how many times?

Q Would you say it's more than three times?

A Absolutely. I'm saying between -- yeah, I'm estimating 20 times.

Q Did you believe him?

A At some point I did start to believe him. I didn't want to believe him, but then I realized I really am going to get killed here tonight, and I really am going to die here tonight.

Q Now, you used the words at some point you changed your tone?

A Yeah.

Q What do you mean by that?

A As soon as I did see several punches with blood splatter, and all of those things, I realized that he's actually going to kill me. He's actually going to kill me. I have to change my tone of the voice.

Q What do you mean, though? Like, what did you change?

A Well, because when I don't want something, I don't want something. So earlier in the evening I had told him, fuck you. You will never have me, and you will never fuck me. And I was very aggressive, and really expressive, expressing that to him. And I meant something like that clearly didn't work. He is getting more angry and aggressive, and he really is going to kill you. So I had to change the tone of my voice, and instead

of being no and no, I then said please. I don't think I even had to think about it, because seeing the blood coming all over the sheets, and feeling the pain in my face, I just automatically went to please, no. Please. Please, don't kill me. Please, stop it. Please.

Q How many times do you think you said that?

A Oh, many times.

Q Now, you described at some point that you noticed the time was about 11:50 p.m.?

A Yes. Yes.

Q Where was the clock?

A On the nightstand table.

Q Which nightstand table?

A I think it was on the far side. So not the one closest to the front door.

Q And when you noticed the time you said you started to tell this story about your daughter?

A Yes.

Q Do have you a daughter?

A I do not have a daughter.

Q Why did you tell the defendant you had a daughter?

A I knew that he had told me that he had children, and I figured this is the only chance I have to get out of here alive, is to make up a story that I'm a single mom, and her dad died, and I might have a chance to get out of here alive.

My sister's a single mom, and she has a niece this age, and I just pictured my lovely little niece, and I described everything about her, and I just really went into the position of my sister to where I was just realizing I have to make up that story, and potentially he can have some sort of empathy and compassion for being a single mom, where the father has died and I'm the only one here, which I am, of my family members in the U.S., and everybody else is oversea. So I am all she has.

THE COURT: Ms. Baraiola, it is now about noon. I would like to take a brief break for a moment since we didn't have a morning break. It is not going to be too long, but I just want to give everybody a chance to stretch and use the restroom. And I also want to give our reporter a chance to rest.

So let's take a quick break.

COURT OFFICER: All rise. Jury exiting.

(Whereupon, the sworn jury exits the courtroom.)

THE COURT: Ms. Risdal, you can follow the instructions of my Sergeant, and it will just be a brief break, if you want to use the restroom.

THE WITNESS: Sure. Anytime.

THE COURT: You can follow the man in the white shirt.

THE Witness: Oh, yes. Thank you.

THE COURT: Sorry. He has the white shirt with the

fancy stripes.

(Whereupon, the witness exits the courtroom.)

THE COURT: All right. Everybody can have a seat. So our witness has exited. We will take a few moments, if anybody needs to use the restroom or get a sip of water.

(Whereupon, a brief recess was taken.)

THE COURT: Okay, so I believe our jury is ready. Let's bring back the witness back in.

(Whereupon, the witness enters the courtroom.)

THE COURT: Okay, let's bring the jury back.

COURT OFFICER: All rise. Jury entering.

(Whereupon, the sworn jury enters the courtroom.)

THE COURT: Have a seat, everybody. Thank you. Okay. You may continue, Ms. Baraiola.

MS. BARAIOLA: Thank you.

THE COURT: Ms. Risdal, you are reminded you are still under oath.

THE WITNESS: Thank you.

CONTINUED DIRECT EXAMINATION

BY MS. BARAIOLA:

Q So I think before the break we were talking about that you had told the defendant that you had a daughter.

A Yes.

Q And you had told -- you stated that you had a

babysitter by the name of Stephanie?

A Yes.

Q Is Stephanie a real person that you know?

A Um, I actually do -- I do know a person -- I do have a friend named Stephanie that is a really lovely person, but I don't know if I was particularly thinking of her in the moment, or -- but I do know someone with that name, yes.

Q Now, you said you had made up a phone number?

A Yes.

Q Why did you make it up?

A If I would have texted one of my friends they would have replied or called me back, I suspect.

Q Do you know what phone the defendant used to send this text message?

A Yeah. He used my phone, the same phone that I had used communicating with him on.

Q So is that your phone -- is that the T-Mobile or AT&T phone?

A T-Mobile phone.

Q I'm going to show you what is being marked as People's 17 for identification.

(Handing.)

Q Do you recognize People's 17 for identification?

A Yes.

Q Is that a disc that you viewed before testifying today?

A Yes.
Q And what's on that disc?
A This is the text message to Stephanie. It has my initials on it, so I have viewed it.
Q Is what is on there, does that fairly and accurately depict the text message we were just talking about?
A Yes.
MS. BARAIOLA: I ask that People's 17 be moved into evidence, at this time.
THE COURT: Sure. Any objection?
MR. ROTHMAN: None.
THE COURT: Okay. This will now be admitted. Let's mark it, please.
(Whereupon, People's Exhibit 17, previously marked for identification was received in evidence.)
Q Ms. Risdal, what is the phone number that this message was sent to?
A 917-348-4726.
Q And what is the date and time?
A June 16th at 12:07 a.m.
Q And can you just read the text message?
A Stephanie, can you please stay till 1 a.m.?
Q Now, you said that the defendant kept the phone near him.
A Yes.

Q And that you were concerned about somebody replying. What were you concerned about?

A I was very concerned that these people could potentially have replied back saying you've got the wrong number. Who is this? That was my worry, that they would reply back to say it's the wrong number, my name is not Stephanie.

Q Why was that concerning to you?

A It was very concerning, because then he would know that I made up the story that Stephanie is my babysitter.

Q Now, I want to talk about, after the text message is sent you stated, at some point, you performed oral sex on the defendant?

A Yes.

Q Did you want to do that?

A No.

Q Why did you do that?

A I had to do it to survive and get out of there alive. I realized, even though I do not want to do it, this is my only chance for him not to kill me.

Q While you were on the bed, at the point that you perform oral sex, does the defendant have all his clothes on?

A His pants are off.

Q Did he have anything underneath his pants?

A Well, he was fully exposed, so if he did, then he took off the underwear, as well.

Q Did he still have a shirt on the top?
A Um, I think he did.
Q And, at this point, do you have your dress still on?
A No. I'm fully naked, at this point.
Q What about your bra?
A No, that's off, as well.
Q How did your dress come off?
A He -- he -- he pulled it off.
Q How?
A Um, well, there is a zipper on the dress, so he pulled it off.
Q Did he pull it off over your head, down?
A Oh, no. Down, yeah.
Q And how did your bra come off?
A He took that off, as well.
Q At what point did that happen?
A This happened when we are back up on the bed.
Q At what point when you were back up on the bed?
A Um, right before I start doing -- have to perform oral sex on him.
Q So at the point that your clothes come off, had you already told him about having a daughter?
A Yes.
Q At that point that your dress and your bra come off, has the text message to Stephanie already been sent?

A Yes.
Q So it's after that?
A Yes.
Q Now, you described that when you first started to perform oral sex the defendant was laying on his back?
A Yes.
Q How was he laying on the bed? Was he laying with his head towards the pillows and his feet towards the end, or he is laying the other way, across the other side of the bed?
A He's still laying -- he's laying with the head on the pillow.
Q And you said that you used the words, he was telling you things or guiding you. What was he saying?
A Um, he just told me what to do. You know, I'll go -- you know, first he tells me, obviously, to go down on him, and suck him. And as I'm doing that he's like go deeper. Go harder. Good harder. Lick my ass. Play with my ass. Finger my ass. It was sexual expressions like that, that he would tell me while he's also fingering me, and trying to do things with me while I'm doing that.
Q So how is your body positioned in relation to his, at this point?
A Um, well, at first -- at first -- at first, when he's on the back, I guess I'm below, if you want to call it that.
Q What do you mean, below?

A Well, he's up there and I'm kind of down here, at first (indicating.)

Q When you say down here, where on your body is your body even with?

A Well, then I'm off -- since the first part of it, when I'm sucking him?

Q Uh-huh.

A And then he starts touching and grabbing me, and saying he wants to play with me. And then I think at that point I'm a little more up towards him. Not a fully, I guess people would call it the 69 position, but closer to him to where he's fingering me while I am sucking him.

Q Okay. And you said at some point you are flipped onto your back?

A Yes.

Q Where do his hands touch your body in order to do that?

A You know, I think he's just, like, pushing me over. I'm not quite sure how we were like holding -- you mean when he goes up on me?

Q No. I mean when he flips you over on your back. How does he touch you to make that happen?

A Yeah.

Q Does he tell you to do it, or does he physically touch you to make you do it?

A Um, well, he definitely was telling me the whole time

what to do. So I might have just done it, at this point. I'm not quite sure if he did it or I just did what he told me to do. I think I just did what he told me to do.

Q Okay.

A I wouldn't remember, exactly, how, if he somehow did it, and what. Yeah.

Q And then you said he was on top of you?

A Then he goes on top of me. He puts his -- yeah, he puts his penis inside my mouth.

Q What is he saying to you, at that point?

A Then he is saying, "If you don't make me cum I'm going to fuck you in your ass."

Q Did the defendant ejaculate?

A Yes.

Q Where?

A Inside my mouth. And he told -- he told me to swallow.

Q After that, about how long is it after that, before you get up from the bed?

A Um, he's still sitting a little bit on the bed, but not long at all before I then get to start gathering the stuff back in my purse.

But, yeah, we do sit a little bit, because that's when he's saying, you know, I'm above the law, and if you go to the police I know where you live, and I will find you. So we do sit a little bit, actually, before I do get to put all the stuff

back in my purse. And I just keep reassuring him, I just want to go home to my daughter. That's all I want to do. We haven't heard back from Stephanie. I'm getting really worried. My daughter is way too young to be home alone.

Q You said at some point the defendant also suggested you could be deported?

A He did say that.

Q What did you say in reaction to that?

A I said, oh, wow, is that really what would be happening? And I just really played along and pretended that I was in a vulnerable position, I guess, with immigration status, up to where I just would say, oh, wow, yeah, you're absolutely right. I am not legal. And when he would say that, so I say, yeah.

CONTINUED ON NEXT PAGE...

DIRECT EXAMINATION

BY MS. BARAIOLA:

Q. You stated at some point the defendant instructed you to clean yourself up?

A. Yes.

Q. At the point that you went to the bathroom, what did you do once you were in there?

A. And he follows me to the bathroom and, again, he is standing in the door opening. I washed my face.

Q. Did you use soap or did you just use water?

A. Yeah, I think I did use both soup and water. I definitely used water. I'm not quite sure if I did use soap or not but I did, I really did try to wash it all out. All the blood, I tried to wash away and clean it with Kleenex, and then I went to turnaround and he said that's not good enough, wash it again with water I just tried to, as best as I could, to get all the blood away and wash my face and I wiped it off with Kleenex.

Q. You said at some point the defendant said I will see you on Monday at NoBu?

A. Yes.

Q. What did you say?

A. I said yes.

Q. Why did you say that?

A. So he still thought that I would not go to the police

and I pretended that, you know, I will see him Monday. I just pretended, yeah.

Q. You said that the defendant helped you collect your items?

A. Yeah.

Q. Did you get everything out of that room?

A. No. There was my little pink pocketbook that I did not get out of the room.

Q. What about clothing items, did you have all your clothing items?

A. I don't think I put the pantyhose back on and I don't think I got the bra either.

Q. Before you testified today, have you ever seen any photographs that were taken of this room after this incident?

A. No, I have not.

Q. Now, during this time from when you enter Room 4906 until you are about to leave, how long do you think that is?

A. I think two and a half hours.

Q. During this time period that you were in Room 4906, do you discuss money with the defendant?

A. No, I do not discuss money with him. He did, I forgot to say that part, he did try actually to hand me some cash as I'm getting dressed and when I'm dressed and I have my purse and everything and ready to leave, he tries to give me something that I don't take.

Q. Prior to that point when you are trying to leave, did you have a discussion with the defendant about money?

A. No.

Q. While you are in Room 4906 for this time period, do you discuss being paid to engage in sexual acts with him?

A. No.

Q. Do you discuss slapping?

A. No.

Q. What about bondage?

A. No.

Q. Dominance and submission?

A. No.

Q. Does anything like that come up during this time period?

A. No.

Q. Now, you said that he tried to hand you some cash towards the end?

A. Yes.

Q. What did he say to you when he tried to hand you that money?

A. He just said, here, this is for you and I say no.

Q. Could you tell how much it was?

A. I couldn't see what it even was.

Q. Why didn't you take it?

A. I did not want to take it.

Q. Did you see where he got the money from?

A. No, I didn't. Maybe it was while I was putting stuff back in my purse again. I didn't see it, no.

Q. Now, you said that there were some items of yours that had been left behind in the room?

A. Yes.

Q. Did you leave those things behind intentionally?

A. No. I just tried to get out of there as quickly as possible. There could have been more stuff, I don't know, but I just know my pocketbook for sure because that I noticed when, you know, that was gone from my purse. I'm not quite sure if there was other stuff too.

That was the one thing in particular, you know, the bra and pantyhose. Again, it didn't matter. I just really wanted to get out of there.

Q. You said that the defendant followed you to the elevator?

A. Yes.

Q. Was the elevator a far walk from the front door of his room?

A. No.

Q. And did he wait for you to get into the elevator?

A. Maybe. Probably.

Q. Do you remember?

A. I'm not quite sure. He definitely followed me to the

elevator.

Q. Did he get in the elevator with you?

A. No.

Q. Do you know, did you see where he went once you went to the elevator?

A. I didn't look. I didn't look.

Q. Did you kiss each other goodbye, hug each other goodbye or anything like that?

A. I don't think so.

Q. Now, you said that you exited the W Hotel and you were getting ready to call 911?

A. Yeah.

Q. That's when you saw a policeman?

A. Yes.

Q. I will show you what is in evidence as People's 4, the W Hotel video.

MS. BARAIOLA: For the record, we are on the file labeled female leaves hotel. I am going to go to the camera angle seventh floor shuttle. I'm sorry, high rise seventh floor. We are going to be at about 12:37. I'm going to press play.

(video playing)

Q. Ms. Risdal, what is going on right now?

A. That's me.

Q. What are you doing?

A. First you have to take the elevator to the seventh floor and then some walking on the way out.

MS. BARAIOLA: I'm going to go to the high-rise vestibule. Then I'm going to go to the low-rise elevator.

(video playing)

Q. What are you doing right now?

A. It looks like I'm looking for my phone.

(video playing)

Q. Ms. Risdal, what is going on now?

A. This is the other elevator you have to take from the seventh floor down to the lobby.

Q. Did you enter that elevator previously?

A. You mean earlier that night or?

Q. A few minutes before this.

A. Well, I took the elevator first from 49th to the seventh floor and now from seventh floor down to the lobby.

MS. BARAIOLA: Now I will go to the seventh floor shuttle. For the record, the time is about 23:25.

(video playing)

THE COURT: 12:39.

MS. BARAIOLA: I apologize. I'm 12:39. I apologize.

(video playing)

MS. BARAIOLA: Now going to go to camera angle waterfall. For the record, it's 12:39 and 55 seconds.

(video playing)

Q. What is happening now?

A. I'm walking out of the lobby.

MS. BARAIOLA: I will go to camera angle main. For the record, it's about 12:40 and 20 seconds.

(video playing)

Q. What are you doing now, Ms. Risdal?

A. I'm running to the policeman.

(video playing)

Q. Ms. Risdal, you stated that you had told the officer that you approached what happened to you.

Do you remember the name of that officer?

A. I wouldn't remember his name. I just remember detective's name. I didn't really -- I spoke to him quickly. I didn't really spend too much time with this very nice person.

Q. Now, at some point after this, did you go to the hospital?

A. Yes, I did.

Q. How did you get to the hospital?

A. We took an ambulance.

Q. Who is "we"?

A. Oh, me and my friend Gabrielle.

Q. Is that Gabrielle Muir?

A. Yes, it is.

Q. How did Gabrielle get there?

A. They said we are now going to the hospital and I said, I want to call my friend, Gabrielle, and I want her to come with me.
Q. So you called Gabrielle?
A. I did.
Q. And she went with you to the hospital?
A. Yeah, I called Gabrielle and she came. I didn't even want to go into ambulance until my friend arrived. They kept telling me, we are going into the ambulance. I said, I'm going to wait for my friend to come here first. Then we went together in the ambulance to the hospital.
Q. Did you go to Mount Sinai West? Is that the hospital you went to?
A. Yes. I think it's around 59th or 60th Street and Tenth Avenue. It's definitely there. That's the one over there.
Q. About how many hours do you think you were in the hospital for?
A. About eight to nine hours.
Q. Did you undergo a sexual assault forensic exam while you were at the hospital?
A. Yes, I did.
Q. Now, as part of that, were photographs taken of you?
A. Yes, it was.
Q. I want to show you what is in evidence as People's

16.

MS. BARAIOLA: For the record, I'm clicking on file number 914.

Q. Ms. Risdal, what is this a picture of?

A. This is a picture of me at the hospital.

Q. Okay.

Is it -- I'm sorry. Does this photo fairly and accurately depict how your injuries looked a few hours after you left Room 4906?

A. Yes, it does.

Q. I'm going to file 915.

Ms. Risdal, what does this picture show?

A. Here they had already cleaned out my nose that was filled with blood, my mouth. My mouth was so swollen. The bruises on my neck from the strangulation. I can barely open my left eye.

I remember I had to go to the restroom. I waited until after the rape kit to go to the restroom, and then I had to go to the restroom and I didn't even recognize myself in the mirror. I got a glimpse of myself in the mirror and I have not seen myself. I didn't recognize myself.

Q. Okay. I will go to file 916.

What is this a photo of?

A. Of my neck.

Q. Did your neck look like that before you entered

Room 4906?

A. No, it did not.

Q. I will go to 917, 918.

What is this photo of?

A. This is the side of my face and brain area.

Q. Did your face look like this before you entered Room 4906?

A. No, it did not.

Q. What is this photo? We are at 919.

What does this photo show?

A. It also shows my neck and parts of the side of my face.

Q. Okay.

What does it show about your hair?

A. Yeah, there is blood in the hair too.

Q. Does this photo show part of where you were being punched by the defendant?

A. Yes.

Q. I will go to file 920. What is this a picture of?

A. Picture of my hands.

Q. Now, we are on 921.

What is this a picture of?

A. Also a picture of my hand.

Q. What does it show about your hand?

A. It looks a little bruised there on the hand.

Q. Did your hand look like that before you entered Room 4906?

A. No.

Q. We are on 922.

What is this a picture of, Ms. Risdal?

A. Of my leg or thigh.

Q. What does the picture show?

A. It shows bruises or scratches.

Q. What are they in the shape of?

A. It looks more like finger shapes.

Q. Did you have those markings before you entered Room 4906?

A. No, I did not.

Q. This is 923.

Ms. Risdal, what is this a picture of?

A. Also my upper leg.

Q. Is it the same leg?

A. I think it's the same leg. Wasn't it? I think so.

Q. What does this picture show?

A. Three finger marks.

Q. Ms. Risdal, what is this? This is file 924. What does this show?

A. This is the other side of my face.

Q. Does it show anything in your hair?

A. And blood in my hair as well.

Q. What is this a picture of, 924?
A. This is a picture of my lips and my nose.
Q. Sorry, it's 925. I apologize.
What does it show, file 925?
A. Showing bruises to my lips and my mouth and I had lost pieces of my front teeth. There is also blood in my nose. Most of it we had actually washed away but you still see some blood in my nose.
Q. What is 926?
A. You can see clearly my left eye here that is shut and it's very red and blue and bruised around both my eyes.
Q. We are looking at the photo straight on, the left side of the picture.
Did your face appear to look like that before you entered Room 4906?
A. No.
Q. What does it show about that side of your face?
A. The right side or the?
Q. Well, we are looking at the photo, so the left-hand side of the photo.
A. The left-hand side.
Q. What does it show?
A. You also see blood in the hair. You definitely see blood in my hair on that side.
Q. Did your face have that same shape before you entered

Room 4906?
A. No. Even my shape of the face is completely different. It looks very swollen the whole face overall. I have a very slim, long face. In all of these pictures, it's very bruised, my whole face and cheeks.
Q. I will go to file 927.
What does this picture show?
A. It looks -- it's the top part of one of my breasts, the top chest area.
Q. What does it show?
A. It shows bruises.
Q. Okay. We are now at file 928.
What does this picture show?
A. This is my back.
Q. What does it show?
A. It shows also bruises, some scratches and bruises.
Q. Now we are looking at file 929.
What does that show?
A. Both my legs having scratches and finger from fingers.
Q. Did you have those marks on your legs before you entered Room 4906?
A. No.
Q. In addition to photos, can you tell the members of the jury some of the other steps that were taken during this

sexual assault forensic exam?

A. Yeah. They pulled out hair, a few hairs, to get some samples, the whole sexual rape kit, you know, swabbing my mouth, inside of the mouth, going through swabbing inside my vagina, anal, looking, yes.

Q. What happened to the clothes you were wearing?

A. They kept all the clothes I was wearing.

Q. After the hospital, immediately after, where did you go?

A. We went down state to Detective Jones's office at the police station on 54th Street.

Q. How long were you at the precinct with Detective Jones?

A. I'm guessing -- sorry. I can't guess. I'm estimating.

THE COURT: Estimate.

THE WITNESS: Yes. Thank you.

A. I'm estimating around two to two and a half hours.

Q. After you left the police precinct, where did you go?

A. After I was done giving him my testimonial, we went, Gabrielle and I, because she was with me the whole time, went quickly up to my place to just get a bag of clothes and I wanted only to take my dog, because he was home alone, and I, at the time, only had one dog.

Then we quickly gathered some stuff and we went

straight out to New Jersey to Gabrielle's and her husband's country house in New Jersey. We covered me up in sunglasses and I just looked down. I always talk to my doorman. I was worried that he was going to see how I look like. It's unusual for me not to stop by and talk to him, but I just went straight up and gathered a few things of clothes.

I think she booked a car service and we went straight out to New Jersey. I arranged for a friend to take care of my dog.

Q. How long did you stay at Gabrielle's house approximately?

A. I stayed out between three to four weeks because I could not have my face shown in public because it was still very bruised and swollen and I still have a lot of bruises on my whole face.

Q. How long did you have the bruises to your face?

A. About four weeks.

THE COURT: Are you about finish or do you have one more question?

We need to break for lunch.

MS. BARAIOLA: We can break right now.

THE COURT: So, ladies and gentlemen, we will break for lunch. I need everybody back promptly at 2:15 this afternoon. Please again keep an open mind, don't discuss the case, don't do any research. Please be back

promptly at 2:15. Thank you very much.

COURT OFFICER: All rise.

(Whereupon, the jury exits the courtroom.)

THE COURT: Okay. The jurors have left. You can follow our sergeant again and we will need you back at 2:15 gain please.

THE WITNESS: Thank you, judge.

THE COURT: Thank you very much.

(Whereupon, the witness exits the courtroom.)

THE COURT: Okay, everybody, 2:15 unless anybody has something they want to put on the record?

MR. ROTHMAN: No.

THE COURT: Thank you. Have a good lunch.

(Whereupon, a lunch recess was taken.)

THE COURT: Anybody need to put anything on the record before we begin. Good to go? Okay.

Let's bring in our witness first and then we will bring in our jurors.

COURT OFFICER: Witness entering.

THE COURT: Have a seat. We will bring in our jurors now.

COURT OFFICER: All rise. Jury entering.

THE COURT: All right, everybody, have a seat please.

COURT CLERK: Case on trial continued. All

parties are present, the jury is present and properly seated.

THE COURT: Welcome back. I hope you enjoyed your lunch.

I remind you, you are still under oath.

THE WITNESS: Yes.

THE COURT: Okay, let's continue.

DIRECT EXAMINATION

BY MS. BARAIOLA:

Q. So, Ms. Risdal, I want to direct your attention to December of 2017.

Did you give a deposition about this case?

A. Yes, a phone deposition on the phone.

Q. Were you under oath?

A. Yes.

Q. Did you review any video or documents in connection with this case before that phone deposition?

A. No.

Q. Did you -- were you asked if you ever made a financial arrangement --

MR. ROTHMAN: Objection.

THE COURT: Sidebar, please.

(sidebar)

[]

(open court)

THE COURT: The objection is sustained.

Do you have a different question?

MS. BARAIOLA: Yes, Your Honor.

Q. Ms. Risdal, I would like to direct your attention to June 24, 2016.

Did you view a lineup?

A. Yes, I did.

Q. Was that inside of the midtown north detective precinct?

A. Yes, it was.

Q. Before you viewed the lineup, were you given a set of instructions?

A. No instructions. Well, they just said that we are going to do a lineup and the person might be there or might not be there.

Q. So an officer read to you --

A. Yes.

Q. -- some instruction?

A. Yes, exactly. Yes.

Q. Did you follow those instructions?

A. Yes, I did.

Q. When you viewed this lineup, did you recognize anybody?

A. Yes, I did.

Q. Who did you recognize?

A. I recognized Sanjay the person that raped me.
Q. And where was Sanjay in the lineup?
A. He was number one.
Q. Are you positive the person you identified in the lineup is the same person that you went on a date with?
A. 100 percent certain.
Q. Okay.
Ms. Risdal, before lunch we talked about the fact that you had a purse or a small little wallet that had been left behind in Room 4906, the defendant's hotel room.
What was in that?
A. In my little pocketbook or mini purse or little pink mini purse I guess you can call it, that's what I use as my wallet. So there was my cash, my credit card and my drivers license.
Q. Do you remember about how much cash you had?
A. I would have to estimate again. You know, maybe between anywhere from maybe 3 to $600 or 3 to $500 maybe.
Q. That you had, so you had a couple hundred dollars cash on you at least?
A. I would say at least that, I would say.
Q. Where was that money from?
A. I had taken out cash from the cash machine.
Q. From where? What bank?
A. From my Citi Bank account.

Q. I'm going to show you what is in evidence as People's 7 which is, just for the record, the Citi Bank records.

THE COURT: Okay.

Q. Is the name on this account Better Beauty?

A. Yes, it is, which is another company that I own, yes.

Q. Ms. Risdal, I will direct your attention to June 13, 2016.

What does it show on these records?

A. It shows that I had withdrawal $300 on June 13th.

Q. I will direct your attention to the 14th.

What does that show?

A. On June 14th, it shows a withdrawal $400.

Q. These are both from your Citi Bank account; correct?

A. Yes, both from my account.

Q. Now, you mentioned also before lunch that you stayed with your friend Gabrielle for a few weeks?

A. Yes.

Q. Can you tell the members of the jury how you were feeling in the days after this incident?

A. Yeah. The days after this happened to me, I was not able to eat any solid food for several days, maybe five to seven days, though, she made me soup, just liquid with nothing else in it and bone broth, where it's just liquid because it was so painful for me to swallow. My mouth, I could barely open my mouth.

And eventually after a few days maybe after approximately or estimating, you know, five, six days, she would make me baby food where you put it in the smoothie maker, I guess, to where it was just very soft food that I would eat, I would try to eat. And then it was just very painful to eat to even try to open my mouth.

My friend Gabrielle would put ice packs on my face probably every three to four hours because it was so painful from the bruising.

They had to cover up all the mirrors in the house because I couldn't look myself in the mirrors. I couldn't really do anything myself. She took care of me.

Q. Other than difficulty eating, did you have difficulty doing anything else?

A. I just constantly had nightmares so I didn't really sleep. And that's been going on for almost two years, where I still have a lot of nightmares, estimated three to five nights out of the week, where I have problems sleeping from nightmares of either I am dying or my dogs are dying or my family members or my friends.

Q. I forget if I asked you this before lunch, about how long did it take for your bruising to heal?

A. Yeah, about four weeks. I was supposed to go oversees to visit my family in Norway and I had to delay it a bit because my face had not healed properly. So I waited until

only my left eye was still very red inside the eye, but I did, so that's approximately four weeks after.

Q. You mentioned before that you had been punched around your ear.

Did you experience any difficulty with your ear?

A. Yeah, that was also the problem with the eating, it went like from the ear to the mouth. That was so painful, my ear, for so long.

Q. I want to direct your attention to June 20, 2016.

Did you come to the New York County District Attorney's Office?

A. On June 20th, yes, I believe that was the date I did come just a few days after so that sounds right.

Q. Did you have photographs taken of your injuries at the photo unit inside the New York County District Attorney's Office?

A. Yes, I did.

Q. I will show you what is being marked as People's --

MR. ROTHMAN: Can we approach?

THE COURT: Yes.

(sidebar)

[]

(open court)

THE COURT: Ladies and gentlemen, I will have to excuse you for a few moments. I need to address a legal

matter that will take a little too long for a sidebar. Just bear with us please.

Please keep an open mind as always.

(Whereupon, the jury exits the courtroom.)

THE COURT: I will ask that the witness step down as well. Follow the officer's directions please and we will bring you back.

THE WITNESS: Thank you.

(Whereupon, the witness exits the courtroom.)

THE COURT: I will ask you to hook it up in just a moment. I just want to look something up first.

So, the jurors have left, the witness has stepped down. About how many photographs do you want to introduce at this time?

MS. BARAIOLA: All of them, Your Honor.

THE COURT: Just scroll down and give me a second for each one. Just keep it moving. You don't have to wait for me to tell you.

(pictures displayed)

THE COURT: This was a few days later the 20th?

MS. BARAIOLA: Yes.

THE COURT: Sorry?

MS. SKUTCH: They are just clearing up. The computer is slow. They start off a little pixilated.

THE COURT: Just keep scrolling through. The

photos have to state on there and then they clear up?

MS. SKUTCH: The disk is taking a while.

THE COURT: Okay.

MS. BARAIOLA: That's the last one, Your Honor.

THE COURT: Okay. Just a moment.

(Whereupon, there was a brief pause in the record.)

THE COURT: Okay. After reviewing the photographs and taking a peek at it, you know, the pretty much standard limiting instruction that would apply, I am going to permit the photographs to come in on the People's case or the ones that I have just seen over the defense objection.

I will give a limiting instruction, a version of the standard gruesome photographs one, to just advise the jurors of how they should be able to consider it and, although it may be upsetting, they can't hold the defendant responsible just because they find the photographs are upsetting and believe a serious crime took please and that you want somebody to pay for that crime. That is part of the standard of gruesome photograph.

Is that what you would like me to do, if I am going to admit give it give a limiting instruction?

MR. ROTHMAN: If you are going to admit it, I gave my reasons for the objection at the bench.

THE COURT: If you have an alternative limiting, I will listen to it otherwise I will use the standard?

MR. ROTHMAN: If your ruling is going to be admit, I don't see the relevance of all 15. It's overkill. It's prejudicial. I have said it at the bench. You have seen them all. They are repetitive. They do nothing other than inflame the jury. The fact that she was bruised days later, it's physical injury not serious physical injury.

It doesn't get them any closer to physical injury. Physical injury as already been proven by the original set of photos. This is just prejudicial.

THE COURT: I'm allowing it. They still have to prove impairment of physical condition, substantial paid. It's part of the testimony and part of the exhibits that I am permitting in the court.

Let's bring in the witness first and then jurors.

COURT OFFICER: Witness entering.

THE COURT: Have a seat.

MS. SKUTCH: Your Honor, it seems it's coming up all weird colors on the TV. We will test to see if the pictures are messed up before we bring the jury in.

THE COURT: Okay. Just tell them to hold on outside please. Thank you.

Can they see it on this one?

MS. SKUTCH: It's far way from them and it's not like we can bring it over.

I can try calling the video unit.

MR. ROTHMAN: One of the other problems on cross examination, we will be using a bunch of the video if this is not going to work.

THE COURT: I think it's just this disk.

MS. SKUTCH: It's just this monitor. Our computer is fine. That screen is fine. The witness's screen is fine. It's just this large screen.

THE COURT: Okay. We need to call in the tech people.

Let's bring the jurors back to their room tell them we are having technical difficulty and ask to you step down as well.

THE WITNESS: I can stay here?

THE COURT: You can go relax in the jury room.

THE WITNESS: Okay. Sure. Thank you.

(Whereupon, the witness exits the courtroom.)

THE COURT: We will take a little break.

(Whereupon, there was a brief pause in the record.)

COURT OFFICER: Witness entering.

THE COURT: Have a seat.

COURT OFFICER: Jurors entering the courtroom.

THE COURT: Ladies and gentlemen, I do apologize for the delay. The objection is overruled. We are about to display some additional photographs of Ms. Risdal's injuries. Before we do, I want to make sure everybody understands about certain matters.

The photographs will be admitted into evidence to illustrate certain matters including the People have the burden to prove the elements to show physical injury. I will explain to you at a later time at the end of the case what the definition of physical injury is. Some of the photographs which we have already seen and will see may be upsetting to you.

I just want to remind everybody, everybody is sworn to be fair in this case and that if you evaluate the evidence and at the end of the case believe that the People have proven each and every element beyond a reasonable doubt, and you find that the defendant is the one to have committed the crime, that's when you can find him guilty.

What I want to make sure is that nobody here holds the defendant responsible for committing any of the crimes just based on the photographs because you find them to be upsetting and that a serious crime must have taken place because of the photographs that you have seen and

that you think somebody should have to pay for whatever.

You would have to really believe the People have proven each and every element beyond a reasonable doubt and that the defendant did it.

Everybody gets it? Okay. Okay go ahead.

Q. Ms. Risdal, I will show you what is being marked as People's 18 for identification.

Do you recognize People's 18?

A. Yes, photos at the photo unit.

Q. Did you view that disk before testifying here today?

A. Yes.

Q. Those are photographs that were taken of you at the district attorney's office?

A. Yes, it was and it has my initials.

Q. Does it fairly and accurately depict how your injuries appeared on June 20, 2016?

A. Yes, it dots.

MS. BARAIOLA: Your Honor, at this time I move People's 18 for ID into evidence.

THE COURT: Any additional objection?

MR. ROTHMAN: Nothing additional.

THE COURT: This was just now admitted. We will mark it first. We just need to mark it please.

(Whereupon, an exhibit was marked.)

MS. BARAIOLA: For the record, I'm on the file

marked 109.
Q. Ms. Risdal, what is this a picture of?
A. This is a picture of my eye.
Q. Okay.
Now on the next file, which is 110, what is this a picture of?
A. This is also a picture of my face.
Q. This is on 111.
What does this show?
A. This is a picture of my left eye.
Q. Is your eye opened or closed in this picture?
A. My eye is closed.
Q. We are on file 112. Go ahead. 113. Now we are on file 114.
Ms. Risdal, what does that show?
A. That is also showing bruises on both my eyes.
Q. Does this show the other side of your face?
A. It shows the right side of my face and it shows my left, eye both my eyes. It shows very red left eye.
Q. 115. 116.
What does that show?
A. That is also showing heavy bruising on my right eye.
Q. On file 117. 118. We are on file 119.
What does this show?
A. That looks like my right boobs or the right chest.

Q. What does it show?
A. It shows bruising.
Q. 120. 121. Now we are on file 122.
What does this show?
A. This is showing my neck.
Q. What does it show on your neck?
A. It showing bruising from fingers on my neck.
Q. We are now on 123.
What does this show?
A. This is showing my face and my neck.
Q. Okay. What does it show?
A. That is showing bruising on both my neck and all over my face and my left eye. It's also very, very red.
Q. This photograph is 124.
What side of your face is this?
A. This is my left side of my face.
Q. Okay. 125. We are now on 126.
What does this show? What is it a close up of?
A. This is a close up of my left eye.
Q. Your left, I'm sorry?
A. It's a close up of my left eye.
Q. Okay. Does it show your forehead also?
A. Yes, also my forehead.
Q. Now we are on file 127.
What does this show?

A. That looks like upper leg.
Q. What does it show on your upper leg?
A. It is showing also yellow marks from the bruises on my upper left or I think it's my left leg or my leg or upper thigh.
Q. What is 128?
A. That's also showing yellow marks from the bruises on my upper leg.
Q. Now we are on 129.
What does that show?
A. That is also showing marks and bruises on both my legs.
Q. So this photograph shows both legs?
A. Yes, it does.
Q. Now we are looking at 130.
What does that show?
A. It's my hand and I can see also yellow bruising on my hand.
Q. 131 and 132. Okay.
MS. BARAIOLA: Just one moment, Your Honor. I have no further questions.
THE COURT: Okay. Thank you. Cross examination?
MR. ROTHMAN: Yes.
CROSS EXAMINATION

BY MR. ROTHMAN:
Q. Good afternoon, Ms. Risdal.
A. Hello.
Q. We have never spoken about this case; right?
A. No.
Q. In the beginning of your testimony, you talked about what attracted you or what made you want to respond to that initial e-mail from Sam.
Do you remember that?
A. Yes.
Q. You were asked what do you remember about his profile picture.
Do you remember that?
A. Yes.
Q. And you said, I remember that I wanted to meet an Indian fellow because you had heard or a friend of yours was dating an Indian guy and they seemed to be nice people.
Do you remember that?
A. I did not say that my friend was dating an Indian guy.
Q. You had a reason for wanting to date an Indian guy; right?
A. At the time, I did like Indian guys, yes.
Q. And based on his profile, that was your response to the question by Ms. Baraiola, why did you respond or what

attracted you or what made you respond that was it; right?

A. I also think it's a travel in the profile but I can't quite remember everything that it said in the profile.

Q. And that's all you remember; right? As you sat here the other day, that's what stood out in your mind about Sam's profile page? Do you remember that?

A. Yeah, it was two years ago so I didn't remember the full profile, yes.

MR. ROTHMAN: Can we put that up please.

THE COURT: Do you know the number?

MR. ROTHMAN: It's the profile page. I don't know the number. I'm sorry. Thank you. People's 12.

THE COURT: For the record, People's 12.

Q. There was no picture of Sam; correct?

A. I think there was a picture.

Q. Think hard please. Do you remember?

MS. BARAIOLA: Objection.

Q. Do you remember seeing a picture of Sam?

THE COURT: I'm going to sustain the objection as to think hard. You can ask the question over please.

Q. Do you remember seeing the picture of an actual person or just the silhouette, a generic silhouette?

A. I think it was a picture, yes.

Q. What is on the screen now was what was on his profile page when he first reached out to you; correct?

A. I didn't -- do you want me to read the whole about me. I only see half of it.

Q. Let's see where it says net worth. What does that say?

A. One, two, three, four. A million.

Q. How much? Ten million dollars; right?

A. Ten million dollars, yes.

Q. It also went onto say he makes roughly a million dollars a year; correct?

A. I don't see that part. Where is that? Okay. I see income a million dollars it looks like.

Q. So his profile page said is he worth roughly ten million dollars and makes roughly a million dollars a year, but as you sat here the other day you didn't recall any of that; correct?

A. I didn't remember. I also didn't remember his height and weight.

Q. I'm not asking you about his height and weight.

A. Right.

Q. I'm asking you if you remembered the fact that this person on this Seeking Arrangements.com said he was worth roughly ten million dollars. That part you didn't remember?

A. No, I didn't.

Q. And you said based on this profile you were interested in him because you were into Indian guys; right?

A. Indian and travel, yes.

Q. Okay.

You don't see anywhere up there where he says he is Indian; do you?

A. I see it says Asian.

Q. So Asian to you means not Chinese or Japanese or one of the other many countries in Asia but Indian?

A. To me that does mean Chinese or Japanese or some of the other countries.

Q. You had no reason to think he was Indian based on your initial correspondence or based on your initial viewing of his website?

A. From the picture I did.

Q. Sorry?

A. From the picture I did.

Q. Please put the picture up to the extent one exists, if you have a picture from his profile page.

THE COURT: Who are you asking, Mr. Rothman?

MR. ROTHMAN: I'm sorry. I'm asking the People because they have it.

THE COURT: Sustained.

MR. ROTHMAN: Can we put up the entirety of his profile page please.

THE COURT: Do you have it. You can use the computer. Let's have a sidebar please.

(sidebar)

[]

(open court)

THE COURT: Next question.

MR. ROTHMAN: We will get back to this some other time.

Q. So you were on a dating website called Seeking Arrangements.com right?

A. Yes.

Q. Where sugar babies go to meet sugar daddies; right?

A. I think that's what it says, yeah.

Q. And it's for people who are seeking a mutual beneficial financial arrangement; right?

A. Seeking relationship, yes.

Q. Like a serious relationship? You believe that's what this website is for?

A. I think so. If you communicated in your profile the way did, yes.

Q. Speaking of your profile, I think you said you listed an age that was a little younger than what you are really.

Is that right?

A. Yes.

Q. And you used a fake name; right?

A. Yes.

Q. Everything else about that was accurate?

A. Let's see, I don't remember everything I put in the profile.

Q. Well, your profile is meant to be appealing to someone looking at it; right?

A. Right.

Q. So that you could get into this mutually beneficial financial relationship or whatever it is; right?

A. Yes.

Q. That's one of the goals of your profile page to make yourself sound appealing, if you will; correct?

A. Probably, yes.

Q. And you had a picture on yours; right?

A. Yes.

(displaying picture.)

Q. Who is that?

THE COURT: Mark it.

MR. ROTHMAN: Can we mark this Defense A, for identification, please.

Q. Look at that in private.

THE COURT: This is now Defense A, for identification. We will show the witness and ask if you recognize that photograph.

Q. Do you recognize that photograph?

A. That was on my profile, yes.

Q. That's the picture that you put up on your profile

page, the one Sam or Sanjay would have seen; correct?

MS. BARAIOLA: Objection.

THE COURT: It's the picture from your profile. Sustain the objection as to the last part.

On your profile at Seeking Arrangements during the time that you first communicated with the defendant?

THE WITNESS: Yes.

Q. That is part and parcel of your profile page; right?

A. This was --

Q. That picture?

A. Yes.

MR. ROTHMAN: I offer that into evidence.

THE COURT: Any objection?

MS. BARAIOLA: No.

THE COURT: Okay. So that will now be marked. It's admitted into evidence. Mark as Defendant's A in evidence.

(Whereupon the exhibit was marked.)

Q. This is the picture that you put up on your profile page; correct?

A. Yes.

Q. Now, is that you?

A. No, it's a stock photo.

Q. It's a what?

A. It's not me.

Q. And you did that on purpose; correct?
A. Yes.
Q. That wasn't a mistake? You intentionally put that picture up on Seeking Arrangements for someone to see should they look at your profile page; correct?
A. Yes.
Q. You also used name Nina I think you said?
A. That was my profile name, yes.
Q. You said you used that, I guess, for security reasons; right?
A. Yes.
Q. You don't want anybody to know your real identity on a website like that; right?
A. In general, yeah, until I know them, yes.
Q. Okay.
Again that was a general safety concern; correct?
A. Probably.
Q. The phone that you used was also under the name Nina; correct?
A. Yes.
Q. Did you have any safety concerns with respect to giving the phone company your true name?
A. If I had my -- by my phone number people can find out my name, yes.
Q. So you use the name Nina Nanpalan (phonetic)? Does

that sound; right?
A. Yes, I think so.
Q. Completely made up; correct?
A. Yes.
Q. Okay.
Along with that picture and your discussions of travel, one of the things you said was, on your profile page, I will take care of you in every way; right?
A. Yes.
Q. You received an e-mail from Sam; correct?
A. Yes.
Q. And after a couple of e-mails he asked you if you wanted to meet up; correct?
A. Yes.
Q. In response to that you said, how do you want to deal with dollar sign, dollar sign on a per meet basis; correct?
A. Yes.
Q. And what that meant was, how much are you going to pay me; right?
A. Yes.
Q. How much are you going to pay me every time we meet; right?
A. Yes.
Q. And I think you said that you wanted to make sure you both were on the same page from the very beginning; right?

A. Yes.
Q. Those were your words last week?
A. Yes.
Q. That is why you responded in that way, how are you going to deal with dollar sign, dollar sign, so there was no mistake about what was going to happen -- withdrawn.
There is no mistake about how much you were going to get paid; correct?
A. Yes.
Q. So when you met with Sam, at Zuma Restaurant you wanted to make sure you were on the same page; right?
A. Well, since nothing more was mentioned in the e-mail, we had not really, obviously, agreed on anything so.
Q. You wanted to make sure in your first response to him that you would get compensated for your time on that date; correct?
A. Since he didn't mention anything in the e-mail back, then I didn't really think much of it.
Q. Didn't he say to you, let's wait and see if there is chemistry, I'm flexible, I'm sure it won't be a problem? Didn't he say something like that to you?
A. I think it was in those terms. I don't remember exactly the words.
Q. But that didn't tell you how much you were going to get pay for your time; right? That didn't tell you that?

A. No, he didn't write any number.
Q. You wanted to know?
A. Yeah, but he didn't so I was okay with it.
Q. You wanted to make sure from day one you're going to get paid but you spent three hours with him, an hour at a restaurant, two hours at a hotel bar and you are saying you never once discussed money?
Is that correct?
A. That's, yeah, we did not after dinner or bar, correct.
Q. So for three hours it never came up?
A. No.
Q. Despite what you said in your return e-mail to him?
A. Since he didn't reply any amount, I was okay with that.
Q. It was just okay? You figured it would work itself out?
A. Yeah. It's the same as I do this coffee challenge where I go --
Q. A what challenge?
A. I do the coffee challenge that my mentors do.
Q. Coffee challenge?
A. Yeah. You go to coffee shops and you ask for ten percent off and if they give it to you, great, if they don't give it to you, that's okay too.

Q. So when you put up a picture on a website of a woman in a bikini saying I will take care of you in every way but I want to be paid for my time, that's the same as asking for ten percent off at a coffee shop?

Is that what you are saying?

A. I'm saying taking care of a guy in every way, I also did say there I'm looking for one day. So I was looking for an exclusive, committed relationship with someone. If I have that, then I will take care of him in every way, yes.

Q. You had two dates lined up for the same night possibly; right?

A. I had another date later, yes.

Q. Kevin?

A. Yes.

Q. Right?

A. Yes.

Q. Did you talk to Kevin about money?

A. I don't think so.

Q. Do you want to make sure?

MS. BARAIOLA: Objection.

THE COURT: No, overruled to that first question.

Q. Did you want to make sure that you and Kevin were on the same page when it came to money?

MS. BARAIOLA: Objection.

THE COURT: That night?
MR. ROTHMAN: Sure.
Q. That night before you met him?
THE COURT: In the texts?
MR. ROTHMAN: Let me start over.
THE COURT: Okay.
Q. You were texting Kevin that night; right?
A. Yes, I was.
Q. Before you texted Kevin, I assume, tell me if I'm wrong, there would be some e-mails back and forth between you and him; correct?
A. Well, we saw the text message already, yes.
Q. So you were e-mailing him prior to that?
A. E-mailing prior to the text messages from on the website you mean?
Q. Yes. Yes.
A. I suspect so.
Q. Well, you remember that don't you?
A. Well, there had to be for him to get my phone number.
Q. Right. You had to give it to him?
A. Right.
Q. So when he reached out to you about meeting or hooking up or whatever, did you also respond to him, what are we going to do about money?
MS. BARAIOLA: Objection.

THE COURT: Let's have a sidebar please.
(sidebar)
[]
(open court)
THE COURT: I'm going to allow that question. You can answer that please.
Q. Before you answer that question --
THE COURT: So the question is withdrawn.
MR. ROTHMAN: Yes.
THE COURT: New question.
Q. Did you meet Kevin or originally find Kevin, if you will, on Seeking Arrangements?
A. Yes.
Q. So did you discuss money with Kevin via e-mail before your text with him?
A. I'm not sure. I don't remember.
Q. Okay. You know how important this case is, this proceeding is in terms of telling the truth; right?
A. Yes.
Q. And that applies to your testimony here; correct?
A. Yes.
Q. It applies to your conversations with the police; correct?
A. Yes.
Q. It applies to your conversations with the

prosecution; right?
A. Yes.
Q. It was true, the importance and the necessity of telling the truth was important since the day this incident occurred until today; correct?
A. Yes.
Q. So you would never lie or misrepresent the truth in a court of law, to the DA or the police; correct?
A. Correct.
Q. You would never commit perjury? You would never lie under oath; correct?
A. I would not.
Q. Would not?
A. I would not. No, I would not lie.
Q. Okay.
You corresponded with Sam about money for a short period of time; correct?
A. Where are you talking about?
Q. In your e-mail.
A. I guess to me, I guess I did. I just put a dollar sign but there was not an amount mentioned, yeah.
Q. In your e-mails, you asked him how much he is going to pay you and he responded we will see if there is chemistry, I'm flexible, let's deal with it then or words to that effect; correct?

A. Yes, he did say something like that.
Q. He responded to you about your request for money; right?
A. Yes.
Q. There was no agreed-upon amount but there was a discussion about a monetary transaction; correct?
A. On the e-mail yes.
Q. Okay.
You gave a deposition several months ago, correct, in December? Is that right?
A. December 2017, a year and a half after this happened roughly, yes.
THE COURT: This is in another proceeding.
Q. In another proceeding, a different lawyer, not me --
THE COURT: By phone.
Q. -- by phone ; correct?
A. Over the phone, there on speaker, there is I think six people in the room and I'm sitting by myself on the phone --
Q. Okay.
A. -- doing a deposition, yes.
Q. And you were sworn or you took an oath to tell the truth; correct?
A. Yes.
Q. And that's the same oath you took here in front of

these jurors; right?

A. Yes.

Q. And you lied during that deposition; correct?

A. I think I miss -- I think I misunderstood the question. Which one are you referring to?

Q. Okay. Well --

THE COURT: Read the question and the answer.

MR. ROTHMAN: I'm going to. Page 71.

THE COURT: Which line?

MR. ROTHMAN: Line 2.

Q. Do you recall being asked this question and giving this answer,

"QUESTION: Did you guys ever discuss money or anything like that prior to meeting him that night?

ANSWER: No."

THE COURT: Sorry, that's a different page I have. Can you look again?

MR. ROTHMAN: Page 71, line 2.

THE COURT: Can you just approach without the court reporter please.

(Whereupon, there was an off-the-record discussion held at sidebar.)

THE COURT: Just so we are clear, for the record, there is a page 71 and in a different version it may also be page 65. Same transcript different pages.

Okay, go ahead. I'm sorry.

Q. So, ma'am, did you give this answer to this question roughly five months ago,

"QUESTION: Did you guys ever discuss money or anything like that prior to meeting him that night?

ANSWER: No."

Did you give that answer to that question under oath at a deposition?

A. I gave that answer. In my mind, I think I thought that they meant a dollar amount mentioned. So that was a mistake on me answering no because I'm realizing now that is a yes in the e-mail.

Q. It's not the only time you were asked about money during the deposition. My page 28. Line 17.

THE COURT: Could you give us the first couple words at the top of the page, if you don't mind.

MR. ROTHMAN: Ms. Risdal, yes.

THE COURT: Bear with us. As long as the People are okay with it.

MS. BARAIOLA: I don't know.

THE COURT: It's your page 28?

MR. ROTHMAN: Yes.

THE COURT: Okay. Go ahead.

Q. Again you were asked at a different time during the deposition,

"QUESTION: Did you ever discuss money through any of your text messages or e-mail exchanges with him?

ANSWER: No."

Same questions, same answer, no, by you; correct?

A. Correct. That was a wrong answer to say no. Again, I thought that they were referring to an amount.

Q. Ma'am, did anybody ask you if there was a dollar amount agreed to or did they simply ask you if you sent an e-mail about money?

A. So that was wrong of me then to say no, as I said.

Q. You say it was wrong of you. Nobody asked you in that deposition if there was ever an agreed-upon dollar amount; correct?

A. I don't think they asked that, no.

Q. They asked you three separate times if there was ever a conversation or discussion or e-mail about money and each time you said no; right?

A. Yes.

Q. And all three of those were incorrect answers, they just weren't truthful; right?

A. It's incorrect I am realizing.

Q. This other individual Kevin, who you were thinking about meeting up with that night, you were trying to figure out what time you were going to get done with Sam and whether or not you were going to be able to meet up with Kevin; right?

A. I really wanted to meet up with Kevin and we had plans to meet up that evening, yes.

Q. You were not sure what time your date with Sam was going to end; right?

A. I think so.

Q. Well, in your text with him, you --

MS. BASHFORD: With who? Your text with who?

MR. ROTHMAN: Him. Kevin.

Q. He talked about his flying his plane, he is going here and there. Remember those texts --

A. Yes.

Q. -- about him being a pilot? And he invited you to come to his home; right?

A. Yeah or his neighborhood and home, yes.

Q. He told you to come to his house and have a drink?

A. Yes, he asked for both, yes.

Q. And at one point you said, I don't know if I'm going to get there but if I do I'm going to be very drunk; right?

A. Something in those terms, right.

Q. You never met this guy before; right?

A. No.

Q. Okay. At 9:43 you texted him, still out for dinner I'm running behind, sorry, but I will keep you posted.

Do you remember that?

A. Yes.

Q. And you texted him that when Sam had left the bar; right?

A. Yes, when he was in the restroom I texted him that.

Q. That's what he told you? He told you he was going to the restroom?

A. He said he is going to the restroom, yes.

Q. You have two phones; right?

A. Yes.

Q. One phone you keep for dating only; right?

A. Mostly, yes.

Q. And that phone number for dating is the phone that we have seen the texts on between you and Sam; right?

A. Yes.

Q. Then you have another number that is non-dating; right?

A. It's my business phone, yes.

Q. Okay. So calls and things like that to friends or texts to friends, who are not part of your dating world would probably be on the other phone; right?

A. Yes.

Q. The district attorney has both of those phone numbers. I'm not asking you for them. They have both of those numbers; correct?

A. Yes.

Q. You had conversations with the district attorney

regarding the incidents that happened that night; right?
You spoke to Ms. Baraiola several times about what happened; correct?
A. Yes.
Q. And she talked to you about this whole issue of money; right?
A. What do you mean?
Q. About what you meant by, how do you want to deal with dollar sign, dollar sign.
That's something she asked you many times about; right?
A. I guess so.
Q. Don't guess. Do you remember or no?
A. I can't guess, that's right. Well, she showed me the, you know, the e-mails and stuff, yeah.
Q. And she said, what does this mean? Why are you asking this guy for money; right?
A. Right.
Q. And you explained it to her; right?
A. Yes, I believe so.
Q. You believe that you're entitled to be compensated for your time on a date; right?
A. I was willing to try it.
Q. Was this the first time you are saying that you had sought compensation?

MS. BARAIOLA: Objection.

THE COURT: Sustained.

Q. But you said you were willing to try it, to try what?

MS. BARAIOLA: Objection.

THE COURT: Sustained.

Q. I'm sorry, you just said you were willing to try it?

THE COURT: Jurors, I had sustained the objection meaning I'm going to ask you now to disregard that response.

Q. That night you believed that you should be paid for your time with Sam; correct?

A. I tried to make a suggestion in the e-mail, yes.

Q. But what drove you to make that suggestion is you believe that when you go out on a date you should be paid for it; right?

MS. BARAIOLA: Objection.

THE COURT: With Sam?

MR. ROTHMAN: Correct.

THE COURT: Only with Sam.

A. Yes, I was willing to try, yes.

Q. Okay.

And you believe that night if you were on a date for several hours, for example, six Hours or so that you should get between 3 and $400 for that date; correct?

A. Yeah.

Q. Just for going to dinner with somebody or having a drink, you believe if you are spending several hours with Sam, let's just talk about Sam, you are entitled to compensation?

A. Yes, I was willing to try it as I said, yes.

Q. Okay.

THE COURT: I need a sidebar please.

(sidebar)

[]

(open court)

Q. You said that you were willing to try it meaning compensation for your time spent on a date, money for date; correct?

A. Yes.

Q. And when you say, I was willing to try it, are you suggesting that you had never done that before, sought compensation for a date for your time?

A. I don't remember if I tried it before.

Q. You believe Sam was the first person you sought compensation from in exchange for your time?

MS. BARAIOLA: Objection.

THE COURT: Overruled.

A. You asked if he is the only one, if I believe he was the only one?

Q. Yes.

A. As I said, I don't remember if I sent a similar

e-mail or not so.

Q. You have no recollection whether or not prior to Sam you ever asked anyone else to pay you for your time on a date with them?

Is that what you are saying?

A. Exactly.

Q. When was the first time you saw the videotape from the bar?

A. That was on Thursday evening, this Thursday evening. The evening before I was here on Friday morning. So that was the 17th or 18th I believe.

Q. So maybe in two years you have not seen the video from you and Sam at the bar that night?

A. No, I have not.

Q. And you were asked by Ms. Baraiola, in your meetings with her, about the nature of what happened at the bar. Do you remember that? The relationship at the bar.

A. Yes, she asked me that.

Q. She asked you what it was like, how physical was it, was there a lot of kissing going on, things like that; right?

A. On Friday, yes.

Q. I'm talking about in your meetings with her before you testified.

A. I don't know if we actually particularly was -- she was more asking what were you guys talking about.

Q. Did you tell Ms. Baraiola in your meetings or whenever you spoke to her prior to testifying, there was just a little bit of kissing at the bar but no making out? Do you remember telling her that?

A. I might have.

Q. That's not the truth; right?

A. We were definitely kissing at the bar, yes.

Q. Well, you were there for roughly two hours at the bar?

A. Roughly, yeah.

Q. Roughly 120 minutes; right?

A. Would I say maybe around that, yeah.

Q. Do you think you guys kissed or he kissed your ear or you kissed his ear more or less than 25 to 30 times in those two hours? Any idea?

MS. BARAIOLA: Objection as to form.

THE COURT: Overruled. I will allow it if you understand the question.

A. Kissing the ear you are asking?

Q. Yeah. Either he is kissing your ear, you are kissing his ear, you're on each other's necks. How many times do you think that happened in the two hours you were at the bar?

A. I'm not sure.

Q. More or less than 25 times?

A. I would guess less.

Q. Again, I don't want you to guess. If you don't remember.

A. Yeah, I would obviously not know the exact number of times.

Q. But you also told Ms. Baraiola that you guys never made out at the bar; right?

A. I don't remember particularly saying that but I did tell her we were kissing at the bar.

Q. You specifically said it was light kissing, not making out, there was no making out at the bar? You know what making out is; right?

A. Yes.

Q. Making out is more than just contact between the lips. It's a prolonged or sustained kiss maybe 5, 10, 15 seconds; right?

MS. BARAIOLA: Objection.

THE COURT: Well, that could be your definition of it. Let's use that as a proposed definition.

Q. Is that fair to say that is what making out is? 5, 10, 15 second kiss, something like that.

A. To me making out and kissing is almost the same way but kissing is kissing. It depends.

Q. What is the difference between kissing and making out if there is one?

A. Well, in your opinion making out is longer, from what

I understand, than just a kiss.

Q. Not in your opinion, in my opinion?

A. That's what you said.

Q. What is your opinion of making out, if you have one?

A. Kissing being more affectionate I would say.

Q. There was a lot of that at the bar; right? A lot of that affectionate kissing; correct?

A. We were definitely kissing at the bar, yes.

Q. There were times you guys had your arms around each other interlocked at the lips for a while; correct?

A. Yes, I believe so.

MR. ROTHMAN: Okay. Can we put up please 926 on the video. Thank you.

THE COURT: This is the video of the bar?

MR. ROTHMAN: Of the bar, yes.

THE COURT: Let's just get that number for the record.

MS. BARAIOLA: Number 4.

THE COURT: Thank you very much. People's 4.

MR. ROTHMAN: I think we need to take a break. It's not working for some reason.

THE COURT: Just give it a moment.

We will take a brief recess so I will send you back to the jury room and see if we can fix it.

(Whereupon, the jury exits the courtroom.)

(Whereupon, the witness exits the courtroom.)

THE COURT: I will ask the attorneys to just step up for just a moment. Can counsel step up please.

(Whereupon, there was an off-the-record discussion held at sidebar.)

(Whereupon, there was an ex parte meeting in judge's chambers.)

THE COURT: I revisited the ex parte ruling that I made at the beginning of this case, which was subsequent to what I considered the law of the case based on Judge Obus's ex parte ruling regarding prior conversations with individuals on Seeking Arrangement.com.

What I am going to do at this point is, I am not going to disclose anything yet to the defense, if at all. What I am going to do is, at this point I need to take a break. I'm sorry I know this is your cross examination but I need to be fair to both sides as far as the rape shield law and everything.

I will permit the People at this time, they will meet with their witness, even though it's on cross examination for the limited purpose of showing her some prior conversations to determine if it refreshes her recollection as to whether or not she had a conversation with Kevin regarding her seeking financial compensation for spending time with him on a date, not sex, spending

time on a date, and whether or not it refreshes her recollection as to whether or not she sought compensation with anyone else during this time period on Seeking Arrangement.com, any conversation with anyone else seeking financial compensation to spend time with them on a date. I don't believe that is prohibited by the rape shield and I still have that discretionary catch all that I think is appropriate this time to refresh her recollection.

Depending on what she says, I am most likely going to say the defense is stuck with her answer and you cannot get into whether or not she actually received compensation or followed through but it's the request or, I believe, the expression was whether she sought financial compensation for spending time with someone, which is what I would think is more in line as maybe an escort versus somebody exchanging money for sex.

So I don't believe that this portion of it based solely on her testimony on she was willing to try it indicating it may have been her first time, I think it's important to refresh her recollection and the defense will most I likely be stuck with her answer.

MR. ROTHMAN: Since on the topic for money for sex.

THE COURT: It wasn't on that topic. It was money for spending time.

MR. ROTHMAN: I want to now go to money for sex. I'm looking at those notes and apparently this witness told the people and Ms. Baraiola in particular that while it would be nice to have gotten 3 or $400 for those hours on date, perhaps, if it was more than 3 or $400 that would seem like that would be an exchange for sex to her.

THE COURT: Okay. So what are you saying, you should be able to ask her whether she said that to Ms. Baraiola?

MR. ROTHMAN: Correct.

THE COURT: No, that's not coming in.

MR. ROTHMAN: Okay.

THE COURT: What I think logistically I would provide my robbing room so they can speak to the witness only for that purpose. No other questioning, no other cross examination or preparation. Let us know when you are done. We will bring the witness from across the hall and we will all be here.

(Whereupon, there was a brief pause in the record.)

THE COURT: Let's bring our witness back in. I know I have completely ruined Mr. Rothman's cross examination flow. I apologize for that. I wanted to be clear about my previous ruling. What I am going to do is let Mr. Rothman, if you want, to ask on this particular

issue. I don't want to go past five. I rather end by a quarter to five. If you want to wait, we can do that as well.

MR. ROTHMAN: I suggest we start fresh tomorrow. I don't know what is going to come of this ruling, if there is anything to discuss, any additional cross I will have as a result of it.

THE COURT: I was going to suggest if you want to ask, I don't want to direct your cross by any means, if you want to ask her about this particular area if after reviewing certain documents if it refreshed her recollection and stay on this issue, you can finish that up.

MR. ROTHMAN: I don't know. I assume that is what they just found out, whether or not the documents refreshed her recollection.

THE COURT: I would image have you to ask the complaining witness in front of the jury. Are you proposing to do it outside of the jury's presence?

MS. BASHFORD: I'm happy to tell him what the answer is.

THE COURT: Come on up. I am interested myself. Come on up.

(Whereupon, there was an off-the-record discussion held at sidebar.)

COURT OFFICER: Witness entering.

Jury entering the courtroom. All rise.

THE COURT: All right, everybody, have a seat.

So, ladies and gentlemen, I am sorry it took me a lot longer to take care of this legal matter. I'm going to break for the day. We will start again tomorrow morning promptly at 9:30 and we will continue with the questioning of Ms. Risdal tomorrow.

So again please keep an open mind, don't discuss the case or do any legal research or checking out the site or any investigation on your own. Thank you and enjoy your evening.

COURT OFFICER: All rise.

(Whereupon, the jury exits the courtroom.)

THE COURT: Everybody have a seat. Ms. Risdal, we need you back again tomorrow at 9:30. You can follow the direction of our sergeant.

(Whereupon, the witness exits the courtroom.)

THE COURT: Okay. Anybody need to put anything on the record before we break for the day? No?

Okay 9:30 tomorrow. Thank you.

(Continued Tuesday, May 22, 2018 at 9:30 a.m.)

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 77

-------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK : INDICTMENT NO 2720 - 2016

:

-against- :

SANJAY TRIPATHY, :

Defendant.

-------------------------------------X

100 Centre Street
New York, New York
May 22, 2018

H O N O R A B L E:

ERIKA EDWARDS, PRESIDING

Supreme Court Judge.

A P P E A R A N C E S:

FOR THE PEOPLE:

OFFICE OF THE DISTRICT ATTORNEY
NEW YORK COUNTY
ONE HOGAN PLACE
NEW YORK, NEW YORK 10013
BY: KRISTEN BARAIOLA,
MARTHA BASHFORD,
ASSISTANT DISTRICT ATTORNEYS

FOR THE DEFENDANT:

ROTHMAN, SCHNEIDER, SOLOWAY & STERN, LLP
100 LAFAYETTE STREET, SUITE 501
NEW YORK, NEW YORK 10013
BY: FRANKLIN A. ROTHMAN, ESQ.

SENIOR COURT REPORTERS
DENISE JOHNSON
MELISSA SASSO

THE COURT: All right. So Mr. Habian advised one of our officers that he is flying to London over the weekend and is taking the redeye so he would not be able to be here Tuesday but he can be back for Wednesday afternoon. If necessary, he says if he will to change it. It would cost him like over $4,000 or maybe that's how much the trip cost because that doesn't make sense on the change fee. That's what he advised us.

He would like to know sooner rather than later. That's what he said the other day. If it looks like we are going into Tuesday, since we are not sure about our witness schedule for Friday, I guess we need to maybe wait another day and see how we do with the testimony and everything.

MS. BASHFORD: This is a business trip?

THE COURT: I don't know. We could bring him in.

MS. BASHFORD: The change fee goes to his business.

THE COURT: That's harsh.

MS. BASHFORD: It is.

THE COURT: But we do need to ask. I did check my notes. I don't recall him telling us that during voir dire. Let's continue with where we are and we will take later today and see if we need to bring him in. Let's get

our witness and then we will get our jurors. Thank you.

COURT OFFICER: Witness entering.

THE COURT: Good morning.

THE WITNESS: Good morning.

COURT OFFICER: All rise. Jury entering.

THE COURT: Everybody, you can have a seat.

COURT CLERK: Case on trial continued. All parties are present. The jury is present and properly seated.

THE COURT: I want to start off with a stipulation based on a conversation we had yesterday during the examination or the cross examination of Ms. Risdal. As you may recall, there was some questioning and some responses regarding whether or not Mr. Tripathy had his actual photograph listed on his profile or you may have heard a questions about a silhouette.

The parties have stipulated that at some point after this date, so we are picking the date of something we saw, July 25, 2016, which is after the incident, that Mr. Tripathy's profile did not have the actual photograph of himself for whatever that is worth. Okay.

Please continue with cross examination when you are ready.

You are reminded you are still under oath.

THE WITNESS: Thank you.

CROSS EXAMINATION
BY MR. ROTHMAN:

Q. Ms. Risdal after court yesterday, you had an opportunity to speak to the members of the prosecution table; correct?

A. Yes.

Q. And they showed you some documents; correct?

A. Yes.

Q. And those documents helped you to refresh your recollection about something we had been talking about; right?

A. Yes.

Q. Would it be fair to say after reviewing those documents, you now remember having correspondence texts, e-mails, whatever, in 2016 with other men regarding exchanging time for money; correct?

A. Yes.

Q. You didn't remember that until you saw those documents after court yesterday?

A. Exactly.

Q. Okay. We were talking, before we got onto that, we were talking about your relationship, your physical relationship with Mr. Tripathy at the bar.

Do you remember that?

A. Yes.

Q. And whether you call it or we call it kissing or

making out or whatever, there was a lot of whatever you want to call it going on at the bar; right?

A. A lot of kissing, yes.

Q. A lot of making out too; right?

I will ask you to take a look at 9:26:52 from the bar. That's People's Exhibit 4.

MR. ROTHMAN: Thank you. Maybe we can just backup a couple of seconds please where it starts. What is the time?

THE COURT: 9:26 and 46 seconds.

(video playing)

Q. We can start from there. That's you and Sam or Sanjay at the bar; right?

A. Yes.

(video playing)

MR. ROTHMAN: Okay we can stop it there. Thank you.

Q. That wasn't the only time you had that type of interaction at the bar before you went into the room; correct?

A. Well, what else are you referring to?

MR. ROTHMAN: 10:21:12 please.

(video playing)

MR. ROTHMAN: Or 10:21:10 perhaps. Sorry.

Q. That's you and Sam, right, Sanjay?

A. Yes.

(video playing)

MR. ROTHMAN: Okay. Thank you.

Q. Would it be fair to say that when you were at the restaurant Zuma, at that point in time, you were not really sure if you were attracted to him, to Sam? Would that be fair to say?

A. Yeah, at the restaurant I was probably -- I wasn't unattracted to him but I wasn't super attracted to him yet. That probably would be safe to say, yes.

MR. ROTHMAN: My page 34.

Q. Again referring to that deposition that you gave, back in December, you remember the one I'm talking about; right?

A. Yes.

Q. You were asked these questions, questions about this very topic whether or not you were attracted to him at the restaurant? Do you remember that?

A. I don't remember that they asked that particular question, no.

Q. You do or don't?

A. I do not remember all the questions they asked. They asked so many questions.

MR. ROTHMAN: The line 20.

Q. Were you asked these questions and did you give these answers?

"QUESTION: When you say kissing, does that mean you guys were kissing or when you say kissing me, does that mean you guys were kissing?

ANSWER: Yes, we were kissing at the restaurant, yes.

QUESTION: So you were attracted to him?

ANSWER: Maybe. I wasn't sure yet, you know. I usually give people a couple of chances. I don't necessarily kiss on the first date maybe sometimes I do. We definitely kissed a couple of times, but I couldn't at this point know if, yet, if I was into him or not."

You were kind of unsure at the restaurant; right?

A. I would say so, probably, yeah.

Q. After the restaurant, you took an Uber; correct?

A. Yes.

Q. And you went to the hotel?

A. Yes.

Q. You didn't suddenly become attracted to him in the Uber; right?

A. I don't know when I became more attracted to him.

Q. Well, you went to his hotel and dropped off his bag in his room; right?

A. Yes.

Q. There was no kissing going on in the room then; right?

A. I don't think so because he was in the corner and

doing something with his bag and I was on my phone while he was doing that so I don't think so.

Q. There is no kissing in the room?

A. I don't think so, not that I remember.

Q. Okay. After you left his room, you guys then went to the ATM together; correct?

A. Yes.

Q. And after the ATM, you went back to the W; right?

A. Yes.

Q. At the W before you got to that bar, you were at another little area with the flashing lights.

Do you remember that?

A. Yes.

Q. Is that when you became attracted to him in that area?

A. I was getting it, it was slowly progressing throughout the night, yes.

Q. At the restaurant, you weren't sure; right?

A. Right.

Q. In the Uber, it was 15 minutes of talking; right?

A. Yes.

Q. In the room, it was no kissing; right?

A. I believe so, yes.

Q. You then go to the ATM together; right?

A. Yes.

Q. And then you end up at this club area by yourselves; correct?
A. Only for a little while.
Q. A few minutes?
A. Yes.
MR. ROTHMAN: Can we queue up 8:19:51 please or 8:19:45 maybe please. So we will start 8:19:34 of People's Exhibit 4. Thank you.
(video playing)
Q. So that's the club area; right?
A. Yes, it's the same area. It's the same as the bar just in the back of the bar.
Q. Right. It's not the bar. It's a separate area; right?
A. Yeah, but.
Q. That's where you went first. That's you two coming in now just a few moments later; right?
A. Correct.
Q. Now you sit down. I will ask you to watch your right hand and tell me where it goes.
(video playing)
Q. Right now it appears to be holding his hand, his left hand; right?
A. I think so, yes.
Q. Keep watching please and tell me what you are doing

with your right hand. Not now.

(video playing)

Q. Where is your right hand right now and what is it doing?

A. Rubbing up and down on his leg.

Q. His leg or his crotch?

A. Upper leg or I guess your call it --

Q. I would call it his crotch; wouldn't you?

A. Looks like the upper thigh area to me.

Q. It's his crotch; isn't it?

A. Hard to tell.

Q. Do you remember rubbing his crotch?

A. I don't remember that, no.

Q. As you sit here now, does that refresh your recollection about you rubbing his crotch at that club before you went into the bar area?

A. It's very unclear to me if I'm rubbing the upper thigh or --

Q. Let's look at it again.

THE COURT: Sorry, Mr. Rothman, you have to let her finish the answer.

MR. ROTHMAN: I apologize.

THE COURT: It's very unclear to you?

A. Yes, it's very unclear to me to see if I'm rubbing the upper thigh area or if I'm higher up.

Q. Okay. I will ask you to take another look if you could. If we can rewind it a little bit please.

Before we roll that, if you could, if it wasn't his crotch and I don't really want to demonstrate this on myself but where are you talking about?

THE COURT: You can't could do that on anybody else but go ahead.

Q. Can you are talking about upper thigh versus crotch, where you are rubbing, where are we talking about?

THE WITNESS: Do you want me to show and demonstrate?

MR. ROTHMAN: No. No.

THE COURT: No.

THE WITNESS: On myself obviously.

THE COURT: The video speaks for itself. Jurors, you can see it. You can make your own determination.

It's not refreshing her recollection. If you want to play it again one last time?

MR. ROTHMAN: Yes, one last time.

Q. Just take a look and see if that helps you remember.

A. I'm trying to look at hard as I can.

THE COURT: Please, no in court demonstrations.

MR. ROTHMAN: Okay.

THE COURT: We see it Mr. Rothman. We see it

whatever it is.

(video playing)

MR. ROTHMAN: Okay. We can stop. Thank you.

Q. After a few minutes there no waiter or waitress came over to get you guys drinks so you decided to go to the other bar area; right?

A. Yes.

Q. So whether or not you say that's his actual crotch or an area real close to it, would you agree that it's touching him in a somewhat sexually suggestive way?

A. You know, at this point, we are having fun, and we are honestly kissing and getting into each other. I'm rubbing his upper thigh up and down.

Q. Would you agree with me it's somewhat sexually suggestive? That's all I'm asking you.

A. I'm not sure. I guess that could be viewed so many ways still.

Q. Okay.

You know what BDSM is; right?

A. Say that again.

Q. BDSM?

A. I think I know what it is.

Q. What do you think it is?

A. Well, I watched half of the movie 50 Shades of Gray and I walked out halfway through but that's kind of what I

assume it's about.

Q. That's the only thing you know about BDSM is from watching half of 50 Shades of Gray, is that what you are saying?

A. Yes.

Q. That's what your knowledge is limited to half the movie?

A. Yes.

Q. When you guys were together, when you and Mr. Tripathy were together, you never saw him use cash to pay for anything; correct?

A. No, I don't think so.

Q. Zuma, credit card; right?

A. I believe so, yes.

Q. Uber, credit card; right?

A. Well, that I think is already prepaid on the app.

Q. Through a credit card. He never took money out to pay the Uber driver; correct?

A. No.

Q. You don't do that; right?

A. Yes, it's already paid on the app.

Q. The two hours you were drinking at the bar with him also credit card; correct?

A. Yeah, I think so.

Q. I'm sorry go ahead.

A. I think --

THE COURT: You can finish.

A. Yeah, I think so.

Q. It's all charged to his room; right?

A. Well, I didn't really pay attention if he put it on the room or card or if he left cash in there.

Q. You didn't pay attention to that?

A. I didn't see what he paid, yeah.

Q. You never looked at the check at the bar?

A. I think I actually did look at it but I don't think he had pay at that point.

Q. Did you two at the bar discuss water sports?

A. No.

Q. You know what I'm talking about; right?

A. Well, I don't actually know what water sports is but it is sounding like you are referring to in a sexual way. I don't know what that is.

Q. Urine play. Water sports. You never heard of that?

A. No, I have not.

Q. You didn't discuss that with him that night?

A. No.

Q. What about breath play, oxygen deprivation? Did you talk about that?

A. No.

Q. Face smacking. Butt smacking. Did you talk to him

about those things?

A. No.

Q. When you were at the bar with Mr. Tripathy for those two hours, did he insert his finger into your vagina at the bar?

A. No.

Q. Are you sure about that?

A. Yes.

Q. After about an hour or so at the bar when you say you still have not discussed money at all, he excused himself; correct?

A. After how long did you say?

Q. Maybe about an hour.

A. At some point, do you mean when he made the phone call or when he went to the restroom?

Q. When he left the bar for a while. There was only one time he left the bar for a while; right?

A. Yeah. Yes.

Q. You say he told you he was going to the bathroom?

A. Yes.

Q. He told you he was going to the ATM to get more money for you; right?

A. No.

Q. You expected him to be gone just a couple of minutes to go urinate probably and come back quickly; right?

A. Yes.

MR. ROTHMAN: Can we please queue up 9:34:28 on People's 4. The bar. Thank you.

(video playing)

MR. ROTHMAN: Can you go back about five seconds.

THE COURT: Starting at 9:34:12.

MR. ROTHMAN: If we can go back ten seconds please. Before he gets up.

THE COURT: 9:33:26.

MR. ROTHMAN: Okay. Thank you. Let's watch from here.

(video playing)

Q. There he is on his phone; right. Right, ma'am?

A. Yes.

Q. He takes his phone rather?

A. He takes his phone, yes.

Q. And he goes and has a conversation with the bartender just a couple of feet from you; right?

A. Yes.

Q. Isn't he telling the bartender, I'm going to be gone for a few minutes, whatever she wants just put on my tab? Didn't you hear him say that?

A. I did not.

Q. Let's watch.

(video playing)

Q. At this point, do you know his name to be Sanjay or do you think it's Sam?

A. No, I knew his name is Sanjay at this point.

Q. But you didn't know his last name?

A. No, I don't think I knew his last name at that point.

Q. So there he is speaking to the bartender; right? She gives him two thumbs up; right? You saw that? Here is the kiss goodbye before the bathroom trip.

Is that right?

A. Yes.

Q. You think he is going to the bathroom. Pull him back. You are whispering in his ear; right? Kissing him. Pull him back again. Whispering in his ear.

MS. BASHFORD: Are these questions, judge?

THE COURT: I'm waiting on the question.

Q. That's what is going on, right, you are pulling him back, whispering in his ear before he goes to the restroom; right?

THE COURT: Let's wait on the answer. You can answer.

A. Yes.

Q. Okay.

(video playing)

Q. What are you saying to him?

A. I'm not sure at this point.
Q. The more you get the better time you have.
Does that refresh the recollection?
A. What did you say?
Q. The more you get from the ATM the better time we will have.
Does that refresh your recollection as to what you said to him?
A. I did definitely not say that.
(video playing)
MR. ROTHMAN: Okay. So now he leaves. Let's stop please.
Q. The time is about 9:35; right?
A. Yes.
Q. Okay.
You said on direct that he was gone so long, I think you said 15 to 20 minutes; right?
A. Yes.
Q. That you decided you were going to return a phone call to your friend who testified here; right?
A. Well, I just decided to call my friend because he asked me to call him.
Q. Right. But when you were talking to him, you told your friend, my god, this guy has been gone 15, 20 minutes. He said he is going to the bathroom. I think I'm going to leave.

Right?

A. At the end of our conversation after organizing him coming and staying with me as long as he wanted, I did say I'm on this first date and he has been gone for a while so I think I'm just going to leave.

Q. Well, your conversation with him -- I'm sorry. His name was?

A. Joe.

Q. Joe?

A. His name is Joe.

Q. That conversation was about three minutes, four minutes?

A. I'm not sure how long we spoke.

Q. Okay. Let's watch.

(video playing?)

Q. Now Mr. Tripathy is gone and you say you believe he is going to the bathroom; right?

A. Yes.

Q. Okay. Tell me when you see yourself making that phone call.

(video playing?)

Q. Is that right about now? You're on the phone; right?

A. I think so now.

Q. The time is what? It's about two minutes after he left you're on the phone; right?

A. Yeah, it looks like that.

Q. Right. And looking at your --

A. Actually now it looks like I'm going on the phone. Okay.

Q. At 9:37 closer to three minutes after he left?

THE COURT: So 9:36:20 or so.

Q. Now you are on the phone with your friend maybe three minutes after he left to go to the bathroom; right?

A. I'm trying to see if I'm still texting or looking at his text or if I'm on the phone at this point but fairly soon I'm definitely giving him a call. Yes. Sorry, I was not on the phone yet it doesn't look like because I'm still holding the phone down.

Q. Do you think looking at your phone records would help you refresh your recollection as to whether or not at 9:37 and 28 seconds you made a phone call to your friend?

A. That sounds right.

Q. 9:37 and he, Sanjay, left at 9:34 roughly, right, 9:34:30?

A. That sounds about right.

Q. Okay. Just a few minutes later you are on the phone calling your friend.

Would it be fair to say that call lasted three minutes and 18 seconds?

A. Yeah. I don't know how long we spoke.

Q. Do you want to take a look at your phone records and see if it refreshes your recollection?

A. No. If that's what it says.

Q. Don't take it from me.

Do you want to look at them?

A. Sure.

Q. Okay.

MR. ROTHMAN: For the record this is Ms. Risdal's AT&T records.

Q. You have seen those before; right?

A. I don't know if I have seen this. I don't think I have seen this before.

THE COURT: This is People's 13. You are just showing her something. Okay. Got it.

Q. Okay.

That call lasted a little over three minutes with your friend; right?

A. Yes, 3:18 it said.

Q. Okay.

So that's a total of maybe six minutes from the time he left; correct? Correct?

A. Yes.

Q. That's when you hung up the phone and you're done with your conversation; right?

A. Yes.

Q. So when you said the other day he was gone 15 to 20 minutes when he decided to tell your friend I think he is gone I don't think he is coming back, that was not accurate; correct?

A. I said that he has been gone for a while.

Q. You told the jury he was gone 15 to 20 minutes when you asked your friend, you said, I think I'm going to leave, he has gone so long; right?

A. Yeah. It felt like he was gone a long time, right.

Q. He was gone, as per the time you hung up the phone, no more than six minutes; right?

A. Yes.

MR. ROTHMAN: Okay. Can we keep rolling that please. I'm sorry. Can we play People's 4 at the bar after Mr. Tripathy leaves.

(video playing)

Q. He is gone now; right?

A. Yes.

Q. At this point, you don't think you know his last name; right? You just know him as Sanjay?

A. Yeah, I don't think I know his last name at this point.

Q. By the way, that is the check that is on the bar there, right, to the left of you on an angle?

A. I assume so, yes.

Q. You don't know?

A. Well, I suspect it is because there is no one else sitting close that it would be their check.

Q. Okay.

(video playing)

Q. During this time, you were also texting the other guy about maybe hooking up with him that night; right? That was going on during this time frame?

MR. BARAIOLA: Objection.

Q. Meeting him not hooking up meeting him; right?

A. Texting him to meet him, yes.

Q. That is while Sanjay was gone, you weren't sure where he was and you were trying to figure out what to do with this other guy that you also met on Seeking Arrangements whether or not you were going to get to see him that night; right?

A. I definitely did want to see him that night, yes.

Q. You were unsure of what was going to happen so you kind of had him, the other guy Kevin, on hold sort of; right?

A. I wouldn't say that. I would feel really bad. I have very high integrity.

Q. You have what?

A. I have very high integrity. I would feel very bad just leaving right now. But I should have trusted my gut instinct to leave to meet Kevin my other -- I had agreed to meet.

Q. You had Kevin on hold. You were telling him you're not sure what time you are going to get done here. Do what you got to do and maybe I will see you later. Words to that effect; right?

A. I wanted to see him but I also usually go to bed early so I.

Q. Those were your words to him; right? I'm not sure what is happening here. I'm on a business dinner. I will try to hook up with you later. Do what you have to do.

That kind of sentiment; right?

MR. BARAIOLA: Objection.

THE COURT: Sustained. Compound?

MS. BARAIOLA: Hook up.

THE COURT: Sustained.

MR. ROTHMAN: Sorry. Meet up with.

THE COURT: The term hook up?

MR. ROTHMAN: Right.

THE COURT: Everybody has their own expressions and phrases. Hook up in this particular setting does not mean sexual encounter. Hooking up in terms of meeting.

If you can, refrain from using that.

MR. ROTHMAN: Yes.

Q. You were trying to figure out if you were going to meet up with the other guy, the pilot that you communicated with on Seeking Arrangements; right?

A. I definitely wanted to meet up with him that evening as I had said, yes.
Q. Okay.
As of now you are still not sure where Sanjay is according to you; right?
A. I am still waiting for him, yes.
Q. Right. And he texted you at some point just to say, like, hey, how are you; right? He Sanjay.
A. Yes.
Q. And you were so distraught about not knowing where he was that you were getting ready to leave; right?
A. Yeah and --
Q. Right? It is yes or no. You were thinking about leaving?
A. Yes.
Q. Okay.
So when he texted you, Hi, how are you? You didn't say to him, Are you okay? Are you coming back? Where are you? It's been 15 minutes. You didn't say any of those things; right?
A. No, I did not.
Q. You said, I'm just here waiting for you, still waiting for you; right?
A. Yes.
Q. Do you remember at some point when Sanjay is gone you

take that check and look through it?

A. I might have looked at it, yes.

Q. Okay.

And that's when you learned his last name; right?

A. I'm not sure if that's when I learned his last name. I don't know if that would be on the check.

Q. Tripathy with room number 4906?

A. That I'm not sure.

MR. ROTHMAN: Okay. We can stop that now. Please. Thank you.

Q. If I were to ask you, ma'am, as you sit here now, whether Mr. Tripathy penetrated your anus with anything, you're answer would be yes; right?

A. Yes.

Q. And that's the truth; right?

A. In the room he definitely did, yes.

Q. Right.

You were asked that very same question at the deposition?

A. Yes.

Q. Right?

A. Yes.

Q. Do you recall being asked this question and giving this answer under oath?

MR. ROTHMAN: My page 64, line 6. I already

gave this to the district attorney.

THE COURT: Okay.

Q. "QUESTION: Now at anytime if I ask the question about anal sex, at anytime did he ever penetrate your anus with anything?

ANSWER: No, he didn't."

Did you give that answer under oath at a deposition?

A. I did give that answer.

Q. That's all I'm asking you. Did you give that answer?

A. I gave that answer and I thought it meant with a toy or object but that was a mistake when I gave that answer.

Q. When I just asked you now, would it be fair to say he penetrated your anus with anything you said yes; right?

A. Yes. Now I understand, yes, he did.

As I had told the grand jury --

Q. You can't just go on like that.

MR. ROTHMAN: I ask the judge to admonish the witness.

THE COURT: Please just answer the question. Jurors, please, disregard the last portion of what she said.

THE WITNESS: Thank you.

Q. You were asked at the deposition whether or not you did anything to his anus; right?

A. I don't remember if they asked me that or not. I am

A. Okay.

THE COURT: Do you remember giving that answer to the question is the question.

A. Well, again there were so many questions. I wouldn't, I guess, remember all the questions and answers because it was a very long one but yes.

Q. I'm just asking you about a few questions you were asked at that deposition.

A. Yeah.

Q. Not all of them.

A. Yes.

Q. Not the entirety of it. Just a few choice questions and answers. Okay?

A. Okay.

Q. So, you were at the bar with him and you say he never inserted his finger into your vagina; right?

A. Correct.

Q. And there is no talk about DBSM, whatever limited knowledge you say you have of that; right?

A. There was no talk of that.

Q. Do you know what a safe word is?

A. If I know what a safe word is?

Q. Yeah.

A. That I do know, yeah.

Q. What is a safe word?

not going to remember the whole deposition. It was so many --

Q. I didn't ask you about the whole deposition.

A. Yeah.

Q. I'm asking you if you remember about what you did, if anything, to his anus.

Do you remember any of those questions and those answers you gave?

A. You would have to read it to me.

Q. I'm about to.

You say you put your finger in his anus; right?

A. Yes, I did because he asked me to.

Q. You also said you licked his anus; right?

A. I did because he requested me to, yes.

MR. ROTHMAN: Page 64. Line 10.

Q. "QUESTION: Did you at anytime do anything to his anus?

ANSWER: Yeah, he wanted me to do that, yeah.

QUESTION: What did you actually do?

ANSWER: While I was sucking him, he wanted me to put a finger in his ass."

That's what you said; right? Right?

A. If that's what I said there, okay, yes.

Q. That's what you said there when asked, what did you do to his anus. You didn't say anything about licking his anus. You said you put a finger in his butt; right?

A. From my understanding a safe word is something people have under sex.
Q. What does that mean "under sex"? What do you mean?
A. I think it means that some people will have a safe word.
Q. What is it for, if you know? I mean, when you have sex, you don't need a safe word if you are having bland sex; right?
A. Well, that's why I certainly don't need or have not had so.
Q. So what is your understanding? You say it's used in sex used. For what?
A. I think some people use it for, you know, I think some people have a safe word, I guess. I have heard.
Q. Ma'am, I don't mean to belabor the point.
A. Yeah.
Q. You say you heard of it and people use it in sex from what you know but for what purpose?
A. I guess to be safe since it's called safe word.
Q. When you have had enough of a certain activity and you are uncomfortable, that's a signal to your BDSM partner; right? You have heard that; right?
A. I guess so.
Q. You had a safe word with him; right?
A. No, I did not.

Q. Nina Elsa was the safe word and if you were unable to speak, you were supposed to tap.

Does that sound familiar?

A. No, it does not.

Q. When you were -- it was getting closer to the time that you were going to go up to the room, you said to get his business card and a present; right?

A. Yes.

Q. Do you remember you looked at the check at one point; right? You didn't see it on the video but you remember looking at the check; right?

A. I think I did, yes.

Q. And can we go to 10 -- withdrawn.

Do you remember whether or not at the bar at any point before you left he had his face on your breast?

A. Yeah, I think he did.

Q. Okay. Well, you know he did; right?

A. Yeah, he was like here, yes.

Q. It was what? Where?

A. Yes.

Q. It was on your breast not your shoulder, it was on your breast at the bar; right?

A. Hard to tell. Hard to tell.

Q. Forget what you can see?

A. Right.

Q. What you remember. Forget whether you can see everything on the video?

A. Right.

Q. You know if his head and his mouth and his face was on your breast at the bar. Whether or not you saw it on the video, you know that happened; right?

A. I didn't particularly remember if he was hugging me there or not in that area.

Q. I'm not asking you about hugging.

A. Or laying or leaning on me.

MR. ROTHMAN: People's 4, 10:28:28 please.

(video playing)

MR. ROTHMAN: The bar clip. 10:28:26.

Q. Where is his face, the front of his face?

A. It's somewhere in this area here.

Q. You're touching your right breast area; right?

A. The upper breast area, yeah.

Q. Upper breast. Okay.

MR. ROTHMAN: We can stop that please. Thank you.

Q. That's not the only time at the bar that his face was in your breast area; right?

A. Maybe not.

Q. Okay. At some point before you went up to the room --

MR. ROTHMAN: If we can go to 10 even and 25 seconds.

Q. So this is before you guys went to the room obviously; right?

A. Yes.

Q. Okay. Do you remember demanding to see his license, his identification?

A. I don't remember demanding to see his certification. I think he did show it to me at some point though.

MR. ROTHMAN: Let's play it please. Thank you.

(video playing)

MR. ROTHMAN: This is 9:59:59.

Q. You seem to be going into his pocket; right?

A. Um-hm.

THE COURT: Is that a yes?

THE WITNESS: Yes.

Q. That's you looking at his license, right, with his picture on it and his ID; right?

A. Yes.

Q. Okay. Thank you.

When you were in the room, there was a good amount of yelling going on; correct?

A. I was screaming for help.

Q. There was a good amount of yelling by you and he was also yelling; correct? It's a simple yes or no answer;

correct?

A. I'm trying to remember if he was yelling or not. If you can give me a little time to think if he was yelling.

Q. Sure.

A. Not sure if he was yelling or not but I certainly was.

Q. You don't remember his voice being raised ever or yelling?

A. Yeah, he was definitely talking loud. He was definitely talking loud.

Q. So when you're in the middle of this, what you believed to be a life and death struggle; right?

A. It absolutely was.

Q. You believed you were maybe going to die that night; right?

A. I did think I was going to die that night, yes.

Q. So when he says to you, I'm going to kill you, you respond to him, listen, I have to leave at midnight the babysitter is leaving; right? Those were your words?

A. Yeah, you heard me say earlier, yes.

Q. Right. In response to I'm going to kill you, you said, The babysitter is leaving. How much longer is this going to be?

Right?

A. After a lot of times telling me he is going to kill

me and I'm going to die, yes.

Q. The babysitter is leaving. How much longer are you going to be?

That's what you said to him; right?

A. As you heard earlier, I made up a whole story. I didn't just go from that to that. There is other stuff between.

Q. According to you, after this brutal, brutal attack, his last words to you were, That was good. Let's do it again Monday at 6:30 at Nobu; right?

A. He said, I'll see you Monday at Nobu, 6:30.

Q. After everything that he did to you, he threatened to kill you; right?

A. Yes.

Q. He threatened to have you deported, he threatened to have your kid taken away, he brutalized you; right?

A. Absolutely.

Q. And he said to you, see you again Monday at 6:30?

A. He wanted to make sure I wasn't going to go to the police.

Q. He said to you, I'll see you again at Nobu at 6:30 on Monday; right?

A. He did.

MR. ROTHMAN: Thank you.

THE COURT: All right. Any redirect?

MS. BARAIOLA: Yes, Your Honor.

THE COURT: Okay.

REDIRECT EXAMINATION

BY MS. BARAIOLA:

Q. Ms. Risdal, you were asked some questions about first going to a back room in the bar and then leaving and going into the video that we are watching now, the bar camera feed?

A. Yes.

Q. When you were in the back room, were you the only two people in there?

A. Yes, we were the only two people in there.

Q. When you left, where did you go?

A. We went straight to the bar, which is, you know, it's fairly close. It's in the same area. It's just a little more pulled back than the other area.

Q. So you didn't go upstairs to his room right away?

A. No. We just went straight to the bar which would be from where I'm sitting to you maybe a little bit further.

Q. And when you got to the bar, were there people around you?

A. Yes, lots of people around.

Q. Was it a crowded area?

A. At times there is definitely people around, yes.

Q. Was there music playing?

A. Yes.

Q. Was it loud in that room?

A. Yes, I would say so.

Q. You were also asked a question on cross examination about whether or not the defendant inserted a finger into your vagina at the bar?

A. Yes.

Q. What were you wearing underneath your dress that evening?

A. I was wearing pantyhose.

Q. Did you have those pantyhose on the entire time you were at that bar?

A. Yes.

Q. Did you have them on the entire time you were on the date with the defendant before Room 4906?

A. Yes.

Q. Sorry to be graphic.

Were there any holes in your tights, anywhere in your pantyhose?

A. I don't think so. I mean, he ripped them off me upstairs.

You mean if I had any holes before I put them on at home?

Q. Before you go to the room, when you left your house that night and you put them on, did they have holes anywhere?

A. No.

Q. Now, you were also asked on cross examination about Mr. Rothman, you know, you thought you were going to die and then you decided to talk about a child.

Why did you bring up and make up a story about having a daughter?

A. It was the only way I could get out of there alive.

Q. Why did you think that was the only way you could get out of there alive?

A. I knew he told me that he had children and I had to do whatever it took to get out of there alive. I was screaming for help. I was fighting for my life. I did think I was going to die there in that room. So that was the only thing I could come up with to get out of there place alive to say I'm a single mom.

I was trying to put myself in my sister's position and I made up that story. I didn't see how else I was going to get out of there alive. He didn't allow me to go to my phone. He didn't allow me to do anything. I was kept hostage in there.

Q. Ms. Risdal, you were also asked a question on cross examination about when the defendant was gone for 15 to 20 minutes.

He had sent you a text saying how are you?

A. Yes.

Q. You were asked about what you wrote back.

You wrote back to him something along the lines of still here waiting for you?

A. Yes.

Q. Why did you write that?

A. I was still sitting there waiting for him to get back.

Q. Why hadn't you left?

A. I was still debating on leaving. My integrity level -- I, you know, I do find it rude to just leave someone when, you know, yeah, I would find it rude. But I am going to regret it for the rest of my life that I did not trust my gut instincts. I should have just left. But it's not my style. It's note my integrity. Yeah.

Q. Did you send that text message after you had spoken to Joe?

A. Yes, I believe so.

Q. After everything that happened in Room 4906, you walked out of the building and you approached the policeman?

MR. ROTHMAN: Objection. Not asked on cross.

THE COURT: Sustained.

MS. BARAIOLA: Your Honor, may we approach.

THE COURT: Sure. Let's have a sidebar please.

(sidebar)

MS. BARAIOLA: Your Honor, Mr. Rothman was asking the complaining witness about inconsistent

statements. I believe the People are allowed to bring out the consistent statement she made to Sergeant Schack, the doctors in the hospital and in the grand jury. We are allowed to.

THE COURT: Regarding the areas that he addressed?

MS. BARAIOLA: Sure.

MR. ROTHMAN: They are not allowed to do that. They are not allowed to bring out prior consistent statement because impeachment unless there is a claim of --

THE COURT: I'm going to allow it.

MR. ROTHMAN: It's wrong, judge. It's 100 percent wrong. It's a prior consistent statement --

THE COURT: After impeachment on prior inconsistencies.

MR. ROTHMAN: It doesn't matter. With all due respect, check before you agree to do that.

THE COURT: Give me a moment.

Anything you want to add?

MS. BASHFORD: You said this didn't happen on earlier occasions. She did say a year and a half later on the telephone with no documentation.

Your Honor, I think we are allowed to bring out on earlier occasions prior to that she had, in fact, said

that.

THE COURT: Give me a second.

(Whereupon, there was a brief pause in the record.)

THE COURT: It's for rehabilitation. I am going to permit them to ask the questions but it has to be consistent statements based on the alleged inconsistencies brought out. Nothing else.

I'm just looking at something I pulled up, where prior inconsistent statement has been admitted into evidence, a prior consistent statement may thereafter be admitted into evidence to rehabilitate the witness.

And a prior consistent statement may also, in addition to not in place of, may also be admitted to rebut a claim of recent fabrication. There are two different things.

MR. ROTHMAN: Every prior inconsistent statement does not give rise to prior consistent statement. It's just credibility impeachment, judge.

THE COURT: They can rehabilitate.

(open court)

THE COURT: All right, ladies and gentlemen, I'm reversing my ruling that the objection is sustained. The objection is overruled which means the question stands and I will permit the answer.

Actually, we cut you off I think. Why don't you say the question again.

MS. BARAIOLA: Okay, Your Honor.

Q. So, Ms. Risdal, after you left Room 4906, you exited the hotel and you went to a police van?

A. Yes, I went straight across the street to the police van.

Q. Did you tell an officer in that van what happened to you?

A. Yes, I did.

Q. Did you tell that officer whether or not anything had been inserted into your vagina or anus?

A. I know I think I said I had been raped and I almost died and a guy tried to kill me.

MR. ROTHMAN: Objection. It's not responsive. I move to strike it.

THE COURT: Yes, I ask that be stricken. The objection is sustained.

Did you hear that question? If you can, respond only to that question. Did you tell the officer what was asked?

If you don't remember, maybe they can refresh your recollection.

A. Can you refresh?

Q. You don't remember?

A. Just, yeah, can you refresh?
Q. Okay.
When you went to the hospital --
A. Yes.
Q. -- after you left Room 4906 --
A. Yes.
Q. -- did you tell the doctors what had happened to?
A. I did tell the doctor at the hospital, yes.
Q. Did you tell the doctors at the hospital whether or not the defendant had inserted anything into your anus or vagina?
A. Yes, I did.
Q. What did you tell them?
A. I told him that he had put fingers in both my vagina and my anal.
Q. A few days after this incident --
A. Yes.
Q. -- on or about June 24, 2016, did you testify in the grand jury?
A. Yes, I did.
Q. Is that here in Manhattan?
A. Yes, it was.
Q. Did you take an oath to tell the truth before you testified?
A. Yes, I did.

Q. Did you agree to take that oath?

A. Yes.

Q. To tell the truth?

A. Yes, I was telling the truth, yes.

Q. Did you tell the grand jury whether or not the defendant had inserted anything into your anus or vagina?

A. Yes, I did.

Q. What did you tell them?

A. The same thing as I told the doctor, that he had put fingers in both my vagina and in my anal.

Q. Did you also speak to Detective Christopher Jones on June 16, 2016?

A. Yes, the same morning after this happened I did give a testimonial to Detective Jones.

Q. Did you tell Detective Jones whether or not the defendant had inserted anything into your anus or vagina?

A. Yes, I did.

Q. What did you tell him?

A. The same thing that happened. He put fingers in my vagina and in my anal.

MS. BARAIOLA: I have no further questions.

THE COURT: Anything on cross based on that redirect?

MR. ROTHMAN: Yes.

RECROSS EXAMINATION

BY MR. ROTHMAN:

Q. Do you recall when you were at the bar with Mr. Tripathy one incident where he pulled you close and you guys were, there was no space between you? Do you remember anything like that?

A. I think so, yeah.

Q. Do you remember at that point you hiking up your skirt or your dress and giving him access to your vagina with his finger?

A. No.

MR. ROTHMAN: Okay. Nothing else.

THE COURT: Any additional questions?

MS. BARAIOLA: Nothing, Your Honor.

THE COURT: Thank you for your time. You're free to leave.

THE WITNESS: Thank you so much.

(Whereupon, the witness exits the courtroom.)

THE COURT: Okay. People, do you have another witness?

MS. BARAIOLA: The People call Denrick Cooper.

THE COURT: Okay.

MS. BARAIOLA: Your Honor, before we get started I wanted to put in the stipulation.

THE COURT: Okay. Yes.

BARAIOLA: Ladies and gentlemen, I'm holding in