MS. BARAIOLA: Objection.

THE COURT: Sustained.

Q. But you said you were willing to try it, to try what?

MS. BARAIOLA: Objection.

THE COURT: Sustained.

Q. I'm sorry, you just said you were willing to try it?

THE COURT: Jurors, I had sustained the objection meaning I'm going to ask you now to disregard that response.

Q. That night you believed that you should be paid for your time with Sam; correct?

A. I tried to make a suggestion in the e-mail, yes.

Q. But what drove you to make that suggestion is you believe that when you go out on a date you should be paid for it; right?

MS. BARAIOLA: Objection.

THE COURT: With Sam?

MR. ROTHMAN: Correct.

THE COURT: Only with Sam.

A. Yes, I was willing to try, yes.

Q. Okay.

And you believe that night if you were on a date for several hours, for example, six Hours or so that you should get between 3 and $400 for that date; correct?

A. Yeah.

Q. Just for going to dinner with somebody or having a drink, you believe if you are spending several hours with Sam, let's just talk about Sam, you are entitled to compensation?

A. Yes, I was willing to try it as I said, yes.

Q. Okay.

THE COURT: I need a sidebar please.

(sidebar)

[]

(open court)

Q. You said that you were willing to try it meaning compensation for your time spent on a date, money for date; correct?

A. Yes.

Q. And when you say, I was willing to try it, are you suggesting that you had never done that before, sought compensation for a date for your time?

A. I don't remember if I tried it before.

Q. You believe Sam was the first person you sought compensation from in exchange for your time?

MS. BARAIOLA: Objection.

THE COURT: Overruled.

A. You asked if he is the only one, if I believe he was the only one?

Q. Yes.

A. As I said, I don't remember if I sent a similar

e-mail or not so.

Q. You have no recollection whether or not prior to Sam you ever asked anyone else to pay you for your time on a date with them?

Is that what you are saying?

A. Exactly.

Q. When was the first time you saw the videotape from the bar?

A. That was on Thursday evening, this Thursday evening. The evening before I was here on Friday morning. So that was the 17th or 18th I believe.

Q. So maybe in two years you have not seen the video from you and Sam at the bar that night?

A. No, I have not.

Q. And you were asked by Ms. Baraiola, in your meetings with her, about the nature of what happened at the bar. Do you remember that? The relationship at the bar.

A. Yes, she asked me that.

Q. She asked you what it was like, how physical was it, was there a lot of kissing going on, things like that; right?

A. On Friday, yes.

Q. I'm talking about in your meetings with her before you testified.

A. I don't know if we actually particularly was -- she was more asking what were you guys talking about.

Q. Did you tell Ms. Baraiola in your meetings or whenever you spoke to her prior to testifying, there was just a little bit of kissing at the bar but no making out? Do you remember telling her that?

A. I might have.

Q. That's not the truth; right?

A. We were definitely kissing at the bar, yes.

Q. Well, you were there for roughly two hours at the bar?

A. Roughly, yeah.

Q. Roughly 120 minutes; right?

A. Would I say maybe around that, yeah.

Q. Do you think you guys kissed or he kissed your ear or you kissed his ear more or less than 25 to 30 times in those two hours? Any idea?

MS. BARAIOLA: Objection as to form.

THE COURT: Overruled. I will allow it if you understand the question.

A. Kissing the ear you are asking?

Q. Yeah. Either he is kissing your ear, you are kissing his ear, you're on each other's necks. How many times do you think that happened in the two hours you were at the bar?

A. I'm not sure.

Q. More or less than 25 times?

A. I would guess less.

Q. Again, I don't want you to guess. If you don't remember.

A. Yeah, I would obviously not know the exact number of times.

Q. But you also told Ms. Baraiola that you guys never made out at the bar; right?

A. I don't remember particularly saying that but I did tell her we were kissing at the bar.

Q. You specifically said it was light kissing, not making out, there was no making out at the bar? You know what making out is; right?

A. Yes.

Q. Making out is more than just contact between the lips. It's a prolonged or sustained kiss maybe 5, 10, 15 seconds; right?

MS. BARAIOLA: Objection.

THE COURT: Well, that could be your definition of it. Let's use that as a proposed definition.

Q. Is that fair to say that is what making out is? 5, 10, 15 second kiss, something like that.

A. To me making out and kissing is almost the same way but kissing is kissing. It depends.

Q. What is the difference between kissing and making out if there is one?

A. Well, in your opinion making out is longer, from what

I understand, than just a kiss.

Q. Not in your opinion, in my opinion?

A. That's what you said.

Q. What is your opinion of making out, if you have one?

A. Kissing being more affectionate I would say.

Q. There was a lot of that at the bar; right? A lot of that affectionate kissing; correct?

A. We were definitely kissing at the bar, yes.

Q. There were times you guys had your arms around each other interlocked at the lips for a while; correct?

A. Yes, I believe so.

MR. ROTHMAN: Okay. Can we put up please 926 on the video. Thank you.

THE COURT: This is the video of the bar?

MR. ROTHMAN: Of the bar, yes.

THE COURT: Let's just get that number for the record.

MS. BARAIOLA: Number 4.

THE COURT: Thank you very much. People's 4.

MR. ROTHMAN: I think we need to take a break. It's not working for some reason.

THE COURT: Just give it a moment.

We will take a brief recess so I will send you back to the jury room and see if we can fix it.

(Whereupon, the jury exits the courtroom.)

(Whereupon, the witness exits the courtroom.)

THE COURT: I will ask the attorneys to just step up for just a moment. Can counsel step up please.

(Whereupon, there was an off-the-record discussion held at sidebar.)

(Whereupon, there was an ex parte meeting in judge's chambers.)

THE COURT: I revisited the ex parte ruling that I made at the beginning of this case, which was subsequent to what I considered the law of the case based on Judge Obus's ex parte ruling regarding prior conversations with individuals on Seeking Arrangement.com.

What I am going to do at this point is, I am not going to disclose anything yet to the defense, if at all. What I am going to do is, at this point I need to take a break. I'm sorry I know this is your cross examination but I need to be fair to both sides as far as the rape shield law and everything.

I will permit the People at this time, they will meet with their witness, even though it's on cross examination for the limited purpose of showing her some prior conversations to determine if it refreshes her recollection as to whether or not she had a conversation with Kevin regarding her seeking financial compensation for spending time with him on a date, not sex, spending

time on a date, and whether or not it refreshes her recollection as to whether or not she sought compensation with anyone else during this time period on Seeking Arrangement.com, any conversation with anyone else seeking financial compensation to spend time with them on a date. I don't believe that is prohibited by the rape shield and I still have that discretionary catch all that I think is appropriate this time to refresh her recollection.

Depending on what she says, I am most likely going to say the defense is stuck with her answer and you cannot get into whether or not she actually received compensation or followed through but it's the request or, I believe, the expression was whether she sought financial compensation for spending time with someone, which is what I would think is more in line as maybe an escort versus somebody exchanging money for sex.

So I don't believe that this portion of it based solely on her testimony on she was willing to try it indicating it may have been her first time, I think it's important to refresh her recollection and the defense will most I likely be stuck with her answer.

MR. ROTHMAN: Since on the topic for money for sex.

THE COURT: It wasn't on that topic. It was money for spending time.

MR. ROTHMAN: I want to now go to money for sex. I'm looking at those notes and apparently this witness told the people and Ms. Baraiola in particular that while it would be nice to have gotten 3 or $400 for those hours on date, perhaps, if it was more than 3 or $400 that would seem like that would be an exchange for sex to her.

THE COURT: Okay. So what are you saying, you should be able to ask her whether she said that to Ms. Baraiola?

MR. ROTHMAN: Correct.

THE COURT: No, that's not coming in.

MR. ROTHMAN: Okay.

THE COURT: What I think logistically I would provide my robbing room so they can speak to the witness only for that purpose. No other questioning, no other cross examination or preparation. Let us know when you are done. We will bring the witness from across the hall and we will all be here.

(Whereupon, there was a brief pause in the record.)

THE COURT: Let's bring our witness back in. I know I have completely ruined Mr. Rothman's cross examination flow. I apologize for that. I wanted to be clear about my previous ruling. What I am going to do is let Mr. Rothman, if you want, to ask on this particular

issue. I don't want to go past five. I rather end by a quarter to five. If you want to wait, we can do that as well.

MR. ROTHMAN: I suggest we start fresh tomorrow. I don't know what is going to come of this ruling, if there is anything to discuss, any additional cross I will have as a result of it.

THE COURT: I was going to suggest if you want to ask, I don't want to direct your cross by any means, if you want to ask her about this particular area if after reviewing certain documents if it refreshed her recollection and stay on this issue, you can finish that up.

MR. ROTHMAN: I don't know. I assume that is what they just found out, whether or not the documents refreshed her recollection.

THE COURT: I would image have you to ask the complaining witness in front of the jury. Are you proposing to do it outside of the jury's presence?

MS. BASHFORD: I'm happy to tell him what the answer is.

THE COURT: Come on up. I am interested myself. Come on up.

(Whereupon, there was an off-the-record discussion held at sidebar.)

COURT OFFICER: Witness entering.

Jury entering the courtroom. All rise.

THE COURT: All right, everybody, have a seat.

So, ladies and gentlemen, I am sorry it took me a lot longer to take care of this legal matter. I'm going to break for the day. We will start again tomorrow morning promptly at 9:30 and we will continue with the questioning of Ms. Risdal tomorrow.

So again please keep an open mind, don't discuss the case or do any legal research or checking out the site or any investigation on your own. Thank you and enjoy your evening.

COURT OFFICER: All rise.

(Whereupon, the jury exits the courtroom.)

THE COURT: Everybody have a seat. Ms. Risdal, we need you back again tomorrow at 9:30. You can follow the direction of our sergeant.

(Whereupon, the witness exits the courtroom.)

THE COURT: Okay. Anybody need to put anything on the record before we break for the day? No?

Okay 9:30 tomorrow. Thank you.

(Continued Tuesday, May 22, 2018 at 9:30 a.m.)

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 77
-----------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK : INDICTMENT NO 2720 - 2016

:

-against- :

SANJAY TRIPATHY, :
Defendant.
-----------------------------------X

100 Centre Street
New York, New York
May 22, 2018

H O N O R A B L E:

ERIKA EDWARDS, PRESIDING

Supreme Court Judge.

A P P E A R A N C E S:

FOR THE PEOPLE:

OFFICE OF THE DISTRICT ATTORNEY
NEW YORK COUNTY
ONE HOGAN PLACE
NEW YORK, NEW YORK 10013
BY: KRISTEN BARAIOLA,
MARTHA BASHFORD,
ASSISTANT DISTRICT ATTORNEYS

FOR THE DEFENDANT:

ROTHMAN, SCHNEIDER, SOLOWAY & STERN, LLP
100 LAFAYETTE STREET, SUITE 501
NEW YORK, NEW YORK 10013
BY: FRANKLIN A. ROTHMAN, ESQ.

SENIOR COURT REPORTERS
DENISE JOHNSON
MELISSA SASSO

THE COURT: All right. So Mr. Habian advised one of our officers that he is flying to London over the weekend and is taking the redeye so he would not be able to be here Tuesday but he can be back for Wednesday afternoon. If necessary, he says if he will to change it. It would cost him like over $4,000 or maybe that's how much the trip cost because that doesn't make sense on the change fee. That's what he advised us.

He would like to know sooner rather than later. That's what he said the other day. If it looks like we are going into Tuesday, since we are not sure about our witness schedule for Friday, I guess we need to maybe wait another day and see how we do with the testimony and everything.

MS. BASHFORD: This is a business trip?

THE COURT: I don't know. We could bring him in.

MS. BASHFORD: The change fee goes to his business.

THE COURT: That's harsh.

MS. BASHFORD: It is.

THE COURT: But we do need to ask. I did check my notes. I don't recall him telling us that during voir dire. Let's continue with where we are and we will take later today and see if we need to bring him in. Let's get

our witness and then we will get our jurors. Thank you.

COURT OFFICER: Witness entering.

THE COURT: Good morning.

THE WITNESS: Good morning.

COURT OFFICER: All rise. Jury entering.

THE COURT: Everybody, you can have a seat.

COURT CLERK: Case on trial continued. All parties are present. The jury is present and properly seated.

THE COURT: I want to start off with a stipulation based on a conversation we had yesterday during the examination or the cross examination of Ms. Risdal. As you may recall, there was some questioning and some responses regarding whether or not Mr. Tripathy had his actual photograph listed on his profile or you may have heard a questions about a silhouette.

The parties have stipulated that at some point after this date, so we are picking the date of something we saw, July 25, 2016, which is after the incident, that Mr. Tripathy's profile did not have the actual photograph of himself for whatever that is worth. Okay.

Please continue with cross examination when you are ready.

You are reminded you are still under oath.

THE WITNESS: Thank you.

CROSS EXAMINATION
BY MR. ROTHMAN:
Q. Ms. Risdal after court yesterday, you had an opportunity to speak to the members of the prosecution table; correct?
A. Yes.
Q. And they showed you some documents; correct?
A. Yes.
Q. And those documents helped you to refresh your recollection about something we had been talking about; right?
A. Yes.
Q. Would it be fair to say after reviewing those documents, you now remember having correspondence texts, e-mails, whatever, in 2016 with other men regarding exchanging time for money; correct?
A. Yes.
Q. You didn't remember that until you saw those documents after court yesterday?
A. Exactly.
Q. Okay. We were talking, before we got onto that, we were talking about your relationship, your physical relationship with Mr. Tripathy at the bar.
Do you remember that?
A. Yes.
Q. And whether you call it or we call it kissing or

making out or whatever, there was a lot of whatever you want to call it going on at the bar; right?

A. A lot of kissing, yes.

Q. A lot of making out too; right?

I will ask you to take a look at 9:26:52 from the bar. That's People's Exhibit 4.

MR. ROTHMAN: Thank you. Maybe we can just backup a couple of seconds please where it starts. What is the time?

THE COURT: 9:26 and 46 seconds.

(video playing)

Q. We can start from there. That's you and Sam or Sanjay at the bar; right?

A. Yes.

(video playing)

MR. ROTHMAN: Okay we can stop it there. Thank you.

Q. That wasn't the only time you had that type of interaction at the bar before you went into the room; correct?

A. Well, what else are you referring to?

MR. ROTHMAN: 10:21:12 please.

(video playing)

MR. ROTHMAN: Or 10:21:10 perhaps. Sorry.

Q. That's you and Sam, right, Sanjay?

A. Yes.

(video playing)

MR. ROTHMAN: Okay. Thank you.

Q. Would it be fair to say that when you were at the restaurant Zuma, at that point in time, you were not really sure if you were attracted to him, to Sam? Would that be fair to say?

A. Yeah, at the restaurant I was probably -- I wasn't unattracted to him but I wasn't super attracted to him yet. That probably would be safe to say, yes.

MR. ROTHMAN: My page 34.

Q. Again referring to that deposition that you gave, back in December, you remember the one I'm talking about; right?

A. Yes.

Q. You were asked these questions, questions about this very topic whether or not you were attracted to him at the restaurant? Do you remember that?

A. I don't remember that they asked that particular question, no.

Q. You do or don't?

A. I do not remember all the questions they asked. They asked so many questions.

MR. ROTHMAN: The line 20.

Q. Were you asked these questions and did you give these answers?

"QUESTION: When you say kissing, does that mean you guys were kissing or when you say kissing me, does that mean you guys were kissing?

ANSWER: Yes, we were kissing at the restaurant, yes.

QUESTION: So you were attracted to him?

ANSWER: Maybe. I wasn't sure yet, you know. I usually give people a couple of chances. I don't necessarily kiss on the first date maybe sometimes I do. We definitely kissed a couple of times, but I couldn't at this point know if, yet, if I was into him or not."

You were kind of unsure at the restaurant; right?

A. I would say so, probably, yeah.

Q. After the restaurant, you took an Uber; correct?

A. Yes.

Q. And you went to the hotel?

A. Yes.

Q. You didn't suddenly become attracted to him in the Uber; right?

A. I don't know when I became more attracted to him.

Q. Well, you went to his hotel and dropped off his bag in his room; right?

A. Yes.

Q. There was no kissing going on in the room then; right?

A. I don't think so because he was in the corner and

doing something with his bag and I was on my phone while he was doing that so I don't think so.

Q. There is no kissing in the room?

A. I don't think so, not that I remember.

Q. Okay. After you left his room, you guys then went to the ATM together; correct?

A. Yes.

Q. And after the ATM, you went back to the W; right?

A. Yes.

Q. At the W before you got to that bar, you were at another little area with the flashing lights.

Do you remember that?

A. Yes.

Q. Is that when you became attracted to him in that area?

A. I was getting it, it was slowly progressing throughout the night, yes.

Q. At the restaurant, you weren't sure; right?

A. Right.

Q. In the Uber, it was 15 minutes of talking; right?

A. Yes.

Q. In the room, it was no kissing; right?

A. I believe so, yes.

Q. You then go to the ATM together; right?

A. Yes.

Q. And then you end up at this club area by yourselves; correct?
A. Only for a little while.
Q. A few minutes?
A. Yes.
MR. ROTHMAN: Can we queue up 8:19:51 please or 8:19:45 maybe please. So we will start 8:19:34 of People's Exhibit 4. Thank you.
(video playing)
Q. So that's the club area; right?
A. Yes, it's the same area. It's the same as the bar just in the back of the bar.
Q. Right. It's not the bar. It's a separate area; right?
A. Yeah, but.
Q. That's where you went first. That's you two coming in now just a few moments later; right?
A. Correct.
Q. Now you sit down. I will ask you to watch your right hand and tell me where it goes.
(video playing)
Q. Right now it appears to be holding his hand, his left hand; right?
A. I think so, yes.
Q. Keep watching please and tell me what you are doing

with your right hand. Not now.

(video playing)

Q. Where is your right hand right now and what is it doing?

A. Rubbing up and down on his leg.

Q. His leg or his crotch?

A. Upper leg or I guess your call it --

Q. I would call it his crotch; wouldn't you?

A. Looks like the upper thigh area to me.

Q. It's his crotch; isn't it?

A. Hard to tell.

Q. Do you remember rubbing his crotch?

A. I don't remember that, no.

Q. As you sit here now, does that refresh your recollection about you rubbing his crotch at that club before you went into the bar area?

A. It's very unclear to me if I'm rubbing the upper thigh or --

Q. Let's look at it again.

THE COURT: Sorry, Mr. Rothman, you have to let her finish the answer.

MR. ROTHMAN: I apologize.

THE COURT: It's very unclear to you?

A. Yes, it's very unclear to me to see if I'm rubbing the upper thigh area or if I'm higher up.

Q. Okay. I will ask you to take another look if you could. If we can rewind it a little bit please.

Before we roll that, if you could, if it wasn't his crotch and I don't really want to demonstrate this on myself but where are you talking about?

THE COURT: You can't could do that on anybody else but go ahead.

Q. Can you are talking about upper thigh versus crotch, where you are rubbing, where are we talking about?

THE WITNESS: Do you want me to show and demonstrate?

MR. ROTHMAN: No. No.

THE COURT: No.

THE WITNESS: On myself obviously.

THE COURT: The video speaks for itself. Jurors, you can see it. You can make your own determination.

It's not refreshing her recollection. If you want to play it again one last time?

MR. ROTHMAN: Yes, one last time.

Q. Just take a look and see if that helps you remember.

A. I'm trying to look at hard as I can.

THE COURT: Please, no in court demonstrations.

MR. ROTHMAN: Okay.

THE COURT: We see it Mr. Rothman. We see it

whatever it is.

(video playing)

MR. ROTHMAN: Okay. We can stop. Thank you.

Q. After a few minutes there no waiter or waitress came over to get you guys drinks so you decided to go to the other bar area; right?

A. Yes.

Q. So whether or not you say that's his actual crotch or an area real close to it, would you agree that it's touching him in a somewhat sexually suggestive way?

A. You know, at this point, we are having fun, and we are honestly kissing and getting into each other. I'm rubbing his upper thigh up and down.

Q. Would you agree with me it's somewhat sexually suggestive? That's all I'm asking you.

A. I'm not sure. I guess that could be viewed so many ways still.

Q. Okay.

You know what BDSM is; right?

A. Say that again.

Q. BDSM?

A. I think I know what it is.

Q. What do you think it is?

A. Well, I watched half of the movie 50 Shades of Gray and I walked out halfway through but that's kind of what I

assume it's about.

Q. That's the only thing you know about BDSM is from watching half of 50 Shades of Gray, is that what you are saying?

A. Yes.

Q. That's what your knowledge is limited to half the movie?

A. Yes.

Q. When you guys were together, when you and Mr. Tripathy were together, you never saw him use cash to pay for anything; correct?

A. No, I don't think so.

Q. Zuma, credit card; right?

A. I believe so, yes.

Q. Uber, credit card; right?

A. Well, that I think is already prepaid on the app.

Q. Through a credit card. He never took money out to pay the Uber driver; correct?

A. No.

Q. You don't do that; right?

A. Yes, it's already paid on the app.

Q. The two hours you were drinking at the bar with him also credit card; correct?

A. Yeah, I think so.

Q. I'm sorry go ahead.