MS. BARAIOLA: Yes, Your Honor.

THE COURT: Opposing it?

MS. BARAIOLA: Correct.

THE COURT: The application is denied.

Can we go straight to summation, I have my brief charge I have to say prior to summations, or do you need a few moments?

MR. ROTHMAN: Five.

THE COURT: Five minutes? Okay, take a five minute break everybody.

(Whereupon, there was a brief pause in the record.)

THE COURT: Let's bring in the jurors, please.

COURT OFFICER: All rise. Jury entering.

THE COURT: Everyone, have a seat please.

All right, ladies and gentlemen, welcome back. We are about to begin the summations from the parties. I just need to give you a brief instruction. Under our law, defense counsel must go first and then the prosecutor must follow and then the lawyers may not speak to you after that. They won't be able to address you with their arguments.

Summations give each attorney an opportunity to review the evidence presented and submit for your consideration the facts, inferences and conclusions that

they contend may be properly drawn from the evidence presented. If you find that a lawyer has accurately summarized and analyzed the evidence and if you find that the inferences and conclusions the lawyer asks you to draw from that evidence are reasonable, logical and consistent with the evidence, then you may adopt those inferences and conclusions.

But, I do need you to bear in mind the following points: First, you are the finders of fact and it is for you and you alone to determine the facts based on the evidence that you find to be true and accurate. Thus, you should consider and always remember that whatever the lawyers say and however they say it is simply an argument submitted for your consideration. Whether to find the fact or draw the inference or conclusion set forth by the lawyers is completely up to you and will depend on your analysis of the evidence.

Second, please remember that the lawyers are not witnesses in this case. So, if a lawyer asserts as fact something that is not based on the evidence, then you must disregard it. Remember nothing the lawyers say at any time is evidence, including what they say during their summations. You have heard all of the evidence in this case. So, it's up to you to decide this case based solely on the evidence as you find it and also based on the law

as I will explain to you after the summations.

Third, during the summation one lawyer's recollection of the evidence may be, in good faith, different from the recollection of the other lawyer or even from your own recollection. The lawyers will undoubtedly differ with each other on the conclusions to be drawn from the evidence. However, it is your recollection, your understanding, your evaluation of the evidence that controls regardless of what the lawyers have said or will say about the evidence.

Again, you are the judges of the facts in this case. So, during your deliberations, if you need to have your recollection regarding the testimony refreshed, all you have to do is ask us. I will tell you how to do that at the end of the case.

Fourth, remember, under our law, I am responsible for explaining the law to you not the attorneys. The lawyers have been advised of the substance of my legal instructions that I will deliver to you at the end of this case and the lawyers are permitted to briefly refer to portions of those instructions in their summations if they would like to do so, so that's fine.

But, even if the attorneys refer to parts of my instructions, you do have to still listen to it the way I'm going to read them to you and that, again, happens

after the summation. If there is any difference between what the lawyers say and what I instruct you on the law, of course, you have to go with me on that one.

Fifth, if during the summation I sustain an objection to a comment made by an attorney, that comment will be stricken from the record and you need to disregard it. If I overrule it, that means the comment stands. Whether I sustain or overrule an objection or even object on my own, that does not mean that I have any opinion about the case. It just means that I don't think it was legally proper, either based on the facts or the law, for the attorney to make that statement.

So, again, it's your opinion about the evidence and the facts of the case that matters. All right, let's turn to the summations.

Mr. Rothman.

MR. ROTHMAN: Good morning, everyone. It's almost over. Okay.

Mette Risdal is incapable or unwilling to tell the truth. I don't mean just with respect to whether or not this was sex for money. I mean about the whole thing. She lied from the very beginning. This is her testimony. You can have it read back.

You don't need to go word for word, it's there, but what she said in sum and substance was, I remember his

profile page and what attracted me to him was he was Indian and I had a thing for Indian guys and I wanted to date an Indian. I said, you mean it had nothing to do with the ten million dollars that he said he was worth? No, she didn't remember that. That's the beginning of this relationship according to her. She wanted to go out with an Indian guy.

So, we put up his profile page and said, tell us where it says he is Indian. She said, well, Asian. Well, Asian doesn't mean Indian. You said he put up Indian. Well, she admitted Asian means to her either Chinese or Japanese. This table tried to get him to say yesterday that Asian in Europe would refer to Indian and he said no but Mette said no. She said, no. She said Asian means Chinese or Japanese.

So, she had to fix it again and she said his picture was up there. I showed her his profile. That's the Indian guy that you are attracted to? No, there was a picture up there. Then you heard this table say, well, the stipulation says that as of July 25th, a month later, that's the picture that was up there. The suggestion was, not so subtly, that there had been a picture up but he took it down. That's how they are trying to fix this mess because there never was a picture.

Don't rely on me. Rely on the correspondence.

After he says, let's meet for a drink and she says, well, basically, how much are you going to pay me, he says, I'm flexible. Let's see where it goes. We will figure it out. Remember, she says, I saw his picture on the profile page. That's why she was attracted to him. But, here it is, I'm flexible. It will depend on how we get along. If we are into each other, it shouldn't be a problem.

Look what she says after that. Sounds good. Do you want to e-mail or text me a picture or do you prefer not to? Why in the world would she say that if she had his picture? She never did. What it all suggests and what it points to is -- it's not like I have this stuff and they don't. They know it's there. They have the materials but they let this witness try to pull the wool over your eyes by saying there was a picture. Well, it's not there. He must have taken it down. They have the text. They know it's not true.

Look, when you are on a website and you suggest that this is about romance, this is about a long-term relationship potentially and you put up this picture, which is not Mette Risdal never was Mette Risdal, you put that up, you lie about your age, you lie about who you are, and you immediately in response to, hey, let's get together for a drink, you say, how much are you going to pay me, that's not the foundation for a relationship.

That's not what this is about. This was a financial proposition. Period.

What it tells you, what it tells you about Mette Risdal is she is so willing to lie under oath. It comes naturally to her. You saw her with this stuff, with this picture nonsense. She doesn't think twice about taking an oath and lying.

The judge is going to tell you in her instruction, if you find a witness has lied about a material fact, it's your prerogative to disregard all of that testimony. You don't have to, but it's your prerogative, and the judge will tell you that. Keep that in mind when you are evaluating the testimony.

More lies from Mette Risdal. She says with Kevin, this other guy that she was going to meet with when she was with Sanjay, I asked her, did you ask him, did you have a financial arrangement with him too? Well, I don't remember. Well, what about other guys, did you have any financial arrangements with them? It was late in the day. It was the end of the day. She said, I don't remember. I don't remember if I did. Then we broke for the day, we came back the next day and she was asked, well, now that you're had a chance to review some paperwork with the prosecution, did that refresh your recollection? Yes. Yes. In 2016, I was corresponding, e-mailing and texting

other men about dates for money. Do you really think she didn't remember that when she saw --

MS. BARAIOLA: Objection as to dates for money.

THE COURT: Again, it's your recollection that controls. What the lawyers are saying is just argument.

MR. ROTHMAN: Okay. Exchange money for time, whatever you want to call it. Do you think she really didn't remember that, that she was doing that in 2016? She said, here you go,

"You believe that you're entitled to be compensated for your time on; right?"

Here you go,

"ANSWER: I was willing to try it.

QUESTION: And when you say, I was willing to try it, does that suggest that you had never done that before?

ANSWER: I don't remember if I tried it before."

That's just a lie. She knows she did. She swore to tell the truth at a deposition several months ago. She committed perjury at the deposition. The questions were clear.

Ma'am -- that wasn't me. It was another lawyer asking the questions over the phone. Sworn with the same oath she took here.

Ma'am, did you ever e-mail Mr. Tripathy or text

him anything about money?

The answer in the deposition was, no.

We know that's not true and she knows it's not true. So, when she is confronted under oath, she says we never agreed upon a price. She wasn't asked about a price. She was asked if there was ever any correspondence about money and she denied it.

Another example of her lying, just willing to lie willy nilly. She is at the deposition, remember she said she had not seen the video, she had not seen the video from the bar or the club area before the bar, and she was asked at the deposition, At any time did you touch him sexually, in a suggestive way? For example, did you rub his crotch? She said under oath, no. Then you show her the video here, because she had not seen it at the time of the deposition, and you clearly -- no matter what she wants to say, well, it's not his crotch. It's his upper leg. She is rubbing his crotch.

She testified that when she was at the restaurant with him, they did a little kissing. She was asked if she was attracted to him at this point. She said, I wasn't really sure. That was prior testimony. She wasn't sure if she was attracted to him or not at that point in the restaurant. So, think about it.

They leave the restaurant. 20 minutes later, a

half hour later, they are in the club and she is rubbing his crotch. Obviously, she has to be attracted to him to do that. So, what has happened? What is the only thing that has happened between Zuma Restaurant, when she is not sure if she is attracted, and the club at The W, where she is pretty darn attracted? The only thing that has happened is they went to the ATM together to get her money. There is attraction.

Her friend testified. Her friend testified that, yeah, I got a call from Mette, my good friend, and she said, wow, this guy has been gone 15, 20 minutes. I don't know what to do because, as she put it, she is a woman of integrity and she didn't want to just leave. So, 15 to 20 minutes, she doesn't know what to do. Then you see the video and she is on the phone three minutes after he left. She is on the phone with her friend Mr. Palmer.

Mr. Palmer didn't know what is going on. He doesn't know what is going on with Mette Risdal I asked him, I said, would you be surprised to learn that she has two phones, one for dating, and he was like, yeah, I would be shocked.

People lead double lives. He is not the only one. Listen, I'm not here to evaluate Mette Risdal as a person. I'm not here to judge her as a human being. What she does for money, how she lives her life, is really none

of my business. I couldn't careless. I am here and you are here to evaluate her as a credible witness. Period.

She tells you she is honest. She tells you she has integrity. She wants you to believe her, but there is every reason in the world to know that she is lying. You have seen the video. You have seen the texts. You have seen everything. It's indisputable that she is a liar. She wants to present herself as some type of CEO, land investments, a successful business person. You don't hustle 300 bucks for dates if you are a successful business person, you just don't do it.

It's really kind of sad. It's sad and pathetic, I have to say. Both of them, both situations are sad and pathetic. You know, she wants to portray herself as a jet setter, successful corporate executive, when she is essentially, essentially an escort.

He wants to present himself as a happily married guy and hardworking. I mean, his story is pretty damn sad too. Hardworking, college educated, Harvard, wife, kids, making a lot of money, never been in trouble with the law in his life. It seems like everything is good, but he is cheating on his wife. He is cheating on his wife.

But what makes it sad is not just that he is cheating on his wife but the phrase that he used. He is looking for the GFE, looking for the girlfriend

experience. The guy does great work in the community, charitable organizations, does all kinds of good stuff, but he is looking for the GFE. That's why it says no escorts please. I don't want street walkers.

He pretends it's a date. He pretends that it's some type of one-night love affair. That's what he thought he was headed to. He doesn't want street walkers.

You know, there is this code, right. There is this code on these websites. Like when he says no escorts please, he doesn't want straight up prostitutes. Just like when Mette puts on her website or her profile page, I will take care of you in every way, it's code. It doesn't mean I will make you dinner and rub your back. I will take care of you in every way is a signal.

They are both acting as if this is something other than what it really is, but down deep they both know the truth. They both know what this is. Let's talk about the truth, okay.

This table is more concerned with proving a case than getting to the truth.

MS. BARAIOLA: Objection.

THE COURT: Again, it's just argument. Overruled.

MR. ROTHMAN: Do you want to prove a case or do you want the truth to come out of the witness stand?

Devora Goldberg, the woman who works at the OCME, she told you, hands down, his semen was on her neck. Absolutely never in dispute. Here is where the truth is trying to be buried. Ms. Goldberg says, this test that you do is presumptive for saliva. That is correct. The reason it's so important is because there is saliva on his penis. So, we know she performed oral sex on him. That they are willing to accept because that furthers their proof.

Amylase. The other screening test we do is for amylase. Amylase is found in large quantities of saliva. We screen for saliva. You mentioned there was amylase present on the vulva swab of Mette Risdal. That's correct. Just reminding the members of the jury, amylase is found in large quantities. We use the test as screening for the potential presence of saliva.

It's good enough to show saliva on his penis but they don't want to accept there is saliva on her vulva. Why? Because Mette Risdal never told anybody that he went down on her. He said it and the science backs it up. But it doesn't fit their proof, so the truth get the buried.

They try to suggest, they try to suggest, well, yes, isn't there amylase also found in the vaginal secretion? Yes, but Ms. Goldberg says that's not the test we do. It's not a presumptive test for vaginal secretion.

It is a presumptive test for amylase found in saliva, in saliva, large quantities but it don't fit their script so they try to tweak it.

More attempts to hide the truth. Dr. Cooper, Denrick Cooper, guy is as straight -- straight shooter as they come, the doctor who examined Mette. Unimpeachable, Princeton educated. He is the real deal. He says, these slaps, I can't say. But if someone hit another human being in the face 20 to 25 or 30 times with a fist, I would expect to see a lot of damage. I would expect to see broken bones, a bunch of lacerations. I would expect to see a lot.

We will get to what they did see, but they didn't see a lot. The injury to the cheek consistent with a slap. The injury to the eye consistent with a slap. What's trauma? You see, it's there in black and white. You see the finger marks above the eye that is red, that has the subconjunctive hemorrhage. You see it there and he says it's from trauma. He can't tell if it's a fist or slap, but you see finger marks outlined above so you know he hit her here. You know that happened.

In his chart, he never once used the term "petechiae" which he said is a term that is used with strangulation. He never used that word. He used erythema, reddening of the skin. Ecchymosis. He never

used petechiae. But petechiae can be caused from trauma as well. Sometimes you will see petechiae outlined like fingers like we saw. Sometimes you will see a broad -- and I asked him, Would you see the marks on the cheek, that defused pattern, could that come from a palm? Absolutely. Not definitive, but absolutely possible.

Then he talked about her neck. Her neck is bruised. 100 percent the neck is bruised. But that is all it is. I don't mean to minimize that. It is bruised. Other than that, there is no injury there. He told you the hyoid bond, the bone in the neck, is very easy to damage. That is one of their concerns when there is strangulation. They test to see if somebody is breathing okay. They test to see if somebody can speak okay, can they drink water.

He said everything was fine. He made a note in the chart non tender. Non tender means it doesn't hurt when you touch it. It is supple. Nothing is out of the ordinary. They never even went to step two, as he put it, where they put a scope down the throat and look because it wasn't necessary. Full range motion. It's not tender to the touch. Yes, it has some bruises. Yes, fair-skin people, as he said, can bruise more easily on the neck, on the leg.

Let's talk about the leg, because he said

something that is consistent with the amylase on her vulva from him going down on Ms. Risdal. It's consistent. Look at the finger marks on her left leg. The finger marks on her left leg are consistent with the pinky closest towards the knee and larger fingers up closer towards the crotch because when he is down there doing what he is doing, he is pushing and as he said -- they tried to get him to say, well, isn't it a fact that you pried her legs open? He told you, the only time her legs closed -- I got to be graphic -- is when I was fingering her and she was coming and she started to close her legs around my head and I pushed them open again.

This is more about them trying to hide the truth. You saw that hand. You saw that right hand red and inflamed. It can't be denied. The doctor said that hand is inflamed consistent with smacks. 100 percent. You don't have to be a doctor to know it. You see a red palm, yes, it's consistent with smacking.

Key portion in the testimony is when they questioned the doctor and tried to fix that problem. Doctor, you don't know what that person's skin tone is all the time; do you? They used the word "baseline". You don't know what the baseline color is? Before they could even finish it the doctor said, no, I don't but that's a red palm. That's them trying to knock off what their

witnesses are saying. The truth. I don't know the baseline of his hand but that's an inflamed hand. I know it when I see it. I'm a medical doctor.

They want punches. They want punches and they are not getting punches. They tried something else with the doctor. Well, doctor, the palm is red but let me show you the backs of the hands. It has the two 1/8 of an inch cut, the size of the tip of a pen. They put those up there and they say, Doctor, the cuts on the back of the hand, are those consistent with smacks? He says, Yeah, you mean backhands, yeah. That's their witness. It's their witness. That's what he said, I was smacking her.

Dr. Cooper said one of the tests they do is they look or one of the exams they do is they look to see if there is lacerations, bruises, tears, any signs of trauma, inflammation, when there is a claim of forcible penetration to the vagina, to the anus, they want to check to see it. It's Dr. Cooper's testimony. It's on the form. They do it for a reason.

When I asked him, what were the findings, as a medical doctor, that you found that were consistent with forced penetration to the anus or the vagina and he said none. None because there is no forced penetration. It was consensual. Their own doctor said there is no signs of forcible penetration.

What do they do in an attempt to get the truth -- because we are not looking for the truth, we have to prove a case -- they try to impeach or make you second guess Dr. Cooper with Michelle McCullaugh. Now, nice enough lady. No argument with her. She has a bachelor's degree in biology and then took a three-day test in how to do the kit or take the kit whatever it was. That's her expertise.

They ask her. She says, I don't think you see trauma to the anus. You don't see trauma to the anus because it expands and a vagina expands. Yeah, okay. With all due respect to her, she is not a doctor. She is not a medical doctor. Her expertise is in these kits not making medical diagnosis. She was qualified as an expert in doing these kits not in diagnosing injuries. Dr. Cooper hurts them so they don't just accept it and move on, they try to have you second guess him with somebody who really shouldn't be second guessing the doctor.

You want some more attempts to distort the truth? How about the officer with -- it's not a blue bling dress. Apparently, it is a black or gray bling dress. But, the officer with the dress, they allowed you, they allowed you to leave with the impression or have the impression that the dress, that the zipper was busted,

right, it was broken. Oh, my God. It's consistent with being torn off or something. Mette said he ripped the dress off. The broken zipper is pretty important if that's the truth. There is no broken zipper.

It's an old dress with a tattered hem and the zipper is completely fine, operable. There is nothing wrong with the zipper, except the base of the zipper where it's sewn into the fabric is just disintegrated from age. That's all it is. It's not a broken zipper. It's irresponsible. It's inaccurate. It's deceptive to leave it out there, the zipper is busted, to leave it out there for me to clean up.

You say it's broken, the zipper is broken? Take it out of the bag. Let's try this together. The thing zips up fine, it's just not attached at the bottom because it's old. Same thing they tried to do with this thing of the missing beads. There was talk about, yeah, the dress has some beads in one patch that are missing. Okay, great.

The crime scene unit is there. The scene is preserved. Where are the beads? One officer, whoever he was, said, it was Jones, I saw some beads on the floor. Great. Where are these beads? Let's see them. How many were there? Where are you going with these beads? There is zero testimony about it. There is no proof of it,

nothing. They just leave it out there. Just like they leave out there that Mette Risdal, according to Detective Jones, had only a few hundred dollars in her purse.

Okay. That might be true. I don't know. They gave the purse back to her. They gave the purse back to her. They didn't give the big black bag -- withdrawn. They didn't voucher the money. They didn't show, they didn't take pictures, here is all the money that Mette Risdal had. They didn't do any of that. He says in the pink wallet I only remember seeing 2 or 300 dollars. She had 1,500 bucks and she had a big bag over her shoulder when she leaves the hotel. It's on the video. It's on the video. She had her big bag. They tried to suggest, you mean, she just flung it willy nilly in her bag. There's zippers, there's compartments. I don't know. They didn't take the bag. They didn't voucher the bag to prove money or no money, they just let her go with it.

He did document the red hands though. He documented Sanjay's red hands, red for a reason, red from slaps, small cuts from smacking. They are red from smacking. He believed they were significant enough to take pictures of them to show you. You saw them. You saw the right hand, palm beet red and her face smacked her, left side of her face.

Then you had Officer Poon. Officer Poon said

something, I don't know, he said it took 15 minutes for the door to open when they went up to the room. Then when I asked Sergeant Schack, he said, no, it was like five minutes at most.

No police officers ever said anything about he locked the door, he was trying to do something, it took six minutes after he opened the door. They said, we knocked on the door, he opened, he looked out a little. What do you want? Who is it? He closed it and came right out. The officers themselves said that. Nobody ever said he locked the door and for five minutes we couldn't get in.

They all said we didn't hear anything inside and then after, at most, five minutes he comes to the door, opened it a little. Who is there? What do you want? Did you have a woman here? I had a woman here earlier. And he gets arrested.

Mette knew who he was. She knew everything about him. You know that because when she left the hotel Sergeant Schack told you she had his picture on her phone whether it was LinkedIn, whatever, we know it wasn't from Seeking Arrangements because there was never a picture up there. She did her homework and she knew who she was with.

I don't know, stockings, the pantyhose, the bra.

There is a picture of it in the garbage can in the bathroom but there was testimony that one of those things was in the bedroom -- I don't know. I go by the pictures -- but then a cop says it was somewhere else when he saw it. So who moved it?

No nobody would have moved it. You are not supposed to move anything. I don't know what is going on. I don't know how that garment got from the bedroom floor when the first police officer saw it to the bathroom. I don't know. But the testimony is there and something happened, somebody moved it.

The judge is going to tell you about how you evaluate the evidence but also how you evaluate the lack of evidence. So, Ms. Risdal made up a really compelling story here on the stand. She said to get sympathy I said I was a single parent and I had to get home to my babysitter. Please try to follow me on this. I had to get home to my babysitter because I was afraid she was going to leave. She is a college student, whatever that story was, so I texted her.

I made up a phone number. I made up a number. That person does not exist and that phone number doesn't exist. Okay. You have seen this table submit record after record, phone calls, phone calls, phone calls, his records, her records, Palmer's records, everybody's

records. Everybody's records are in evidence.

Where are the records, where is the subscriber information for this phantom person that was texted? Whose phone is that? Why aren't they bringing you that information? It's supposed to be a phantom person. Where is the subscriber to that number if it exits? If it doesn't exist, if it is not assigned to anybody, bring in somebody from the phone company, yeah, that phone number doesn't belong to anybody. That would backup her story. But they don't do that.

If it belongs to Mr. X, let's bring in Mr. X or Mrs. X. Mr. X, do you know somebody named Mette Risdal? I have no idea. Did you get this text? I did. I don't know who it came from. I ignored it. There is some support for the story, but they don't do it. You don't want to bring somebody in? Okay.

Subpoena those phone records. Subpoena the records for this phantom number. Subpoena the records from Mette's both phones, the dating phone and the personal or business, whatever, business is dating so it's a personal phone. Why not? Why not get those phone records and show you 12 people that have to decide this case, listen, here is the proof that phone number that she says she made up has not appeared in her call history for months. That was the only time.

Just take a random sample. Take a month, take two months, take three month. If that number is in her call history before that day, you got more proof that she is making up that story. If it's a made up number, there is no reason she would ever call it or text it. If it's not in her call history for some period of time, that is pretty damn significant too.

Let's get it, let's get it and put there before you, but they don't. I asked Ms. Risdal. They have, this table has both of your phone numbers; right? Right. Not me. They have it. It is such a potentially huge piece of evidence in this case. It could corroborate her story, I never called that number before, or it could blow it out of the water completely.

Wait, you said you made it up. Why did you have a six minute call with that number three weeks earlier? But it's not here. They don't put it in front of you. Ask yourselves why. They have the power. They have the ability to do this and they didn't.

They don't because they are really banking on one thing. They are banking on those pictures, and those pictures are brutal. The pictures are hard to look at, and you looked at them. Every day of this trial they put up pictures because that's what they are banking on to take this case home, those pictures.

Speaking of banking, okay, why in the world would this guy, with an American Express Black card, you see him charging everything that night on his credit cards. Uber is paid for on a credit card. Zuma is paid for on a credit card. Drinks paid for on his credit card. Why in God's name does he need to go to an ATM twice to get $500 each time? Why? Who is the only person in this picture that is not taking a credit card? I mean, it's almost a rhetorical question. For what reason?

But more importantly, he has the proof. Aside from the videos -- you see the videos of them at the bank. You have everything you need to know. He needed $1,000 for some reason in the middle of a date with this woman. It got so bad that you see him at the bar and you see him on the phone. You have his phone records.

He is calling Bank of America. He is calling Bank of America because he has a $500 limit from the ATM but that's not enough because Mette wants more. Yes, he could have gone to his safe. He hold you, look, it's a negotiating tactic. I say I don't have the money. I have to get it from the ATM. I don't want her to know I can just get whatever. If I go to the safe, then she will want more and more and more.

So, at that point, he had given her $500. She saw me go to the ATM. Then we are in the middle of a

date, then I need some more money. I don't know if I can get it. Well, then you need to call your bank. Then you see that exchange at the bar where he has called Bank of America and he is getting ready to leave. He is not getting ready to go to the men's room. He is not getting ready to go to the men's room.

He tells the bartender, you see it on film, listen, I will be gone, he points to her, the bartender points to her, yes, he gives him the thumbs up, whatever she drinks put it on my tab. Then you see this kiss goodbye, come back, whispers in the ear. Who does that if somebody is going to urinate? It just doesn't make sense.

Go to the bank. The more you get the better time we will have. That's what he said happened. And it has the ring of truth because you see he is calling the bank to get more money. That's what they want you to put your faith in Mette Risdal.

She was assaulted badly. She was beaten up. She was assaulted. She was brutalized. There is no excuse for it.

His words make that clear. He said no human being should ever do that to another human being. That's the God's honest truth. She is the victim here. She is the victim of an assault. There is no denying that here.

It is easy to sympathize. It is easy to feel

outrage. It's easy to be angry at him for doing that to her. 100 percent.

I told you at the beginning, I would never, never ever suggest to you that because he paid for drinks and because he paid for dinner that he was entitled to take what he wanted. There was a lot of that on jury selection. That is not what this case is about. She did a victim.

This is not a referendum on violence against women. This is not about making him pay for every schmuck in the newspaper that has done the things we read about. This is not the guy to pay for those things. It's easy to want to put that on him.

The guys in the newspaper that take what they want because they are rich and powerful, that's not this case. This case started as a consensual BDSM relationship with smacking, with breath play, cash. That's what this case was.

Then it turned into something really ugly. Really ugly by both of them. He described it as an extortion attempt. Well, did you think of going to the police? Officer, I was just with a hooker and she is trying to take more money. Come on, really?

She went into the bathroom, she came out and she said, Look at my face. Look what you did. I can't work

for a couple of days. I can't go on dates for a couple of days. You owe me money. You have to pay more.

What do you mean? We had a deal. We had a deal. I gave you $1,500. We had a deal. Yeah, but you have to pay more. I can't work.

So, she flips and says I will ruin you. I know who you are. She has seen his license, we saw that. Why is she looking at his license? She was looking at his license because she is about to get into some pretty significant BDSM activity and she wanted to make sure who she was with.

I know you tell me you are Sam, you are Sanjay. I want to see a license. I want to see proof. I want to see a photo. Show me something. You see him take out his wallet to prove, I'm a real person. I exist. This is me.

You have to be safe. When you are doing this stuff, you can't be too safe. You do safe words. She tried to -- at first when I asked her, Do you know what a safe word is? Yeah, I do. What is a safe word? Then she backs off of it. She says, it's a word you use when you are having sex and you want to be safe.

Come on, what is a safe word? She wouldn't admit it. She wouldn't admit it because she said the only thing I know about BDSM I learned from watching half of 50 Shades of Gray. Okay. That's a joke. That's a joke.

She knows what a safe word is. She knows what oxygen play is. She knows what urine play is. Water sports. Face smacking.

She knows that stuff, but she can't come in here and admit it, just like she can't come in here and admit that this was all about money. Give me money or I'm going to the cops. They are right. Ms. Bashford is right. How can beating somebody up make that okay? How did you think it was going to fix your problem?

Of course not. Of course not. He is an idiot. Instead of just giving the woman a thousand bucks, here is your money, get the hell out of here, it's over, we are never here, we never get to do this. He is not in court two years later with a judge and prosecutors. This is not happening because she has her grand, she can go back to work in two or three days and it's over. But he F'ed up. He went off. He lost his shit. Excuse me.

THE COURT: Mr. Rothman.

MR. ROTHMAN: Excuse me. I lost my.

I will ruin you if you don't pay me. He said, in hindsight, damn, I wish I would have given her the grand, but he can't go back. He can't do it over. He can't fix it.

This is a case of assault. This is an assault. They bring the charges. He doesn't bring any charges.

The assault that they brought to you through the indictment, the count in the indictment that charges assault is just wrong. Had this been a straight assault count, intend to hit somebody, hit somebody, injury, if this was a straight assault count, there is nothing to talk about. It's over. He is guilty of assault.

They charged him with assault in furtherance of a sex crime, the strangulation, the forcible oral sex, the forcible penetration. The assault that he committed on her, to be guilty, has to be to get the sex. That's not what happened here. He is charged with the wrong crime.

The judge is going to tell you the elements of these crimes and you have to follow each element and see if they have proven it beyond a reasonable doubt, each element. This jury, you guys, cannot consider straight assault. That's not for you to consider. It's not one of the charges. That's not for you guys to consider.

There is an urge. I know you have an urge, you have to have an urge to want to make him pay for this. Those pictures, those injuries, her black eyes, her trauma, everything that happened to her, her tears, everything that happened to Mette Risdal you have an urge to make him pay for it. It's natural. I get it. But it's just the wrong thing to do because the facts of the case don't fit the crimes that are charged.

There is no forced sex here. There is no forcible strangulation. There is no unlawful imprisonment. There is no assault in furtherance of sex acts. It's a consensual BDSM that was followed by what we will call an extortion attempt.

It's just an attempt to get more money with threats and then he went off. He went off. I don't mean to belittle it in saying that. He beat her up. He beat the crap out of her. He smacked her. He bruised her eyes. He swelled her face.

You will hear about legal concepts from the judge. Proof beyond a reasonable doubt. Proof beyond a reasonable doubt really is, if you have a reason to doubt what you have heard, if you have a reason to doubt the proof, then he is not guilty. That is all it is. If you have a reason to doubt. Not wild speculation, not based on something because you don't want to do something unpleasant but if you have a reason to doubt. That's all it is, he is not guilty.

You will hear also that the defendant, Mr. Tripathy, was an interested witness and you can consider that. An interested witness is somebody who has an interest in the outcome of the case and you can consider that in evaluating their testimony. There is nobody in this room more interested than him. 100

percent. No argument there. The law says you can consider it. It doesn't mean you don't believe him. It means can you consider it.

She is also going to tell you, as I said, if the witness has lied about a material fact, you can disregard all of that testimony. That's your prerogative.

Listen, if there is any question about anything that I have said about the transcript or the questions and answers, have it read back. It's all being taken down. It's all -- the amylase issue, the dress, the doctor's testimony, Ms. Risdal's lies. It's all there for the asking. If you need it, ask for it.

Nobody is looking for sympathy, certainly not for him. You can't feel bad for him. There is no reason to feel bad for him. You can't feel bad for somebody who did that to another human being. I'm asking you please, please listen to the elements of the crime, apply the facts to the law and, at the end of the day, as bad as those pictures are, as much as those pictures move you to want to make it right somehow, the crimes charged are not proof.

The assault was not in furtherance of sex. Everything was consensual until he beat her up because she tried to extort him. But that count, that assault count does not apply because the assault came after they were

done with the sex. After it's all said and done and you applied everything, you have to find him not guilty.

Thank you.

THE COURT: Thank you very much.

Ladies and gentlemen, we will take just a brief break. If you need to, use the restroom. We will come back with the summation of the People. Okay.

Thank you.

(Whereupon, the jury exits the courtroom.)

THE COURT: Everyone, have a seat. Just a few moments everyone.

(Whereupon, a brief recess was taken.)

THE COURT: Everybody, before the jurors come in, I just realized talking with Mr. Morales, Mr. Rothman, you had the photographs of the defendant's hand.

MR. ROTHMAN: I have them.

THE COURT: They were only admitted subject to connection. It was Defendant's B, C, and D. They were never fully admitted so the jurors can't see those if they ask.

MR. ROTHMAN: They are on her disk.

THE COURT: You just have the hard copies of the same ones?

MR. ROTHMAN: Correct.

THE COURT: Thank you.

COURT OFFICER: Ready?

THE COURT: Yes. All set. Thank you.

COURT OFFICER: All rise. Jury entering. Everybody, have a seat.

THE COURT: Ladies and gentlemen, we are going to proceed. Normally during summations, I know it's a few minutes after 12, we will finish the People's summation and break for lunch. It may be a little after one. I have no idea. If it is, we will make sure we give you the hour, by law, and 15 minute lunch. So, we will make sure, it may just be a little bit after one when you start your lunch and then after lunch when you come back, I will be able to do my charge.

People? Ms. Baraiola.

MS. BARAIOLA: I am going to kill you. You are going to make me cum or I'm going to fuck you in the ass. That is not dirty talk. That is not role playing. That is not a dominant talking to his submissive. This is a threat.

That is the defendant, Sanjay Tripathy, telling Mette Risdal, inside of Room 4906, at the W Hotel, which is located in Manhattan, you are going to do what I want or something worse is going to happen to you. It's also an ultimatum. That is the defendant, Sanjay Tripathy, telling Mette Risdal you have two choices about how this

is going to go down, but either way, I'm getting what I want whether you want it or not.

Ladies and gentlemen, this is a case about entitlement. To be specific, it's about the defendant Sanjay Tripathy's sense of entitlement. It's about a wealthy, educated man who signed up to be a sugar daddy and he had a certain set of expectations about how things were going to work as a sugar daddy.

He paid for the date, he could demand sexual acts. He could have what he wanted as long as he had enough money for it. He saw his date with Mette Risdal as nothing more than a business transaction. He saw Mette Risdal as nothing more than an object, a means to a sexual end. This is also a case about the defendant refusing to accept no for an answer. It's a case about what happened when Mette Risdal said no, when she said I want to leave, when she told the defendant you will never have me.

Ladies and gentlemen, the defendant leads a double life. He signed up on Seeking Arrangements to be a sugar daddy. He falsely advertised himself in his profile. He lied about his name. He lied about his age. He lied about being single. He lied about having children.

He lied because he wanted to appear powerful. He wanted to appear intimidating. He wanted to appear

wealthy like a man who had connections. He said he didn't have any children because he wanted to come off detached. He knew exactly how to present himself on this profile. He knew exactly what he was doing.

He knew exactly what role to play, so he played that role. He played the role of gentleman on the date to gain Mette Risdal's trust. He paid for the dinner. He paid for the Uber. He paid for drinks after dinner.

He talked non-stop about himself during this date. His work, how important he is, he is executive, how much he likes to travel, all the places he has been to. He made sure she knew he went to Harvard, looking up the certification trying to prove to her that he is not lying about that. He was trying to impress, her ladies and gentlemen. He wanted to come off as worldly.

He took out cash in her presence. He wanted her to know he is wealthy. He was physically affectionate to her. He wanted her to know he was interested and he wanted to gage her level of interest in him, see how she would respond to it.

Then, when all of the groundwork is laid, she feels comfortable around him, she has been upstairs to the room before, nothing bad happened, he seems like a nice guy, he seems, you know, he has money, he is educated, he seems like he knows what he is doing, he has been nice to

me, then he invites her up to his room. He tells her, I have a gift for you, a gift from Texas. She goes up to that room with him willingly and that's when everything changes.

That's when the defendant takes what he wanted, takes what he feels he has earned, what he feels entitled to. He refused to accept no for an answer so he held Mette Risdal against her will inside of Room 4906. He wouldn't let her leave, not until he got what he wanted.

He placed his hands around her neck and he applied pressure. He told her, you're not leaving. He told her he was going to fuck her. He pried her legs apart and he forcibly inserted his fingers into her vagina, his fingers into her anus without her consent.

When she tried to make a run for it, ladies and gentlemen, he pulled her back into that room and he started to beat her. He punched her in the face and on her body repeatedly. He beat her to the point that she started to bleed to the point that there was blood flying out of her face splattered.

You have seen the crime scene photographs. She is not making that up. He placed both hands around her neck and he started to choke her to stop her from screaming, to stop her from trying to get help. He pinned her on the bed so she couldn't get away.

He choked her, ladies and gentlemen. He applied pressure to the point that she told you she felt out of it. She is not sure if she lost consciousness, but he certainly, definitely choked her to the point that he caused physical injury.

You have seen those photographs. That is not from light choking, ladies and gentlemen, that is not from breath play. You don't get marks like that on your neck from a consensual act. He choked her hard enough that she had difficulty swallowing and eating food for days after. She told you that.

Ladies and gentlemen, the defendant, Sanjay Tripathy, beat Mette Risdal into submission. He beat her until she stopped resisting. He beat her until she gave in, until she felt like she had no choice but to do what he wanted, no choice but to make up an elaborate story about having a child and having a babysitter watching that child. He made her feel like she had to make up this story.

She wanted the defendant to start to see her as a person, not just a sex object. She picked the one thing that she thought would work. He told me he has children, so I will mention that I have a child maybe he will have a little bit of sympathy for me. You know what? It worked. That changed his tone. It worked for her.

She made up the story, she did what he wanted and she got out of there alive. Thank God for that because this would be a very different case if that had not happened.

Ladies and gentlemen, he did not let her go until she performed the oral sex, until he got what he was after. Then what does he do? He tells her, go in the bathroom and clean yourself up. Get the blood off your face. First time not good enough. Go back in there and do it again. You have seen the blood around the sink.

Then he tells Mette Risdal I'm important. I have money. I have connections. I'm higher up than the FBI -- which sounds ridiculous but that's what he said -- if you report this, I will find you. Someone will find you and I will kill you. He wanted to scare her. He wanted her to be too scared to report this to the police.

He started telling her, you know, you're not from this country. You could be deported. Your child could be taken away. He wanted her to be intimidated, ladies and gentlemen, and she played along. She acted as if she was. No, no, no. I just want to go home and be around my child. I promise, I promise, I promise. Anything to get out of there alive.

Then what does he do, ladies and gentlemen? He offers her the money. Here, we have an agreement, you're

not going to report this to the police. Here is some money. I will see you Monday. Okay. He offered her the money to keep her quiet and then he let her go. He let her go, ladies and gentlemen, because he didn't think she was going to report this.

He said to himself, I'm going to get away with this. No one is going to believe her. She is basically a prostitute. I'm better than her. I'm smarter than her. I have more money than her. I'm a business executive. If it's my word verse her word, who are they going to believe? They are going to believe me not this woman.

After she left, what does he do? It is very telling, ladies and gentlemen, he stays in the room. He starts to clean up a little bit. He takes the bra, the ripped stockings from the floor and puts them in the garbage can. A hotel person will throw them away tomorrow. Let me get the soap from the bathroom and start cleaning up a little bit around the bed because this looks a little bad so I will start to wipe that down.

You know what, this was exhausting, the beating that I just gave her. I'm hungry now. Let me take a bag of chips. Let me sit down and catch my breath. Oh, no, the cops are here. What am I going to do, wait inside the room until they try to open it? Then he realizes he doesn't have a choice. He realized they are going to

enter that room and he is going to be taken into custody and then he complies.

You have those records. Six minutes after they attempt to open that door, what does he do? One minute after throws the deadbolt and then he waits six minutes before he opens that door. What does he do when he opens the door, ladies and gentlemen? He has changed to different clothes. He is calm.

He is calm when they ask him to step out. He is calm when they place him in cuffs. He knows exactly what role to play, ladies and gentlemen. He knows his audience. He knows who he is in front of and he knows how to behave.

Ladies and gentlemen, what I want to do now is, I want to outline for you how I will breakdown my summation. It's going to be in separate parts. Okay?

First, I will summarize the evidence in this case for you using a PowerPoint presentation. I know a lot of things came in not necessarily in order. I'm going go through the evidence in a chronological order using PowerPoint.

The second thing I'm going do is, I will talk to you about the credibility of the People's witnesses. I'm going to talk to you, when I say credibility, about why you should believe the testimony of every single one of

the witnesses you heard on the People's case. I will tell you how you know they are telling you the truth.

Then, I will go briefly over the charges of the case. I will not go very much in depth because that's the judge's jurisdiction. I will tell you about briefly what the People have to prove beyond a reasonable doubt and then I will tell you how we did that, how you know the defendant is guilty of each and every crime he is charged with.

Finally, I will respond briefly to some of the defense arguments. Okay?

So, we will start with the first section as I mentioned, the summary of the evidence in this case. So, ladies and gentlemen, I'm not going to belabor this because we have heard a lot about Seeking Arrangement but we will start here.

What does Mette Risdal tell you? She tells you, I have an account on Seeking Arrangements. She tells you my name is Nina. She tells you what she wrote in her profile. I like to travel. I like to workout. She told you all of those things.

You don't have to take her at her word. You have the record. You have the profile. This existed. She is not denying being on this website. She also tells you that she had a photograph on this website that is not

her. She is not hiding that from you.

She tells you, I meet the defendant on Seeking Arrangements. She tells you she has profile with the user name NewYorker2016. She tells you that he has -- well, actually you know this is his account because you can see the phone number linked to it, 919-809-4477.

Those records are in evidence. That is a number that is registered to the defendant. It is linked to an AT&T account that's in evidence. It is also the phone number he communicates with her on so you know NewYorker2016 is his address.

She tells you the defendant puts in his profile, I'm 41. I like to travel. She told you, I can't remember exactly what it says but all of those things, all the things she tells you are in this profile. All of these things are true. You have it in evidence. You can read it. We have seen it. We have gone over it 100 times.

What is significant about the defendant's profile is in the "about me" section. He is telling women looking at his profile, here is what I'm all about. Here is the kind of person I am. I'm successful. I'm wealthy, I'm decently good looking. I want companionship. I like to golf. I like whisky, food and travel. What is missing from that section is any mention at all about BDSM. He does not say anywhere in the "about me section" that this

is what I'm into, these are my preferences, this is what I like.

Then we go to the "looking for section". He is supposed to be in this section telling the women this is what I want you to be. This is the things I want you to be into and this is what I am looking for. I want you to be smart. I want you to be hot. I want you to have good communication skills.

I want you to be my companion in New York City. I want to go on dates with you. I want to go to dinners and I want to have a good time. I don't want any escorts.

Again, ladies and gentlemen, no mention anywhere in what he is looking for, because he is not looking for a woman who is into BDSM. He is not looking for a woman who wants to be smacked around, who is into breath play, urine play. He doesn't mention it nowhere in his profile.

Ladies and gentlemen, the language of his profile is wholly inconsistent with his entire defense in this case. He told you that is what he is into. He told you that is what he liked. Why wouldn't you put it in writing? Why wouldn't you want the people you are interacting with on this site to know that?

Why not be up front? It's not logical to wait until the date. It's not logical to bring that up then. You could run the risk of scaring your date away. They

could be like I'm not into that. This guy is a creep. I'm out of here. That is a waste of your time and your money and her time. You wait until an hour into the date, you run the risk of her running out on you. Again, a waste of your time and your money and her time and her money. It's too big of a risk. That's because that's not what happened, ladies and gentlemen.

He tried to downplay it saying, you know, I don't want to explicitly write it in my profile when he testified. Then he volunteered on cross examination, but I have another website I'm on and I write it on there. So, ladies and gentlemen, he knows what he is doing. He knows how he is portraying himself in this profile and it is not as a guy who is looking for that type of a relationship.

I want to move on and talk to you about the days leading up to this date. I want to talk to you specifically about June 11th to June 14, 2016. Ms. Risdal told you, I get a message from the defendant and we start communicating, e-mailing back and forth on Seeking Arrangements.

You can see he reaches out first, Nina, you are a catch. Would love to meet you and see if there is chemistry. She responds. They have this whole conversation back and forth. She tells you, he writes her

a message, we should meet for a drink and discuss. Discuss what, ladies and gentlemen? Discuss the money arrangement. Then she brings up, sure, what are you thinking? What will we be discussing on money for a per-meet basis?

She is not denying that message. It's in writing. Everybody knows it. It is what it is. What is Seeking Arrangements? It's a financial arrangement between men and women. You have all of those messages. The conversation takes place and you can see she gives him her phone number.

We know it's her phone number because you have the T-Mobile records in evidence. You have this account ending 4129 registered to a Nina Pollen in the T-Mobile records. Then she tells you that they make an arrangement to meet on Wednesday at a restaurant. He tells her, I'm going to ping you on Monday.

On Monday, June 13th, the defendant texts Ms. Risdal to confirm these plans just as she told you it happened. You have these messages in evidence. They talk back and forth. No mention of BDSM in any of these text messages. No mention in BDSM in any of the e-mails back and forth. That is lacking in every form of communication between these parties leading up to this date.

We have video showing the defendant checking

into the W Hotel on the 13th. That makes sense. That's the date he starts to message her. He is now in New York. He is ready to set this date up. We know that he checks in and that he is in Room 4906. He checks in as soon as he gets in the room on June 13, 2016.

We also know on June 13, 2016, Ms. Risdal tells you, I have a Citi Bank account. She tells you, I withdraw money. I take out a couple hundred dollars. She couldn't remember exactly how much, but she has a couple hundred dollars in her bank at least because two days before this date she is taking out a couple hundred bucks.

She then tells you the next day she takes out another couple hundred dollars, again, she couldn't tell you how much. It is Citi Bank, you have these records in evidence. Two days later taking out another $400. This is a woman who has in her bank account, at a minimum, $700. She is able to take that out and she has it on her. That is the money she has on her, the money that is in her purse, ladies and gentlemen, which is left in Room 4906.

You also know that from Detective Jones. You don't have to take Ms. Risdal at her word about having cash in her wallet. Detective Jones tells you, I went to Room 4906, that's where this whole thing happened, I pick it up, I open it and it has a couple hundred dollar bills. He specifically told you one hundred dollar bill. That is

significant because when you look at the money that is recovered from the defendant's hotel room, the biggest bill is a fifty dollar bill. So, that money in that purse is not from the defendant.

Now we are going to move onto June 15, 2016, which is the date of the incident, and we will go to that date to the early morning hours of date. So Ms. Risdal tells you, we start to text each other on the day of our date making arrangements back and forth. Are we still on for the date this evening? All of that stuff. You have these text messages in evidence. They talk about what they are going to be wearing, where to look for each other.

Again, no mention of what type of, other than that they are meeting for a dinner, no mention of anything else that is going to happen during this evening, no mention of BDSM in any way in these text messages. This is not an arrangement made ahead of time. Then Ms. Risdal tells you that after they text they go to the Zuma Restaurant.

She tells you that I get there a little after six. You don't have to take her at her word. You have records in evidence, the defendant's Uber records, that show him leaving a location and arriving the 6:04 p.m. at 260 Madison Avenue, which is the address for Zuma. You

see it's 6:04 p.m. and he texts saying I'm here in the bar area and she says I'm running late.

You have video that shows them being seated together at dinner. You can see the bling dress she described wearing. You have the full video. We didn't play this for you at trial, but if you were inclined to watch it you could. You have them together for about an hour and ten minutes at the restaurant.

You will see in this hour and ten minutes, they are ordering drinks, multiple rounds of drinks, multiple rounds of food. The weight staff is back and forth to the table. You will see they are physically affectionate just as she told you they were, but this is -- and she tells you what they are talking about.

She says we are talking about traveling, we are talking about London where I used to live, we are talking about his family, his brother, what his brother does. Then she tells you, we kissed and eventually we leave this location. You have the video of this. You have the receipts. You know what Ms. Risdal told you about this night is true, it's corroborated.

Clearly, there is no sound on the video here. This is where the stories between the defendant and the complaining witness start to differ. Because there is no sound here, you will never know definitively exactly word

for word what is said between those parties. But you have to use your common sense, ladies and gentlemen. You have to think about what is logical. Think about what makes sense.

They just met. This is the first time. They don't know each other at all. Their communication leading up to this are very bland. I'm wearing this. Meet me here at this time. Here is mu phone number. There is nothing specific. They are in a crowded restaurant with wait staff that keeps approaching the table. Ms. Risdal's explanation about how this beginning part of the date went makes a lot more sense than the defendant.

We are talking about the normal things we talk about on a first date. We are getting to know each other. That is what she is telling you is happening. The defendant's explanation isn't logical. He says to you, she walked into the restaurant, I said to her, you don't look like your photos, that's the first word out of his mouth to her, and she immediately says to him, Don't worry. I'll make it worth your while. I'm into BDSM. I'm into all of these things.

For two people who don't mention anything about sexual preferences at any point in any form of communication for four days leading up to this date, for that to be the first words out off her mouth, the minute

she walks into a restaurant, it just doesn't make sense, ladies and gentlemen. That is just not what happened. That's the defendant trying to setup his version of events, trying to confuse you about what actually happened.

So, they leave the Zuma Restaurant. Ms. Risdal tells you that they get into an Uber and they take it back to the W Hotel. She tells you, you know, there is quite a bit of traffic and it takes us a while to get back to the W Hotel. In the car, we are talking. He is talking to the cab driver. We are going back this location, she knows that is where he is staying. Nobody is disputing that.

She tells you, we get back to the W Hotel, we walk inside. Again, all on video. She is corroborated at every step of everything she has told up to this point. The defendant is wheeling a little brief case. He says, I want to drop it off upstairs. She doesn't think anything of it. She goes upstairs with him.

You know she goes into the room. She tells you that and you have the video showing they are going all the way up to the 49 floor and you have the door locked record. At 7:49, the defendant uses his card to enter his room. The door shuts behind them at 1950. Then ten minutes later they exit.

She tells you what they are doing for those ten minutes. She says, he puts his bag down, he is going through it, he takes off his coat, changes into a different shirt and she is on her phone not really paying much attention. Then they leave the room. She says when they are in the elevator he says to me, you know what, I am going to grab some cash. She doesn't think anything of it. She just goes along. You want to go to the bank? I will go with you.

You have you all these steps corroborated. She leaves the W Hotel with the defendant and they head to the Bank of America. It takes them, ladies and gentlemen, seven minutes approximately to walk from the W Hotel to the ATM. This is important because this will come up later on.

From 8:09 to 8:11 they are together in this ATM. What is very important about this is Ms. Risdal's demeanor the entire time they are in this ATM. She is not standing next to him. She is not whispering in his ear. She is not telling him take out this much money. She is standing there and not paying any attention. In fact, half the time she is looking at a completely different direction. She is completely disinterested in what he is doing. That is because that money is not for her.

She is just with him because that's what he

wanted to do. She tells you that they are in there for a few minutes and there is no exchange of money of any kind and then they leave and they head back to the W Hotel to get the drinks like they originally planned to have. You can see, you have the defendant's bank records. They show at that ATM, the one she describes going to, he takes out $500.

Then you have a video of them returning to the W Hotel. Again, everything she is telling you is corroborated by independent evidence. She tells you, we go back upstairs to the seventh floor and we go into this back part of the bar. We are in the back part of the bar. We are there for a few minutes.

We are kissing. We are being physically affectionate. She tells you, yeah, my hand is running up and down his chest, up and down his leg. My hand is near the inside of his leg. She tells you that. You can watch it yourself. You have it in evidence.

She tells you they are not getting any service so the defendant says lets get up and move to the Living Room Bar. Let's get up and go from a very secluded, private area and go into a crowded bar with other people. Let's get up from this secluded private room and after, if you believe the defendant's version of events, I have just taken out $500 for you, and instead of going upstairs we

will go into a crowded room and hang out for two more hours.

Does that make sense? If this date is about sex, if this date is about BDSM, if they have already discussed at Zuma exactly what they are going to do and how they are going to do it, why, after they go to the bank and take out cash, don't you go to the room and get going, start things up. It doesn't make sense, ladies and gentlemen.

They hang out in the Living Room Bar and they are there for about two hours. Again, we didn't play all of this for you at trial but you have all of this video in evidence. You can watch it if you want to. Nobody is denying or hiding from you that they are into each other. That is not a crime. Nobody is saying there is anything wrong with that. It is what it is.

They like each other. They were on a first date, they had a few drinks, they were making out. Then, Ms. Risdal tells you, back at the point that they are at the bar, while they are being physically affectionate, they were talking about more travel, the defendant going to Harvard, they were talking about very common first date things. She tells you, we don't talk about BDMS at this bar. We don't talk about him getting me money, none of those things.

Then, she says, the defendant tells me I have to go to the bathroom. He gets up and he leaves. Then, ladies and gentlemen, you will watch this video. You know from the testimony of Jorge Chico that this screen that is on the right is the seventh floor shuttle elevator, the only way to get downstairs from the seventh floor. He tells you on the very bottom of this screen there is an exit for the bar and you go this way and you can access the bathroom. We will watch this clip for two-and-a-half minutes.

Where is Sanjay Tripathy, ladies and gentlemen? He is in the bathroom. That's where he goes, just like he told her he was going to do. Ms. Risdal is sitting there at the bar waiting just like she told you she was. Two-and-a-half minutes later, 9:37:26 seconds, here he is, he walks back into the camera view, long enough to go to the bathroom. What does he do? He walks around the edge and he peeks right into this entrance of the W Hotel. These two things over here.

He makes sure she is still sitting there, he wants to make sure she doesn't see him, before he goes to the bank again. So, let's talk about why he goes to the bank again, ladies and gentlemen. He is on a date, things are going well, it's a woman he met off of Seeking Arrangements. He says to himself, she seems into me, I'm

into her, I don't really know what is going to happen upstairs but I want to make sure I have enough money on me.

So, he makes the decision, unbeknownst to Ms. Risdal, after he goes to the bathroom, it's only a couple minutes away, I will run downstairs, go back to the bank, take out some more money and then I will come back. So, he leaves the W Hotel.

What is Ms. Risdal doing during this time? She tells you. He walks out a couple of minutes, I look at my phone, my friend Joe has told me, hey, when you have a minute can you give me a call. What does she do? She waits a few minutes, the defendant has not come back, and she picks up her phone and she makes a phone call. She talks to Joe for a few minutes.

The phone call is about three minutes long. She tells you, we are talking about travel arrangements. He is coming to stay in my apartment. Then towards the end I mentioned I am on this date and I don't know where this guy is. He has been gone for a while at this point. It's weird. He said he had to go to the bathroom.

Joe tells you the same thing. Joe tells you, I get a phone call from her. We are discussing what is going on and he tells you it sticks out in my head because she told me she is on a date and that's weird for her to

call me while on a date. He tells you, we talk about it. Maybe this guy's stomach isn't feeling good. Maybe that's why he is in the bathroom so long. Maybe he is just checking his work e-mails. You should not leave him. Don't be rude. Stay. She does, she stays and continues to wait for the defendant.

The defendant reaches out to her. He says to her, hi or hello, how are you? She writes back great still here waiting for you. That's at 9:42. That's about eight minutes or so after he has left the bar. Ladies and gentlemen, the wording of that text message is significant. That is not what you send somebody when they know where you are. You don't say, Hey, how are you, just checking in, how is it going, when the person knows that you are walking seven minutes away to the bank and you are going to be gone for 15 minutes.

She did that walk before. She knows how far it is. That is not a text message that you send when somebody knows where you are. You send a message like that when a person doesn't know and you realize, you recognize I have been gone for longer than what makes sense for what I said I was doing. That's why he sends that message. He wants to make sure because I have been gone for a long time, you don't know where I am, I want to make sure you are doing okay. She writes back, I'm here.

I'm still waiting for you. Then she continues to wait. The defendant still is not back.

She told you, I have another date that night. You have all of these messages in evidence. She setup that date before she even met the defendant. Those messages pre-date the beginning of her evening with Sanjay Tripathy. The plan is to go on a dinner with Sanjay Tripathy and then meet this other man, Kevin, some time later at 9:30, 10 or so in the West Village.

You have all of that in writing. She is on this date waiting for the defendant. She responds back to him, sorry, I'm still -- I'm running behind. Will keep you posted. This is while she is waiting for the defendant. He writes back to her a couple messages and she writes back, I'm out. Sorry. Not sure. Do what you need to do. Don't want to hold you up.

They continue to write back and forth. She says to him, I'm out on a business dinner. I'm going with the flow unfortunately. She says to him after that 9:50 p.m., again, the defendant is still not back to the bar, I'm trying. If I ever get out of here, I will be very drunk. Then she sends him another message with a kissing face, 9:52 p.m., again, before the defendant comes back, I'm trying to move this along fast.

What do these text messages tell you, ladies and

gentlemen? They tell you, first of all, that Ms. Risdal wasn't lying about having another date that evening. She has the text messages. She isn't making them up. She is corroborated. It tells you she didn't have plans to go up to a hotel room and stay with the defendant for hours. She didn't have plans to hook up with him in any way. She had plans to have dinner, meet him and then go and meet someone else later that evening.

She puts in writing, I'm trying to move this along fast. She puts in writing, I don't know how much longer things are going to take. I'm very, very sorry. She is communicating with him throughout this date. She is definitely planning on going, ladies and gentlemen. Then you will notice, ladies and gentlemen, all a sudden communication stops. The defendant returns to the bar about 9:54 p.m. She doesn't reply back to Kevin.

We know she goes upstairs about 10:30 p.m. Kevin sends her something at 10:44. She doesn't respond. We know she is in the hotel room until about 12:36 in the morning on the 16th. Kevin sends her another one at 11:22 p.m. She doesn't respond. She doesn't respond because she is being physically and sexually assaulted by the defendant inside of Room 4906 not because she is having a consensual sexual encounter with him.

The defendant tried to tell you during his

testimony that she is on her phone at different points during this date. She has access to it, that's how they are trying to explain the text to Stephanie. If she has access to the phone, and you want to believe the defense's version of events, why doesn't she write back to Kevin? Why doesn't she write back and say, you know what, plans have changed, I'm not going to make it tonight? Because that never happened.

What the defendant told you happened in that room did not happen. What Mette Risdal told you happened is the truth. We have video of the defendant taking out more cash at the ATM at 9:44 p.m., a couple minutes after he sends the, hey, how are you text.

Ladies and gentlemen, you will see when he takes out the $500 you will be able to see what type of bills they are as he counts it in the camera. They are all fifties and twenties. Consistent with the denominations recovered from his hotel room. Inconsistent with his testimony that the money in the room is money he brought with him from North Carolina, money that someone has handed him money cash. You have also bank records that show an additional withdrawal of $500. Nobody is disputing that fact.

Then we have him, about 9:53 p.m., coming back to the hotel and heading back up to the bar to join

Ms. Risdal. Then, ladies and gentlemen, he returns about 9:54 p.m. They stay there for another 35 minutes. They hang out at the bar, they order more drinks, they continue to talk, they continue to kiss. You have this whole video in evidence. Again, if this money is the agreed upon, this is what is going to happen when we go up to this room, why come back and order more drinks? Why come back and sit down and talk for another 35 minutes? If you believe the defendant's version of events, you have taken out $1,000 to make this happen. It just does not make sense, ladies and gentlemen.

So, now, we are going to focus on once she enters Room 4906 and all the evidence that corroborates her. You know she told you, we headed upstairs at about 10:30 p.m. You have the video of this and you can see on here the elevator stops on the 49th floor at 10:32 p.m. Up to this point, everything Ms. Risdal has told you is documented by a piece of independent evidence.

She told you about text messages, phone calls, places they went, how they got there, what they ate, what they drank. Every single thing she told you is documented and in evidence. You don't even have to take her word for it. You have all of it. She is telling you the truth about what is going on up until this point. She continues to tell you the truth about what happened inside that room

and we are going to go through that now.

Now we will talk about once she enters the room. We know they get into the room around 10:33 p.m. You know that because you have these door records. It shows his card is entered at 10:33 p.m. It shows that the door is opened and it shows the door is shut immediately behind. That is them entering the room. You know six minutes later into this encounter that the deadbolt on the door is thrown by the defendant. You have those records that show that.

What does Ms. Risdal tell you is happening in the first couple of minutes in this room? She tells you, I walk in, he tells me to go stand by the window and we are looking at the view and then, she says, he starts to kiss me and starts getting aggressive. I start telling him, I don't like that. Stop it. I want to go. He tells her, no, you are not and he throws the deadbolt. Then, she tells you what starts to happen next. She tells you, he continues to kiss me. I'm telling him I want to go. He is telling me I want to fuck you and I'm telling him you are never going to have me. She tells you, he pushes me on bed, he starts to choke me.

Ladies and gentlemen, he at 10:51 p.m. is locking that door. He is making sure that nobody is going to be able to get in or out that room. He checks it to

make sure it's actually good and then he continues to assault Ms. Risdal. He tells her, I'm going to fuck you, he puts his hands around her neck. She tells you the first time he does this, you know, he was applying pressure. She told you it wasn't to the point that I couldn't breath completely but she said I started to get really, really scared.

He is doing that to me, then he is holding my arm on the bed, holding me by the arm by with one hand and he pulls down my stockings and he pulls them off. She tells you, I don't have underwear on underneath that I just have my stockings on and he inserts forcibly his fingers into her vagina and anus. She said she is struggling with him and that he is able to insert them and move them in and out a few times.

You have, ladies and gentlemen, her tights in evidence. You can see where the holes are. There is a hole right here right above the thigh on the side like where the stomach would be, consistent with a person grabbing them and pulling it down. She has a hole on the side of the stockings, you have this in evidence, consistent with somebody yanking them down.

Not consistent with, as the defendant would like you to believe, him inserting his finger into her vagina at the bar. You saw during cross examination, with

Mr. Bashford, what those tights looked like, you have them you can look at them. Ms. Bashford demonstrated for you. She put her finger like this. You can't just put your finger through and cause a hole. That is not realistic, it's not believable and that certainly is not what is happening on the video at this Living Room Bar. It is just impossible. The location of the hole is impossible for it to be what the defendant is saying it's from.

Ms. Risdal tells you, I'm on the bed, he inserts his fingers into my vagina and my anus. I'm getting scared. I need to get out of here. I have to do something. So, she tells you, I tell him I have to go to the bathroom. Eventually, he lets me up and lets me go to the bathroom. You know where this bathroom is, ladies and gentlemen, in relation to the front door.

She tells you the defendant walks with me to the bathroom and he stands outside the door. He won't let me shut the door. He won't let me take my purse with me. He watches me. I start to go to the bathroom so he turns his back a little bit and he steps a little bit forward and he is facing the bed. She says that's the moment that I make a run for it. She tells you, I run and I yank open this door but I don't realize that the safety latch is on the door. I don't realize it's there, so I only get it open a little bit and then it shuts.

Immediately the defendant is behind me, he grabs me and he pulls me back to the bed and things start to get physical. Ladies and gentlemen, you have these door records in evidence. They corroborate Ms. Risdal. They tell you that at about 11:12 p.m., about 39 minutes or so into being in this room, that the door, the deadbolt is released, and the door is closed.

You know from the testimony of Jorge Chico what that exactly means. That means when it doesn't show the door being opened that means it was opened from the inside and then it is shut. You know it happens quickly because it is registered at 2312, the same time, the deadbolt is released and then the door is shut. So you know it's opened quickly and shut immediately. That is consistent with what Ms. Risdal told you happened.

You know, ladies and gentlemen, we have pictures in evidence from the crime scene that this door has this latch that she described to you. She didn't make it up. It's on the door. You can see it. You have these photographs in evidence.

So, let's talk about what the defendant tells you these records mean. The defendant, who has been prepped by his lawyer, gone over all of the evidence --

MR. ROTHMAN: Objection. Move to strike. She knows she can't say that.

THE COURT: Thank you, Mr. Rothman. You can have a sidebar if you like. I am going to sustain the objection and direct the jurors to disregard that.

MS. BARAIOLA: The defendant has had an opportunity to review all of these records.

MR. ROTHMAN: Objection. Move to strike.

THE COURT: Sidebar please.

(sidebar)

THE COURT: Basis?

MR. ROTHMAN: She can't keep saying he has a opportunity to review things with his lawyer. She is not allowed to comment on that.

THE COURT: What were you going to say? I didn't catch it.

MS. BARAIOLA: I was saying he had an opportunity to review the records. I mean, that was my sentence. I didn't have any other words.

MR. ROTHMAN: She knows where she is going with it.

THE COURT: Okay. It's overruled.

MR. ROTHMAN: She is not allowed to comment on our conversations, that he has been here. He has a right to review the paperwork. You can't comment on that.

THE COURT: That he reviewed paperwork, the defendant reviewed it?

MR. ROTHMAN: That's his constitutional right. It's like saying he was sitting here and he heard the evidence before he testified.

THE COURT: It's different.

MR. ROTHMAN: It's not.

THE COURT: Overruled.

MR. ROTHMAN: It's the same thing.

(open court)

THE COURT: Objection is overruled.

MS. BARAIOLA: The defendant reviewed the records in this case. He knows that it shows that this door is opened and shut very quickly from the inside. He knows there has to be some sort of explanation for it.

Let's talk about what he tells you. He tells you, I have been in the room for about 39 minutes. First he says, we are just discussing this role playing that we are going to do again after they have already discussed it at Zuma, already discussed it for two hours at the Living Room Bar but we are talking about it again inside the room. When Ms. Bashford says, you are still talking about it? He says, well, actually no, no. We are kissing and we are holding each other and, you know, we are in the throws of passion here. We are very, very into each other.

Then Ms. Risdal says, I want some ice and he

try to grab the hotel phone. She tells you exactly where it is. It's in the crime scene photographs. That phone is on the table where she told you. She has never seen those crime scene photographs. She told you that when she testified. Two years later she remembers where that phone was.

She tells me, he starts to punch me on that side of the bed. There is blood on that side of the bed, not as much as the far side, but you have seen it, it's in evidence and we will go through it. She tells you then he lifts me up, he throws me on the bed and he sits on me, my hands are down on my side like this. He is straddling me. I can't move. I'm trying to wiggle and I can't do anything and he has two hands around my neck and he starts to apply pressure and that's when she tells you, I can't breath, I can't speak, and I start to think I am actually going to die in this hotel room.

He is telling her, I am going to kill you and she believes him. She tells you that the defendant stopped choking her and it takes her a minute or two to kind of get her bearings. She tells you she is not sure if she passed out. She tells you when she gets her bearings her neck is painful, the defendant is still on top of her and he starts to hit her again. He continues to hit her and, she tells you, she is punched in the face

says, okay, sure no problem, let me get up and get some. Let me stop what we are doing and I will grab that ice bucket and I will go out, because I'm such a gentleman, and go out and get ice. Then he tells you, she calls me back and says wait, wait, wait. Don't get me ice. I want $500 more. I want to talk about money. I want to finalize things.

He is so distracted and confused that he doesn't know what to do so he shuts the door, goes to the safe, gets out the money, and somehow he magically puts this ice bucket back on the tray that it belongs on tongs perfectly on the top, everything is back where it belongs.

That's not what happened, ladies and gentlemen. That is not why that door is opened from the inside and shut immediately behind. It is opened and shut because Ms. Risdal is making a run for it, not because the defendant was trying to go get ice. It's not locked after that brief opening and shutting, there is no deadbolt thrown because he has both hands on Ms. Risdal and he is dragging her back to the bed where he begins to assault her. He is trying to stop her from screaming. He is covering her mouth with his hands.

That's what those door lock records show and that's why there is no lock thrown after the fact. Ms. Risdal tells you, he pulls me back to the bed and I

by him multiple times.

You have seen these photographs. These marks are consistent with punches. His knuckles, the injuries to them are consistent with punching. The blood flying is consistent with punching somebody, not slapping somebody, across the face. She tells you at the point she starts to see blood flying out of her face, she has to change steps.

I have to approach the situation in a different way. Me fighting back, me resisting, me telling him no, that's not working. He has overpowered me. He is bigger than I am. He is stronger than I am. I don't know how I'm going to get out of here any other way. She starts telling him about her daughter. She told you she was just picturing her little niece in her head and she is describing her niece.

She tells the defendant, I have a babysitter. I need to get out of here. She remembers looking at the clock. She tells you where the clock is in the room and it is 11:50 p.m. I said, my babysitter needs to leave at midnight. She tell you the defendant already dumped her bag in the corner of the room and she tells you the defendant says, okay, what is the phone number. She makes up a random number and she tells the defendant the babysitter's name is Stephanie.

The defendant sends this message, Stephanie, can

you please stay until 1:00 a.m. sent from Ms. Risdal's phone at 12:07 in the morning. You know the message is sent because you have Ms. Risdal's T-Mobile phone records. They show the message was sent, it's 407 UTC which converts to 12:07 in the morning, while she is inside of this room. What could this text message possibly be about other than what she told you? Who are you messaging at 12:07 in the morning asking them to stay until 1:00 a.m.? What are they doing? What other thing could this text message be besides what she told you?

There will is no logical explanation for it other than her version of events. This is independent evidence, ladies and gentlemen, that corroborates Ms. Risdal. She tells you after I makeup the daughter, I tell him, I will perform oral sex. I will do what you want. I just want to be able to get home to my daughter. I want to be able to hug my daughter.

Between 12:07 and 12:36 in the morning, after she was physically assaulted by the defendant, after the defendant forcibly inserted his fingers into her vagina and anus, after he choked her, she performs oral sex on the defendant. The defendant is telling her, you are going to make me cum or I'm going to fuck you in the ass. She tells you first she is performing oral sex and the defendant is on his back and she is between his legs. She

walked right out of this hotel, I have my phone in my hand, I'm covering my face with my hair because I don't want anybody to see what I look like, that is exactly what she is doing on this video, and I'm getting ready to call 911. I'm not sure if he is following me so I want to wait until I'm outside. Then, she tells you, I see a police van and I walk, I make a B-line for it. I walk straight right to it.

She is corroborated by Sergeant Schack. Sergeant Schack tells you, I'm sitting in the van having my dinner and I notice this woman. She seems out of place. She seems very, he described her as frantic, as visibly bruised and beaten, bleeding, still actively bleeding. She tells the whole story to him.

I bring that up, ladies and gentlemen, because the judge will give you an instruction that you will be allowed to consider whether or not Ms. Risdal promptly reported this crime when you are evaluating her credibility, when you are deciding whether or not you should believe her testimony. This is very important because she walks out of the W Hotel and walks right to the police. There will is no significant amount of time between the incident and the report. There is no time for her to make up a story to fabricate evidence, to make up lies. She leaves that room and she goes and immediately

tells you, then, she moves her body to the side and he is touching her body while it's happening and then, she tells you, the defendant flips her over on her back and he is sitting on top of her and he puts his penis in her mouth. She describes all of that.

She can tell you all the details about how this happened, where he touched her, how he moved her. This is testimony of somebody who is telling you the truth. She can answer the detailed questions, in contrast to the defendant who cannot answer any detailed questions. So, she performs oral sex, the defendant tells her to clean up, they have that whole exchange about don't report this, I promise I won't, all of that, and then she leaves the hotel room.

What does she tell you? She tells you he walks me to the elevator. So, here we have, ladies and gentlemen, the door is closed 0036. That's Ms. Risdal leaving. She opened it from the inside, which doesn't register, and then it shuts. That is her and the defendant walking out and going to the elevator together. Then you have his guest car being accepted. That is him at 0036 walking back into his room opening the door, closing it and throwing the deadbolt. The door records corroborates her, the video corroborates her.

What does she tell you she does? She says, I

gets help. She leaves that room and she immediately tells the police everything that just happened to her.

The police tell you they go up to this room. They enter the W Hotel. First they go to the seventh floor to check what room, make sure they have the right room, make sure it is 4906 where the defendant stayed. They tell they go up with some W Hotel security. They are waiting to get into the room. They are knocking the door. Police, open up. Police, open up sort at first, louder later. They tell you the defendant is not answering the door. They don't hear anybody moving around.

They tell you one of the W Hotel members tries to open the door, they can't get in. They start telling the defendant, you got to get out of here. What does the defendant do in response? He throws the deadbolt and then he waits six minutes. He waits six minutes until he decides to open the door for the police. Once he opens the door for the police, he is taken into custody. About 15, 20 minutes later he is led out of the hotel in police custody.

You heard, ladies and gentlemen, that a search warrant was executed on this room. You heard about the layout of the room over and over again. I will not belabor it. The detective tells you what exactly what he found and tells you where he finds it. He takes

photographs. He tells you, I took the bedding, the sheets, the pillow cases because there was blood all over it. I photographed the walls and the floor. I took stockings and bra from the garbage.

You have those photographs in evidence. So, one of those photographs you will see is the side of the bed that's the closest to the front door. When you zoom in on this picture, you will see the blood evidence that Ms. Risdal tells you about as she starts to get punched on this side of the bed. There are blood drops, ladies and gentlemen, on this sheet just like she tells you. She tells you he pulls me up on the bed and more blood is flying when she is lying across the bed consistent with the forensic evidence in this case.

You saw the dress. You see there are sequins missing from the back of the dress. You have it. I have it right here. You can see right around the area where the dress is ripped in the back and right around close to the area where it's ripped at the bottom of the zipper, there is a bunch of sequin and beads missing from this dress. Detective Jones tells you, when I walk in that room, I see them on the ground. These are the crime scene photos showing the sequins from the dress that were ripped off and are on the ground.

You can see the blood splatter on the pillow and

you can see in this picture, ladies and gentlemen, the blood, he hit her so hard, went from the bed and onto the wall. You will see drops here, up there, on the wall, on this metal. Will you see drops on the bottom part of it, other beads or sequins and you will see blood on the floor. Again splattering across consistent with being punched in the face over and over again not with being slapped.

Ms. Risdal tells you she had to wash herself off in the bathroom. You have this blood in the bathroom. You have this blood in the bathroom. You can see it around the sink. The defendant tells you, I went in there and I didn't notice it. The defendant tells you, I stayed in this room for 25 minutes afterwards and I didn't notice blood on the white bedding in the room. It's just not believable, ladies and gentlemen.

You have the photographs of these items, you have the physical items in evidence. You can examine them if you need, if you need to look closer where the holes are in the stockings.

Then we get to the money. Detective Ribustello tells you he recovered $1,219 roughly from the safe inside the defendant's hotel room. The defendant tells you, I keep my money in the safe. You know on this date he withdraw $1,000. You know from the video it was in the

denominations of 50s and 20s. He did not give any money to Mette Risdal on that date. All the money he withdrew is recovered from that hotel room. She did not accept any money from him.

Ms. Risdal tells you afterwards she goes to a hospital and you have these medical records in evidence. She tells you she is in a lot of pain. You can see on this exhibit, it tells you her pain is eight out of ten. You can see she immediately reports all of the things that happened to her. She is sexually and physically assaulted being repeatedly hit on the face and choked. The man forced himself upon her without consent, penetrated her vagina and anus with his finger, he forced her to perform fellatio on him and ejaculated on her face consistent with what she told the police, consistent with DNA evidence in this case.

Severe facial injuries. You have the diagram that was done by Dr. Cooper documenting Ms. Risdal's injuries. You have the photograph of her face. This is just a few hours later, ladies and gentlemen. This is just a few hours later how she appears.

Let's talk about this photograph. The defense wants you to believe that Ms. Risdal is slapped across the face and that's how she gets this very big circular injury to the top of her head. That is not logical. If you look

at that picture, it looks like a fist hits you in the head over and over again, a right-handed person's fist, just like the defendant who is right handed, which is why a majority of the damage is to the left-hand side of her face.

You have marks on her neck. You can see significant bruising, you can see scratches, you can see it around her chin, you can see she has been beaten up by this defendant. You can see, ladies and gentlemen, Dr. Cooper told you all about this, he said that when somebody is choked, the airway is restricted, the blood has nowhere to go, it is up in your head and so blood vessels start to pop.

He told you the marks along her face, the pattern that they are in, the fact that it is not a clear hand or clear fist, the pattern of them is consistent with it being from choking. He said if it was from trauma, it would be more of an assigned area like the temple, where it looks like three stripes on the top of her head. You can see she had a bloody nose, her lips were bleeding, you can see how swollen her face was, both eyes are nearly swollen shut, consistent with being punched in the eye, and you can see the blood in her hair. She told you he was punching her about her body in her breast, she had a bruise to her breast. She told you about struggling with

the defendant, and she has marks on the inside of her thighs.

The defendant wants you to believe that these marks are not from pulling her legs apart like this, they are from the throws of passion, she is so into the sexual act he is performing that she orgasms, tightens her legs around his head and he has to push them aside. But, ladies and gentlemen, that doesn't make sense. Those marks would not appear like this if you are prying someone's legs open. This is consistent with a person's hands going like this, pulling this way, not holding them that way. It is not realistic. It's not logical. It does not match the evidence in this case. It is the defendant's way of trying to explain an injury. She has marks to her back, bruising.

Then we get to the defendant. You know that a kit was done on the defendant and we know that he has injuries. He has cuts to his fingers, abrasions to his hands consistent with punching somebody over and over again. His knuckles are swollen. The cuts are around the knuckles. The cuts on his hands are consistent with hitting somebody in the face.

Then we get to the DNA. So you know that this suspect kit is done. You know that a rape kit is done on Ms. Risdal. You know the DNA evidence is recovered. The

DNA evidence, despite what the defense would like you to believe, corroborates Ms. Risdal. Ms. Risdal is swabbed and DNA from male donor A is recovered from her neck and from the dry secretion around her mouth. That male donor A later turns out to be the defendant Sanjay Tripathy. This DNA evidence corroborates what Ms. Risdal told you, that she was forced to perform oral sex, that's why sperm cell fractions were found on her neck and her lips.

The DNA also tells you there is amylase that is found on her vulva swab. The DNA criminalist was very clear with you, ladies and gentlemen. She cannot tell what that is. She can't say it's definitively saliva. She can't say that it isn't vaginal secretion. She did tell you amylase is present in the two of them.

This vulva swab amylase being present does not support the defense story of how things went down. It just doesn't because if it did, you would have gotten Ms. Risdal's DNA from the defendant's lips and that's not where they get it from on this case. We get the DNA of Ms. Risdal from the hands of the defendant, from the dried secretion swabs of the hands of the defendant. That is the only place DNA is gotten.

He tried to tell you he washed himself up a little bit, went to the bathroom, probably to explain the lack of DNA in this case. We still get it from his hands.

If he went to the bathroom and washed his hands, how are we still getting it from there? He didn't wash up.

We know that Ms. Risdal viewed a lineup on June 24, 2016 and she identifies the defendant. Ladies and gentlemen, what I now what to do is talk to you about the credibility of the People's witnesses. Okay? I'm going to focus specifically on Ms. Risdal because she is the witness for the People who gave you direct testimony in support of all the charges the defendant is facing.

I submit to you, ladies and gentlemen, that if you do not credit a single word of her testimony, then you have to find him not guilty. But, on the other hand, if you believe her, if you credit her as to what happened inside of that hotel room, he is guilty of every single crime he is charged with.

The judge will give you instructions on this. She will tell you when assessing the credibility of a witness, there are a number of things you can take into consideration, there are things you use every day in your life, common sense things.

You can look at whether or not a person's testimony in this trial was consistent or inconsistent with other evidence in the case, you can consider a witness's demeanor on the stand when they are testifying, you can consider whether or not the witness has a motive

to lie, whether or not the witness has a stake in the outcome of the case, whether they gain anything by testifying, those sorts of things.

Some of the things that you cannot consider when assessing the credibility of a witness is whether or not you personally like these witnesses. The credibility determinations in a court of law have nothing to do with whether or not you like Ms. Risdal, whether or not you want to grab a cup of coffee with her, whether or not you agree with her life decisions.

Credibility is about whether or not the testimony is believable, whether or not it makes sense, whether or not it is corroborated by other pieces of evidence. From the very beginning, I told you who Ms. Risdal was. I told you during voir dire she is on a website, you probably wouldn't like hearing about it, it has to do with sugar babies and sugar daddies. I told you she went willingly upstairs.

We talked about this during voir dire. You all promised you would not automatically discredit her testimony just because you didn't like that she was on this type of a website, you promised you would not automatically discredit her simply because she went upstairs on a first date. This is the point where I will hold you to that promise.

I will go very quickly through the other witnesses. You heard from police witnesses in this case. I'm submitting to you, you should credit their testimony fully. Every single officer involved in this case got involved after the fact after everything happened in Room 4906. They were simply doing their jobs. They have absolutely no reason to lie to you, no reason to tell you anything other than what they remember and what they saw.

They were honest with you. They were honest on both cross and direct. If they didn't remember something they told you, if they weren't sure they told you. That is why I ask you to credit all of the officers in this case and they testimony fully.

You heard from medical and expert witnesses. Dr. Cooper and Michelle McCullaugh are the medical witnesses and you also heard from the DNA criminalist. Again, people who are simply involved in the investigation of this case because of what their jobs are. Their jobs are to treat people, collect evidence and analyse evidence. They have no stake in the outcome of this trial. They don't even know the full story about what happened. I'm asking you to credit their testimony fully.

I will talk to you about Tasha Sullivan. You heard from Tasha Sullivan that she was in town during this time frame for a business trip. She told you she was in

the help me, all of a sudden, it goes quiet and she goes to sleep. The next thing she knows in the morning there is a police officer outside the hotel room, consistent with what Ms. Risdal told you. Tasha Sullivan's testimony corroborates her, a person Ms. Risdal doesn't know at all.

I want to talk to you about Joe Palmer. He has no reason to lie to you. He had about a three minute conversation with his friend. His testimony about what happened in that bar, that phone call, it corroborates Mette Risdal It tells you what her mind frame was at that time when the defendant leaves the bar. She calls a friend, she has no reason to lie to this person, and she says to her friend, he has been gone for a while, he went to the bathroom it's weird.

Now I want to talk to you about Mette Risdal. You had the opportunity to observe her demeanor on the witness stand. She started out a little nervous and then she got really upset when she started to talk about what happened to her inside of that room. You could see her when she was describing, being asked the detailed questions about what happened, step by step. You could watch her. She looked in the same area ever time, off to the side, down a little bit just like this as if she is picturing reliving this and trying to answer the question most accurate way that she can. You can see her almost

her hotel room, Room 4905, which is directly next to Room 4906. She said, I hear a commotion in the room next door to me. First it sounds like an argument, she thought maybe it's a domestic fight between a man and a woman. She heard a man's voice very loud and she heard a woman crying. She didn't think too much of it.

Then she told you things escalated. She told you, I started to hear banging around on the wall. I heard feet running. I heard a woman screaming and I heard that woman scream help. She has absolutely no idea who is staying in that room. She was honest with you and said I don't know what they were saying, I couldn't quite hear it.

She has no reason to make any of this up. She clearly didn't want to get involved. She didn't call the police that night. But, ladies and gentlemen, her testimony corroborates Mette Risdal. It corroborates her because the first thing Tasha hears is argument consistent with what Ms. Risdal is telling you. He is yelling at me saying I'm going to fuck you. She is saying you will never have me. Then she starts to get upset and starts to cry. Then things escalate, things get physical and there is banging around. That is when the defendant is physically assaulting Ms. Risdal.

Then what does Tasha Sullivan tell you? After

mentally replaying it in her brain. She got emotional when she described what had happened to her. She got very, very upset looking at the photographs of her. Those are genuine reactions of a person who went through a very traumatic experience. I suggest to you, ladies and gentlemen, that her demeanor on the stand shows you that she is telling the truth.

You also got to observe her on cross examination. She was polite to Mr. Rothman. She did her best to follow his instructions about how to answer questions. She was not rude. She didn't answer any of his questions with an attitude. I would agree if you were to say maybe a little evasive when talking about sleeping arrangements.

I would agree with Mr. Rothman that everybody here knows exactly what that website is about. But you aren't here today because these two individuals are on Seeking Arrangements. You are not here today because of what they did or did not write in their profiles. You are here today to decide what happened in Room 4906, whether you believe Mette Risdal. That is what this case is about. It is not about being on Seeking Arrangements.

I mentioned this briefly, but you can and should consider the fact that Mette Risdal immediately reported this to the police. Despite what defense wants you to

think, Ms. Risdal has no reason to lie. She has no reason to make up this story. She has nothing to gain from the outcome of this case.

I want to talk to you a little bit about what Ms. Risdal has gone through in the two years leading up to this trial. When she first reported that she had been physically and sexually assaulted, she had to tell her story to police officers, a bunch of strangers, then she had to repeat and relive this incident when she went to the hospital. While in the hospital, she underwent a sexual assault forensic exam. She was poked, she was prodded, she had hair plucked from her head, she was photographed and she had to tell her story all over again to a new set of strangers.

Then, she had to come down to the district attorney's office and she had to tell her story all over again to a new set of strangers, she had explained what had happened to her. She had to relive this event all over again. Then she had to testify in the grand jury, and you heard about this, a room full of strangers, people who are sitting there trying to decide whether or not a crime has been committed. She had to testify and take an oath and tell them what happened.

Then, she had to come here and sit in this courtroom before you, another group of strangers and tell

and relive this incident all over again. She subjected herself to cross examination at trial. She sat there while his lawyer insinuated and then argued to you that she is a liar, that is a prostitute.

I want you to think about all of those things. Think about what that must feel like to have to tell that story over and over again, to know that people are going to ask you questions, they are going to be inclined not to believe you, they are going to be skeptical. Think about what that feels like, to have to discuss this brutal physical and sexual assault over and over again. Who would willingly put themselves through all of that?

It just doesn't make sense that she is doing this because she is vindictive and she wants to get back at the defendant. It certainly doesn't make sense that you would go through all of this for $1,000, $500, whatever the disagreement was over. It's not logical, ladies and gentlemen.

The defense is also suggesting to you that you should discredit her fully because of this previous deposition. He wants you to think, she intentionally lied to you before so she is lying to you now. You know that's not true. You heard her here testify and you heard about all the consistent statements that she made about what had happened to her, to the police, in the grand jury,

Sergeant Schack.

Let's talk about that Florida deposition and want it actually is. That interview was a year and a half after this incident. She told you she didn't review any materials at all. She told you it was a phone interview. She is not in the same room as the people asking her questions. She told you she wasn't prepped by anybody before she gave this statement. She told you she wasn't shown any materials by the person asking her questions. Her recollection was not refreshed in any way.

She admitted what is most important in this courtroom before you, she admitted to those inconsistencies. She didn't hide from them. She didn't say I didn't say those words. She told you she did and see explained why. She told you she had difficulty understanding the question. She told you she thought the question meant something different. She told that you. She is not hiding from that. That fact alone, you should not discredit her fully. You should listen to her and you should focus on what the evidence actually shows and that is that Ms. Risdal is telling the truth.

Now I want to talk to you about the defendant's testimony. The judge, as she told you in the beginning, the burden is always on the People and that burden always lies with the People. It never ever shifts. She told you

the defense and the defendant can sit there, they don't have to call a single witness, they don't have to say a single word. They can sit silent and listen to the trial.

The judge will instruct you, now that the defendant has chosen to testify, that you can evaluate his testimony in the same way you would any other witness. She is going to tell you the defendant is an interested witness as a matter of law. By that, that means that he has a very strong interest in the outcome of this case. The reason you're allowed to consider that is because it goes to his credibility. It goes to whether or not he is telling you the truth. You can and should take that into consideration.

Now let's talk about what he did tell you. I'm sure everybody has heard the saying the truth is in the details. Well, the defendant can't keep his details straight. When he was pressed by Ms. Bashford about the specifics about how things happened, he couldn't answer questions consistently. His story kept changing. That is because he is not telling you the truth about what happened inside of that room. The only facts in his whole story that he was consistent about are the ones that we have concrete indisputable evidence of, video where he went, records those sorts of things. Everything else that is left to interpretation, he cannot keep his story

straight. That is in direct contrast to Mette Risdal. He told you he leads two lives, he has a double life. He said I have a home life and I have this whole other person I become when I travel for work. He is an experienced liar, ladies and gentlemen. He wanted to stand up before you and act as if he is being transparent but I saw through it and I hope you can too.

MR. ROTHMAN: Objection. Move to strike.

THE COURT: Ladies and gentlemen, I'm going to ask that your recollection of the testimony controls. This is just argument. It's overruled. Would you like a sidebar?

MR. ROTHMAN: Yes, I would.

THE COURT: Okay. Let's have a sidebar, please.

(sidebar)

MR. ROTHMAN: I don't know if you heard what was said.

THE COURT: I'm going to ask for it again.

MR. ROTHMAN: What she said was --

THE COURT: I didn't understand.

MR. ROTHMAN: I saw through it, that she saw through it.

THE COURT: Okay.

MR. ROTHMAN: It's not personal opinion. You should see through it. She can't say, I saw through it.

That's like my saying, I don't believe Mette Risdal. You shouldn't believe her.

THE COURT: That's correct. I will ask you to watch your language on what you saw through.

MS. BARAIOLA: Okay.

THE COURT: I'm not rushing you but, is there any way -- do you want to take a break now because it's now past 1:30 -- I was thinking like 1:30 would be my cut off -- or do you think you still have a lot more?

I feel like this is a long time for jurors not to eat.

MS. BARAIOLA: I have 15 or 20 minutes.

THE COURT: I want to take a break. This was longer than I anticipated and I don't want to rush you. Is this a good time or do you want to say something else in the next couple of minutes.

MS. BARAIOLA: That's fine.

MS. BASHFORD: Just finish up on the defendant. Is that a long piece?

MS. BARAIOLA: We can just take a break now.

THE COURT: Are you sure?

MR. ROTHMAN: I would just ask you to sustain the objection and strike what she said about her own personal beliefs. They are not relevant.

THE COURT: Yes, Mr. Rothman.

(open court.)

THE COURT: So, ladies and gentlemen, I'm going to reverse my ruling. I'm going to sustain the objection on that moving to strike the portion of the comment regarding what Ms. Baraiola saw through. It's not, you know, what her view of the evidence is. She is giving you arguments but it's your view and your decision about credibility and whether they have proven their case beyond a reasonable doubt which matters. All right? So that will be stricken.

Now, this happened a little longer than I thought. Nothing against the parties. I want to give you lunch. All right? So we will take our break even though we are in the middle of the People's summation. I will ask everybody to come back promptly at ten minutes to three. Okay? Ten minutes to three. You can follow the directions of the officer.

Please, keep an open mind and don't discuss the case.

COURT OFFICER: All rise.

(Whereupon, the jury exits the courtroom.)

THE COURT: Come back at 2:50.

(Whereupon, a lunch recess was taken.)

COURT OFFICER: Jury entering. All rise.

THE COURT: Everybody, have a seat.

Welcome back, ladies and gentlemen. We will keep it moving and continue with the summation on behalf of the People of the State of New York.

MS. BARAIOLA: Ladies and gentlemen, the truth is in the details and the defendant can't keep his details straight and that is because he is not telling you the truth about what happened inside of that hotel room. You know he is an experienced liar because he told you he leads two lives. He has his home life and he has a travel life.

His travel life is where he likes to indulge. He keeps them separate. He hides his travel life from his family, from his friends, from his colleagues. He is experienced at hiding details about himself. He is experienced at covering up what he is really up to.

You got to see both sides of his personality when he testified in this case. You got to observe his demeanor on direct. He was prepped and came across as rehearsed --

MR. ROTHMAN: Objection. Objection.

THE COURT: Sustained.

MS. BARAIOLA: He came across as rehearsed?

THE COURT: No. Prepped.

MS. BARAIOLA: He came across as rehearsed. He was rushing through the answers as if he had practiced

them. He had no problem portraying himself in the light that he wanted you to see him in. After all, he knows who his audience is. He is a good guy, family man, he is religious, charitable. He went on and on and on. He is happily married with two kids.

When we talked about the incident about his date with Ms. Risdal, everything was her idea. It was all what she wanted, how she wanted it and he said she brought all of this up and I was just intrigued so I went along for the ride.

Then he has to switch it, right, and he tells you that the plan, even though all of this is her idea, what she wants, she is demanding money, it's all of that, then he tells you but I'm the dominant one. That was the agreement. I'm dominant and she is submissive. Which one is it? Whose idea is it? Whose plan is it? Whose actions? Who is in charge of this?

He can't make up his mind, ladies and gentlemen. His story doesn't make sense because he is not telling you the truth. He makes it all her idea when he is telling you about the plans and the date because he wants to make her look bad. He wants her to be the perverse one. He wants to paint her in direct contrast to himself. Then he switches it up and he is the dominant person because he needs an explanation for her injuries, for why she looks

the way she looks.

His testimony is all just a little bit too convenient, ladies and gentlemen. He has an answer for everything but when it came down to talking about the details it all fell apart. It's the classic example of the defendant admitting what he cannot deny and denying what he cannot admit.

Let's talk about that. Let's talk about how frustrated he gets on cross examination with ADA Bashford when he couldn't keep his story straight. He doesn't like it when he is challenged by a woman, he doesn't like it when his story got messed up. You saw him, as he is answering questions, look over at his lawyer more than once when he didn't know what to say, when he realized he was caught in an inconsistency.

Let's talk a little bit about some of those inconsistencies. He talked about the safe. First the story was, I keep my money in there, I don't want Ms. Risdal to know I have money so I'm not going to open it in front of her so that's why I go to the ATM to take out money.

On cross he is asked a couple more questions, well, where did you get the first $500 from? I got it out the safe while she is in the hotel room. He was pushed a little more. Oh, well, she wasn't paying attention. He

can't keep his story, the facts, straight, ladies and gentlemen. He keeps changing and adjusting his answers creating more details as he goes along.

Then he tells you about the purse, he says she left it behind in the room, a purse that has her ID and her cash in it. He tells you, you know, I tried to hand it to her. I was being this nice person. I tried to give it to her not once but twice and she refused. The implication being that she is so vindictive, she won't take her wallet with cash and ID back because she wants to leave it in the room and plant evidence against him.

Come on, it's so ridiculous. What person leaves their ID and cash behind intentionally? What person would refuse to take that back if someone pointed out to them that they left it? I submit to you, ladies and gentlemen, that's because that's not what happened. What happened in that room is what Ms. Risdal told you which is that she was assaulted, terrified, she ran out of there and she left her purse behind.

He told you about the money he gives her. First of all, he can't explain where the money came from. He tells you, I just randomly take money out every once in a while, sometimes people give me cash. He has no explanation for this money. You have seen no records about where these mounts of cash come from. And then,

conveniently, he tells you, oh, well, she didn't put it in her wallet, she just threw it in her big bag.

That's a convenient answer, ladies and gentlemen, because he knows from the testimony at this trial that an officer looked in that purse and an officer saw $100 bills, which is completely different denomination than what you watched him counting in the bank video. He has to create some sort of explanation for where all this money went that he allegedly gave to her. He says she threw $1,500 loose in her purse.

MR. ROTHMAN: Objection. That's not the testimony.

THE COURT: Again, ladies and gentlemen, these are arguments. Your recollection of the testimony controls.

MS. BARAIOLA: He tells you about the pantyhose. He tells you how the holes are caused. I realize that maybe the men on this jury I don't know if you have ever worn pantyhose before but to the women, if you have ever worn them, understand how insane this argument is. You understand how impossible it is that the placement of those holes were by the defendant's finger. You watched the video. You have seen how quick that interaction is.

The defendant is asking you to believe that in a minute, he is able to create a hole in these thick tights

up here above where he is trying to insert his fingers and then insert it multiple times. It just doesn't make sense. It's not logical. It is impossible based on the clip that he suggested happened.

He also talks to you about letting her scream when he is assaulting her. His version of events is everything is consensual and then she tries to shake me down and I get mad, I'm in a rage because she is threatening that she is going to ruin my life and he is beating her because he is so much in a rage. He tells you or he told ADA Bashford on cross, I didn't try to stop her from screaming. I just let her scream.

This guy who is so concerned about this woman ruining his life because she knows where he lives, she knows where his family is, she knows his job, is going to physically assault her and not be concerned that anybody else in this hotel could hear what is going on. This guy who is so conservative, so concerned about his life, he keeps things so separate, he is not going to stop a woman from screaming.

Ladies and gentlemen, he is not telling you the truth. It's because he doesn't want to admit to you that he covered her mouth like she told you he did. He doesn't want to admit to you that he choked her to keep her quiet like she told you he did. Then he tells you, I'm in this

rage, I'm beating her up and she says, I want to go now and he says, okay, you can go. I mean, think about that. That's illogical.

He tells you, I don't say a single word to her. I don't tell her don't report this. I don't threaten her in any way. I just let her walk out the door. Let me get this straight, you are in a rage, you are so angry you are beating a woman, hitting her multiple times and you just flip it off like that and you say have a nice day. It makes absolutely no sense that, that is what happened in this room.

He also during cross examination fought ADA Bashford on the tiniest of details. For example, she asked him, are you bleeding anywhere at all during this encounter. He said to her probably three times, I don't know what you mean by bleeding. I don't know what you mean by bleeding. She finally had to respond, I don't know any other way to explain to you what bleeding is. Everyone knows what that is. He is just fighting her about the details.

She asked him about the lock interrogation. So, you were fiddling with the lock back and forth making sure it's locked. I don't know what fiddling means. This is a Harvard-educated man. He doesn't know fiddling means? Then she asks him about the fact on the lock interrogation

report that after the door is opened and shut quickly from the inside that the lock isn't thrown again. This is when he allegedly says he is getting ice.

She asks him a question, isn't it true that if your arms were around somebody you wouldn't be able to lock the door. What does he respond? He says, I can't speculate. I can't speculate if I had both hands around someone that I wouldn't have a hand free. I just don't know. Well, you were not asked to speculate, were you? You were asked a very direct question, a question you did not want to answer because you know that your story doesn't make sense.

Then he is asked about when he is inserting his fingers into Ms. Risdal's vagina and anus, about whether or not he did it roughly or gently. He fights Ms. Bashford on these details. He tells you, I don't know. I can't describe the difference between rough and gently. She says, well, is there force? He is like, well, there is always force involved. He won't answer the question because he knows what the answer is.

On direct, he had no problem, when being asked question by Mr. Rothman, describing and demonstrating the types of slaps he was using. When it was consensual, light, gentle slaps. Then he differentiates harder rougher, slaps once things are no longer consensual. He

had no problem differentiating on direct the way he was choking her and how it was nice and light and playful and consensual. He knows the difference between rough and gentle. He just doesn't want to answer the question because the next question is about force and about her not wanting it.

He was asked questions about, he was shown a photo of Ms. Risdal and asked questions about the marks on her neck and he was asked a question about is that a bruise on her neck. What did he say? He fought Ms. Bashford on this fact. I'm not an expert in bruising. I don't know. I'm not sure. Well, he wasn't asked if he was an expert. No one tried to qualify him as an expert. He was asked a very specific question, which he did not want to answer.

Ladies and gentlemen, in addition to fighting over simple facts, he also stated he can't remember something or didn't see it when it's a bad fact for him. Let's talk about the blood in the room. How many times did he tell you on direct and cross examination that he didn't see it? He had no idea that there is blood on the bedding in that room.

Well, everybody here has two eyes and everyone here can see that the bedding is bright white. There is no way in the world he did not notice the blood on that

bed. He can't admit that fact. He blames it on the lighting in the room. One of my favorite lines was to Ms. Bashford, I don't know if you know this, Ms. Bashford, but the W Hotel is intentionally designed to be dark. What does that even mean? You can see from the photographs, it is not intentionally designed to be dark. Those are just the lights in the room.

It's lie after lie after lie. He is asked about the pantyhose and the bra in the garbage can. He tells you, I don't know how those got there. I didn't even notice them. I have no clue. Well, I don't check my garbage. I don't know. Those could have been there from another night.

It's lie after lie after lie, ladies and gentlemen. He tells you, I didn't realize the extent of the injuries I caused. I had no clue. He says the first time I realize how bad it is, is almost a year later when I see these photos. Ladies and gentlemen, that is not true. You can't hit somebody as many times as he admitted to and not know that you have caused injury. It's just not true. He admits he did it hard, he admits he did it multiple times. It's not true.

He is not being truthful with you. He tells you, I don't remember if I punched her. Is it that he can't remember or that he just doesn't want to admit it?

Who wouldn't remember something like that? He doesn't want to admit that he punched her because he doesn't want to admit the extent of the injuries in those photographs. He tells you, I didn't mean to hurt her. Again, he admits to hitting her multiple times, but then he tells you -- he admits to hitting her after he lost it and in a rage but then he didn't mean to hurt her.

I mean, it just makes absolutely no sense, ladies and gentlemen. You don't hit someone multiple times in a rage to be their friend. I mean, it is absolutely insane that he was not intending to hurt her. This is the practice answer of a defendant that is trying to skirt an intent element of one of the charges he is facing. At the end of the day, ladies and gentlemen, he is simply not a credible witness about anything that came out of his mouth.

Now I want to talk to you about the charges in the case. For each charge, I will tell you just briefly what it is the People have to prove to you beyond a reasonable doubt. When I say what the People have to prove, I'm referring to the elements of the charged crimes.

The judge is going to instruct you on the People's burden so I'm not going to get into that, but the burden only extends to the elements. It doesn't extend to

every single fact, it doesn't extend to motive, for example, or what day of the week it was. Those are facts. Those are not elements of the charged crimes.

At the end of the day, the testimony you heard about the background, how these individuals met each other, sheds some light on how they interacted with each other but those are not elements of any of the charged crimes in this case. The People don't have to prove their background or any of that to you beyond a reasonable doubt.

I will start with the first count, criminal sexual act in the first degree. This charge relates to the allegations by Ms. Risdal that the defendant forced her to perform oral sex without her consent. In general, what the People have to prove to you beyond a reasonable doubt is that there was oral sexual conduct between Ms. Risdal and the defendant, between her mouth and his penis.

The People have to prove to you beyond a reasonable doubt that this was accomplished through forcible compulsion. Forcible compulsion can be either an expressed threat, I'm about to punch you in the face right now, or it can be an implied threat, it can be words.

It can be in the context of an entire incident such as this hotel room, what has occurred leading up to

that moment. The People will have to prove to you beyond a reasonable doubt that Ms. Risdal did not consent to that. You have her testimony. She told you that.

The second count is the sexual abuse in the first degree. This chart relates to the allegations of Ms. Risdal that the defendant forcibly inserted his fingers into her vagina and her anus without her consent. So the People have to prove that there was sexual contact between Mette Risdal and the defendant beyond a reasonable doubt.

The People have to prove that the sexual contact occurred through the use of forcible compulsion, again, similar to the first count, through physical force or through a threat of expressed or implied force. They have to prove this was without Ms. Risdal's consent.

The third count is strangulation in the second degree. This charge relates to the testimony of Ms. Risdal, the allegation she made of being pinned down on the bed with the defendant choking her, both hands around her neck, to the point that she had difficulty breathing, to the point that she told you she is not sure if she lost consciousness, to the point that she suffered physical injury to her neck. Beyond that she told you she had difficulty swallowing and eating from her throat for days afterwards.

The People have to prove to you beyond a reasonable doubt that the defendant actually did that, that he actually put hands around her neck and applied pressure. The People have to prove to you that he did that with the intent to cause her to stop breathing and the People have to prove to you the outcome of it, which is what I just described, there was physical injury or some sort of loss of consciousness or stupor.

The fourth count is assault in the second degree. This charge relates to the allegations in this case that the defendant was physically assaulting Ms. Risdal, punching her, choking her, hitting her on the face and body to get her to perform oral sex, to get her to perform a sexual act with him. So, the People have to prove to you that physical injury occurred and the People have to prove to you that the purpose of the physical injury was in furtherance of another felony in this case.

The fifth charge is unlawful imprisonment in the second degree. This charge relates to the allegations of Ms. Risdal that the defendant refused to let her leave the hotel room for hours. It relates to the testimony of Ms. Risdal where she tells you, I tried to make a run for it and the defendant grabs me and pulls me back in the hotel and will not let me leave even after I tell him I want to leave.

The People have to prove he intentionally restricted her movement in a way that interfered with her liberty and the People have to prove to you he did this without her consent and in an unlawful manner.

Just briefly, the People have proven forcible compulsion to you beyond a reasonable doubt. You have the testimony of Mette Risdal. She told you of the force that was used to rip down her stockings, the force that was used to insert the finger into her anus and into her vagina.

She told you she was being held down when it happened. She told you about the force, the assault, the physical assault that occurred prior to performing oral sex. She told you she was scared she was going to continue to be hurt and that's why she complied.

You have the statements, the words. You can consider this when you think about what the defendant was intending to do. His words to Ms. Risdal, his threats to her about what he was going to do if she didn't comply, you are going to make me cum or I'm going to fuck you in the ass, I am going to kill you, those words, that's force.

You also have the photos of the crime scene. You can see that force was used. You can see there is blood around this room. The People have proven lack of

these injuries to look this way four days later, to look this way just a few hours after.

Ladies and gentlemen, the People have also proven to you the defendant's intent beyond a reasonable doubt. There is absolutely no other intent he could have had when he placed his hands around Ms. Risdal's neck in that manner. There is no other intent other than to cause her to stop breathing, to have difficulty breathing, if you are going to choke somebody that tightly that you cause that level of injury. There is no other intent he could have had to hit somebody that many times other than to cause physical injury.

I want to respond briefly to a few of the defense arguments. Mr. Rothman stood before you and said that this is a case where the prosecution is trying to hide the truth. I submit to you that is the absolute opposite of what is going on.

You have the evidence before you. You have exhibits that are in evidence. You can look at everything yourself and you can consider that. You have heard both sides of the story. No one is hiding the truth from you. The truth is laid out in front of you for you to see.

Mr. Rothman talked to you about the dress. He told you that the zipper is absolutely fine, it's just the rips to the dress have simply disintegrated over the last

consent to you beyond a reasonable doubt. I will not belabor it but you have the testimony of Mette Risdal. She told you that she did not want to do these things. You have the statements that are made to Ms. Risdal, the force, that you have to do this. I don't care if you don't want to do this, it's going to happen.

You have the photos of Mette Risdal's injuries. You can see what she looked like. You can see what happened to her. Nobody would consent to that. That is not consensual physical injury, it is just not. You can see that she was forced to do this.

You also have the photos of the room that show lack of consent as well. Obviously, the People have proven to you beyond a reasonable doubt physical injury. The judge will instruct you what this is, but the People have proven it to you through the testimony of Ms. Risdal, and they have proven it to you through the photos of her. They have proven this to you, that there was physical injury, through the photos of the room and through the medical testimony of Dr. Cooper as well as the testimony of Sergeant Schack and Detective Jones what they observed.

Physical injury was caused. It was proven to you beyond a reasonable doubt. You can see the pictures of how the injuries progressed over a period of time, four days apart. You can see how hard he had to hit her for

two years. That's makes absolutely no sense for a dress to disintegrate into a vertical rip in the location that would be consistent with the dress being ripped off of you. That is just an illogical argument and it's just not true.

Finally, Mr. Rothman told you that this is just an assault three case. He said to you, that's not something the defendant is charged with, but that's what this case is and you have to find the defendant not guilty of everything. I submit to you, ladies and gentlemen, that's a pretty convenient argument given the evidence in this case, the facts of this case.

It's convenient to argue that there is physical injury, we will concede that, we will concede a crime that the defendant is not actually charged with. It is just not logical, ladies and gentlemen. It's a classic case of admitting what you can't deny and denying what you cannot admit.

You have a very important job as the factfinders in this case. After I sit down, the judge will instruct you on the law and this case is going to be in your hands and it's going to be up to you. It's going to be your turn to deliberate. You will have an opportunity to discuss the case, to review the evidence and, ultimately, decide if the People have proven the elements to you of

the charged crimes beyond a reasonable doubt.

I want to thank you for your time. You have been very patient during the delays in this trial. I know there were quite a few. You have been paying attention. We have noticed that, and we all appreciate that, both myself, the Court and the defense.

Now is the time that you have to do what you promised to do during voir dire. You have to follow the law as the judge instructs you. You have to put your personal feelings about the law or the people involved in this case aside and you have to apply the law to the facts in this case with precision.

We chose you as jurors because we were confident that you have what it takes to do the job of a juror. We were confident that you have common sense. This is a case where there is a lot going on that leads up to the actual date. You are here to decide what happened June 15, 2016 into the early morning hours of June 16, 2016 inside of Room 4906.

You promised during voir dire that if the People proved the elements to you beyond a reasonable doubt that you would find the defendant guilty. The People have met their burden and the defendant's guilt has been proven to you beyond a reasonable doubt.

Now is the time that I will hold you to that

promise. Now is the time that you have to do the right thing. Now is the time that you must do the one thing that justice demands, you must find the defendant guilty of all of the crimes he is charged with.

Thank you.

THE COURT: Thank you very much. Sidebar, please, with the reporter.

(sidebar)

THE COURT: Okay, two things.

You made a number of objections regarding preparation, your client's preparation, what you believe to be conversations, there is a portion of pretrial witness prep. I had it written down. The prosecutor is allowed to, I thought it pertained to the prosecutor speaking to witnesses or letting them review things. I can add defense attorney, that is part of the actual charge, is allowed to.

MR. ROTHMAN: It does but that wasn't the nature of my objection.

THE COURT: I thought it was your conversation with him.

MR. ROTHMAN: Yes. She is not allowed.

THE COURT: On him being present?

MR. ROTHMAN: Him consulting with me. You're not allowed to comment, to the extent you add that to the

consideration when deciding upon the sentencing here today.

Thank you, Judge.

THE COURT: Thank you very much, Ms. Risdal. I appreciate the statement that you made. I am certainly going to take that into consideration.

Ms. Baraiola.

MS. BARAIOLA: So, your Honor, the defendant was convicted, after trial, of one B violent felony sex offense; three D violent felonies, one of which is a violent sex offense; and one Class A misdemeanor.

The People are asking the Court to sentence the defendant to 18 years in jail on the top count of Criminal Sexual Act in the First Degree, which is a B violent felony, with 15 years of post-release supervision, a Full and Final Order of Protection and SORA registration.

We're asking that this sentence run concurrent with seven years in jail, plus three years post-release supervision on the three D violent felonies in this case: Sexual Abuse in the First Degree, Strangulation in the Second Degree and Assault in the Second Degree.

THE COURT: Tell me one more time the second part of it.

MS. BARAIOLA: Seven years in jail, with three years post-release supervision, on all three D violent felonies, to run concurrent. And one year jail on unlawful

imprisonment, which is a Class A misdemeanor.

This recommendation is based upon the facts of this case and the defendant's testimony at trial.

As the Court is aware, the minimum on the top count is five years in jail and the maximum is 25 years in jail, with a minimum of five years post-release supervision and a maximum of 20 years of post-release supervision due to the fact that this is a B violent felony sex crime.

Before the trial, the People were recommending that the defendant be sentenced to 15 years in jail on the top count and that recommendation did not change at any point during the pendency of this case. The People are not seeking the maximum in this case, but we're seeking a very lengthy state prison sentence for this defendant, to be followed by a significant term of post-release supervision for this defendant, because of the heinous nature of the crimes he committed and because of his blatantly false and offensive trial testimony.

The People are asking for a higher sentence now than before trial, not as a punishment for the defendant taking the case to trial, but because of the fact that he chose to take the stand and lie over and over and over again. By convicting him of each and every count that he was charged with, a jury of his peers completely disregarded everything he testified to and also found him not credible.

neighborhood, grabbing a cup of coffee, sleeping -- those things are difficult for Ms. Risdal because of what the defendant did to her.

Finding a meaningful relationship, trusting another man, is difficult because she trusted the defendant and look what he did to her. He has made her question the true intentions of every person she encounters. She has to live with what the defendant did to her every single day for the rest of her life, and that is significant, and something this Court should consider when you're deciding what to sentence the defendant to.

Finally, your Honor, I want to talk about the defendant's testimony at the trial. The defendant has never taken responsibility for his actions. He has never acknowledged the pain he has caused. What he did instead was testify at trial and lie. What he did instead was deny knowledge of the most basic facts.

I'm not going to go through everything, just a few examples for your Honor: He admitted that he assaulted Ms. Risdal. It's because he had to; there were photographs of her beaten up. But he told this Court and this jury that his intent wasn't to hurt her, which is insane and not true. He denied seeing blood all over the white bedding and the walls in this hotel room. He blamed it on the lighting in the hotel room. He denied the fact that he punched her, he

insisted it was only slaps. He denied how she sustained those injuries to the inside of her thighs. That was probably one of the most offensive portions of his testimony: When he stated that she got those injuries when his hands were inside of her thighs and she orgasmed so hard that it squeezed together and that's how she got those injuries. He lied about the ice bucket. He lied about the safe. He lied about how her tights were torn.

The list went on and on, your Honor. He did not have to testify at this trial. Testifying was a deliberate choice he made. He took that witness stand and he took an oath to tell the truth, and then he deliberately lied to you and to this jury about every single detail that he could lie about. He lied about every single detail that was not video or contained in a business record. He made a mockery of this justice system by getting up there and telling a preposterous, offensive and farcible story. Were the subject matter not so serious, it would be almost comical in its complete lack of common sense.

The defendant deserves to be punished not only for the crimes he committed, which are horrendous in their own right, but also for his conduct at trial. He made deliberate choices on June 15th into June 16, 2016, which a jury of his peers held him accountable for by finding him guilty. And now is the time for the Court to sentence him

accordingly. He ruined the life of a woman because he is selfish, lying, entitled and a sexual predator. Sanjay Tripathy should know that this Court takes the crimes he's been convicted of very seriously and that this Court does not tolerate perjury.

This case is not about who the defendant pretends to be when he is around his family and with his friends and his colleagues. This defendant was leading a double life, which he told this Court about -- he admitted to it while testifying. He is an experienced liar, and his conduct, the conduct that he was convicted of at this trial, shows you exactly the type of person that he is. He is so used to lying, so used to living this double life and pretending to be whoever he thinks he needs to be to suit the audience that he is in front of at the present time.

His trial testimony on direct was almost effortless. It was rehearsed, and it was exactly the type of story that a man of his situation would tell. It is also the exact type of story that a man like him, with an ego like him, would expect others to believe and credit. He underestimated Ms. Risdal and the fact that she would come forward. He underestimated law enforcement; didn't believe that anyone would actually credit what she told them. He underestimated the common sense of this courtroom, and the jury of his own peers. He thought that they would believe

his lies because he is a rich man with money. And I can only hope, your Honor, that he has also underestimated this Court, and that you see him for who he is, and what he is, which is a violent sexual predator.

The minimum which the defense is going to ask you for is simply inappropriate in a case like this. The People are asking for 18 years on the top count of Criminal Sex Act in the First Degree because that is an appropriate sentence for the criminal conduct of this magnitude. Anything less would be unjust.

Thank you.

THE COURT: Thank you very much.

Mr. Rothman, would you like to be heard?

MR. ROTHMAN: I sure would, Judge.

I'm probably going to take a lot of heat for what I'm about to say, but I really don't care. And I say that because not only in my opinion do I believe that Ms. Risdal completely fooled this jury, but it sounds like she's completely fooled the prosecution in this case.

She comes into this courtroom and has the DA stand up on her behalf, and stands up on her own, and says: My life is ruined. I'm a shell of myself. I can't go out of the house. I can't be social. I can't do anything. I have all these phobias. All one needs to do is do what I did about an hour ago and go on her social media website on